1
2
3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

4   UNITED STATES OF AMERICA             *    4:13-CR-00628-1
                                        *
5   VS.                                 *    10:26 a.m.
                                        *
6   HORTENCIA MEDELES-ARGUELLO          *    APRIL 13, 2015

7       **REDACTED HEARING ON MOTIONS, VOIR DIRE AND TRIAL**
              **BEFORE THE HONORABLE DAVID HITTNER**
8                **Volume 1 of 10 Volumes**

9   ************************************************************
    This transcript has been furnished at public expense under
10  the Criminal Justice Act and may be used only as
    authorized by Court Order.  Unauthorized reproduction will
11  result in an assessment against counsel for the cost of an
    original and one copy at the official rate.  General Order
12  94-15, United States District Court, Southern District of
    Texas.
13  ************************************************************

14  **APPEARANCES:**

15  **FOR THE UNITED STATES OF AMERICA:**
    Mr. Ruben R. Perez
16  Mr. Joseph C. Magliolo
    United States Attorney's Office
17  1000 Louisiana
    Suite 2300
18  Houston, Texas 77002
    (713) 567-9344
19
    **FOR THE DEFENDANT, HORTENCIA MEDELES-GARCIA A/K/A RAQUEL**
20  **MEDELES-GARCIA A/K/A TENCHA:**
    Mr. Ali R. Fazel
21  Scardino and Fazel
    1004 Congress
22  Third Floor
    Houston,Texas 77002
23  (713) 229-9292

24

25

                    **APPEARANCES  (continued)**

**INTERPRETERS:**
Mr. Ramon Del-Villar
Ms. Linda Hernandez
Ms. Graciela Dachman
Mr. Gregorio Ayala

Court Reporter:
Laura Wells, RPR, RMR, CRR
515 Rusk, Suite 8016
Houston, Texas 77002

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**VOLUME 1**
**(Hearing on Motions, Voir Dire and Trial)**

April 13, 2015

|  |  | Page |
|---|---|---|
| Announcements................................... | | 4 |
| Opening Statement to Court by Mr. Perez......... | | 8 |
| Opening Statement to the Court by Mr. Fazel..... | | 11 |
| Hearing on Procedures and Exhibits.............. | | 15 |
| Hearing on Motions............................. | | 29 |
| Ruling of Court................................ | | 40 |
| Ruling of Court................................ | | 49 |
| Ruling of Court................................ | | 50 |
| Ruling of Court................................ | | 51 |
| Ruling of Court................................ | | 54 |
| Ruling of Court................................ | | 56 |
| Ruling of Court................................ | | 57 |
| Ruling of Court................................ | | 63 |
| Ruling of Court................................ | | 64 |
| Ruling of Court................................ | | 67 |
| Court Instructions............................. | | 69 |
| Venire Seated.................................. | | 74 |
| Voir Dire by The Court......................... | | 74 |
| Challenges to Prospective Jurors............... | | 140 |
| Jury Seated.................................... | | 168 |
| Opening Statement by The Court................. | | 169 |
| Indictment Read................................ | | 181 |
| Defendant's Plea of Not Guilty................. | | 182 |
| Opening Statement by the Government............ | | 182 |
| Opening Statement by the Defendant............. | | 193 |

| WITNESSES | Page |
|---|---|
| **EDWIN CHAPUSEAUX** | |
| Direct Examination By Mr. Magliolo | 204 |
|  | Page |
| Court Reporter's Certificate.................... | 253 |

*Laura Wells, CRR, RDR*

**PROCEEDINGS**

1

2          THE COURT:  Thank you.  You can be seated.

3      The Court calls the case, criminal matter, 13-628,

4  United States vs. Hortencia Medeles-Arguello.

10:26:02    5      Who represents the Government?

6          MR. PEREZ:  Reuben Perez and Joe Magliolo, Your

7  Honor.

8          THE COURT:  Hang on a second.  I'm just going to

9  write it down.

10:26:23   10          MR. PEREZ:  All right.

11          THE COURT:  All right.  And for the defense?

12          MR. FAZEL:  Good morning, Your Honor.  Ali Fazel.

13  If it pleases the Court, Karen Stoelker, who is a

14  paralegal in our firm, is also here.  I would ask the

10:26:33   15  Court's permission to allow her to be in the courtroom.

16          THE COURT:  Where is she?

17          MS. STOELKER:  (Motioning.)

18          THE COURT:  Stand up.  All right.  Is that your

19  paralegal?

10:26:42   20          MR. FAZEL:  Yes.

21          THE COURT:  All right.  That's granted.  That's

22  okay.

23      All right.  Let me put this here.  All right.  Now, I

24  was pleased to step in and get this thing tried.  It was

10:26:52   25  going to be tried anyhow.  It was going one way or the

*Laura Wells, CRR, RDR*

other.  And if there was anymore delays, it would be a
problem to everybody, including your schedules; and I
cleared the dates.

     I do want to mention that my schedule will be a little
bit chopped up, and I will have it all ready for you and
for the government -- I mean, you and the attorneys will
have a copy of it.

     First of all, every Tuesday we begin at 11:30 in the
morning.  We'll see how long this case takes.  If it takes
into next week, we just have a little bit of time
tweaking.  As you know, I begin at 10:00 in the morning
and end at 6:00 in the evening, depending upon how it
goes.  We may alter that and begin a little bit earlier.
And I always adjourn between 6:00 and 6:10, something like
that, in the evening.

     Ellen, we have the jury scheduled to come up at what
time?

          CASE MANAGER:  1:00.

          THE COURT:  1:00.  I spoke at length with Judge
Werlein, who brought me up to speed somewhat.  He is
disappointed he can't try the case, but I'm doing it.

     What is the best estimate of the case for the whole
trial?  You don't know what the defense puts on; but as
experienced attorneys, what is your best estimate of how
long, how many days this trial will take?

1          MR. PEREZ:  Two weeks, Your Honor.

2          MR. FAZEL:  The government's witness list is, I

3    think, 60 people.

4          THE COURT:  Ain't no way they are all coming.  I

10:28:20    5    can tell you that.  I can tell you both that.  Okay.

6          MR. PEREZ:  We understand, Your Honor.  We just

7    wanted to make sure.

8          THE COURT:  No, no problem.  Just make sure I

9    have a list where I can read it to the jury.  Okay.

10:28:30   10       And what is your best estimate for the whole time?

11          MR. FAZEL:  I would say around two weeks, two

12    working weeks, assuming five days.

13          THE COURT:  Okay.  I'm going to -- I'm not to

14    that point yet; but if it goes too long and if you take

10:28:43   15    too long, I'm going to issue a timing order.  As you know

16    -- well know and I'm sure all of you know, the Fifth

17    Circuit is the lead circuit in the United States on

18    allowing timing orders in criminal cases as well as civil

19    cases; but in criminal cases -- and I had -- I had one in

10:29:02   20    position on a number of criminal cases, including

21    *Stanford*.

22       I was about to enter one on a bank robbery case in the

23    middle of trial because it was just taking too darn long

24    when we had a mistrial after three days.  I was ready to

10:29:20   25    do that.  I will do it here.  So I'm telling you it's not

 1   going ten days.  All right.

 2       So whatever you have got, you speed it up.  And the

 3   same thing on cross.  If you go on and on for a day or

 4   two, you are going to be shut down.  You are going to be

 5   shut down a lot earlier.

 6       Aside from that, I'll leave it up to you.  You are

 7   experienced trial lawyers.  Just keep in mind.  Otherwise,

 8   I will stop and impose a timing order in this case.  I

 9   will pick it up midstream.

10       In fact, Ellen, we did that with a case recently.

11           CASE MANAGER:  Yes, sir.

12           THE COURT:  We picked it up literally in

13   midstream, issued a timing order.  So I'll leave it up to

14   you if you can move it along.

15           MR. PEREZ:  We'll certainly try, Your Honor.

16           THE COURT:  Well, let's do it.  I mean, it's that

17   simple.  If I see it's going to take too long, I'll put a

18   timing order.  And then, it's easy on me.  I just sit

19   back.  You can take three days with one witness, and it

20   doesn't matter to me because it's your time.  And I will

21   shut you down.  And again, this Circuit allows that.

22       But I'll not do it because I don't have a handle on

23   the case to the extent where I think it's needed; but ten

24   days for this kind of a case is too much.  You have got

25   very different sequences.  You have different things you

1    have got to prove up.  But just get them proved up quick,

2    on and off.  The jury can grab ahold of it, I'm sure.

3        All right.  Do you have a witness list, defense, you

4    want me to mention?  You are not required to.  Sometimes

10:30:44    5    the defendant wants me to mention a witness list when I

6    talk to the jury.

7            MR. FAZEL:  No, Your Honor.

8            THE COURT:  All right.  The witness list you

9    have, make sure you give it to Laura Wells, our court

10:30:56   10    reporter.

11            CASE MANAGER:  She has it.

12            THE COURT:  You have got a copy already of all

13    their names?

14            THE REPORTER:  Yes, Judge.

10:31:01   15            THE COURT:  Okay.  I don't know where you want to

16    set up.  I'll do the voir dire on this case since it's

17    going that long and on this many counts and on this kind

18    of a case.

19        All right.  Now, in about five minutes -- five

10:31:14   20    minutes, that's all I want, Mr. Perez, tell me what this

21    case is about.

22        Mr. Fazel, you can be seated.

23            MR. PEREZ:  Your Honor, it's a total of six

24    counts, Your Honor.  Count 1 is --

10:31:25   25            THE COURT:  Six counts?  So what do you need ten

*Laura Wells, CRR, RDR*

 1  days for six counts?

 2          MR. PEREZ:  Your Honor, well, maybe after I

 3  finish, Your Honor, the Court may agree with me.

 4          THE COURT:  No.  I'm not going to agree with you,

 5  even before I hear you; but go on.

 6          MR. PEREZ:  Count 6 --

 7          THE COURT:  You have been doing this long enough

 8  and so have I but go on.

 9          MR. PEREZ:  All right.  Count 1 is conspiracy to

10  commit sex trafficking, Your Honor.

11          THE COURT:  Say it again.

12          MR. PEREZ:  Count 1 is conspiracy to commit sex

13  trafficking.

14          THE COURT:  Okay.  What is it that you anticipate

15  proving?

16      By the way, before I forget, I need an agreed

17  statement from both sides as to what this case is about.

18  Remember, I read to them as to what the allegations are.

19  I do that in every single case.  So before you leave here,

20  just say the government alleges that the defendant did A,

21  B, C and D and, basically, to which the defendant, you

22  know, pleads not guilty to all charges.  Because I'm not

23  going to go too deeply into it, even though in voir dire

24  I'll have to go into some questions as to background; and

25  we pulled the questions you had submitted to Judge

*Laura Wells, CRR, RDR*

 1    Werlein.  We'll take a look at them.

 2        I'm sorry.  Yes, sir.

 3            MR. PEREZ:  Your Honor, Count 1, conspiracy to

 4    commit sex trafficking, we intend to put on sex

10:32:36  5    trafficking victims.  We intend to put on cooperating

 6    individuals.  Basically, that's it, Your Honor.

 7            THE COURT:  Now, cooperating individuals, do you

 8    mean accomplices?

 9            MR. PEREZ:  Yes, Your Honor.

10:32:44 10            THE COURT:  Okay.  Before I forget, make sure we

11    have -- I'm talking to Jordan, my law clerk.  Make sure we

12    have the Fifth Circuit pattern on accomplices because

13    sometimes I discuss that with the jury.

14        Go on.

10:32:57 15            THE CLERK:  Yes, sir.

16            THE COURT:  Go on.

17            MR. PEREZ:  And also, Your Honor, not only do we

18    have accomplice witnesses, we also have sources,

19    confidential sources that will be testifying.

10:33:04 20        In a nutshell, that's basically it.  It's sex

21    trafficking, Your Honor.  Count 2 --

22            THE COURT:  I have done a number of those before.

23    So go on.

24            MR. PEREZ:  Okay.  Count 2 is going to be a

10:33:13 25    conspiracy to commit harboring, which is intertwined with

1   the sex trafficking.  Many of the witness we anticipate

2   calling for the sex trafficking will be intertwined as far

3   as the harboring.  That's basically it on Count 2.

4               THE COURT:  All right.

10:33:28   5               MR. PEREZ:  Counts 3, 4 and 5 will be aiding and

6   abetting, money laundering.

7        And then, Count 6 will be conspiracy to evade bank

8   filing requirements.

9               THE COURT:  Evade bank filing.  Do you mean the

10:33:42  10   $10,000?

11               MR. PEREZ:  $10,000, yes, Your Honor.

12               THE COURT:  Okay.

13               MR. PEREZ:  And that's basically the case, Your

14   Honor.

10:33:48  15               THE COURT:  Okay.  All right.

16        Defense, do you want to add anything to that at this

17   time?

18               MR. FAZEL:  Your Honor, I would put the Court on

19   notice, because I know you have just gotten this case,

10:33:57  20   that the case law and the statute itself changed from 1999

21   where the original indictment was --

22               THE COURT:  1999?

23               MR. FAZEL:  The original indictment was from 1999

24   to over 2000.  Then they did a superseding indictment

10:34:11  25   after everybody pled.  The superseding indictment limits

*Laura Wells, CRR, RDR*

 1   the time frame of the conspiracy, Count 1.

 2          MR. PEREZ:  The conspiracy to commit sex

 3   trafficking.

 4          MR. FAZEL:  So the problem is this, just so I can

 5   put the Court on notice, they have 404(b) notice.  They

 6   want to talk about quote-unquote sex trafficking from 1999

 7   all the way down to 2013.  The law and the statute itself

 8   changed from 2008, I believe.  It made a big change.

 9          So if they want to bring in the 404(b) notice and all

10   these gals to come in and talk about what happened to them

11   from 1999 to 2008, then what we're going to have is a

12   situation where the standard of proof is going to be all

13   confused.

14          And so, we're going to have allegations of sex

15   trafficking where I can argue, well, that's not sex

16   trafficking in 20 -- in 1999.  Minors, I can argue that,

17   well, that's not what the statute said in 1999.

18          THE COURT:  Slow down, please.

19          MR. FAZEL:  Sorry, Judge.  So that's the first

20   thing I want the Court to be aware of.

21          In a nutshell, my side of it is this:  The accused had

22   a house, a prostitution house.  That's all true.  There is

23   no debate about that.

24          The sex trafficking is what we disagree with.  The sex

25   trafficking occurred with pimps.  They are claiming that

             1   the accused was in a conspiracy with the pimps.  We're

             2   saying that just didn't happen.

             3            THE COURT:  Have you got any pimps coming?

             4            MR. FAZEL:  Oh, yeah.

10:35:36     5            THE COURT:  Okay.  Go on.

             6            MR. FAZEL:  They've got all sorts of pimps

             7   coming.

             8            THE COURT:  Go on.

             9            MR. FAZEL:  So they have got pimps pleading to 60

10:35:42    10   months coming in and testifying.  They have got family

            11   members coming in and testifying.

            12            THE COURT:  Family members of who?

            13            MR. FAZEL:  The accused.

            14            THE COURT:  Okay.  Of the accused?

10:35:49    15            MR. FAZEL:  Yes, sir.  Her son; her daughter, who

            16   I believe is in the courthouse or the courtroom.

            17            THE COURT:  Testifying against the mother?

            18            MR. FAZEL:  Yes, sir.

            19            THE COURT:  Go on.

10:35:58    20            MR. FAZEL:  And they have got --

            21            THE COURT:  Were they involved in this at all?

            22            MR. FAZEL:  Oh, yeah.

            23            THE COURT:  They were involved, too?

            24            MR. FAZEL:  Oh, yeah.  Sweet deals.  Five-year

10:36:05    25   deals.  Everybody got 5- and 10-year deals.  And so, my

1    71-year-old female is looking at all day.

2         So conspiracy, we're saying there is no such

3    conspiracy.  The pimps brought them from Mexico, did awful

4    things to them.  I'm sorry.  We had nothing to do with

10:36:20    5    that.

6              THE COURT:  She didn't enter -- well, your

7    position is she didn't enter into it on one occasion,

8    which would, of course, move her into the conspiracy?

9              MR. FAZEL:  I say she didn't enter into it on any

10:36:31   10    occasion.

11             THE COURT:  Okay.

12             MR. FAZEL:  She had a house of prostitution,

13    which is a state crime.  And so, was there prostitution

14    going?  Yeah.  Ain't no debate about that.

10:36:40   15         But was there a conspiracy to traffic minors and

16    traffic folks into the country to commit prostitution?

17             THE COURT:  All right.

18             MR. FAZEL:  No.  No.

19             THE COURT:  All right.  That's it?

10:36:50   20             MR. FAZEL:  That's it.

21             THE COURT:  Okay.  How about the money

22    laundering?

23             MR. FAZEL:  They pled the money laundering --

24    well, there is a motion I filed regarding Count 6.

10:36:59   25             THE COURT:  Okay.  We'll talk about that.  I have

*Laura Wells, CRR, RDR*

1    that down here.

2              MR. FAZEL:  The other pleadings, my understanding

3    is the underlying crime is Count 1.

4              THE COURT:  Which is?

10:37:07  5    MR. FAZEL:  The sex trafficking.

6              THE COURT:  Okay.

7              MR. FAZEL:  So if I knock out Count 1, I've got

8    problems with all those other counts, as well.

9              THE COURT:  Okay.  All right.

10:37:13  10   MR. MAGLIOLO:  May I be heard on something, Your

11   Honor?

12             THE COURT:  Yes, sir.

13             MR. MAGLIOLO:  We developed this chart because,

14   as the Court just found out, this does go over a 13-year

10:37:23  15   period.  And if I could show the Court on the chart, it

16   basically shows from roughly -- it shows 1999.  It's going

17   to be most of --

18             THE COURT:  You are going to put that on the

19   screen, I assume?

10:37:33  20   MR. MAGLIOLO:  We're going to have it available,

21   and we are going run it on the screen.

22             THE COURT:  Assuming we get past any objections.

23   Go on.

24             MR. MAGLIOLO:  Yes, Your Honor.  That's one of

10:37:39  25   the things we need to talk about probably today.  It will

 1    show that the --

 2              THE COURT:  Not today.  This morning.

 3              MR. MAGLIOLO:  This morning, Your Honor.

 4        The harboring conspiracy starts here and runs all the

10:37:50  5    way through until 2013.  The sex trafficking conspiracy

 6    starts at 2000 --

 7              MR. PEREZ:  '09.

 8              MR. MAGLIOLO:  2009, which -- and then runs

 9    through --

10:38:03  10              THE COURT:  Where is 2009?  There is no --

11              MR. MAGLIOLO:  Well, actually between 2008 and

12    2009.

13              THE COURT:  Well, I've got that.

14              MR. FAZEL:  He has got that.

10:38:10  15              THE COURT:  I don't see any line there.  Go on.

16              MR. MAGLIOLO:  That is the sex trafficking

17    conspiracy.  It will be --

18              THE COURT:  So, Joe, you didn't put that in

19    there?  You didn't --

10:38:19  20              MR. MAGLIOLO:  No.  It's a little flexible --

21              THE COURT:  A little flexible.  Go on.

22              MR. MAGLIOLO:  -- when it started.  We agree with

23    counsel for the defense there is going to be evidence that

24    comes out prior to the beginning of the sex trafficking

10:38:36  25    conspiracy that comes in under 404(b).  It will come in as

1   to the harboring conspiracy because the girls will talk

2   about being there, and they will further talk about their

3   prostitution for money because one of the allegations --

4           THE COURT:  All right.  Hang on just a second.

10:38:55   5           MR. MAGLIOLO:  Okay.

6           THE COURT:  I'm actually going to read this.  I

7   do this every time.  I read 404(b) each time.

8           MR. MAGLIOLO:  I have cases for the Court, too,

9   when the Court is ready.

10:39:20  10           THE COURT:  Okay.  It's always available for

11   proving motive, opportunity, intent, preparation, plan,

12   knowledge, identity, absence of mistake or lack of

13   accident.

14           MR. MAGLIOLO:  And --

10:39:36  15           THE COURT:  Hold on up.

16           MR. FAZEL:  May I be heard, as well, Your Honor?

17       (Sotto discussion with the Court and Clerk.)

18           THE COURT:  No, not yet.  We'll get back to you.

19           MR. FAZEL:  Yes.

10:39:48  20           MR. MAGLIOLO:  So it's the government's theory

21   that the fact that the girls are there prostituting

22   themselves --

23           THE COURT:  But they say -- Mr. Fazel said there

24   is no contest as to that.

10:39:57  25           MR. MAGLIOLO:  But they are prostituting

*Laura Wells, CRR, RDR*

 1     themselves and making money doing it.

 2               THE COURT:  All right.

 3               MR. MAGLIOLO:  What we have to prove in the

 4     harboring conspiracy is it was done for financial gain or

10:40:07    5     profit.  So that will -- so that testimony throughout the

 6     entire time will go to that issue.

 7               THE COURT:  Any of the law change on that point?

 8               MR. MAGLIOLO:  No.

 9               THE COURT:  Okay.  Go on.

10:40:18   10               MR. MAGLIOLO:  And -- but that -- that evidence

11     that they are prostituting themselves and they are minors,

12     let's say, would not be evidence that would be admissible

13     for the sex trafficking conspiracy because we would agree

14     with the defense because it's outside the period of the

10:40:44   15     sex trafficking conspiracy.

16               THE COURT:  The harboring, yes.  Not for the

17     purpose of the count -- your accusation of sex

18     trafficking.

19               MR. MAGLIOLO:  Yes, Your Honor.  But it would be

10:40:52   20     admissible, just as the Court said -- and I have all the

21     cases to support it -- for knowledge, motive and intent.

22               THE COURT:  As far as what goes?  Harboring?

23               MR. MAGLIOLO:  As to the sex trafficking.

24     Because what she did prior to the sex trafficking in the

10:41:08   25     404(b), the bad acts, that is supplying the place for

*Laura Wells, CRR, RDR*

 1   these girls to be forced into this sex trafficking, that

 2   goes into -- as to knowledge and motive and lack of

 3   mistake.

 4       So we would ask for an instruction from the Court

10:41:22   5   instructing that that evidence prior to 2009 would be only

 6   admissible as to -- as 404(b) says as to the knowledge,

 7   motive, intent, lack of mistake.

 8             THE COURT:  Will you draw up an instruction?

 9             MR. MAGLIOLO:  We will, Your Honor.

10:41:36   10             THE COURT:  I'll consider it.

11             MR. MAGLIOLO:  Okay.  All right.

12             THE COURT:  What else?

13             MR. MAGLIOLO:  Well, I was -- our plan is to use

14   this diagram because it does go over 13 years and it is

10:41:47   15   somewhat complex, particularly how the harboring goes.

16             THE COURT:  Who are you going to get that in

17   through?

18             MR. MAGLIOLO:  Well, we would -- we plan to get

19   that in through the first witness, which would be the main

10:41:58   20   case agent.

21             THE COURT:  Okay.

22             MR. MAGLIOLO:  And what we would do is --

23             THE COURT:  Who is the main case agent here?

24             MR. MAGLIOLO:  He is present.

10:42:07   25             MR. CHAPUSEAUX:  Edwin Chapuseaux, Your Honor.

 1              THE COURT:  Okay.  Thank you.

 2              MR. MAGLIOLO:  What we would do is, Your Honor,

 3    to avoid the hearsay objection, we would not be offering

 4    what he says other people told him, which we are going to

 5    state and just barely, barely touch on some things to put

 6    the players where they belong on the continuum.

 7              THE COURT:  What players?

 8              MR. MAGLIOLO:  The girls.  We're going to have

 9    13 -- 11 women testify that they were victims in this

10    case.

11              THE COURT:  You can move, for instance, kidding

12    aside -- and I'm not kidding.  You can move on.  I have

13    done this many times.  You can move those young ladies on

14    fast, in and out.

15              MR. MAGLIOLO:  We intend to, Your Honor.

16              THE COURT:  All right.

17              MR. MAGLIOLO:  And two -- and two corroborators

18    and a coconspirator or at least one coconspirator.  But

19    they come in at different points, and it's really

20    throughout the course of the conspiracy.  It's going to be

21    difficult for the jury and maybe even for the Court to

22    follow this without it.

23        So our plan is through our first witness to put the

24    chart, the times of the chart up.

25              THE COURT:  You better have some -- you better

*Laura Wells, CRR, RDR*

1   have some instructions.  What happens if you can't prove

2   everything on that chart?

3           MR. MAGLIOLO:  Everything on the chart we have a

4   witness that will prove it, Your Honor.

10:43:17   5           THE COURT:  Yeah.  But what happens if the

6   witness -- I sustain objections to that person's

7   testimony?

8           MR. MAGLIOLO:  Well, then, they will all be

9   victims.  So we believe they will be relevant.  If someone

10:43:27  10  was to, you know, get killed in a car wreck, then we would

11  ask for it to be excluded.

12      But again, the witness -- the agent is just going to

13  briefly testify.  So, basically, I had a conversation with

14  this person.  They said they were a victim.  And then, he

10:43:38  15  is going to tell what he did to check it out.  And that

16  will locate all the victims during the time period over

17  the 13 years when they were in the continuum, which I

18  believe will help the Court and help the jury quite a bit.

19           THE COURT:  All right.  What is your response?

10:43:52  20           MR. FAZEL:  Okay.  If it pleases the Court, this

21  chart they are claiming -- they are bootstrapping the

22  404(b) information they want to bring in as to the

23  harboring and the minor -- excuse me, as to the minors by

24  saying that they need it in order to prove harboring.

10:44:08  25      Now, some factual background for you.  The harboring

 1   here is this:  These ladies as they came in would pay the
 2   house moneys for their services.  For example, they would
 3   pay $10 for the use of a condom or $5 or $10 for the use
 4   of a room and so forth.  This is not up for debate.  We
 5   will probably agree with that.

 6        Therefore, they can easily prove up the harboring
 7   issue even as far as 1999 without going into the
 8   trafficking of the minors.  So what they are trying to do,
 9   Your Honor, if it pleases the Court, is they are
10   bootstrapping these folks right here because they don't
11   need it.  Because if they want to prove up harboring, they
12   can certainly do it without the need of putting these
13   folks on.

14        So that's my first statement as far as why 404(b) is
15   overly prejudicial.  It's utterly confusing because I
16   don't know what instruction the Court could fashion to
17   talk about the fact that, okay, from 1999 to 2008 the law
18   was this way.  And then, from 2008 it changed to certain
19   things different.  And, therefore, you can't take this
20   evidence into consideration for that purpose.  So that's
21   my first question, my first point.

22        As far as the main case agent is concerned, there is a
23   motion in limine filed with the Court.  The first case
24   agent is going to be speaking 99 percent hearsay as to
25   what he heard other people say.  My understanding of the

1    case agent, who is very knowledgeable of the case, is that

2    his interaction, his live conduct in the case was one

3    phone call towards the end of the case where he made a

4    phone call where he alleges that my client answered the

10:45:50   5    phone.

6         Other than that, his entire case is based on

7    interviews of folks that are either alleged victims or

8    just plain hearsay testimony of snitches or confidential

9    sources.  He has no first-hand knowledge.  So he is going

10:46:08  10    to get on the witness stand and testify about pure

11    hearsay.  That's why I filed my motion in limine.

12              THE COURT:  How do you get around the hearsay?

13              MR. MAGLIOLO:  Your Honor, it's not hearsay

14    unless it's offered for the proof of the assertion.  This

10:46:19  15    is not offered for the proof of the assertion.

16              THE COURT:  What is it?

17              MR. MAGLIOLO:  It's offered to show --

18              THE COURT:  Slow down.

19              MR. MAGLIOLO:  In this particular case, I would

10:46:27  20    cite *Carrillo*, which was mentioned in the case counsel

21    cited, *Johnston*; and the Court says "out-of-court

22    statements providing background information to explain the

23    actions of investigators are not hearsay."  And that's

24    exactly what we plan to do to explain the time continuum.

10:46:43  25              THE COURT:  How about your main witness here?

*Laura Wells, CRR, RDR*

                1   Does he have no hands-on knowledge of any of this stuff?

                2            MR. MAGLIOLO:  Counsel is mistaken about that.

                3            THE COURT:  Lower your voice, please.

                4            MR. MAGLIOLO:  Counsel is mistaken, Your Honor.

10:46:52        5   He went actually to the bordello.  He can describe the

                6   bordello.  He really conducted the interviews.  He can --

                7            THE COURT:  It's bordello, isn't it?

                8            MR. MAGLIOLO:  Bordello, Your Honor.

                9            THE COURT:  Not that I would know.  I just know

10:47:08       10   the pronunciation, by the way.

               11            MR. MAGLIOLO:  Yes, Your Honor.  He was --

               12   obviously, he wasn't there --

               13            THE COURT:  Unless they have a bar in there and

               14   it's a --

10:47:17       15            MR. MAGLIOLO:  A bar-dello.

               16            THE COURT:  Yeah, a bar-dello.  Go on.

               17            MR. MAGLIOLO:  He wasn't there during the stuff

               18   that happened there, Your Honor; but he talked to all the

               19   witnesses and then corroborated all the witnesses'

10:47:29       20   statements by actually going to the bordello --

               21            MR. FAZEL:  Bordello.

               22            MR. MAGLIOLO:  -- and seeing if it, in fact, was

               23   like it was described to him.

               24            THE COURT:  Where was it located, by the way?

10:47:41       25   What part of town?

Pretrial Conference                          Vol 1 - Page 25

1           MR. PEREZ:  610 and Telephone Road, Your Honor.

2           THE COURT:  Okay.  I just want to ask right now

3    because it may impact the way I voir dire.  Is your client

4    -- and it may or may not come out.  Is she a citizen of

10:47:52   5    the United States?

6           MR. FAZEL:  She is, Your Honor.

7           THE COURT:  She is?

8           MR. FAZEL:  Yes, sir.

9           THE COURT:  Okay.

10:47:56  10           MR. MAGLIOLO:  But --

11           THE COURT:  Hold it.  Naturalized citizen?

12           MR. FAZEL:  Yes, sir.

13           THE COURT:  Do you disagree with that?

14           MR. MAGLIOLO:  No, sir.  All our witnesses are

10:48:03  15    not.

16           THE COURT:  Okay.  No.  I'm just saying she is

17    using an interpreter.  How long has she been in the

18    country?

19           MR. FAZEL:  She has been in the country for a

10:48:11  20    long time.  The reason she is using an interpreter, Your

21    Honor, is it's just a stressful event.  Her children speak

22    to her in English.  I speak to her in Spanish and English.

23    But it's out of an abundance of caution.

24           THE COURT:  Oh, no.  I have had that before.

10:48:24  25    That's fine.  No problem.  Go on.

Pretrial Conference                           Vol 1 - Page 26

1    MR. MAGLIOLO:  Well, I mean, that's where we are

2  on this.  It just would be very, very difficult, we

3  believe, for the jury to understand what happened over a

4  13-year period without some guideline.

10:48:37    5    THE COURT:  Now, before I forget, any objection

6  from either side for me when I discuss burden of proof and

7  the right to the presumption of innocence, anybody have a

8  problem my saying that she is a citizen?

9    MR. FAZEL:  No, Your Honor.  I just don't see how

10:48:51    10 it's relevant; but, no, I have no objection to that.

11    MR. MAGLIOLO:  The government does not, Your

12 Honor.

13    THE COURT:  All right.  I'm just saying because

14 it's a matter of when an accused -- and the lady happens

10:49:00    15 to be a citizen, that may put it just in a different

16 context and make it more pressed upon than relative to the

17 presumption of innocence and what citizenship carries with

18 it.  I don't mean it in any negative connotation.  I mean

19 it in a positive one.  But if anybody had an objection, I

10:49:17    20 would ask why.  We don't have any.  Move on.

21    MR. MAGLIOLO:  As to the Court's voir dire, I

22 would wonder if the Court would consider giving each side

23 maybe 15 minutes.

24    THE COURT:  No, not in this case.  A number of

10:49:28    25 reasons.  First of all, I think already one week has gone

1   past, right?  You must have witnesses up here that you

2   brought up for the last trial.

3             MR. MAGLIOLO:  We sent them home and brought them

4   back, Your Honor.

10:49:37   5             THE COURT:  You had them brought back.  On top of

6   it all, I don't want to take any chance -- any chance in

7   having to go through this all again if something untoward

8   happens.  If anything untoward happens, I want to make it.

9   I don't want to just -- it's just you don't want to make

10:49:50   10   it.  So, no.  After we're done, I have your questions; and

11   I'll handle it that way.

12             MR. MAGLIOLO:  Thank you, Your Honor.

13             MR. FAZEL:  Your Honor, if I may say one other

14   thing.  Counsel for the government is incorrect that I'm

10:50:01   15   incorrect.  The lead agent did go to see the bordello

16   after the event occurred.  So did I, and so did folks in

17   this room.  But the fact of the matter is, during the time

18   of the investigation he might have been outside of it; but

19   he never had any interactions inside of it.  The only

10:50:20   20   interaction he had that I would say as a fact witness

21   would be that one phone call.

22             THE COURT:  Okay.

23             MR. MAGLIOLO:  Again, we stand on the case.  It's

24   very clear what the Fifth Circuit said about this is not

10:50:30   25   hearsay and it's admissible.

```
 1          THE COURT:  All right.  I have got a handle on
 2  it.  Let me go down the motions you have here.  We're in
 3  no rush.  We'll get it done.  But you'll have the jury
 4  forms up.  We'll go through how I pick a jury.  All of you
 5  have been that route before, but I would just get it in
 6  the record.
 7          But the jury is coming up, Ellen, what time?  1:00?
 8          CASE MANAGER:  1:00, yes, sir.
 9          THE COURT:  So the jury forms will be here at
10  11:30?
11          CASE MANAGER:  12:30.
12          THE COURT:  12:30.  So make sure you come up with
13  your highlighters and so forth.
14          Oh, also, Ellen, --
15          CASE MANAGER:  Yes, sir.
16          THE COURT:  -- are the facilities available
17  across the hall?
18          CASE MANAGER:  I can make them available.
19          THE COURT:  Okay.  All right.  It's up to the
20  marshals.  In other words, go back upstairs if you want to
21  or just go across the hall.  I mean, there are all sorts
22  of ways to make it less inconvenient to the defendant in
23  this case.  That's strictly up to the marshal service.
24          All right.  Let me just go down through this.  I had
25  to put this together over the weekend.  Let me just go
```

10:50:41
10:50:52
10:50:58
10:51:07
10:51:21

1   down this.

2              MR. MAGLIOLO:  Which document, Your Honor?

3              THE COURT:  Don't worry.  Motion to disclose

4   identity and location of informants and request for

10:51:32   5   interview with informants and cooperating individuals.

6   That's document number 474.  Is that -- you still want to

7   discuss that; is that correct?

8              MR. MAGLIOLO:  Yes.

9              THE COURT:  Give me a moment to go over what I

10:51:42   10   dictated out.  Okay.  I was moving pretty fast.

11         Let me ask you this:  At this point, before I go down

12   and hear your position on it, the informants, these two

13   confidential informants, did any of them actively

14   participate in or are a witness to the acts underlying the

10:52:38   15   crime?

16              MR. MAGLIOLO:  Yes, Your Honor.

17              THE COURT:  Okay.

18              MR. MAGLIOLO:  It's CH1 and CH2 I think we are

19   talking about.

10:52:46   20              MR. FAZEL:  No, Joe.  CH1.

21              THE COURT:  All right.  Tell me what your

22   position is on this and we'll go --

23              MR. FAZEL:  Yes, Your Honor.  There is a part of

24   the motion that was put in ex parte.  The ex parte part of

10:52:57   25   it says that I didn't want everybody to know what my trial

1    strategy was.  I also included in the ex parte the

2    entirety of the reports of the confidential sources so

3    that it didn't look like I was picking and choosing areas.

4    I wanted to be fair.

10:53:10    5           THE COURT:  All right.

6           MR. FAZEL:  There are two specific reasons why I

7    want the confidential sources, these two particular

8    confidential sources.

9           THE COURT:  You just want their identity?

10:53:20   10           MR. FAZEL:  I want their identity; and I want to

11    be able to speak to them during trial, if necessary.  I

12    would like to know what they got.

13           MR. MAGLIOLO:  We are just trying to figure out

14    which.  There are so many confidential informants.

10:53:29   15           THE COURT:  Off the record.  Go and talk to him

16    off the record.  Narrow it down.

17       (Discussion off the record.)

18           THE COURT:  Okay.  Back on the record.  All

19    right.  Now what?  You know who it is now, right?

10:54:19   20           MR. MAGLIOLO:  Yes, Your Honor.

21           THE COURT:  All right.  What is your position?

22           MR. MAGLIOLO:  Our position is that we gave the

23    defendant all the information we had as to what these

24    particular confidential informants knew.  None of these

10:54:38   25    confidential informants are we calling in this case.

1          THE COURT:  You are not calling them?

2          MR. MAGLIOLO:  No, Your Honor.  And none of them,

3   based on what we understand they know, has anything

4   exculpatory regarding the defendant.  Everything is either

10:54:57   5   neutral or inculpatory.  These are -- some of these are --

6   these were all at one time law enforcement confidential

7   informants.  Some are still law enforcement confidential

8   informants.

9          The law says the Court should use a balancing test in

10:55:17   10   deciding whether or not to give these informants up.  If,

11   in fact, we give up informants, particularly ones who

12   requested we go to the law enforcement and give them

13   information with the understanding that they will not be

14   identified because perhaps they are -- for whatever

10:55:32   15   reason.  Maybe they are afraid.  For whatever reasons.

16          If we go behind that deal that law enforcement and

17   informants make, which law enforcement gains very, very

18   good intelligence information from, if we go behind that,

19   force that person to be identified, force them to be

10:55:50   20   presented to the defense lawyer, then we put that law

21   enforcement technique in jeopardy unless we do it for a

22   good reason.

23          If, in fact, the defense had a good reason that

24   somehow something they would say -- and we gave him all

10:56:05   25   the reports.

1          THE COURT:  You gave him all the reports?

2          MR. MAGLIOLO:  All the reports just without their

3   name.

4          THE COURT:  Uh-huh.

10:56:10   5          MR. MAGLIOLO:  If he could show the Court there

6   was something really good for the defense, something

7   exculpatory, then we would be hard-pressed to fight that;

8   but we do not believe there is anything exculpatory by any

9   of these that we withheld the names on.  We gave the full

10:56:26   10   information in the report, Your Honor.

11          THE COURT:  All right.  Your position, also, just

12   for the record, is the case law backs you up; is that

13   correct?

14          MR. MAGLIOLO:  Yes, Your Honor.

10:56:32   15          THE COURT:  All right.  Your response.

16          MR. MAGLIOLO:  That is the balancing test.

17          THE COURT:  All right.  Yeah.  Go on.

18          MR. FAZEL:  The Court has seen the reason why I

19   think it's *Brady* information.  I put it in the ex parte

10:56:41   20   side of it so that I don't give up what I'm thinking and

21   what I want to ask them.  So I'm not going to go into

22   that.

23       I would also submit to the Court that since these are

24   fact witnesses, I think the case law is a little bit more

10:56:51   25   on my side of the aisle because they are actual witnesses

1    to events that transpired.  With all due respect to the

2    government, they are not their witnesses.  They are

3    witnesses.

4         And, therefore, I think I have a Sixth Amendment right

10:57:03  5    to have them, to confront them, to have them come in and

6    compel them to testify.  I appreciate that they have law

7    enforcement techniques, but we are under the Constitution.

8    I think constitutionally my client is entitled to have

9    this information before the jury.

10:57:16  10        THE COURT:  Pretty succinctly put.  What's your

11   response?

12        MR. MAGLIOLO:  The response is we can't defend

13   something we don't know.  He says there is some secret

14   information that he thinks they have based --

10:57:26  15        THE COURT:  He said based upon the reports.

16        MR. MAGLIOLO:  Well, I have read the reports

17   numerous times; and I really don't see anything

18   exculpatory.  And even if he tells me what it is, to try

19   to keep these people in place, maybe it's something we

10:57:37  20   could stipulate to if, in fact, that is actually what they

21   are going to say.  The government would consider that.

22   But we can't stipulate to anything, we can't know how to

23   defend our position if he says there is something secret

24   in there that -- in the report.

10:57:50  25        THE COURT:  You do this all the time.  What is

 1   the best cases on this?

 2             MR. MAGLIOLO:  I'll have to look.

 3             THE COURT:  Oh, no.  Wait a second.  You look.

 4   Then go look.  Go find it right now.  You knew this was

10:58:00  5   coming up.  We don't have much time.

 6             MR. MAGLIOLO:  I was -- somehow I don't think I

 7   have it here, Your Honor; but it is a balancing test.  I

 8   will have to look through it.  I have 14 cases here.  I'll

 9   find it for the Court.

10:58:10  10             THE COURT:  Well, again, the one case that was

11   referred here, this -- what is this?  The *Vizcarra-Porras*

12   case.  It's the informant's degree of involvement in the

13   crime, the helpfulness of the disclosure to the defense

14   and the government's interest in nondisclosure.

10:58:25  15        Now what more of a balancing test is there?

16             MR. MAGLIOLO:  That's it, Your Honor.

17             THE COURT:  Well, which is your best case on it?

18   I just cited one.  What is the best case your office uses

19   to support this?

10:58:34  20             MR. MAGLIOLO:  I believe it's this case, Your

21   Honor; but I don't have it.  I am just telling you the

22   best I can.

23             THE COURT:  The best you can do right now off the

24   top of your head, huh?

10:58:44  25             MR. MAGLIOLO:  Yes, Your Honor.

*Laura Wells, CRR, RDR*

```
           1          THE COURT:  All right.  What we're going to do.
           2    I'm not going to jump out of sequence here.  All right.
           3    It's now 10:59.  I'll be back at 11:05.  Get ready with it
           4    because I'm listening to it.  We're going to go right in
10:58:57   5    sequence.  If need be, we'll work right up to 12:30.
           6          And then, we'll get your juror forms here.  We're
           7    going to select the jury.  There is no way that we can
           8    delay this case anymore.  It really needs to get done, and
           9    I'm glad to be of assistance to the Court.  I'll be back
10:59:12  10    in five minutes.
          11          THE MARSHAL:  All rise.
          12       (Recess from 10:59 a.m. to 11:07 a.m.)
          13          THE COURT:  Thanks.  Be seated.  All right.
          14    Where are we?
11:07:22  15          MR. MAGLIOLO:  Ready.
          16          THE COURT:  Counsel, go on.
          17          MR. MAGLIOLO:  Okay.  Counsel did a masterful job
          18    in this document that he filed late Thursday, Your Honor,
          19    just so the Court will know.
11:07:25  20          MR. FAZEL:  Last week.
          21          MR. MAGLIOLO:  Late Thursday last week.
          22          MR. FAZEL:  Thank you.
          23          MR. MAGLIOLO:  And we agree with counsel that
          24    this is the test.  Number one, the informant's degree of
11:07:36  25    involvement.  Our position is that these informants he is
```

1   asking for had virtually no involvement in this crime.

2   They may have been involved in other trafficking crimes.

3   Specifically --

4            THE COURT:  That case was cited by the defense.

5            MR. MAGLIOLO:  And it's a good case, Your Honor.

6            THE COURT:  Go on.

7            MR. MAGLIOLO:  And specifically as to 423, which

8   he is interested in, the gravamen of his testimony would

9   be he was getting ready -- he saw some other folks talking

10  about -- with some minors talking about girls, and they

11  were going to take it to this club.  That would be the

12  gravamen of that.  So there were some pimps and some girls

13  and they were talking about taking those girls to this

14  club.  Actually, what -- this club was renamed in 2013.

15      It's the government's position that would be the

16  minimal, minimal involvement, if involvement at all.  They

17  never even made it to the club, as far as this person

18  knows.

19            THE COURT:  What else?

20            MR. MAGLIOLO:  Secondly, the second person he is

21  talking about now talks about El Gallo, who is another

22  pimp who runs girls, who may also have had girls at this

23  club.  Minimal involvement.

24      The second test is the helpfulness of the disclosure

25  to the defendant.  I just don't see how helpful it could

*Laura Wells, CRR, RDR*

           1  be to the defendant.  Again, we would consider if there

           2  was something that we could stipulate to that would be

           3  correct, we would consider that if he would tell us -- if

           4  we could have a little while to talk about that.

11:09:04   5       Three, the government's interest in nondisclosure and

           6  I have told the Court --

           7            THE COURT:  Slow down.

           8            MR. MAGLIOLO:  I'm sorry.  The government's

           9  interest in nondisclosure, I have already discussed with

11:09:13  10  the Court about protecting the confidentiality of

          11  informants, particularly ones who are not going to testify

          12  and who do not want to be made available.

          13       Specifically, Your Honor, as to the second person,

          14  686 --

11:09:28  15            MR. FAZEL:  I'm sorry.

          16            MR. MAGLIOLO:  He was disclosed as an informant

          17  and deported in 2006.  So we don't even know where he is.

          18            MR. FAZEL:  I'm sorry, Your Honor.  686 is who we

          19  don't know.  Could you tell me who that is?  Is that CH1?

11:09:43  20            MR. MAGLIOLO:  No.  That person -- all I can tell

          21  you is this person was deported in 2006, and we have no

          22  idea where he would be.

          23            THE COURT:  All right.  Response.

          24            MR. FAZEL:  Yes, Your Honor.  For the record, the

11:09:55  25  gentleman that he is describing is Attachment B of my

                              *Laura Wells, CRR, RDR*

1    motion under ex parte seal.

2           THE COURT:  Go ahead.

3           MR. FAZEL:  That is clearly, clearly *Brady*

4    material because it clearly says in the highlighted

11:10:07   5    portion why I think it's *Brady*.  I would secondly say --

6           (addressing interpreter)  Yes, ma'am.  I'm so sorry.

7           THE COURT:  What about *Brady*?

8           MR. MAGLIOLO:  I don't -- I don't know how that

9    could be *Brady* that other people -- because there are

11:10:17   10   other people in the conspiracy.  It's not *Brady* that the

11   defendant is not in the conspiracy because someone else is

12   taking girls to her club.  I just don't see how that could

13   be *Brady*, Your Honor.

14          THE COURT:  Okay.  Go on, Counsel.

11:10:28   15          MR. FAZEL:  Yes, Your Honor.  The first one

16   obviously, again, Your Honor, this is clearly *Brady*

17   information that I have highlighted for you.  I don't know

18   how they missed it.  I don't know what else to say.

19          THE COURT:  Specifically what?

11:10:43   20          MR. FAZEL:  Well, if I say it, then they will

21   know where I'm going.

22          THE COURT:  Okay.  Well, okay.  All right.  So

23   you just want to stand on what was filed?

24          MR. FAZEL:  I do, Your Honor.  And I explained in

11:10:52   25   the motion under the sealed portion why it's filed.  Now,

1    if they want to agree with me as to the gentleman that I

2    just found out was deported, then maybe the case would be

3    over real quick.

4              THE COURT:  The whole case?

11:11:07    5         MR. FAZEL:  The whole case as to Count 1, yes,

6    sir.

7              MR. MAGLIOLO:  I don't know what I'm supposed to

8    agree with or disagree with, Your Honor.

9              THE COURT:  I don't know either.  I mean, I might

11:11:17   10   know; but he doesn't want to disclose it.

11             MR. FAZEL:  It's in the report.  It's not like I

12   haven't -- I got the report from them.  They handed me the

13   report.  I am reading their own report.  If this is not

14   *Brady*, then --

11:11:28   15             THE COURT:  Then from their own report what is

16   it?

17             MR. FAZEL:  Quote -- all right.  I'll say it.

18   "Some men, pimps or traffickers are not as violent as some

19   are.  El Gallo and his group are the violent ones.  El

11:11:44   20   Gallo goes to the bars -- "

21             THE COURT:  Slow down.

22             MR. FAZEL:  "-- talks to the bar owners and asks

23   if he can bring some of the girls.  The girls are under El

24   Gallo's rules and not the bar owner's rules."

11:11:54   25             MR. MAGLIOLO:  I don't see anything *Brady* about

*Laura Wells, CRR, RDR*

1  that, Your Honor.  It's a conspiracy.

2          THE COURT:  All right.  Anything further?

3          MR. FAZEL:  No, sir.

4          THE COURT:  All right.  As to the request to

11:12:05  5  identify and the location of informants, that motion is

6  denied.  If by some chance you can work out anything by

7  stipulation, it's strictly up to you; but I need to make a

8  ruling.

9      The next one is the defendant's motion to dismiss

11:12:19  10  Count 6 of the first superseding indictment.  That's the

11  conspire with one another to conduct financial

12  transactions, correct?

13          MR. FAZEL:  Correct.

14          THE COURT:  All right.  Do you want to explain

11:12:29  15  that?

16          MR. FAZEL:  Yes, Your Honor.  The motion is

17  pretty straightforward.  It just simply says that they did

18  not allege the offense on the indictment, they did not put

19  the defendant on notice as to the transactions.  There are

11:12:41  20  multiple definitions of transactions.  The Court has seen

21  many, many of these charges and knows how they are

22  generally charged.

23          THE COURT:  You are saying money laundering is

24  too general a term?

11:12:51  25          MR. FAZEL:  It can't get any more general than

*Laura Wells, CRR, RDR*

 1   that.

 2              THE COURT:  All right.  What is your response?

 3              MR. MAGLIOLO:  Your Honor, first, this is a

 4   superseding indictment.

11:12:57   5              THE COURT:  So?

 6              MR. MAGLIOLO:  The count in the earlier

 7   indictment lays things -- for pages lays things out.

 8              THE COURT:  Oh, yeah.  Wait a second.  In a

 9   superseding do you have to retype it all out?

11:13:08  10              MR. MAGLIOLO:  No, Your Honor, you don't.  What

11   I'm saying is as far as the practicality of the defense,

12   knowing the actions the government has alleged, the

13   defense knows them if for no other reason than through the

14   initial indictment.

11:13:22  15         And then, I will talk about the case law, Your Honor.

16              THE COURT:  Now, wait a second.  You are saying

17   it was included in the first indictment, but you didn't

18   keep the same detailed language in the second indictment?

19              MR. MAGLIOLO:  Yes, Your Honor.  At the beginning

11:13:33  20   of the case there were approximately 15 defendants.  They

21   have all pled.  We are down to one defendant, and we

22   simplified -- we believe we've simplified the case,

23   simplified the indictments.

24              THE COURT:  But did you simplify it too much

11:13:46  25   under the law?

*Laura Wells, CRR, RDR*

1              MR. MAGLIOLO:  Under the law, no, Your Honor.

2              THE COURT:  Why?

3              MR. MAGLIOLO:  Because in the *Richard* case, which

4     cites *U.S. v. Franco*, Fifth Circuit, the Court says,

11:13:57   5     "Generally, however, an indictment -- "

6              THE COURT:  Slow down.

7              MR. MAGLIOLO:  "Generally, however, an indictment

8     that closely tracks the language under which it was

9     brought is sufficient to give a defendant notice of the

11:14:07  10     crimes with which he is charged."

11              THE COURT:  Now, what does the language of the

12     statute say?  Money laundering?

13              MR. MAGLIOLO:  The language of the statute is

14     tracked in the indictment, Your Honor.

11:14:15  15              MR. FAZEL:  No, it's not.  No, sir.

16              MR. MAGLIOLO:  Our position is the language is

17     tracked.

18              THE COURT:  Okay.  Why isn't it tracked?

19              MR. FAZEL:  Because, Your Honor, the conspiracy

11:14:27  20     statute in money laundering is Section, I believe, C or H

21     or whatever it is, says that anything that the statute

22     says is a crime, a conspiracy thereof is a crime as well

23     and, you know, the punishment is the same.  Great.

24         So, in other words, in order for us to be able to know

11:14:45  25     what they are charging us with, we have got to know what

 1    the money laundering allegations are.  All they said in

 2    the statute --

 3              THE COURT:  Who took this to the grand jury?  Did

 4    either one of you do it?

 5              MR. MAGLIOLO:  We did it, Your Honor.

 6              THE COURT:  All right.  Let me see the

 7    indictment.  We are pulling it out.

 8              MR. MAGLIOLO:  I have a couple of other cases,

 9    Your Honor.

10              THE COURT:  I want to see the indictment.  Okay.

11    Which one do you say is not sufficient enough?  Count 6?

12              MR. FAZEL:  Count 6, yes, Your Honor.  That is on

13    Page 5.  It is starting on Page 5.  It's the last count.

14        I'm sorry, Ellen.  Is it okay if I stand here?

15              CASE MANAGER:  Absolutely.

16              THE COURT:  Now, is Number 6 the $10,000 each?

17              MR. MAGLIOLO:  Yes, Your Honor.

18              THE COURT:  Which one is money laundering?

19              MR. FAZEL:  I'm sorry.  Question?

20              THE COURT:  Where is money laundering?  Is that

21    it?

22              MR. MAGLIOLO:  That is the money laundering

23    count, yes, Your Honor.

24              THE COURT:  Who says?

25              MR. MAGLIOLO:  Well, that's what counsel said.

1          THE COURT:  Well, you tell me.  Is that the money

2    laundering count?

3          MR. MAGLIOLO:  That's the money laundering count,

4    yes, Your Honor.

11:16:13   5          THE COURT:  What should it say?

6          MR. FAZEL:  It should define "transactions."  For

7    example, let me -- I mean, Your Honor, there are multiple,

8    multiple transactions here that could be described as a

9    type of, quote, structuring so that it's below $10,000.

11:16:30   10   Multiple cashier's checks.  We don't know which cashier's

11   checks they are talking about.  All they have got to do is

12   go up one count.  Their other counts specified numbers,

13   amounts, dates.

14         MR. MAGLIOLO:  Counsel had a remedy for that but

11:16:42   15   did not choose to avail himself of it.

16         MR. FAZEL:  This is my remedy.  It is the day

17   before trial.  I haven't picked a jury.  I want the count

18   dismissed.

19         MR. MAGLIOLO:  I would like to cite two more

11:16:52   20   cases when the Court is ready.

21         THE COURT:  Go on.

22         MR. MAGLIOLO:  Your Honor, this says the basic

23   purpose --

24         THE COURT:  Slow down.

11:16:55   25         MR. MAGLIOLO:  Sorry.  In *Ramos*, Your Honor, it's

1    a Fifth Circuit case, the basic purpose of indictment is

2    to inform the defendant of the charge against him.  Those

3    minimal constitutional standards, therefore, do not compel

4    a ritual of words.  The validity of the indictment is

11:17:17  5    governed by practical, not technical, considerations.

6               THE COURT:  You say he has got enough notice.

7    What did the first one say?  I don't have that in front of

8    me.  The original indictment, did it go -- on the money

9    laundering.

11:17:28  10              MR. MAGLIOLO:  I have it, Your Honor.

11              THE COURT:  Let's see what that says.

12              MR. FAZEL:  He needs the original indictment.  I

13   think that's the superseding.  I'm sorry.

14              THE COURT:  Hand it up, please.

11:17:47  15              MR. MAGLIOLO:  It's Count 7 of the original

16   indictment, Your Honor.

17              THE COURT:  Okay.  Thank you.

18              CASE MANAGER:  Thank you.

19              THE COURT:  All right.  Let me ask the

11:18:47  20   government.  How come you spell that out in some detail as

21   to what kind of a deal it was and then in the superseding

22   indictment it's just bare bones?

23              MR. MAGLIOLO:  We thought it would make it easier

24   for everyone to understand and prosecute, Your Honor.

11:19:07  25              THE COURT:  What is -- what is your best case on

1    these kinds of facts where the first one spelled it out in

2    detail and the second one spelled it out in nothing but

3    the bones?

4              MR. MAGLIOLO:  I was unable to find that case.

11:19:17  5              THE COURT:  What is your best case on that?

6              MR. MAGLIOLO:  The case is, Your Honor --

7              THE COURT:  No.  Hold it.  I'm asking the

8    defense.  What is your best case on it?

9              MR. FAZEL:  I don't -- let me answer it this way.

11:19:25  10   I'm not avoiding the question.  I didn't look at that

11   because the numbers are different; and the superseding

12   indictment, as we all know here, is the live instrument.

13   So it doesn't matter what the other indictment says.

14   We're not going on the other indictment.  We're going on

11:19:40  15   the live instrument.  And this live instrument does not

16   provide enough notice.

17             THE COURT:  All right.  All right.  Why didn't

18   you provide enough notice --

19             MR. MAGLIOLO:  We believe --

11:19:48  20             THE COURT:  -- as a safety precaution?

21             MR. MAGLIOLO:  We believe we did.  And if counsel

22   needed something, he could have filed a bill of

23   particulars.  That's pretty much the way it goes.  We

24   believe we've provided enough notice to satisfy what the

11:20:00  25   Courts have said.

_Laura Wells, CRR, RDR_

1          THE COURT:  Talk to me about bill of particulars.

2          MR. MAGLIOLO:  He had the choice to file it if he

3    didn't -- if he wanted to and if he needed additional

4    information.

11:20:09  5          THE COURT:  Slow down.  I can't -- you know.  You

6    have tried cases with me before.

7          MR. MAGLIOLO:  Yes, Your Honor.

8          THE COURT:  Okay.  All right.  If you don't

9    answer to me, you are going to have to answer to the court

11:20:18  10   reporter.  You know you are better off with me.

11         MR. MAGLIOLO:  She is looking at me, Your Honor.

12         THE COURT:  I bet you she is.  Hold it a second.

13   Which rule are we looking at?  Which specific rule are we

14   looking at at this point?

11:20:30  15         MR. FAZEL:  Seven, Your Honor.

16         THE COURT:  Rule 7 of what?

17         MR. FAZEL:  Code of Criminal Procedure and the

18   Sixth Amendment of the United States Constitution.

19         THE COURT:  I'm talking about the criminal

11:20:38  20   procedure.  I'm familiar with Six.  Okay.  All right.

21   Again, I have got so many rules up here.  All right.

22   Criminal procedure.  What rule?

23         MR. FAZEL:  Seven, Your Honor.

24         THE COURT:  Rule 7?

11:20:52  25         MR. FAZEL:  Yes.

```
         1            THE COURT:  Let me go back and read it here.

         2            MR. FAZEL:  God forbid the government know that.

         3            THE COURT:  All right.  Anything further?

         4            MR. MAGLIOLO:  Yes, Your Honor.

11:21:55 5            THE COURT:  Anything further from the government?

         6   No.  You've got further?  Anything further from the

         7   defense?

         8            MR. FAZEL:  Yes, Your Honor.  Just briefly, there

         9   are two reasons why notice has to be provided.  First is

11:22:07 10  the constitutional right to be on notice as to what the

        11   charges are against you.

        12       But more fundamentally, you should be able to defend

        13   yourself against double jeopardy at a later date.  And as

        14   the motion indicates, because they don't state what

11:22:20 15  financial transactions, the type of financial transactions

        16   and because -- the Court called it bare-boned.  I would

        17   submit it just doesn't cut it because it's not sufficient

        18   to put you on notice.  It's not a charge.

        19       I would submit under those circumstances that it

11:22:34 20  should be dismissed.

        21            THE COURT:  How about the double jeopardy

        22   business here?  I see his point there.  I mean, how does

        23   it narrow down just to the facts of this case?

        24            MR. MAGLIOLO:  It's over a small period of time,

11:22:48 25  Your Honor.
```

*Laura Wells, CRR, RDR*

1          THE COURT:  Where does it say that?  Beginning on

2    or around September 5th of 2011 and continuing through

3    November 7th, 2011.  That's the time you are alleging for

4    the money laundering?

11:23:01   5          MR. MAGLIOLO:  Yes, Your Honor.

6          THE COURT:  That's it?

7          MR. MAGLIOLO:  Yes, Your Honor.

8          THE COURT:  All right.  Anything further?

9          MR. MAGLIOLO:  Just one other cite to a case,

11:23:08  10   Your Honor.  *United States v. Cooper*.  Moreover, the

11   validity of the indictment is governed by practical and

12   not technical considerations where they cite *Ramos*.  And

13   further, the basic purpose behind the indictment is to

14   inform the defendant of the charges against him, which we

11:23:21  15   believe it does.

16          THE COURT:  All right.  The motion to dismiss

17   Count 6 is denied.

18       You can hand this back.  This is the original one.

19          CASE MANAGER:  Yes, sir.

11:23:28  20          THE COURT:  Next one, defendant's motion.  We did

21   that.  All right.

22       The government's motion in limine.  Do we -- let's

23   see.  The government asks to exclude any evidence or

24   argument relating to the sentences pimps have received

11:23:45  25   from cases involving sex trafficking because such evidence

*Laura Wells, CRR, RDR*

 1   is irrelevant and immaterial.

 2        How is that immaterial?

 3             MR. PEREZ:  Your Honor, he is talking about how

 4   other defendants got punishment and they got five years or

11:24:00  5   they got ten years.  I don't see how that's relevant to

 6   whether the defendant is guilty or not, Your Honor.

 7             THE COURT:  Well, is that -- are they going to

 8   testify in this case?

 9             MR. PEREZ:  Not the ones that I think he is

11:24:10  10  alluding to, Your Honor.

11             THE COURT:  What about those?

12             MR. FAZEL:  Well, Your Honor, I guess since this

13   is a motion in limine, to make things simple, I would say

14   I can agree to the motion in limine and approach if I want

11:24:24  15  to bring that up.

16             THE COURT:  Yes.  That's what we're doing.  Okay.

17   It's granted.  It's granted but approach.

18             MR. PEREZ:  Okay.

19             MR. FAZEL:  It's very --

11:24:36  20             THE COURT:  As long as you know I routinely set

21   aside motions in limine if I feel that the facts at the

22   time require it.

23             MR. FAZEL:  Right.

24             THE COURT:  All right.  The defendant's motion in

11:24:43  25  limine, parties have agreed on four motions in limine.

1    The following are opposed.

2         One is any evidence that implicates the accused in

3    criminal activity through inadmissible hearsay.  Well,

4    that's inadmissible hearsay.

5         MR. FAZEL:  We talked about that earlier this

6    morning, Your Honor.  This is the issue that we are having

7    with they are trying to bring in evidence of -- hearsay

8    evidence not through just the lead agent but also through

9    other individuals, including their, quote, star, unquote,

10   witnesses.  The --

11        THE COURT:  Are you going to use that chart

12   through other witnesses or just through the main one, your

13   case agent?

14        MR. MAGLIOLO:  We're going to use it with the

15   case agent.  The other witnesses will testify.  The

16   witnesses that are listed on the chart will testify as to

17   their part.  So they really won't be involved with the

18   chart.

19        THE COURT:  All right.  That's granted.  That's

20   granted.  I'll make the ruling on hearsay.  Okay.  I'm

21   going to -- inadmissible hearsay.  You have no problem

22   with inadmissible hearsay because I'm --

23        MR. MAGLIOLO:  Correct.

24        THE COURT:  -- going to rule, and I will rule on

25   that chart.

1          MR. MAGLIOLO:  Yes, Your Honor.

2          THE COURT:  And if I allow it in under the

3     limited purposes for which you've elicited, then if it's

4     hearsay and it probably is based partially on it, it's

11:26:05   5     that the officer, the police officer in charge, the

6     marshal in charge or the investigator in charge.

7          Now let me -- what agency is your primary witness

8     with?

9          MR. MAGLIOLO:  Sheriff's department, Your Honor.

11:26:15  10          THE COURT:  Sheriff's department.  In other

11     words, that is something ordinarily relied upon; and for

12     that limited purpose, I'll allow him to set it because

13     it's based upon his investigation.

14          MR. MAGLIOLO:  Thank you, Your Honor.

11:26:26  15          THE COURT:  The way it's around here is the word

16     "inadmissible."

17          MR. MAGLIOLO:  Yes, Your Honor.

18          THE COURT:  He is entitled to that ruling.

19          Next one.  Any expert testimony where Rule 16 required

11:26:36  20     disclosures have not been made or used to attempt to

21     introduce inadmissible hearsay.  Any problem with that?

22          MR. MAGLIOLO:  Well, we should, I suppose, get

23     clear on the disclosures that have been made to make sure

24     that everything we think we got to the defense we did,

11:26:50  25     Your Honor.

*Laura Wells, CRR, RDR*

```
       1              THE COURT:  What hasn't been made?

       2              MR. FAZEL:  Yes, Your Honor.  There is a witness

       3   that they just added to their list this week.  He is an

       4   IRS agent.  His name is --

11:26:59  5           MR. PEREZ:  Aaron Gogley.

       6              MR. FAZEL:  I'm sorry?

       7              MR. PEREZ:  Aaron Gogley.

       8              MR. FAZEL:  Aaron Gogley?  I wouldn't know how to

       9   spell it.  I apologize.  Mr. Gogley is -- Mr. Gogley?

11:27:09 10           MR. PEREZ:  Yes.

      11              MR. FAZEL:  Mr. Gogley is going to come testify,

      12   according to the brief synopsis that I got in the e-mail,

      13   about the fact that the conduct of the defendant is quote

      14   -- and I want to -- I don't have the e-mail.

11:27:22 15           MR. PEREZ:  It's in our motion.

      16              MR. FAZEL:  The conduct of the defendant is

      17   similar to or appears to be in congruity with money

      18   laundering.  Now, we just got this two days ago.  I have

      19   had no chance to look at this witness.  I don't know what

11:27:45 20   reports they have created, if any.  I don't have any

      21   notice as to what they have reviewed.

      22          I would submit it's late notice.  I would submit that

      23   it is inadmissible testimony because basically what they

      24   are saying is the defendant -- it is going to knowledge.

11:28:02 25   It is saying that the defendant did commit the crime of
```

|   | money laundering. |
|---|---|
| 2 | THE COURT:  All right.  I'm going to grant that. |
| 3 | And now, as to that witness -- as to that witness -- and |
| 4 | again, it's inadmissible.  In other words, Rule 60 |
| 5 | requires disclosure.  I'm not ruling on that.  If it was, |
| 6 | then it's granted.  If not, I let it in. |

1   money laundering.

2          THE COURT:  All right.  I'm going to grant that.

3   And now, as to that witness -- as to that witness -- and

4   again, it's inadmissible.  In other words, Rule 60

5   requires disclosure.  I'm not ruling on that.  If it was,

6   then it's granted.  If not, I let it in.

7          If he thinks that due to that late disclosure it's a

8   prejudice to him, if necessary, we'll put the witness on

9   with the jury out.  You can ask him a few basic questions.

10  And if you say it's a total surprise -- like I assume it

11  will be -- then we'll discuss how hurtful it is to your

12  case.  Okay?

13         MR. MAGLIOLO:  Yes, Your Honor.

14         THE COURT:  That's the easiest way to handle it

15  at this point.  All right.

16         Granted subject to examination of witness out of jury

17  presence, if we need it and if you need this witness,

18  knowing what is coming.

19         All right.  Next one.

20         MR. PEREZ:  May I be heard, Your Honor?  There

21  are two other experts.  We put him on notice.  I don't

22  know what his position on those two is.

23         THE COURT:  Well, now, wait a second.  I'm going

24  down just what I have here.  That's all.

25         MR. PEREZ:  Okay, Your Honor.

11:28:16
11:28:30
11:28:42
11:29:07
11:29:19

1            THE COURT:  That's all.  That's all.

2            MR. PEREZ:  Okay, Your Honor.

3            THE COURT:  This one witness was who?  This was

4   the IRS guy, right?

11:29:26  5            MR. FAZEL:  Yes, Your Honor.

6            THE COURT:  IRS agent.

7            MR. FAZEL:  Well, there are two IRS agents.

8            THE COURT:  IRS agent what?  Gogley?

9            MR. FAZEL:  Gogley.

11:29:34  10           MR. PEREZ:  G-o-g-l-e-y, Your Honor.

11           THE COURT:  G-o-g --

12           MR. FAZEL:  l-e-y, Your Honor.

13           THE COURT:  -- l-e-y.

14           MR. FAZEL:  No, it's Gogley.

11:29:43  15           THE COURT:  Yes.  One or the other.

16           MR. MAGLIOLO:  I might tell the Court, because of

17  our time constraints I expect to develop, it may not be a

18  problem.

19           THE COURT:  Absolutely.

11:29:53  20           MR. MAGLIOLO:  If they --

21           THE COURT:  Next one.  Witness's opinion

22  regarding the accused's intent or knowledge.

23           MR. FAZEL:  That is pretty -- I think the law is

24  clear on that.  I just want to make sure that we have that

11:30:04  25  in place so that no agent accidentally says that.

*Laura Wells, CRR, RDR*

Hearing on Motions                                Vol 1 - Page 56

1          THE COURT:  Well --

2          MR. MAGLIOLO:  That's -- if he -- if his

3    complaint is going to be a witness who would say

4    whether --

11:30:18   5          THE COURT:  She knew.

6          MR. MAGLIOLO:  -- she knew, unless that witness

7    had direct contact with her and had a conversation about

8    it, there has to be a reason they believe she knew.

9          THE COURT:  That's pretty -- that's pretty clear

11:30:30  10   if it's speculation.

11         MR. MAGLIOLO:  Yes, Your Honor.

12         THE COURT:  All right.  I'm going to -- I'm

13   circling "if speculation."

14         MR. MAGLIOLO:  Yes, Your Honor.

11:30:40  15        THE COURT:  Guilt assuming a hypothetical.  No

16   problem with that?

17         MR. PEREZ:  No.

18         MR. MAGLIOLO:  No, Your Honor.

19         THE COURT:  Those are granted.  What is the role

11:30:47  20   of the YMCA in this case?

21         MR. MAGLIOLO:  The YMCA is what they call an NGO,

22   non-governmental organization; and they are designated by

23   the Victims Protection Act to take care of the victims in

24   some way, to protect them.  And they will give them a

11:31:07  25   shelter.  They will give them medical attention.  They

```
 1   will give them --

 2           MR. FAZEL:  Education.

 3           MR. MAGLIOLO:  -- sometimes food, sometimes to

 4   help them get some status in the United States.

 5       The purpose of that witness is we think counsel may

 6   try to intimate to the jury that somehow we are doing all

 7   these things to endear ourselves to the victim so they

 8   will testify the way we want.

 9       In fact, the YMCA person will testify that that is the

10   law, it is required to be done, and it pretty much has

11   nothing to do with the government.

12           THE COURT:  All right.  I'll listen to it as it

13   comes and if you have any objection at that time.

14       What about exhibits?

15           MR. FAZEL:  Your Honor, there is --

16           THE COURT:  Well, I'm just looking at objections

17   to exhibits under Criminal Rule 55.2.B.  All right.

18           MR. FAZEL:  The government --

19           THE COURT:  And authentication under 55.2.A of

20   the local rules.

21           MR. FAZEL:  The parties have gone through the --

22   we had a phone conference about that.  We have agreed that

23   they do not need to bring in the bank folks to

24   authenticate, in other words, the bank records.  We have

25   agreed to do that so they don't have to bring in the
```

11:31:16
11:31:32
11:31:43
11:31:57
11:32:11

*Laura Wells, CRR, RDR*

1    custodian of records for that.

2        We have agreed that they do not have to bring in the

3    custodian of records for Harris County -- I'm sorry.

4    Harris County.  We have also agreed to some other exhibits

11:32:23    5    as to foundation, and I think they are ready to present

6    that to the Court.

7            MR. PEREZ:  Your Honor, this is the latest

8    exhibit list we have, Your Honor.

9            THE COURT:  All right.  Well, what about it?

11:32:34    10            MR. FAZEL:  Well, Ms. Stoelker, can I have the

11    one we went over?

12            MS. STOELKER:  This is the one we went over.

13            MR. FAZEL:  Your Honor, I don't know what is in

14    the latest version; but we did go over with them last week

11:32:52    15    -- and I mean --

16            THE COURT:  How many exhibits do you have here?

17            MR. PEREZ:  Quite a lot, Your Honor.

18            THE COURT:  What?

19            MR. PEREZ:  Quite a lot, Your Honor.

11:33:08    20            MR. FAZEL:  We have had three or four renditions

21    of their exhibit list, Your Honor.

22            MR. PEREZ:  Well, Your Honor -- in all fairness,

23    Your Honor, we have been trying to work together so we can

24    have a final list; and this is the final list.

11:33:18    25            THE COURT:  All I'm looking at is the local

1    rules, Rule 55 of our criminal local rules, 2.A and 2.B.

2    You have agreed on much of them.

3         Do you have any objections, specific screaming

4    objections to any one?

11:33:32   5         MR. FAZEL:  Your Honor, I guess the way I would

6    answer that is that we have agreements as to what I have

7    just outlined.

8         Anything regarding the Harris County documents

9    involving anything they've pulled from Harris County, they

11:33:43  10    don't need to bring authentication.

11         Anything regarding the banks, both Bank of America and

12    Chase, which is a lot, they don't have to bring

13    authentication.

14         THE COURT:  You object to everything else?

11:33:54  15         MR. FAZEL:  Yes.

16         MR. MAGLIOLO:  If it please the Court --

17         THE COURT:  When were they filed?  When were your

18    objections filed pursuant to our local rules?

19         MR. FAZEL:  I did not file them.  I spoke to the

11:34:04  20    parties about them last week.

21         THE COURT:  All right.

22         MR. MAGLIOLO:  We were wondering -- and we --

23    both sides have been working diligently together on this,

24    Your Honor.  So we perfectly understand and understand why

11:34:18  25    perhaps we are taking a little leeway with the local rule;

1  but we only have a couple of things we would like to

2  address with the Court, just so the Court will be ready

3  for the objection and the government's response and will

4  perhaps help us speed through this.

11:34:31  5       THE COURT:  That's all done in advance.

6       MR. MAGLIOLO:  That's what I'm asking.

7       THE COURT:  I mean, in federal court that's why

8  you have those objections seven days before trial

9  according to our local rules.

11:34:41  10      MR. MAGLIOLO:  Yes, Your Honor.  Counsel has been

11 -- is not going to object to, basically, anything that has

12 a certification, anything from Harris County.

13      THE COURT:  Well, everything -- he is objecting

14 to everything else.

11:34:52  15      MR. MAGLIOLO:  Yes, Your Honor.  I want to

16 address a couple of things he is objecting to.  Perhaps we

17 could get --

18      THE COURT:  Generically, anyhow.

19      MR. MAGLIOLO:  Yes, Your Honor.

11:35:00  20      THE COURT:  What as a group is he objecting to?

21      MR. MAGLIOLO:  Well, he is objecting to -- to

22 find records of property we go to various property

23 websites that are put on by the -- that are sponsored by

24 the state, the people that are in charge of recording

11:35:15  25 these things.  We have several of those documents counsel

1    is going to -- is objecting to.

2              THE COURT:  How do you get them in?

3              MR. MAGLIOLO:  It would be 14 and 15.

4              THE COURT:  No.  How do you get them in?

11:35:29   5      MR. MAGLIOLO:  Oh, the exceptions to the hearsay

6    rule.  14 is records of documents that affect an interest

7    in property; and 15, statements and documents that affect

8    an interest in property.

9         Additionally, we would get it in by the final hearsay

11:35:45  10   catchall rule basically anything --

11             THE COURT:  Well, anything, is that number 26?

12             MR. MAGLIOLO:  Yes, Your Honor.

13             THE COURT:  That's the one where if it's

14   technically hearsay if you provide it a certain number of

11:35:55  15   days in advance?  Isn't that the one, 26?

16             MR. MAGLIOLO:  Well, there is the one that says,

17   basically, if something has a significant indicia of

18   reliability that the Court has the prerogative to let it

19   in.

11:36:07  20        These are put on by government websites.  These show

21   the transfer of property, shows when one person buys it,

22   when another one sells it, when it's moved in their name;

23   and we believe there is sufficient indicia of reliability,

24   Your Honor, that these would be exceptions to the hearsay

11:36:24  25   rule based on, again, 14, 15 and then the eventual

*Laura Wells, CRR, RDR*

1  catchall that says if there is sufficient indicia of

2  reliability.

3      MR. FAZEL:  Your Honor, as far as the property

4  records are concerned, what I'm concerned about is there

11:36:38  5  was some talk about -- and I don't know if they decided

6  not to do it.  I think they did.  There were some records

7  from the title company regarding the chain of custody and

8  the title chain.  I absolutely object to that.  I don't

9  think that has anything to do with any of the rules he has

11:36:51  10  mentioned.

11      MR. MAGLIOLO:  Again, it's property rules; and it

12  is property transfers and sufficient indicia of

13  reliability, Your Honor.  I would say that millions and

14  billions of dollars worth of property move around based on

11:37:05  15  title change and title companies.

16      THE COURT:  Look.  Yeah.  But if it's raised

17  which specific other -- what is it -- other indicia?

18  Which rule is that?

19      MR. MAGLIOLO:  It's 803 and then 14 and 15 under

11:37:24  20  803, Your Honor, regarding whether or not the declarant is

21  available as a witness.  And it has to do a lot with

22  property, property transfers and property and who owns

23  what property.

24      THE COURT:  No, the other one.  The one that has

11:37:41  25  other indications -- indicia of validity.

                    1          MR. MAGLIOLO:  Oh, that is -- I think it's --

                    2          MR. FAZEL:  I mean, the Court -- I'm telling you

                    3   we're agreeing to a lot of these warranty deeds and so

                    4   forth on the list.

11:38:02            5          MR. MAGLIOLO:  Your Honor, all they are agreeing

                    6   to is what we have certifications on.

                    7          THE COURT:  Which rule?  I'm looking at them.

                    8          MR. MAGLIOLO:  Specifically 807, Your Honor, I

                    9   believe.

11:38:11           10          THE COURT:  That's 807 now, right?

                   11          MR. MAGLIOLO:  Yes, Your Honor.

                   12          THE COURT:  All right.  What I'm going to do is

                   13   this:  Everything you have agreed on as officers of the

                   14   Court is admitted into evidence on both sides.

11:38:24           15          MR. FAZEL:  Yes, sir.

                   16          THE COURT:  As to everything that you haven't,

                   17   I'm going to reserve ruling, just like I did in criminal

                   18   cases, in that I am initially admitting them into

                   19   evidence.  I say initially.  However, subject to the

11:38:39           20   following:

                   21      Number one, if it's identified in trial and it's not

                   22   objected to by one side or the other, it's then

                   23   automatically admitted into evidence.  That's why I'm

                   24   saying everything you have identified.  You don't have any

11:38:56           25   documents at this time, right, exhibits or do you?

                              *Laura Wells, CRR, RDR*

1          MR. FAZEL:  Not at this time, no.

2          THE COURT:  At this time.  So all of the -- all

3  of the government's documents that you have agreed on as

4  far as custodians and so forth are admitted into evidence.

11:39:10   5  Everything else you have on the list is conditionally

6  admitted into evidence.  Meaning that when you call it up

7  and you identify it and you show it to a witness, if I

8  hear no objection by the defense, it's in evidence.  If I

9  hear an objection, I stop; and we rule on it just like you

11:39:29  10  do in state court.

11          MR. MAGLIOLO:  Yes, Your Honor.

12          THE COURT:  All right.  What is next?

13      I think we have covered it.  Think about it.  I'm sure

14  you'll think -- let's talk about how I select a jury.  And

11:39:39  15  then, we'll get back to any kind of a catchall that you

16  have got.

17          MR. FAZEL:  There is a 404(b) still outstanding,

18  Your Honor, as to the prior of the defendant.  And then,

19  the timeline issue.

11:39:49  20          THE COURT:  Oh, yeah.  I'll rule on that one.

21  I'll rule that the timeline -- at this time the defense's

22  objection is overruled as to the sheriff's officer stating

23  his background, where he got the information, how he got

24  the information; and for that purpose only I will let him

11:40:07  25  discuss that timeline.  If it's going to come in through

1    anybody else, it's not coming into evidence; and you may

2    be able to use that in summation.  But that's it for right

3    now.

4            MR. MAGLIOLO:  Thank you, Your Honor.

11:40:18    5            THE COURT:  All right.  Now, what exhibit

6    number is that, by the way?

7            MR. MAGLIOLO:  It is exhibit number -- right now

8    -- A, Your Honor.

9            THE COURT:  A or 8?

11:40:29   10            MR. MAGLIOLO:  A.

11            THE COURT:  A, like in Alfred?

12            MR. MAGLIOLO:  Yes, Your Honor.

13            THE COURT:  Okay.

14            MR. FAZEL:  Your Honor, so I'm clear on the

11:40:35   15    record and I can make my record clear, if it pleases the

16    Court, my objection is not only to the timeline but the

17    documents and the statements in the timeline, including

18    the fact that, for example, the timeline says things like

19    Tencha that is --

11:40:47   20            THE COURT:  That what?

21            MR. FAZEL:  "Tencha," which is one of the names

22    that they claim the defendant used, "deferred adjudication

23    ends."  So, in other words, they are putting on the

24    timeline that she was put on deferred adjudication by the

11:41:00   25    State of Texas.  So I object to that.

*Laura Wells, CRR, RDR*

1        And then, also, they have got statements like "minors

2    escape" and so forth.  I object to those statements, as

3    well.  I understand the Court's ruling.  I just want to

4    make my objection clear.

11:41:11   5        MR. MAGLIOLO:  Those will be all testified to by

6    the person involved in it.

7        THE COURT:  All right.  As long as it's testified

8    to.  Otherwise, you have got a problem with it.

9        MR. MAGLIOLO:  Yes, Your Honor.

11:41:19   10        THE COURT:  As long as it's backed up.  Okay.

11    And your objection is duly noted.

12        MR. FAZEL:  Thank you.

13        MR. MAGLIOLO:  That leads us to counsel was

14    objecting to the defendant's prior, which would have

11:41:29   15    something to do --

16        THE COURT:  The defendant's prior?  This

17    defendant's prior?

18        MR. MAGLIOLO:  Yes, this defendant's prior, Your

19    Honor.

11:41:32   20        THE COURT:  Okay.  How do you get that in?

21        MR. MAGLIOLO:  The government would cite to the

22    Court *Blocker* --

23        THE COURT:  No.  Just tell me.  What rule, first

24    of all?

11:41:41   25        MR. MAGLIOLO:  Let's see.

*Laura Wells, CRR, RDR*

1           THE COURT:  How do you get it in?

2           MR. MAGLIOLO:  It's 404(b), Your Honor.

3           THE COURT:  All right.  Who is going to testify

4  to that fact?

11:41:48    5           MR. MAGLIOLO:  Actually, the case agent would.

6  He has access to the county records as a county police

7  officer --

8           THE COURT:  What is the former conviction for?

9           MR. MAGLIOLO:  Prostitution, Your Honor.  It's an

11:42:01   10  organized crime, prostitution case out of the same club,

11  same location, involving many of the same people.  And

12  again, that goes to knowledge, intent, lack of mistake.

13           THE COURT:  All right.  I'm going to sustain the

14  objection at this point.  I don't have -- I want to look

11:42:22   15  at case law.

16      Mr. Fazel, I understand your position.  You may feel

17  strongly about this one.  Let me have your best cases

18  highlighted on that.  But right now it's a motion in

19  limine not to go into that until I have ruled on that.

11:42:32   20           MR. MAGLIOLO:  Yes, Your Honor.

21           THE COURT:  I understand that.  As to her priors,

22  nothing until you hear it from me.

23           MR. MAGLIOLO:  We will block it on the chart.

24           THE COURT:  Please.  Absolutely.

11:42:42   25           MR. MAGLIOLO:  May I present a case to the Court?

*Laura Wells, CRR, RDR*

Hearing on Motions                           Vol 1 - Page 68

```
        1         THE COURT:  If you have got one.  Just hand it
        2    up.  I'm not looking at it now.  We don't have the time.
        3    That's why I say we've got plenty of time to look at it.
        4         MR. MAGLIOLO:  The United States v. Blocker, Your
11:42:55 5    Honor.
        6         THE COURT:  Is this Blocker, the whole case?
        7         MR. MAGLIOLO:  Yes, Your Honor.  But the
        8    highlighted --
        9         THE COURT:  What is the citation on it?  It looks
11:43:01 10   like it's a published opinion.
       11         MR. MAGLIOLO:  It is, Your Honor.
       12         THE COURT:  What is the -- what is the citation
       13   on it?  I mean, if it's in the books, we can pull it up
       14   off the computer.
11:43:11 15        MR. MAGLIOLO:  I would have to look at the
       16   document, but it gives -- the front page is there, Your
       17   Honor.  The entire case is there.  The front page shows
       18   the court number and everything.
       19         THE COURT:  Huh?  No.  I'm saying it shows here
11:43:25 20   it is a published opinion.  It's not an unpublished
       21   opinion.  Meanwhile, it should be in the books somewhere.
       22   Have you got a cite on it?
       23         MR. FAZEL:  No, Your Honor.  I'm looking for it.
       24         THE COURT:  Okay.  We'll keep it.
11:43:39 25        Ellen, just keep it with the records here.
```

1    We'll keep it.  We'll call it up on the machine, and I

2    can run it off on West or whatever they call it now.

3         All right.  Let's go.  You heard about my dates for

4    trial.  I'm dead serious I will put a timing order if it

11:43:58   5    gets too long.  Go quick, to the point, one after another;

6    and the same thing on the cross.  Let's see.

7         All right.  The juror questionnaires will be up here.

8    I think Judge Werlein ordered something like 45 jurors or

9    something like that.

11:44:18   10              CASE MANAGER:  Yes, sir.

11              THE COURT:  45.  They will be up here at 1:00.

12              CASE MANAGER:  12:30.

13              THE COURT:  What?

14              CASE MANAGER:  12:30.

11:44:23   15              THE COURT:  The questionnaires will be here at

16    12:30.  The jury will be here at 1:00.  In a criminal case

17    I have decided in this case there are -- there are

18    jurisdictions.  I just did this in Arizona about a year

19    ago.  They do this as a matter of course.  Let me ask:

11:44:41   20    Anybody have a problem with a blind draw where you can get

21    everybody's 14, fully-qualified jurors; and at the end of

22    the trial, two names are drawn at random?  Any objection?

23              MR. MAGLIOLO:  No, Your Honor.

24              THE COURT:  Any objection?

11:44:50   25              MR. FAZEL:  (Shaking head side to side.)

1          THE COURT:  Yes or no on the record?

2          MR. FAZEL:  No.  I'm sorry, Your Honor.  No

3    objection.

4          THE COURT:  I thought it was really unique until I

11:44:58    5    got around there.  Apparently it is as a matter of course

6    in some districts.  All right.

7          So your initial strikes.  Initially -- let's see.  So

8    it's initially number 32, right, Ellen?

9          CASE MANAGER:  Yes, sir.

11:45:13   10          THE COURT:  Initially number 32 is in the panel.

11    The defense will have 11 strikes, and the government will

12    have seven strikes.  You can go up and down all over 32.

13    You don't have to reserve your last strike to the last

14    four people, which is the old way of doing it.  In other

11:45:29   15    words, the alternate way of doing it.  All right.  Let's

16    see.

17          Opening statement.  With me, as you know, an opening

18    statement is nothing more -- oh, yeah.  Additional

19    strikes.  I think you know that when I'm all done that if

11:45:45   20    we have any jurors left over and an even number -- let's

21    say if we have 32.  All right?  With 32 and we disqualify

22    eight.  All right.  That means number 40 is in the panel.

23    So you have got five jurors left.  All right.  The even

24    number there is four.  I'll offer each of you two more

11:46:07   25    strikes, if you want.  That's strictly up to you at the

          1    end.  Okay.  If we have any jurors leftover who could in

          2    effect be in the panel with an even number of strikes,

          3    I'll ask you if you want anymore strikes.

          4         You need not ask permission to approach a witness in

11:46:24  5    my court.  You have got full range of the courtroom.  So

          6    you don't have to do that.  When you examine a witness,

          7    you can sit like you do in state court.  No problem.  You

          8    can stand at your place, stand dead center, put the podium

          9    here, put the podium at the end of the jury box.  It

11:46:39 10    doesn't matter to me.  Each of you can do it differently.

         11         The only thing I need to discuss with you now is the

         12    -- what is it -- opening statement.  How much time does

         13    the government want for an opening statement?

         14              MR. PEREZ:  15 minutes, Your Honor.

11:46:55 15              THE COURT:  How about the defense?

         16              MR. FAZEL:  15.

         17              THE COURT:  All right.  15 is fine.  All right.

         18    Thanks for working with me on this.

         19         Oh, you've got another one, Mr. Magliolo.  Can't get

11:47:04 20    out of here.  Go on.

         21              MR. MAGLIOLO:  Yes, Your Honor.  Co-conspirator

         22    statements, we're going to expect to go into that.  It's

         23    an exception to the hearsay rule.  Obviously, the Court

         24    knows how there has to be a conspiracy before the Court

11:47:15 25    can take it into consideration.

                              *Laura Wells, CRR, RDR*

1          THE COURT:  Hold it a second.  You know, the

2     *James* case is no longer in the law.  That *Bourjaily* case,

3     what, 25 years ago did away with it, right?

4          MR. MAGLIOLO:  Yes, sir.

11:47:28    5          THE COURT:  So I don't have to go through that.

6     What else?

7          MR. MAGLIOLO:  That's it.

8          THE COURT:  I'm fully up to speed.

9        Mr. Fazel, are you up to speed on that?

11:47:36   10          MR. FAZEL:  I think so.  I think I have got it

11    covered.

12          MR. PEREZ:  Your Honor, I know the Court said

13    don't go into the defendant's prior conviction.

14          THE COURT:  That's correct.

11:47:43   15          MR. PEREZ:  I understand, Your Honor.  She was

16    also prior -- you know, obviously, she was arrested.

17    Should we stay away from the arrest?

18          THE COURT:  All of it.  All of it.

19          MR. PEREZ:  Okay.  I just wanted to make sure.

11:47:50   20          THE COURT:  I have been that route many times.

21    We all have.  But if you feel strongly that you need it

22    in, take a look to see whether you need it in.  You may

23    not need it in.  It may pollute up the case where you

24    don't need it.  That's what I'm saying.

11:48:04   25          MR. MAGLIOLO:  The case we presented to the

*Laura Wells, CRR, RDR*

1  Court, I think, makes it clear it's admissible, Your

2  Honor.  And it is important.

3          THE COURT:  That doesn't mean I'm going to admit

4  it.  Okay.  I understand where we are at.  Okay.  I

11:48:12  5  understand where we are at.

6          MR. MAGLIOLO:  Yes, sir.

7          THE COURT:  I'm in no rush.  I'm looking for your

8  time.  Not for mine.  There is a lot you have to do.  I

9  have to go through all those juror forms and I have to

11:48:22  10  work up the questions you have and the -- how we're going

11  to have accomplice testimony.  All right.  That's about

12  it.  I don't have much of a lunch hour.  All right.

13      Anything else you want to talk about now?

14          MR. MAGLIOLO:  No, Your Honor.  Thank you.

11:48:38  15          MR. PEREZ:  We will pick a jury, do opening

16  statement, and are we going to put on evidence today?

17          THE COURT:  Absolutely, if we can.  Get right

18  into it.  Tomorrow morning -- the only thing for today is

19  that tomorrow morning, tomorrow, on Tuesday, we get

11:48:50  20  underway at 11:30 instead of 10:00 a.m.  I go to work from

21  10:00 to 6:00 generally.  Tomorrow we get underway at

22  11:30 and go to 6:00.  I have knocked out some luncheon

23  appointment I have.  On Friday we may have to adjourn a

24  little bit earlier on Friday.

11:49:08  25      If we get into next week, I will tell you next week,

Voir Dire By The Court                    Vol 1 - Page 74

1    next Tuesday we're not getting underway until 1:30.  I had

2    to move a lot of things around, but I have cleared up a

3    half a day.  That's a week from tomorrow.

4        Ellen, I think that's the only thing, isn't it?

11:49:23  5           CASE MANAGER:  Yes, sir.

6           THE COURT:  I'll let you know.  I'll let the jury

7    know as we go along.  I'm going to tell the jury that this

8    case will take this week, probably into next week.  We'll

9    move it as fast as we can and see if that smokes them out.

11:49:37  10  I don't want to get a run on the panel.

11       All right.  Just glad to be of assistance, and I know

12   you are thrilled to be here.

13       Just ask them and they will tell you, right, Ellen?

14           CASE MANAGER:  Yes, sir.

11:49:50  15          THE COURT:  But at least we need to get it done.

16   The case needs to be tried.  You get your people.  You

17   have got your own schedule.  You have got witnesses you

18   have got to deal with.  And the system didn't think

19   another week or so of delay would be of assistance.  So on

11:50:07  20  Saturday I agreed to take it, and thank you for working

21   with me on it.  All right.  Thank you.  Then unless we

22   hear otherwise, I'll see you back at 1:00.

23       (Recess from 11:50 to 1:33.)

24       (Prospective jurors seated.)

01:33:31  25          THE COURT:  Thank you.  You can be seated.  That

*Laura Wells, CRR, RDR*

1    was loud enough to wake everybody up.  Let's see.

2        Good afternoon, ladies and gentlemen.  I'm David

3    Hittner.  I'm one of the Judges of the U.S. District Court

4    for the Southern District of Texas.  I'd like to welcome

01:33:52   5    you to the next stop on your jury selection process.

6        Voir dire is a French term meaning to speak the truth

7    or, basically, it is to tell the truth, to speak the

8    truth.  It's some translation close to that.  Basically,

9    what it is is the opportunity that -- in this case --

01:34:10  10    sometimes the lawyers but in this situation that I'll have

11    to visit with you about the case and if there is any

12    questions.  There are no right answers or wrong answers.

13    We'll visit with you later, if we have to.

14        I think the easiest thing to do is get all my papers

01:34:29  15    here together, and I'm going to come down there and visit

16    with you down there.  I think it's a lot easier for me.

17    But we have -- you notice there is a lot of technology.

18    There really is in this courtroom.  This was not an

19    original courtroom.  It was built after the main building

01:34:47  20    was built.

21        But, oh, about two years ago I had a case that went a

22    real long period of time, the *Stanford* financial fraud

23    case; and I did it right here.  And they re-did this whole

24    courtroom.

01:35:03  25        So if you get a chance, they have huge courtrooms

*Laura Wells, CRR, RDR*

01:35:20

1  upstairs. The ones upstairs were the ones that were
2  originally built in the building. They are something like
3  three times as wide and four times as deep. I'm going to
4  put -- I'm going to put, what do you call it, a lapel mic
5  on.

6      Ellen, have you got that? Are you putting a new
7  battery in? That's always -- is it on? I'm going to
8  visit, now that I have got your jury information forms.
9  This is always the biggest challenge to get this correct.
01:35:47  10  Now, the biggest challenge right now, believe it or not,
11  the judge's robe has a pocket in it. And it's a hidden
12  pocket so it looks cool. So I am going to fish around and
13  find which crease it's really in. There it is. All
14  right. I'm going to come on down.

01:36:05  15      We're going to visit a little bit about this case and
16  get ourselves a jury and get right underway. Okay. Let's
17  see.

18      I don't think -- did I turn it off? Ellen, I guess I
19  turned it off. Oh, it's higher up. I'm getting needled
01:36:39  20  from back there. No, it's not working. Oh, all right.
21  Now I will quietly put this back in here. It's a big
22  challenge. Make a big deal out of this. All right.

23      If it's a court official, someone can sit up front or
24  sit right back here in this corner. We've always got
01:37:13  25  room.

1       All right.  Away we go.  First of all, when I first

2   got down here -- I have been down here -- gosh, I have

3   been on the federal side for 29 years.  I was an elected

4   state judge for seven and a half years.  The first thing I

01:37:30   5   did when I got in here, this is the courtroom that all the

6   junior judges start in.  And then, they quickly move as

7   quick as they can off the 8th floor.

8       But I've stayed here the whole time because every time

9   people moved off a floor, I was snatching office space.

01:37:45   10   And because of the smaller courtroom, I guess I'm still

11   within what is the design code for federal judges; but it

12   goes -- I have a bigger office space than the chief judge.

13   It goes across the back, all the way down the whole side

14   of the building and even behind -- right behind the bench.

01:38:04   15   Of course, the jury room is over in the corner.  So I've

16   just elected never to move.

17       But everybody says -- jurors always ask, what are you

18   going to do about that darn pole?  Well, when I first got

19   down here, I was told that federal judges can do most

01:38:17   20   whatever they want.  So, I got the district clerk; and I

21   said, "Jesse, would you look into me getting rid of this

22   pole?"

23       He said, "Okay."

24       He had some engineering studies done.  Some of you, I

01:38:28   25   know, are engineers.  They said it would take about

*Laura Wells, CRR, RDR*

01:38:45

1    $250,000 to get rid of that pole if they put big steel
2    girders like they did on bridges across here.  They still
3    couldn't guarantee that it would hold up the 8th floor.
4    This is a weight-bearing pole for the whole building.  So
5    I have left it there.  That's why when we select the jury,
6    I always do it on my own sideline.

7         But it's an interesting case that we're coming to.  I
8    just want to visit with you about it.

9         Nothing is 100 percent.  So I say 99 percent of the
01:39:00
10   folks that have served on juries during the years that I
11   have been judging have found it to be a very positive
12   experience.

13        I did serve on a jury myself and called to jury
14   service a number of times.  If you'll look to the corner
01:39:14
15   of the jury box, those are my juror badges up there.  I
16   served once as a state judge for a week and a half on a
17   state court jury.  And I have been to -- let's see.  One
18   of them is for justice of the peace court, and the other
19   is for Houston city traffic court.  So -- well, we all go
01:39:33
20   to jury service.

21        Although, when I got down to jury service with the,
22   what is it, the city, they thought it was such a
23   revelation that a judge was down there, they followed me
24   around with a camera the whole day through the hallway.
01:39:48
25   In federal court they don't allow it.  In state court they

1    did at one time.  She had windows in the back of the

2    courtroom right where the marshals are standing.  Right

3    behind them would be windows in the state court system.

4         Anyhow, we also have -- we have had a lot of people.

01:40:04  5    No matter what we do for a living, everybody serves on the

6    jury.  The system could not operate.  The system couldn't

7    operate without all you folks actually coming here.

8         We had a second grade teacher years ago -- I have it

9    written down here -- from the Katy Independent School

01:40:20  10   District.  She served about a week and a half on a case.

11   And you'll notice that white document in that frame right

12   close to the jury room door.  I blew it up.  It was a card

13   sent to me by her class.  Each of the children drew their

14   own stick figure, and they had their own name underneath

01:40:39  15   it.  And what is written on there -- if you get on the

16   jury, you can take a closer look.

17        It says this, it says, "Dear Mr. Judge, please let my

18   teacher come back to school soon.  We really do miss her."

19        I said okay.  And she eventually came back.  I guess

01:40:56  20   they thought she was going to the jailhouse or something.

21   She came back to them.

22        This -- going back to your high school and your

23   college courses, the U.S. District Court is the highest

24   level of trial court in the federal system.  I'd say below

01:41:14  25   but ancillary to this court, you have got the United

01:41:35

 1  States magistrate judges and their courts.  You have the

 2  U.S. Bankruptcy Court.  You have got the -- many of the

 3  federal agencies like the Social Security Administration,

 4  the Veteran's Administration, even the Department of

 5  Engineering and, what is it, the Department of Science and

 6  Engineering.

 7      In any event, all of those different branches of

 8  government have their own sort of administrative hearings.

 9  So you have to appeal things up through it.  For instance,

01:41:49

10  the Social Security Administration, if somebody applies

11  and they turn him or her down, you will appeal it up

12  through that system.  When it gets through there, you can

13  then appeal it to the one judge federal court.

14      So I sit, actually, as an appeals judge on some

01:42:06

15  magistrate work, magistrate cases, bankruptcy and

16  administrative.

17      But this is the last stop when you are dealing with

18  juries in the box.  It's the United States District Court.

19      If you move up the line, so to speak, the next thing

01:42:19

20  is the court of appeals.  If you want to take a case from

21  this court, civil or criminal, to the court of appeals you

22  can appeal it to the United States Court of Appeals for

23  the Fifth Circuit.  The country is divided into 12

24  appellate circuits.  We're in the Fifth Circuit.  The

01:42:36

25  Fifth Circuit takes in the states of Texas, Louisiana and

Voir Dire by The Court                    Vol 1 - Page 81

1    Mississippi.

2        So any appeals from any of these federal courts end up

3    at the Fifth Circuit.  The headquarters is in New Orleans,

4    but the judges live in all three states.  In fact, right

01:42:53    5    here in this building we have about seven or eight circuit

6    judges.  They just gather together from the three states

7    about once every six weeks in New Orleans, hear a bunch of

8    cases; and they fly back to their own city.

9        They don't hear any testimony.  They sit in panels of

01:43:09    10   three.  They hear the appeal.  They read the file.  You

11   know, we have got an official court reporter.  They read

12   the transcript.  They read the briefs of the attorneys and

13   then hear -- if you have an oral hearing, you have 20

14   minutes a side.  That's all.  Then the judges go back in,

01:43:27    15   and they visit.  And then they decide how they are going

16   to rule on the case.

17       I sat on the Fifth Circuit.  Gosh, it's been about 25

18   or 26 years ago.  Every once in a while they will call a

19   district judge up to fill in a three judge panel if they

01:43:43    20   get overloaded or somebody is ill or whatever.

21       So it was interesting.  I sat on five cases.  I

22   actually wrote two opinions for the circuit court, but I

23   have never accepted even a temporary assignment since.  I

24   prefer the trial work, you know, dealing with the folks,

01:44:01    25   the jurors and the litigants and the lawyers and the, you

Voir Dire by The Court                        Vol I - Page 82

 1    know, jury deliberations and all of that and to do the

 2    best you can and send it to the court of appeals.

 3         And, heck, you know, if they reverse you, they send it

 4    back; and I'll do just what I'm told.  But I have never

01:44:18    5    had a yearning, either temporarily or permanently, to sit

 6    on the appeals court.  All of us have had some

 7    opportunities, at least, to apply; but I have never had an

 8    interest in that.

 9         Let me talk to you about the workday.  I have had a

01:44:34    10    unique workday since I have been in state court.  We begin

11    at 10:00 in the morning.  We adjourn at 6:00 in the

12    evening.  That allows you to come in after the rush hour

13    and to leave after the rush hour, and I still get a full

14    day in.

01:44:47    15         You are going to find that, when I tell you about the

16    length of the case, we have some time off, meaning a half

17    a day here, a half a day there.  I will tell you why the

18    schedule is a bit chopped up after the case is over.  If

19    you are on the jury, I will tell you after you go into

01:45:08    20    deliberations.  I come in and visit with every jury for

21    about an hour just to fill you in on what went on behind

22    the scenes.

23         What is it?  Oh, let's talk about the duration of this

24    trial.  Okay.  The duration of the trial can last any

01:45:25    25    length of time.  In fact, in the 1990's I had the three

*Laura Wells, CRR, RDR*

1    city hall bribery trials that lasted three and a half, two

2    and a half and then two months.

3         Again, I had the *Stanford* case, which lasted about

4    two-plus months.

01:45:42    5    One of my colleagues, Judge Werlein, a few years ago

6    had a case go five months even though it was scheduled for

7    seven.

8         And the IBM litigation actually in New York City about

9    40 or 45 years ago lasted one year with the same federal

01:45:57    10   jury.

11        I will tell you this:  If you are selected to serve on

12   this jury, even as compared to other cases that may be

13   floating around this building, it will be an extremely

14   short case for federal court.  It probably will last this

01:46:11    15   week, perhaps a bit into the next week.  But, in any

16   event, it's an extremely short case for federal jury duty.

17        In fact, you know, there is a lot the state -- in the

18   newspaper about the state system and the grand jury

19   system.  I think some of you may have read about that.

01:46:30    20   The federal system works that you can come up like this to

21   a trial.  You think it's a trial.  But you could end up on

22   grand jury service for up to 18 months.  It is just

23   different.  Not necessarily better but the systems are a

24   little bit different.

01:46:48    25   All right.  We have all seen TV trials.  Some of them

1    are live TV.  Of course, you have got Judge Judy, you

2    know.  I lecture.  I give lectures.  I've talked to a

3    kindergarten or first grade class.  One kid one time I

4    told him how important the work was, and he wanted to know

5    was I as important as Judge Judy.  I said no.  But, you

6    know -- oh, heck no.

7         Whatever business we are in -- I know we have people

8    with doctor's degrees and so forth on this panel.  No

9    matter what we do for a living, there is nothing like kids

10   to put you right back in shape no matter what you do for a

11   living.

12        My story is when my son was in the Cub Scouts, the

13   Tiger Cubs, which are the real small kiddos, we had a

14   Halloween party.  Each of the parents had to come dressed

15   as what they did for a living.  Okay.  My now ex-wife and

16   I both went.  She is a physician.  So she came with a

17   doctor's coat on.  And I came with this outfit and walking

18   around.

19        And one kid told -- George told me this later.  He

20   said one kid came up and said, "Boy, your daddy is really

21   cool.  He came dressed as a bat."  So, you know, what can

22   I tell you, right?

23        Another one was one of the -- I have two daughters and

24   one son.  One girl asked my daughter, she said, "Your

25   daddy wears a dress?"  I said, well, it's just the tools

1    of the trade that we work in, right?  It's the tools of

2    the trade.

3        Let's talk about this.  We're going to talk about

4    burden of proof.  You have all heard about burden of

01:48:24  5    proof, the two different kinds of, basically, burden of

6    proof.  And we're going to talk about two of them.  You

7    don't know if this is a civil case or a criminal case.

8    We're going to talk about that.  But let's talk about

9    burden of proof.

01:48:36  10       In a civil case the plaintiff -- that's the person who

11   brings the lawsuit -- must prove his or her case by a

12   preponderance of the credible evidence.  Now, what does

13   that mean?  Lawyers often explain to juries, for instance,

14   you take the scales of justice.  A very slight tipping and

01:48:58  15   that's a preponderance of the evidence.  Other lawyers, a

16   very effective one, if I ever go back out I might use

17   that, comes in with two reams of paper, you know, the big

18   thick reams, 500 pages.  He takes one page out of one ream

19   and puts it on the other.  He says, now, that's a

01:49:16  20   preponderance of the evidence.  Anything over an absolute

21   balance.

22       Now, if it's a criminal case, then the burden of proof

23   will be the government has to prove its case beyond a

24   reasonable doubt.  That's not beyond all doubt, beyond a

01:49:31  25   shadow of a doubt but beyond a reasonable doubt.  And if

01:49:48

1    it's a criminal case, you'll get instructions on how to

2    judge that.  Again, you picture the scales of justice.

3    It's a much heavier tipping of the scales by a

4    preponderance of the credible evidence.  If it's civil or

5    criminal, I'll visit with you about that in a moment.

6         Now, when I visit with you I'm going to be asking you

7    a number of questions.  No matter what we do for a living,

8    we all have our own ideas; but you may not know what the

9    law is.  In a case there is really two judges.  I'm one of

01:50:07  10    the judges and, literally, the jury is the other judge.

11    I'm the judge of the law.  You are the judge of the facts.

12    You decide the facts of the case, not me.  I'll tell you

13    what the law is in the final instructions and then you

14    plug the two together and you come to your decision.

01:50:27  15         The questions I have for you remember -- and I'll be

16    asking this over and over again as we get into individual

17    questions.  I'll bring up a subject, and maybe you have

18    got some background or experience in that area.  The

19    question is:  Would that -- would your mindset, coming

01:50:45  20    into this court of law, prohibit you from being fair and

21    impartial in this case without yet having heard any of the

22    evidence?  And there is the key.

23         It's that last phrase "without yet having heard any of

24    the evidence."  And that's what controls.  We all have our

01:51:04  25    different feelings.  But the question is can both sides

 1   get an equal start?  It's got to be an equal start.  Once

 2   the testimony comes, then you can change your mind and

 3   listen and so forth as it goes on.

 4       So would that prohibit you from being fair and

 5   impartial in this case without yet having heard any of the

 6   evidence?  And only you will know that, and I'm going to

 7   fill you in a little bit.

 8       All right.  This case is a criminal case.  Now, in

 9   federal court only the judge does the sentencing.  So if

10   you are selected on this jury, your job will be guilty or

11   not guilty.  That's strictly up to you.  Once you

12   determine that, then it's up to me.  And I will discuss

13   all of that with the jury, also, as to what the possible

14   penalties might be and so forth after you reach a verdict.

15   But that's the biggest difference between the state system

16   and the federal system.

17       Usually in the state system, unless they waive

18   sentencing by the jury, you come in; and if you find a

19   guilty verdict, you then come back in -- some of you have

20   been on a state jury -- and then you decide the penalty

21   phase.  It's called the penalty phase.

22       In federal court all of it is done by the judge except

23   in one instance.  That's in a capital murder case where

24   the death penalty is on the table.  That's certainly not

25   this case.  Okay.  That's the only exception to what I've

```
01:52:47

01:53:09
```

 1  told you.

 2       I'm going to read an agreed statement that the

 3  attorneys have consulted on this.  And this is what this

 4  case is about.  It is going to be a fascinating case.

 5  It's multi-faceted.  One thing that I have never tired of

 6  in this job, everything is different.  I mean, in civil

 7  cases I have learned to sandblast a bridge, what is it,

 8  dredge a canal.  I have had Ph.Ds in swimming pools, in

 9  bagging.  I have had a man who had a masters in bus

10  driving.

11       But, you know, when they come into the courthouse and

12  you have, for instance, someone slips on a swimming pool,

13  the coping on a swimming pool, a former football player,

14  and he breaks his back because there was no gripping

15  ability.  Then there was a person they found who had a

16  Ph.D in parks and recreation, and his thesis was on the

17  design of swimming pools.

18       The one in bagging was I had a gentleman -- it was one

19  of my first cases in state court.  It was loading a ship

20  in the hold of a ship down in Galveston.  And a rice bag

21  slipped off a sling, hit him in the head; and he was a

22  quadriplegic.  It was John Henry Johnston.  I'll never

23  forget him.  We had someone to come in who had a Ph.D who

24  was a professor of packaging -- of packaging at one of the

25  Michigan universities.  He had a Ph.D.  He taught all of

Voir Dire By The Court                          Vol 1 - Page 89

1    the theories of how you package, the coefficient of

2    friction.  There was a way you could spray something on

3    the rice bags so they wouldn't slip.  How to arrange the

4    sling.

01:54:15   5    And the one with the bus driving, well, the man -- a

6    woman, a teacher, had been killed on the premises of a

7    school by a school bus.  And the gentleman we had in as

8    the expert witness had a masters degree in, what is it, in

9    Metropolitan School District Administration with the

01:54:38   10   specialty on organizing the various bus aspects of it.  We

11   had the physics of it, how you saw -- looked in the mirror

12   and blind spots and how buses are supposed to gather on a

13   school ground.

14   So whatever we do for a living -- it's really true --

01:54:56   15   I have learned to appreciate that doing what I have done

16   over all these years.

17   With that as the basis, let me tell you what this case

18   is about.  The United States government is alleging in

19   Count 1 that the defendant is accused of being the

01:55:13   20   proprietor of a brothel that allowed prostitution.  She is

21   accused of conspiring with others to allow women to engage

22   in sexual acts for money at her brothel, knowing or

23   recklessly disregarding the fact that some of the women

24   were minors and were engaging in prostitution through

01:55:32   25   force, fraud or coercion or to have profited therefrom.

*Laura Wells, CRR, RDR*

01:55:50

01:56:10

01:56:33

01:56:50

01:57:06

1  That's one of the counts.

2      The other areas that you have to decide or

3  allegations -- they are only allegations -- the

4  government, the U.S. government is alleging that in

5  Count 2 the defendant conspired with others to knowingly

6  or recklessly disregard the fact that aliens had entered

7  the United States and that she concealed or tried to

8  conceal the aliens for the purposes of making money.

9      The next count, the United States government alleges

10 that in Counts 3 through 5 the defendant, assisted by

11 others, concealed the nature, ownership and control of the

12 money she made in the sex trafficking alleged in Count 1.

13     The final count, the government is alleging in Count 6

14 the defendant conspired with others to purchase cashier's

15 checks in the amounts of less than $10,000 in an effort to

16 avoid currency reporting requirements.  A number of these

17 can be classified generally as what you have heard of as

18 money laundering.

19     The defendant pleads not guilty to all of these

20 charges.

21     Now, I want to talk to you about a criminal case.  I

22 want to deal with the analogy of a traffic court case.

23 Hopefully, not you but someone you know may have been in

24 traffic court at some time.  That's a criminal court.

25 That's a criminal court.  What happens?

Voir Dire by The Court                    Vol 1 - Page 91

1       Well, first of all, you have got to show some basis.

2    The burden of proof is on the government, whether it's a

3    municipality.  Like it could be The Villages.  It could be

4    West University.  It could be the City of Houston,

01:57:25    5    Bellaire, Huntsville, what is it, College Station,

6    whatever it is on the traffic case.  All right.

7       The burden never shifts.  It never shifts to the

8    defendant.  It always remains on the government.  So what

9    does the government have to show?

01:57:42   10       Well, you come up or someone you know comes up and you

11   can sit there; and the government has got to prove its

12   case.  That's the burden.  That's the way the country is

13   organized, on traffic court and up in here as district

14   court.

01:57:58   15       Somebody has got to show that it's within the

16   boundaries of that city, that there was a stop sign up

17   there, that it was that individual behind the wheel and

18   that for no apparent reason they just drove through the

19   stop sign.  If you don't approve it, the case is

01:58:14   20   dismissed.  Of course, if the officer doesn't show up,

21   it's done sometimes.  Sometimes it's dismissed.  That's

22   not what we have here.

23       Let's talk about this burden of proof.  From the

24   founding of our republic going back to, I guess, based on

01:58:30   25   the English common law, an individual, citizen or

1    noncitizen for that matter, who comes into a court in the

2    United States is assumed to be innocent and the government

3    has the burden to prove the individual guilty beyond a

4    reasonable doubt.

01:58:46    5        Now just picture this -- not with you perhaps but with

6    someone else -- if someone is in a third-world country and

7    he or she is picked up on a charge, in some third-world

8    countries you are presumed to be guilty and you have got

9    to prove yourself innocent.  Well, that's never been the

01:59:05   10    level of proof in the United States since our founding.

11    But just picture that.  You are presumed to be guilty, and

12    you have got to prove yourself innocent.  No.

13        Now, the presumption of innocence never shifts.  So in

14    this case, the defendant's attorney doesn't even have to

01:59:24   15    ask one question.  I'm sure he will.  But in theory, he

16    doesn't have to.  Because in our -- in our constitutional

17    system it's all on the government to prove the defendant

18    guilty on each element of each count that they're

19    alleging.

01:59:41   20        Does anybody here have a problem with that in our

21    country?

22             PROSPECTIVE JURORS:  (No response.)

23             THE COURT:  All right.  No hands.  That's where

24    we are at.  Overly simplified?  Perhaps.  But that's the

01:59:51   25    rock-bottom thing that I'm sworn to uphold; and frankly,

1   you don't realize that until -- if you are not chosen

2   today, when you walk out or when you are on the jury, you

3   are an officer of the court subject -- you are an officer

4   of the court like myself, like my court staff and like the

02:00:08   5   attorneys when they take their oath and they come in.  And

6   we're all here to apply that, to apply that.  So you have

7   no requirement to testify.

8        Let's talk about an indictment, when you hear that,

9   well, the grand jury handed down the indictment against

02:00:25  10   the defendant.  Let me tell you what that is.  You could

11   be called up here like this.  23 of you could be on the

12   grand jury for 18 months.

13       What the grand jury does is they meet and they hear

14   only the government's side.  They hear only one side of

02:00:41  15   the case.  No questioning from defense counsel, no

16   defendant getting on the stand except a rare occasion

17   where they volunteer to do it.  But most defense attorneys

18   would say, no, stay out of the grand jury room.  The grand

19   jury hears only the government's evidence.

02:01:01  20       And based upon what they hear, they hand down an

21   indictment, meaning they hand down the request for the

22   order that will be tried to you.  Overly simplified?

23   Perhaps.  But that's what the grand jury does.  They hear

24   only the government's part of the case.  No defense.  No

02:01:22  25   questioning from the other side.  And based upon what they

Voir Dire By The Court                        Vol 1 - Page 94

 1  hear, the one side only, they say the case should be tried

 2  by a trial jury.  That's the whole thing.

 3      Now, I want to impress upon you, because for the

 4  purposes of this case and your service and everything

 5  else, that an indictment is no presumption of guilt.  It's

 6  no evidence of guilt.  It's only the mechanism that you

 7  get to try it to you, and that's the system.  And that's

 8  how it works.

 9      I also mention that in federal court sentencing, if it

10  does become applicable -- we don't know guilty or not

11  guilty.  That's up to you -- the sentencing is strictly up

12  to the judge.  I'm going to go down and ask a few

13  individual questions.

14      Let me ask you this:  Just for right now, is there

15  anybody here, from what they have heard, feel they

16  couldn't be a fair and impartial juror in this case

17  without having heard any of the evidence or any of the

18  other questions I have?

19          PROSPECTIVE JURORS:  (No response.)

20          THE COURT:  Great.  Okay.  Let the record reflect

21  no hands at this point.  I assume we'll get perhaps some

22  hands later.  Maybe not.  I tried a case in New York and I

23  was ready for hands and I didn't get one.  You know, not

24  that you can tell but I grew up in New York or you can

25  tell.  It was like my coming back.  I was not the top of

*Laura Wells, CRR, RDR*

 1   my law school class, by the way.

 2        When I got up to that courthouse in New York and just

 3   looking up, I said to myself, look who is back.  I walked

 4   in, and I called some cases and got right into it.   In

 5   fact, I had a lot in common with the marshals because a

 6   lot of them had been former police officers and whatever

 7   and I had grown up in the time of the Brooklyn Dodgers.

 8   And when they heard there was a real Brooklyn Dodger fan

 9   and someone had actually seen Robinson play, Jackie

10   Robinson -- I actually met Jackie Robinson as a youngster.

11   It was a great experience.

12        I have tried them all over the United States.  I have

13   been out in Phoenix, Arizona; and I have been around a

14   bit.  I did mostly -- I don't travel too much.  I really

15   prefer the Texas folks.  You know the old story:  I wasn't

16   born here, but I got here as quick as I could.  I've got

17   that bumper sticker up in my office.  I really do.

18        First thing, I want you to meet who we have here.

19   Remember, we've got assistant U.S. attorneys for the

20   government.  We have defense lawyers.  I know -- I know

21   these guys.  They have been in major, major cases.  You

22   are going to see some of the finest criminal prosecutors

23   and defense lawyers around in this case.

24        What I want to do now is I'm going to have them

25   introduce themselves and their client or their case agents

*Laura Wells, CRR, RDR*

Voir Dire by The Court                    Vol 1 - Page 96

1    and whatever.  So the government will go first, if you

2    would, up in front of the jury and introduce yourself.

3              MR. PEREZ:  Thank you, Your Honor.  Good evening,

4    ladies and gentlemen.  My name is Ruben Perez.  I'm an

02:04:11   5    assistant U.S. attorney.  Assisting me in this case will

6    be Joe Magliolo.  He is also an assistant U.S. district

7    attorney.

8              THE COURT:  Can you see him on all sides?  Can

9    you see him over there?  You can't miss Joe.  He has been

02:04:26   10    around quite a bit.  Go on.

11              MR. PEREZ:  Right here -- if you will stand up,

12    please -- is Edwin Chapuseaux.  He is a Harris County

13    Sheriff Deputy.

14              THE COURT:  Move forward, sir.

02:04:36   15              MR. CHAPUSEAUX:  I've been with the sheriff's

16    office for 25 years.

17              THE COURT:  Thank you.

18              MR. PEREZ:  Right here to my immediate left is

19    Suzanne Bradley.  She is with the FBI, a special agent.

02:04:48   20        And over there is Lucy Tan.  She is an IRS special

21    agent.

22        And over there is Pam --

23              THE COURT:  Come on up.  You have got to come

24    around the pole so everybody can see you.

02:05:01   25              MR. PEREZ:  She is with the FBI, Federal Bureau

*Laura Wells, CRR, RDR*

1   of Investigation.

2        Right here you'll be seeing this young lady.  She is

3   Lolita Pouncey.  She is our paralegal.

4            THE COURT:  Thank you.  Now, for the defense.

02:05:15  5            MR. FAZEL:  Good afternoon, ladies and gentlemen.

6   My name is Ali Fazel.  I'm with the law firm of Scardino &

7   Fazel.

8        With me is Carin Stoelker.  She works with us.

9        This is the accused here, Ms. Medeles-Garcia.

02:05:30  10            THE COURT:  Could she stand up, please.

11            THE DEFENDANT:  (Complying.)

12            THE COURT:  Okay.  Thank you.

13        Does anybody know any of these folks?

14            PROSPECTIVE JURORS:  (No response.)

02:05:36  15            THE COURT:  Okay.  I now have some general

16   questions.  And then, I'll get to -- I'll go down your

17   juror form that I have looked through and made some notes.

18   And then, we're going to select ourselves a jury.  We're

19   going to get in here.  I'm going to have opening

02:05:51  20   statements, and we will call our first witness.  We're

21   going to get moving on it right away.

22        A couple of background things that I have talked to

23   the lawyers about and some of the questions they suggested

24   I will ask you and some of my own.

02:06:12  25        But just as a background, the defendant is a

*Laura Wells, CRR, RDR*

 1    naturalized citizen of the United States.  She is, again,

 2    a native.  Her first language was Spanish, and she has

 3    elected to use an interpreter.

 4         Does anybody have a problem with the defendant using

02:06:27   5    an interpreter in this case even though she is a citizen?

 6              PROSPECTIVE JURORS:  (No response.)

 7              THE COURT:  It's just more comfortable.

 8    Sometimes some of the terminology may not be fully

 9    understandable.  Heck, you'll see when we get into a

02:06:40  10    crossfire with the attorneys some of the terminology may

11    not be understandable to them either.  They will let me

12    know about this.

13         One or more of the witnesses and/or victims in this

14    case are not citizens of this country.  There are

02:07:00  15    allegations they were brought in.  They were put into

16    prostitution.  That's the allegations.  Okay.  So some of

17    them are illegal aliens and were not here legally in the

18    United States.

19         Does anyone believe that illegal aliens should not be

02:07:19  20    treated as victims or differently than anyone else only

21    because they are not legally here in the United States if

22    they are shown to be victims?  Anybody agree with that?

23              PROSPECTIVE JURORS:  (No response.)

24              THE COURT:  Okay.  Thank you.  Let's talk about

02:07:34  25    this, also.  There is a different -- there is always a

1    question between direct and circumstantial evidence.  You

2    hear that all the time on the TV programs.  Oh, that's

3    circumstantial evidence.

4         Well, circumstantial evidence can be fully admissible,

02:07:48    5    along with eyewitness evidence.  I want to give you -- I

6    want to give you -- I actually have it.  It's called the

7    pattern jury charges.  Okay.  I want to read you just the

8    -- what you'll be getting eventually on the circumstantial

9    evidence.

02:08:07    10        In considering evidence you are permitted to draw such

11   reasonable inferences from the testimony and exhibits as

12   you feel are justified in the light of common experience.

13   In other words, you may make deductions and reach

14   conclusions that reason and commonsense lead you to draw

02:08:25    15   from the facts which have been established by the

16   evidence.  Do not be concerned whether the evidence is

17   direct or circumstantial evidence.  You should consider

18   and weigh all the evidence that was presented to you.

19        Direct evidence is the testimony of one who asserts

02:08:39    20   actual knowledge of a fact, such as an eyewitness.

21        Circumstantial evidence is proof of a chain of events

22   and circumstances indicating that something is or is not a

23   fact.  The law makes no distinction between the weight you

24   may give either to direct or circumstantial evidence; but

02:08:57    25   the law requires that you, after weighing all of the

1   evidence, whether direct or circumstantial, be convinced

2   of the guilt of the defendant beyond a reasonable doubt

3   before you can find him or her guilty.

4        Now, one that the lawyers use all the time.  That's

02:09:15   5   the academic side.  How about the practical side?

6   Circumstantial evidence.  You are sitting up there in the

7   jury box or you are sitting right here or you happen to be

8   just here as an observer and walk in and sit down.  There

9   are no windows in here.  You hear some rumblings going on.

02:09:34   10  The next thing you know, somebody comes in through the

11  door with an umbrella soaking wet, shaking it dry and sits

12  down with a raincoat on and everything soaking wet.  You

13  have not seen the rain.  All you have heard was some

14  thunder, and you see somebody coming in.  But by

02:09:51   15  circumstantial evidence you might assume that it's raining

16  outside.

17       Now, there is the simple.  You have got the academic,

18  and now you have got the practical side as to a definition

19  of circumstantial evidence.

02:10:06   20       One question I ask all the jurors and I have done that

21  in civil and criminal cases because I do civil cases, of

22  course, as well as criminal.  Is there anyone here --

23  again, any time you really feel uncomfortable visiting,

24  let me know.  We're going to go up later to the bench, and

02:10:23   25  we can visit up there.

Voir Dire by The Court                    Vol 1 - Page 101

1    Anyone here for religious purposes feel that you
2    cannot sit in judgment of another person?
3         PROSPECTIVE JURORS:  (No response.)
4         THE COURT:  Okay.  No hands.
02:10:34   5    Now, this case, as you know, involves prostitution.
6    I'm asking you this question.  Regardless of your basic
7    feelings as to right or wrong, could you follow the law
8    given to you by the Court and consider the facts in this
9    trial on a case of prostitution?  In effect, could you be
02:10:57  10    fair and impartial in this case without yet having heard
11    any of the evidence strictly because it's on the subject
12    of prostitution?  Anybody feel that way?
13         PROSPECTIVE JURORS:  (No response.)
14         THE COURT:  Thank you.
02:11:09  15    Negative feelings.  Anybody have negative feelings
16    against the United States government, the FBI, the U.S.
17    attorney or the Internal Revenue Service?
18         PROSPECTIVE JURORS:  (Laughter.)
19         THE COURT:  Just raise your hands.  The returns
02:11:30  20    are due Wednesday.  There is no excuse being on a federal
21    jury.  You will get your returns in.  Okay.
22    Let the record reflect no hands were raised.
23    Now, you are going to hear testimony from a lot of
24    folks that have been charged with crimes.  We're going to
02:11:43  25    get to that in a moment.  And you are also going to hear

1  testimony from various police officers, law enforcement

2  agencies.

3      Now, is there anyone here who would give more weight

4  to a law enforcement officer just because he or she is a

02:12:00    5  law enforcement officer; or could you weigh that testimony

6  as you would with anyone else and give it whatever weight

7  you think it deserves?

8      Now, that was a compound question.  I'm now going back

9  to the beginning.  Is there anyone here who just because a

02:12:17   10  person is employed, he or she does that for a living,

11  would give more initial credibility to a law enforcement

12  officer than any other citizen or, in this case, any other

13  witness without having first heard them?  Anyone as far as

14  that goes?

02:12:33   15          PROSPECTIVE JURORS:  (No response.)

16          THE COURT:  Thank you.  Again, no hands.

17      Oh, yes.  You are going to hear some folks who are

18  accomplices in this case.  Some of them have pled guilty

19  already.  Some may not have pled guilty or were somehow

02:12:53   20  involved.  And this is an instruction.  You can see it's

21  right out of that book.  I copied it out of this book.

22  Because we're talking about accomplice, codefendant and

23  some of them, most of them, a good many of them, have

24  entered into plea agreements, meaning an agreement that

02:13:11   25  they reached with the government to plead guilty with the

 1   possibility of a lower sentence.  As they will all tell

 2   you, it's up to the judge.  Okay.  But up to this point.

 3        Now, let me read this to you because this is an

 4   instruction I'll be giving those of you that are on the

02:13:25   5   jury or one very similar.

 6        In this case the government is called -- I'm going to

 7   say this is after the fact, as if I'm giving it to you at

 8   the end.  In this case the government called as one of its

 9   witnesses, probably more than one, an alleged accomplice

02:13:40  10   named as a codefendant in the indictment with whom the

11   government has entered into a plea agreement.  This

12   agreement provides for, such as, the dismissal of some

13   charges in a binding or nonbinding recommendation for a

14   favorable sentence.  As far as I know, none of them are

02:14:01  15   binding on me.  Such plea bargaining, as it is called, has

16   been approved as lawful and proper and is expressly

17   provided for in the rules of this federal court.

18        An alleged accomplice, including one who has entered

19   into a plea agreement with the government, is not

02:14:20  20   prohibited from testifying.  On the contrary, testimony of

21   such a witness may alone be of sufficient weight to

22   sustain a verdict of guilty.

23        You should keep in mind that such testimony is always

24   to be received with caution and weighed with great care.

02:14:40  25   You should never convict the defendant upon the

*Laura Wells, CRR, RDR*

1  unsupported testimony of an alleged accomplice unless you

2  believe that testimony beyond a reasonable doubt.

3      The fact that an accomplice has entered into a plea

4  agreement or a plea of guilty to the offense charged is

02:14:57  5  not evidence of the guilt of any other person.  And that's

6  what we are here for, the "any other person."  We have one

7  American citizen who is here to be tried by a jury.

8      Anybody have a problem with that, with just

9  considering; and anybody have a problem with that

02:15:17  10  instruction?

11          PROSPECTIVE JURORS:  (No response.)

12          THE COURT:  No hands are received or were

13  exhibited.

14      All right.  Let me ask you this, just generally:  Does

02:15:29  15  anybody here work or serve as a volunteer or actively

16  support any organization or government entity, private

17  organization or government entity, that concerns immigrant

18  rights or immigration issues?

19          PROSPECTIVE JURORS:  (No response.)

02:15:46  20          THE COURT:  No hands.

21      Also, you'll find that some shelter was given by the

22  YMCA or YWCA.  Are any of you active in the YMCA or YWCA?

23          PROSPECTIVE JURORS:  (No response.)

24          THE COURT:  All right.  I am now going to some

02:16:08  25  individual questions.  What is it they say?  Moving right

1    along.  Okay.

2        Don't be upset if I don't call on you and the judge

3    doesn't grill you.  We have gone through all of these.

4    Thank you so much for filling out these forms.

02:16:22  5        By the way, I was on board, I guess, 27 or 28 years

6    ago when we adopted this form.  I have tried cases all

7    around the country in state and federal court.  This is

8    the most comprehensive juror information sheet anywhere in

9    the country.  It really is.  And, for instance, if lawyers

02:16:43  10   do this, even with me doing it, I don't have to say, you

11   know, where do you work, what type of work do you do, and

12   how many years have you been there.  It's all here.  So I

13   can go to the -- what is it, to the last question being

14   what do you do as such and such.  I'm going to move along

02:17:04  15   quickly, if I have any questions.

16       Ms. XXXXXX, you are a dental hygienist.  I was in the

17   dental chair this morning.  So I won't hold that against

18   you.  I went in to the dentist and put in a new crown, and

19   I went down to an office I am never in.  It was all the

02:17:29  20   way down on the end.  And I asked the hygienist why I was

21   put down there.  They said, well, if you scream they can't

22   hear you too well at the other end of the office.  It

23   didn't hurt at all.  One of your colleagues did a fine

24   job.

02:17:54  25       I see Dr. XXXXXXX.  Do you want to stand up, sir,

Voir Dire by The Court                          Vol 1 - Page 106

1    please.

2                   PROSPECTIVE JUROR:  (Complying.)

3                   THE COURT:  While you were in the Army -- I know

4    you served in the Army for quite a while -- what was your

02:18:06   5    MOS in the Army, meaning your specialty?

6                   PROSPECTIVE JUROR:  I am branch qualified as

7    signal and engineering.

8                   THE COURT:  Signal and engineering.  I know you

9    are a Ph.D in chemical engineering; is that correct?

02:18:19  10                   PROSPECTIVE JUROR:  That is correct.

11                   THE COURT:  And you have been a consulting

12   engineer.  Is it S&PP?

13                   PROSPECTIVE JUROR:  That is my company.

14                   THE COURT:  That's your own company.  Okay.

02:18:26  15   Thank you, sir.  I just wanted to know what your military

16   occupational specialty is.

17       Dr. XXXXXXXXXX, how long have you been retired as a

18   veterinarian?

19                   PROSPECTIVE JUROR:  Since last June.

02:18:51  20                   THE COURT:  What was your specialty?  I think it

21   was veterinary anesthesiologist.  I see you have a masters

22   degree in that.

23                   PROSPECTIVE JUROR:  Sorry.  I was a professor at

24   Texas A&M, and my specialty was anesthesiology.  I taught

02:19:05  25   basic pharmacology and clinical anesthesia.

Voir Dire by The Court                    Vol 1 - Page 107

```
 1              THE COURT:  Large animals or small?
 2              PROSPECTIVE JUROR:  I did all of it.
 3              THE COURT:  All of it.  Thank you, sir.  I will
 4    never forget I married a local girl and the first few
 5    months we were driving around -- and this is how bad it
 6    was growing up in the big city.  I'm driving around and in
 7    farm country and I see a veterinarian's office.  I really
 8    said this.
 9         I said, "How can a vet earn a living out here?  No
10    dogs or cats."  Of course, there were cows and horses all
11    over the place.
12         That's all right.  My first assignment when I was in
13    the military -- well, my last duty, my last duty
14    assignment was Fort Polk, Louisiana.  And coming from New
15    York, for a Brooklyn boy, that is the swampland back
16    there.  But the story is it took me about five months to
17    realize an armadillo didn't live its whole life like this
18    on the side of the road.  So roadkill was something new.
19         Okay.  Ms. XXXX, I see you have a notation down here.
20    Are you okay to serve on the jury; or do you want to talk
21    about it?
22              PROSPECTIVE JUROR:  Yes.
23              THE COURT:  Are you all right?
24              PROSPECTIVE JUROR:  I'm okay.
25              THE COURT:  I just notice that, you know, you are
```

 1    expecting.  You have it noted down here.  Fine.

 2              PROSPECTIVE JUROR:  Everything is fine.  I just

 3    wanted it to be known.

 4              THE COURT:  Oh, sure.  You want it to be known?

02:20:34  5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  It's known.  If it wasn't known

 7    before, it is sure known.  Thank you.  Good luck to you.

 8    Thank you for coming down.  Thank you so much.

 9         Let's see.  I want to get my -- Mr. XXXXXXX.

02:20:57 10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Do you want to stand up, sir, please.

12              PROSPECTIVE JUROR:  Yes, sir.

13              THE COURT:  I see you served on a jury on a rape

14    case; is that correct?

02:21:04 15              PROSPECTIVE JUROR:  That's correct.

16              THE COURT:  How long ago was that?

17              PROSPECTIVE JUROR:  That was in the 1980's.

18              THE COURT:  1980's.  How long did the case take?

19              PROSPECTIVE JUROR:  I believe it took a week.

02:21:12 20              THE COURT:  Okay.  Now, this is not a rape case.

21    No accusations like this.  But it's concerning, you know,

22    some sexual activity and so forth.  You sat on the rape

23    case.  Were you the foreman of the jury?

24              PROSPECTIVE JUROR:  No, I was not.

02:21:27 25              THE COURT:  All right.  Is there anything about

1   that experience that would prohibit you from being fair

2   and impartial to both sides and starting them both equal

3   in this case without yet having heard any of the evidence?

4          PROSPECTIVE JUROR:  No.

02:21:38  5          THE COURT:  Thank you, sir.

6      Mr. XXXXXXXX, I see you are an attorney, correct, sir?

7          PROSPECTIVE JUROR:  Yes, Your Honor.

8          THE COURT:  All right.  Now, let's see.  You went

9   to University of Virginia, some study at Oxford and then

02:21:54  10  to Washington and Lee School of Law.  How did you get down

11  to Texas?

12          PROSPECTIVE JUROR:  I took an in-house position

13  with Exxon-Mobil.

14          THE COURT:  I see you are an attorney with Exxon.

02:22:03  15  What sort of area are you in?

16          PROSPECTIVE JUROR:  Primarily was supporting

17  production organization.  Basically, oil and gas law.  I

18  moved to the chemical organization.

19          THE COURT:  Is there anything about your

02:22:14  20  background as an attorney that you think might prohibit

21  you from being fair and impartial in this case?

22          PROSPECTIVE JUROR:  No, Your Honor.

23          THE COURT:  All right.  Also, it says government

24  agencies you or a relative have worked for.  One of them

02:22:24  25  is the U.S. Department of Justice; is that correct?

1    Summer clerk, was that you?

2              PROSPECTIVE JUROR:  That was me, yes, sir.

3              THE COURT:  Where about?

4              PROSPECTIVE JUROR:  I was with the USA's office

02:22:34    5    in D.C.

6              THE COURT:  All right.  What division did you

7    work in?  What sort of work did you do during your

8    internship?

9              PROSPECTIVE JUROR:  Mostly training MPD officers

02:22:45   10    on --

11             THE COURT:  What?  MPD?

12             PROSPECTIVE JUROR:  Metropolitan Police

13   Department.

14             THE COURT:  Oh, the Metropolitan Police

02:22:50   15   Department?

16             PROSPECTIVE JUROR:  Yes, sir.

17             THE COURT:  Doing what kind?

18             PROSPECTIVE JUROR:  Mostly constitutional issues,

19   Fourth Amendment, just basic training.  Also assist other

02:22:58   20   attorneys within the U.S. attorney's office.

21             THE COURT:  Okay.  All right.  Well, you are an

22   attorney.  Let me just ask you this:  Is there anything

23   about your background and working with the U.S. attorney's

24   office that would prohibit you from being fair and

02:23:05   25   impartial in this case without having heard any of the

1    evidence?

2            PROSPECTIVE JUROR:  No, Your Honor.

3            THE COURT:  Thank you, sir.

4        Ms. XXXXX, I was going to call on you.  I saw that

02:23:19  5    look.  Yes.  But it's very simple.  You have some graduate

6    study.  You have a masters degree.  What is the masters,

7    please?

8            PROSPECTIVE JUROR:  It's in health service

9    administration.

02:23:30  10           THE COURT:  What kind?

11           PROSPECTIVE JUROR:  Health service

12   administration.

13           THE COURT:  Which means?

14           PROSPECTIVE JUROR:  Which means I have a

02:23:35  15   concentration in gerontology.

16           THE COURT:  Gerontology.  Oh, well, looking

17   around, I'll be right at home.  Those are the only

18   questions I have.  Thank you, ma'am.

19           PROSPECTIVE JUROR:  Okay.

02:23:49  20           THE COURT:  A question I have for Ms. XXXXXX.

21   Where is Carson-Newman College?

22           PROSPECTIVE JUROR:  Jefferson City, Tennessee.

23           THE COURT:  Okay.  Thank you very much.  You may

24   be seated.  You know, I have some prerogatives, you know,

02:24:07  25   if something interests me.

Voir Dire by The Court                              Vol 1 - Page 112

```
 1        Okay.  This is -- I was looking this over with my
 2   staff.  Mr. XXXXXXX.
 3             PROSPECTIVE JUROR:  Yes.
 4             THE COURT:  Do you want to stand up?
 5             PROSPECTIVE JUROR:  (Complying.)
 6             THE COURT:  It says you are a tank driver.
 7   That's not military.  I looked.  No military, right?
 8             PROSPECTIVE JUROR:  A tanker driver.
 9             THE COURT:  Tank truck driver.  You've done it
10   for 17 years.  What is Univar, please?
11             PROSPECTIVE JUROR:  It's a chemical distributor.
12             THE COURT:  Okay.  What sort of chemicals did you
13   haul in the back?
14             PROSPECTIVE JUROR:  Pardon me?
15             THE COURT:  What sort of chemicals did you haul
16   around?
17             PROSPECTIVE JUROR:  We do mostly in my branch
18   solvents, flammable liquids.
19             THE COURT:  Inflammable or flammable?
20             PROSPECTIVE JUROR:  Flammable.
21             THE COURT:  Flammable.  Okay.  Thank you.
22        Ms. XXXXXX.
23             PROSPECTIVE JUROR:  Yes.
24             THE COURT:  You have -- I see you are a
25   registered nurse.
```

02:24:21 (line 5)
02:24:31 (line 10)
02:24:41 (line 15)
02:24:50 (line 20)
02:25:01 (line 25)

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  What is it?  Is it you who worked --

3     someone -- you put down you work at the Texas Department

4     of Criminal Justice and Montgomery County Sheriff's

02:25:13    5     Office.  What is that about?

6          PROSPECTIVE JUROR:  My mom works for TDCJ in

7     Huntsville.  My brother-in-law works for the sheriff's

8     office.

9          THE COURT:  What are their occupations or

02:25:21    10    assignments?

11         PROSPECTIVE JUROR:  My brother-in-law is

12    currently a patrol officer, and my mom works -- she does

13    all the paperwork and adding on and taking off time

14    disputes.

02:25:33    15         THE COURT:  Does she get out actually into the

16    prison area?

17         PROSPECTIVE JUROR:  No.  She stays in the

18    admissions office.

19         THE COURT:  Do you talk to the two individuals

02:25:40    20    about what they do for a living?

21         PROSPECTIVE JUROR:  At times, yes.

22         THE COURT:  Okay.  So do you think you could be

23    fair and impartial in this case without having heard any

24    of the evidence with two family members in that?

02:25:51    25         PROSPECTIVE JUROR:  Yes, I do.

*Laura Wells, CRR, RDR*

1          THE COURT:  Fine.  Thank you.

2      Ellen, may I see you a moment, please.  Just for a

3  second.

4      (Discussion off the record.)

02:26:21    5          THE COURT:  All right.  Oh, I also see you are in

6  the Air Force, an Airman First Class; is that correct?

7          PROSPECTIVE JUROR:  I was.

8          THE COURT:  Okay.  Do you want to stand up.  What

9  was your MOS or assignment in the military?

02:26:32   10          PROSPECTIVE JUROR:  I was actually in Corps of

11  Cadets at Texas A&M.  I was on scholarship for the Air

12  Force.

13          THE COURT:  Fine.  Thank you so much.

14      Dr. XXXXX.

02:26:46   15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  All right.  Fascinating background.

17  Montreal, Canada, undergraduate and Alberta for college.

18  You have UT, all your three advanced degrees.  You said

19  Austin, Texas.  Is that the University of Texas?

02:27:05   20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  Okay.  And what sort of engineering

22  is your specialty or science?  It says engineering.  You

23  are with Aries Operating.

24          PROSPECTIVE JUROR:  Petroleum.

02:27:16   25          THE COURT:  Petroleum engineer?

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  All right.  Thank you, sir.

3      Mr. XXXXXX, please.  I see that you are also an

4  engineer; but, basically, that you did serve on a burglary

02:27:43  5  case; is that correct?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  Were you the presiding juror on that

8  burglary case?

9          PROSPECTIVE JUROR:  Yes, sir.

02:27:49  10         THE COURT:  All right.  Now, not what it was; but

11  did you reach a verdict?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Okay.  Is there anything about that

14  experience that would prohibit you from being fair and

02:27:57  15  impartial to both sides, starting them equal in this case

16  without having heard any of the evidence?

17         PROSPECTIVE JUROR:  No, sir.

18         THE COURT:  Thank you, sir.

19      Ms. XXXXXXXX.

02:28:08  20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  You are an administrative assistant.

22  I always need to know.  What do you do, which department,

23  at Texas Children's Hospital?

24         PROSPECTIVE JUROR:  Right.  I work in the Women

02:28:21  25  Services Department.  I'm in the pavilion for women, which

1    is the adult side.  We are all Texas Children's.

2            THE COURT:  Okay.  Do you see any kind of abuse

3    cases in there or anything like that?

4            PROSPECTIVE JUROR:  No.  That's not my area.  I

02:28:31  5  work on the labor and delivery floor.

6            THE COURT:  Oh, okay.  They keep an eye on each

7    other there.  Okay.  Labor and delivery.  Have you had

8    that assignment the whole time?

9            PROSPECTIVE JUROR:  No, I have not.

02:28:42  10           THE COURT:  Before that, what was your

11   assignment?

12           PROSPECTIVE JUROR:  I was in the development

13   department, the legal department, the home health

14   department.

02:28:51  15           THE COURT:  The secret word, the legal

16   department.  What did you do in the legal department?

17           PROSPECTIVE JUROR:  I was an administrative

18   assistant; and we handled all of the cases, like risk

19   management cases.

02:29:03  20           THE COURT:  Anything anywhere close to what we

21   are dealing with here?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  No.  Okay.  Thank you.

24       All right.  Ms. XXXXXX.

02:29:17  25           PROSPECTIVE JUROR:  (Standing.)

| | |
|---|---|
| | 1 |
| | 2 |

 1      THE COURT:  All right.  I see that -- who is the

 2  Air Force retired?

 3      PROSPECTIVE JUROR:  My husband.

 4      THE COURT.  Okay.  What branch was he in?

02:29:24   5      PROSPECTIVE JUROR:  He was in National Guard duty

 6  at Ellington.  He was a security police.

 7      THE COURT:  Security police.  Was it Air Force

 8  police?

 9      PROSPECTIVE JUROR:  I guess.

02:29:35  10      THE COURT:  Was he in the Air Force?

11      PROSPECTIVE JUROR:  Yes.

12      THE COURT:  Okay.  Air Force.  Also, you have a

13  retired DPS and Pearland Police Department.  Do you want

14  to explain what is that about?

02:29:47  15      PROSPECTIVE JUROR:  I guess.  My husband is

16  retired Air Force, and he worked for the DPS office in

17  Pearland for a little bit.

18      THE COURT:  CPS, Child Protective Services?

19      PROSPECTIVE JUROR:  No.  Dis --

02:30:01  20      THE COURT:  Dispatcher?

21      PROSPECTIVE JUROR:  Yeah, dispatcher.

22      THE COURT:  Okay.  Had you talked -- did he ever

23  get involved in any kind of the law enforcement like we

24  are dealing with here?

02:30:11  25      PROSPECTIVE JUROR:  No.  We did talk to his

*Laura Wells, CRR, RDR*

1    brother who retired as captain at L.A. Sheriff's

2    Department and talked about things with him before.

3              THE COURT:  Okay.  How long?  What division was

4    he assigned to, or was he assigned on all divisions?

02:30:26   5              PROSPECTIVE JUROR:  He was assigned to all

6    divisions.

7              THE COURT:  Okay.  Is there anything about that

8    that would prohibit you from being fair and impartial in

9    this case without having yet heard any of the evidence?

02:30:34   10              PROSPECTIVE JUROR:  No.

11              THE COURT:  Okay.  Thank you, ma'am.

12         Ms. XXXXXX.

13              PROSPECTIVE JUROR:  Yes.

14              THE COURT:  I note here that you are a homemaker.

02:30:49   15    Did you work at one time outside the home?

16              PROSPECTIVE JUROR:  Yes, I did.

17              THE COURT:  When you worked outside the home,

18    what did you do?

19              PROSPECTIVE JUROR:  I was a television news

02:30:56   20    reporter.

21              THE COURT:  Oh, where?

22              PROSPECTIVE JUROR:  In Michigan and California.

23              THE COURT:  Okay.  How long were you in that

24    business?

02:31:05   25              PROSPECTIVE JUROR:  Oh, about ten years.

1      THE COURT:  Did you ever cover any of these kind

2  of stories that we are talking about today?

3      PROSPECTIVE JUROR:  No.

4      THE COURT:  Of course, you were exposed to that.

02:31:17   5  I see you have a masters in journalism, also.  Anything

6  about that experience that would prohibit you from being

7  fair and impartial in this case without having heard any

8  of the evidence?

9      PROSPECTIVE JUROR:  No.

02:31:26  10      THE COURT:  Okay.  Thank you, ma'am.

11    Okay.  Ms. XXXXXX.

12      PROSPECTIVE JUROR:  (Standing.)

13      THE COURT:  I've got to ask you.  What is

14  in-store visual?  What are you looking at as an in-store

02:31:46  15  visual person?

16      PROSPECTIVE JUROR:  I'm in charge of how the

17  store looks, mannequins, merchandising, everything.

18      THE COURT:  Okay.  And Chico's is a --

19      PROSPECTIVE JUROR:  Ladies clothing.

02:31:56  20      THE COURT:  -- ladies clothing store?  Okay.

21  Where about is your store located?

22      PROSPECTIVE JUROR:  It's at Memorial and Beltway.

23      THE COURT:  Thank you.

24    Ms. XXXXX?

02:32:04  25      PROSPECTIVE JUROR:  Yes, sir.

|   |   |
|---|---|
|          | 1 | THE COURT:  You have down here that -- what is |
|          | 2 | it?  You have someone was -- one of your children was a |
|          | 3 | legal assistant? |
|          | 4 | PROSPECTIVE JUROR:  My daughter. |
| 02:32:13 | 5 | THE COURT:  Okay.  Who does she work for? |
|          | 6 | PROSPECTIVE JUROR:  She works for a group of |
|          | 7 | attorneys in Brenham. |
|          | 8 | THE COURT:  Okay.  Do you know what type of work |
|          | 9 | they do? |
| 02:32:25 | 10 | PROSPECTIVE JUROR:  General. |
|          | 11 | THE COURT:  General practice? |
|          | 12 | PROSPECTIVE JUROR:  I think, yes, sir.  They do a |
|          | 13 | little bit of everything. |
|          | 14 | THE COURT:  Have you ever discussed any of the |
| 02:32:32 | 15 | criminal work that her attorneys may be doing? |
|          | 16 | PROSPECTIVE JUROR:  Not recently. |
|          | 17 | THE COURT:  Okay.  How recent? |
|          | 18 | PROSPECTIVE JUROR:  Last year. |
|          | 19 | THE COURT:  Okay.  You also, without getting into |
| 02:32:46 | 20 | details, wrote something down here at the last thing.  Do |
|          | 21 | you want to talk to us later about that? |
|          | 22 | PROSPECTIVE JUROR:  Yes, sir. |
|          | 23 | THE COURT:  Okay.  So mark down.  We'll call you |
|          | 24 | up later.  Thank you. |
| 02:32:56 | 25 | PROSPECTIVE JUROR:  Thank you. |

1          THE COURT:  That's why we move along this

2    quickly.  Just move along.  I'm not ignoring you.  We're

3    going down that side.  I've got some good questions for

4    the left side.

02:33:08   5      (Laughter.)

6          THE COURT:  Ms. XXXXX, I notice here that you

7    have worked for this Wyman Gordon accounting firm.

8          PROSPECTIVE JUROR:  Wrong person.

9          THE COURT:  Hold it here.  Ms. XXXXX.

02:33:33  10      PROSPECTIVE JUROR:  I'm sorry.

11          THE COURT:  I'll ask you.  No.  With an IRS agent

12    right here, I'm not going to tell this story; but maybe I

13    will.  If you want me to go on the record and issue an

14    apology, I'll do it ahead of time.  Okay.  Remind me.

02:33:49  15      The IRS agent who comes in -- I have -- I have a

16    cartoon of it.  The man is there in front of, obviously,

17    the secretary to the executive.  And the caption is and

18    reminded me of this said, "Well, if he is not available,

19    I'll just audit you."

02:34:07  20      So I could ask you the questions.  It wouldn't do much

21    good as to Ms. XXXXX in the back.

22      Ms. XXXXX.

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  You have been with that firm for

02:34:17  25  one year; is that correct?

*Laura Wells, CRR, RDR*

| | | |
|---|---|---|
| | 1 | PROSPECTIVE JUROR: Yes, sir. |
| | 2 | THE COURT: Prior to that year what did you do, |
| | 3 | please? |
| | 4 | PROSPECTIVE JUROR: Same thing. Accounting. |
| 02:34:23 | 5 | THE COURT: Where about? |
| | 6 | PROSPECTIVE JUROR: Metrics Instruments. |
| | 7 | THE COURT: Okay. Is that here in town? |
| | 8 | PROSPECTIVE JUROR: Yes. |
| | 9 | THE COURT: What sort of accounting work do you |
| 02:34:30 | 10 | do? |
| | 11 | PROSPECTIVE JUROR: General accounting, AP and |
| | 12 | AR, inner company. |
| | 13 | THE COURT: AP and AR, what is that? |
| | 14 | PROSPECTIVE JUROR: Accounts payable, accounts |
| 02:34:39 | 15 | receivable. |
| | 16 | THE COURT: Got it. All right. Got it. All |
| | 17 | right. Thank you. |
| | 18 | Let's see. Mr. XXXXXX, I see you listed a civil suit; |
| | 19 | and you are a juror on a civil matter, business financial |
| 02:34:55 | 20 | dispute. When you said not guilty, in other words, it |
| | 21 | just wasn't true and you found for the defense, correct, |
| | 22 | sir? |
| | 23 | PROSPECTIVE JUROR: Yes, sir. |
| | 24 | THE COURT: Were you the foreman of the jury? |
| 02:35:03 | 25 | PROSPECTIVE JUROR: No, sir. |

*Laura Wells, CRR, RDR*

1          THE COURT:  All right.  Thank you.

2      Ms. XXXXXXX.

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  I see you have a bachelor and masters

02:35:13    5  degree both from Texas State University.  I know that

6  school.  My daughter graduated there.  What were the --

7  what did you specialize in the bachelors and the masters,

8  please?

9          PROSPECTIVE JUROR:  Accounting.

02:35:22   10          THE COURT:  Both in accounting?

11          PROSPECTIVE JUROR:  Yes, sir.

12          THE COURT:  Okay.  Thank you.

13      Okay.  And, Ms. XXXXXXX, industrial relations.  Didn't

14  Cornell have one of the original programs in industrial

02:35:43   15  relations?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  Because I know it used to be a time

18  and motion study.  Some call it now industrial

19  engineering.  But the industrial relations, what is an

02:35:54   20  MILR?

21          PROSPECTIVE JUROR:  It's a Masters in Industrial

22  and Labor Relations.

23          THE COURT:  Okay.  Got it.  Thank you.  That

24  sounds right.  It said here MILR.  Maybe it's sometimes

02:36:07   25  too obvious.

1       Mr. XXXXXXX.

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  You are a petroleum engineer?

4              PROSPECTIVE JUROR:  Yes, sir.

02:36:18    5      THE COURT:  What is it?  Is this your wife who is

6  a paralegal?

7              PROSPECTIVE JUROR:  She was.  She hasn't been for

8  15 years or more.

9              THE COURT:  It's a paralegal in pension.  So she

02:36:28   10  was mostly in that aspect of law practice?

11             PROSPECTIVE JUROR:  Yes, sir.  Pension.

12             THE COURT:  Someone here was with the treasury of

13  the IRS.  Who was that?

14             PROSPECTIVE JUROR:  That was me, sir.

02:36:39   15      THE COURT:  That was you.  How long ago?

16             PROSPECTIVE JUROR:  1980 to 1982.

17             THE COURT:  1980.  What was your position at the

18  time?

19             PROSPECTIVE JUROR:  I was an engineer, but I

02:36:46   20  carried a commission.

21             THE COURT:  All right.  What did you do as an

22  engineer?  Who did you check on?

23             PROSPECTIVE JUROR:  Oil companies mostly.

24             THE COURT:  Mostly oil companies.  Okay.  In the

02:36:54   25  engineering aspect?

*Laura Wells, CRR, RDR*

Voir Dire by The Court                          Vol 1 - Page 125

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  All right.  Now, one of the -- some

3  of the agents in the case are from the Internal Revenue

4  Service.  Only you know the answer.  Is there anything

02:37:03   5  about your association in the 1980s with the Internal

6  Revenue Service that would prohibit you from being fair

7  and impartial without having heard any of the evidence?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Thank you, sir.  Now I'm not sure.

02:37:20  10  Is it XXXXX or XXXXX?

11          PROSPECTIVE JUROR:  XXXXX.

12          THE COURT:  Now, is it Dr. XXXXX?

13          PROSPECTIVE JUROR:  Not yet.

14          THE COURT:  Not yet.  You are working on it?

02:37:27  15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Okay.  At Sam Houston in library

17  science.

18          PROSPECTIVE JUROR:  That's my masters, yes.

19          THE COURT:  Is that correct?  You have a masters

02:37:34  20  in that now?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  How much further until the Ph.D comes

23  onboard?

24          PROSPECTIVE JUROR:  The Ph.D is in higher

02:37:41  25  education.  It should be a year.

*Laura Wells, CRR, RDR*

1          THE COURT:  About one more year.  So you commute

2    up and back?

3          PROSPECTIVE JUROR:  No.  It's an on-line program.

4          THE COURT:  Okay.  It's an on-line program.  Now,

02:37:49   5    you are a financial aid administrator for the Houston

6    Community College.  What is it you do specifically?

7          PROSPECTIVE JUROR:  Award students, check their

8    eligibility for financial aid, Federal Pell and state

9    grants.

02:38:02  10          THE COURT:  You also served years ago.  I don't

11    know years ago.  I'm just saying that.  It says on a

12    sexual assault case; is that correct?

13          PROSPECTIVE JUROR:  That's correct.

14          THE COURT:  That was in state court?

02:38:11  15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Correct?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Okay.  Were you the foreman of the

19    jury?

02:38:15  20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Was a verdict reached, yes or no, --

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  -- in that case?  Now, what did it

24    involve?

02:38:22  25          PROSPECTIVE JUROR:  Someone was assaulted on the

1  worksite.

2        THE COURT:  On the worksite?

3        PROSPECTIVE JUROR:  One employee against the

4  other.

02:38:29  5        THE COURT:  And it was a criminal case; is that

6  correct?

7        PROSPECTIVE JUROR:  Yes.

8        THE COURT:  All right.  And now you know this is

9  a criminal case.  It's not a sexual assault case; but you

02:38:37  10  have heard the background, you have heard me read that,

11  correct?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  Is there anything about that that

14  would prohibit you from being fair and impartial in this

02:38:45  15  case without yet having heard any of the evidence?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Okay.  Thank you, ma'am.

18     By the way, when I get through with all these, I need

19  to call a few folks up.  We'll take a short break.  We're

02:38:59  20  getting close to wrapping.  Once we do this, we're going

21  to go straight into jury selection.  You get a long break.

22  Pardon me for doing it.  It will move it right along if we

23  can do this in one sitting.  Okay.

24     Mr. XXXXXXX.

02:39:14  25        PROSPECTIVE JUROR:  Yes, sir.

*Laura Wells, CRR, RDR*

1          THE COURT:  I notice here that you served on a

2     case, is that correct, an assault case?

3          PROSPECTIVE JUROR:  That's correct, sir.

4          THE COURT:  Is that state court?

02:39:22   5          PROSPECTIVE JUROR:  It's Harris County.

6          THE COURT:  Okay.  What kind of assault was it?

7          PROSPECTIVE JUROR:  Aggravated assault.  He used,

8     like, a tire iron.

9          THE COURT:  Okay.  Was a verdict reached in that

02:39:35  10     case?

11          PROSPECTIVE JUROR:  Yes, Your Honor.

12          THE COURT:  All right.  Were you the presiding

13     juror?

14          PROSPECTIVE JUROR:  No.

02:39:38  15          THE COURT:  Do you know any reason why you

16     couldn't sit on this case, without having heard any of the

17     evidence?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Okay.  Thank you.

02:39:53  20      All right.  Ms. XXXXXXXX, you note down here that you

21     have served on a rape case in a civil -- in the criminal

22     system, correct?

23          PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Also, it says that a verdict was not

02:40:07  25     reached; is that correct?

*Laura Wells, CRR, RDR*

1    PROSPECTIVE JUROR:  Correct.

2    THE COURT:  All right.  Did it go into trial?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  Or were you just getting picked as a

02:40:14  5  juror?

6    PROSPECTIVE JUROR:  No.

7    THE COURT:  It went to trial?

8    PROSPECTIVE JUROR:  Went to trial.

9    THE COURT:  And for some reason it was terminated

02:40:19  10  during the case, correct?

11   PROSPECTIVE JUROR:  Yes.

12   THE COURT:  Before you reached a verdict?

13   PROSPECTIVE JUROR:  No.  Well, we didn't reach a

14   verdict.  We were hung.

02:40:26  15   THE COURT:  You got -- all right.  So, in other

16   words, no verdict was reached.  You couldn't reach a

17   verdict, the jury could not?

18   PROSPECTIVE JUROR:  Right.

19   THE COURT:  Were you the foreman of that jury?

02:40:34  20   PROSPECTIVE JUROR:  No.

21   THE COURT:  All right.  The -- I asked you.

22   That's right.  My last question was or would have been,

23   you know, did you reach a verdict?  And the answer was no.

24     Is there anything about your service -- how long ago

02:40:49  25  was that, by the way?

1          PROSPECTIVE JUROR:  I think that was 10 or

2    11 years ago.

3          THE COURT:  Anything about your experience in

4    that case that would prohibit you from being fair and

02:40:57  5    impartial and have both sides start equal in this case?

6          PROSPECTIVE JUROR:  No, sir.

7          THE COURT:  Thank you.

8        Mr. XXXX.

9          PROSPECTIVE JUROR:  Yes, sir, Your Honor.

02:41:11  10          THE COURT:  I notice down here you have on the

11    civil case "simple kidnap" and again down there.  Was that

12    a criminal case?

13          PROSPECTIVE JUROR:  The simple kidnap was.

14          THE COURT:  The other one was a civil site

02:41:25  15    construction case, right?

16          PROSPECTIVE JUROR:  Yes, sir.  I was the

17    plaintiff in that.

18          THE COURT:  The simple kidnap, what was that

19    about?

02:41:31  20          PROSPECTIVE JUROR:  We lived in the state of

21    Louisiana, and that's what they called it.  It was a

22    six-person jury trial, and I was the foreman of the jury.

23          THE COURT:  You were the foreman of the jury.

24    Was that -- again, just "yea" or "nay."  You did reach a

02:41:46  25    verdict, correct?

```
         1        PROSPECTIVE JUROR:  Yes.

         2        THE COURT:  Okay.  Anything about that prohibit

         3    you from sitting on this kind of a case?

         4        PROSPECTIVE JUROR:  No, sir.

02:41:50 5        THE COURT:  Thank you.

         6      Ms. XXXXXXXXXXXXX.

         7        PROSPECTIVE JUROR:  Yes.

         8        THE COURT:  One question:  What is USPI?

         9        PROSPECTIVE JUROR:  It's United Surgical

02:42:01 10   Partners, Incorporated.

        11        THE COURT:  Okay.  You are an RN?

        12        PROSPECTIVE JUROR:  Yes, sir.

        13        THE COURT:  You have your degree from Lamar

        14   University.  What sort of nursing do you do?  What

02:42:10 15   specialty?

        16        PROSPECTIVE JUROR:  Right now I'm in recovery

        17   room.

        18        THE COURT:  Recovery.  Do you work in a hospital

        19   setting of some sort?

02:42:17 20       PROSPECTIVE JUROR:  In an outpatient surgery

        21   center.

        22        THE COURT:  Okay.  What primary surgeries go in

        23   there in that surgery room?

        24        PROSPECTIVE JUROR:  We do plastics, orthopedics,

02:42:26 25   ENT.
```

Voir Dire by The Court                          Vol 1 - Page 132

```
 1              THE COURT:  All right.  Thank you.
 2         Okay.  Is it Mr. XXXXXX, XXXXXXXXXXXXX?  XXXXXXXXXX
 3    or -- oh, it's a "c" at the end.
 4              PROSPECTIVE JUROR:  XXXXXX.
 5              THE COURT:  I didn't see it.  It looked like an
 6    "L".  The Wood Group, do you work offshore?
 7              PROSPECTIVE JUROR:  No.  I work in Houston.
 8              THE COURT:  Okay.  Engineering of what sort?
 9              PROSPECTIVE JUROR:  I do piping design.  I design
10    the piping in refineries.
11              THE COURT:  I see.  Did you get -- what is it?
12    Did you get a lot of on-the-job training in that, or how
13    did you get into the business?
14              PROSPECTIVE JUROR:  I have been in it for
15    40 years.  I just fell into it, really, right out of high
16    school.
17              THE COURT:  You have been with the firm for
18    40 years?
19              PROSPECTIVE JUROR:  Not this one that I'm at, no.
20              THE COURT:  But in the business?
21              PROSPECTIVE JUROR:  Yeah, but in the business.
22              THE COURT:  Okay.  Thank you, sir.
23         Okay.  Let's see.  Ms. XXXX.
24              PROSPECTIVE JUROR:  You said Ms. XXXX?
25              THE COURT:  XXXXXXXXXXXXXXXXXXXX.
```

02:42:51
02:43:04
02:43:16
02:43:28
02:43:44

1          PROSPECTIVE JUROR:  XXXX.

2          THE COURT:  I see you have -- I notice something

3    at the bottom.  Do you want to visit with us later?

4          PROSPECTIVE JUROR:  Yes.

02:43:54    5          THE COURT:  That will be number 42 coming forward

6    later.

7       Mr. XXXXXXXXXXXX.

8          PROSPECTIVE JUROR:  Yes, sir.

9          THE COURT:  I see that you are -- what is it --

02:44:17   10   Houston Methodist doing administrative work, correct?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Administrative management.  You have

13   been with them for three years.  What did you do prior to

14   that, sir?

02:44:27   15          PROSPECTIVE JUROR:  I worked for the University

16   of Texas Health Science Center.

17          THE COURT:  Here in Houston?

18          PROSPECTIVE JUROR:  In Houston, yes.

19          THE COURT:  So you moved from one UT over to

02:44:35   20   Methodist?

21          PROSPECTIVE JUROR:  Correct.

22          THE COURT:  Okay.  Thank you.

23       Mr. XXXXXXX.

24          PROSPECTIVE JUROR:  Yes, sir.

02:44:42   25          THE COURT:  You have down here that someone in

1  the family is a police officer.

2            PROSPECTIVE JUROR:  Yes, sir.  My son.

3            THE COURT:  Your son.  What police department?

4            PROSPECTIVE JUROR:  Allen; Allen, Texas.

02:44:53  5            THE COURT:  Okay.  What sort of work does he do?

6            PROSPECTIVE JUROR:  Patrol officer.

7            THE COURT:  How long has he been with them?

8            PROSPECTIVE JUROR:  Approximately four years.

9            THE COURT:  And you talk to him often about his

02:45:02  10  work?

11            PROSPECTIVE JUROR:  No, sir.

12            THE COURT:  An interesting case or whatever?

13            PROSPECTIVE JUROR:  He prefers not to talk about

14  that.

02:45:06  15            THE COURT:  Okay.  I see you were in the Army,

16  correct, E-4 specialist?

17            PROSPECTIVE JUROR:  Yes, sir.

18            THE COURT:  What was your MOS, please?

19            PROSPECTIVE JUROR:  Personnel.

02:45:14  20            THE COURT:  Personnel.  Anything about any of

21  those experiences with a family member in law enforcement

22  prohibit you from being fair and impartial in this case?

23            PROSPECTIVE JUROR:  No, sir.

24            THE COURT:  Thank you, sir.

02:45:25  25      Ms. XXXXXX, just wanted to know what is CGG?

02:45:37

02:45:48

02:46:06

02:46:14

02:46:26

1    PROSPECTIVE JUROR:  It's a seismic company.

2    THE COURT:  A seismic company.  What does it

3    stand for?

4    PROSPECTIVE JUROR:  It doesn't stand for anything

5    anymore.

6    THE COURT:  Okay.  Somebody's initials.

7    PROSPECTIVE JURORS:  It was Compagnie General de

8    Geophysique but it's gone through many mergers and such

9    and they rebranded it only CGG.

10   THE COURT:  Okay.  Thank you so much.  Just like

11   Kentucky Fried Chicken became KFC.  We all know what it is

12   now.

13   Ms. XXXX, you have down here that, what is it, your

14   mother was in US Customs, the Internal Affairs Division,

15   correct?

16   PROSPECTIVE JUROR:  Yes, that's correct.

17   THE COURT:  How long was she with them?

18   PROSPECTIVE JUROR:  I think at least 11, 11 or

19   12 years.  A long time.

20   THE COURT:  Okay.  Let's see.  You also wanted to

21   talk to us about something else, correct, the last entry?

22   PROSPECTIVE JUROR:  Yeah, but that's fine.  I had

23   it taken care of.

24   THE COURT:  You had it taken care of.  Talking

25   about a youngster?

```
 1              PROSPECTIVE JUROR:  Yes.
 2              THE COURT:  Well taken care of?
 3              PROSPECTIVE JUROR:  Well taken care of.
 4              THE COURT:  Thank you.  Thank you for making
 5    arrangements.
 6              PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  Mr. XXXXXXX.
 8              PROSPECTIVE JUROR:  Yes, sir.
 9              THE COURT:  All right.  You are in IT for
10    30 years?
11              PROSPECTIVE JUROR:  Yes, sir.
12              THE COURT:  You are looking great for 30 years.
13              PROSPECTIVE JUROR:  Thank you.
14              THE COURT:  Not that everybody else didn't, but I
15    was -- I saw you sitting down.  I said 30 years.  But what
16    is it?  There was -- you state down here you were on a
17    criminal case for the sentencing phase for a murder trial,
18    correct?
19              PROSPECTIVE JUROR:  Correct.
20              THE COURT:  What -- did you sit on the main
21    murder case?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  So for some reason they had to
24    empanel a separate jury, I guess, just to either retry or
25    something?  I'll ask you how did you happen to get on the
```

02:46:31  5
02:46:42  10
02:46:51  15
02:47:07  20
02:47:21  25

         1    sentencing phase only?

         2            PROSPECTIVE JUROR:  They just said show up.

         3    That's what it was.

         4            THE COURT:  Pardon me?

02:47:28  5            PROSPECTIVE JUROR:  They chose a jury just for

         6    the sentencing.

         7            THE COURT:  You didn't know what was the

         8    background?

         9            PROSPECTIVE JUROR:  No, sir.

02:47:33 10            THE COURT:  Let me ask you this:  Was a verdict

        11    reached, yes or no?

        12            PROSPECTIVE JUROR:  Yes.

        13            THE COURT:  Okay.  Were you the foreman of the

        14    jury?

02:47:41 15            PROSPECTIVE JUROR:  No, sir.

        16            THE COURT:  All right.  Now, is there anything

        17    about your service on that criminal case that would

        18    prohibit you from being fair and impartial on this one

        19    without having heard any of the evidence?

02:47:51 20            PROSPECTIVE JUROR:  No, sir.

        21            THE COURT:  Okay.  Okay.  Let's see.  We have

        22    Ms. XXXXXX.

        23            PROSPECTIVE JUROR:  Yes, sir.

        24            THE COURT:  Who was it that works for CPS?

02:48:05 25            PROSPECTIVE JUROR:  I did.

                              *Laura Wells, CRR, RDR*

1          THE COURT:  You did.  What would -- CPS is Child

2     Protective Services?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  What exactly did you do?

02:48:13   5          PROSPECTIVE JUROR:  There I was an administrative

6     assistant.

7          THE COURT:  Did you deal with any of the teenage

8     prostitution problems or things like that?

9          PROSPECTIVE JUROR:  Well, I knew about them

02:48:22  10     because we would prepare the cases for discovery for the

11     court.

12          THE COURT:  Prepare them for discovery?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Now, let me ask you this.  Only you

02:48:30  15     know.  Is there anything about you doing that from your

16     side, from that side, that would prohibit you from being

17     fair and impartial to the folks in this case without

18     having heard any of the evidence?

19          PROSPECTIVE JUROR:  No, sir.

02:48:42  20          THE COURT:  So you could be fair and impartial?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  Yes, ma'am.  Thank you.

23          PROSPECTIVE JUROR:  You are welcome.

24          THE COURT:  And I do not have a question for

02:48:51  25     number 50 in the corner.  I just want to make sure you are

```
 1   there.  All right.  Ladies and gentlemen --
 2              PROSPECTIVE JUROR:  (Raised hand.)
 3              THE COURT:  Yes, ma'am.
 4              PROSPECTIVE JUROR:  Could I speak to you in the
 5   end?
 6              THE COURT:  We're going to do that.  We are going
 7   to give you a chance to come up.  I want to just talk to
 8   the people who raised their hands first.  Then I'm going
 9   to ask a catch-all question, keeping in mind it's an
10   extremely short case for federal court and there are other
11   cases floating around the building.  We'll do the best we
12   can to talk to them.  Yes, you'll have one more
13   opportunity on that point.
14       I'm going to go up.  How many people do we have to
15   call up, Ellen?
16              CASE MANAGER:  Two.
17              THE COURT:  We have just two.  It ought to take
18   me about -- maybe about a minute each.  And then, we'll
19   ask for people that may want to ask something else to see
20   if it falls within any category.
21       Do you want to move up?
22              THE REPORTER:  Yes, Judge.
23              THE COURT:  By the way, when we had the system
24   completely redone for that major criminal trial, I had
25   everything -- everything now is pretty sophisticated.
```

02:49:00
02:49:09
02:49:19
02:49:32
02:50:14

*Laura Wells, CRR, RDR*

02:50:31

1    When Ellen or I push a button on this pad, all the
2    microphones in the courtroom will be muted except for the
3    one right here in front of the court reporter.  And the
4    technology now that she does, it's wireless.  In other
5    words, she will pick up exactly what is going on.

6        May I see the attorneys up here, please, with your
7    sheets.

8        (Proceedings held at sidebar.)

9        THE COURT:  Do we have anything?  Number 9 has a
02:51:13  10   criminal conviction.

11       (Proceedings concluded at sidebar.)

12       THE COURT:  Ladies and gentlemen, I just want to
13   add one other thing to everything that I said.  Does
14   everybody understand in a criminal case no one has any
02:51:29  15   obligation to testify?  In other words, she doesn't have
16   to take the stand.  The lawyer doesn't have to ask any
17   questions.  The burden never shifts.  Anybody have a
18   problem with that?

19       PROSPECTIVE JURORS:   (No response.)

02:51:43  20       (Proceedings held at sidebar.)

21       THE COURT:  Anything else?  I'll ask then, who is
22   the first one?

23       CASE MANAGER:  Number 23.

24       THE COURT:  Okay.

02:52:30  25       (Prospective Juror Number 23 approached the bench.)

```
 1              THE COURT:  Right over here.  This is the
 2    microphone.  Come on up.  Okay.  Yes, ma'am.  You said you
 3    have a concern; is that correct?
 4              PROSPECTIVE JUROR:  Yes, sir.  Number one, I have
 5    intestinal issues.
 6              THE COURT:  You have got to run to the bathroom?
 7              PROSPECTIVE JUROR:  Yes.  I have IBS.
 8              THE COURT:  Okay.
 9              PROSPECTIVE JUROR:  And it's very unpredictable.
10    Also, I am now in an MD Anderson research study that I
11    have to go every Wednesday.  I'm taking medication for
12    research.
13              THE COURT:  Okay.  Any questions?
14              MR. PEREZ:  No, sir.
15              THE COURT:  Any questions?
16              MR. FAZEL:  No.
17              THE COURT:  Thank you, ma'am.  You may take your
18    seat.
19              PROSPECTIVE JUROR:  Okay.
20        (Prospective Juror Number 23 left the bench.)
21              THE COURT:  Okay.  Just get in here and block me.
22    I don't want them to see me pick a pen up and have a run
23    on the jury.
24        Do we have any objection to Number 23, or can we agree
25    on it?
```

02:52:43
02:52:52
02:53:05
02:53:09
02:53:22

*Laura Wells, CRR, RDR*

1        MR. PEREZ:  Yes, we agree.

2        THE COURT:  Both sides agree on Number 23.  We

3   have a bunch of hands right up here.  Okay.  The next one

4   up?

02:53:36    5        CASE MANAGER:  Number 42.

6        (Proceedings concluded at sidebar.)

7        THE COURT:  Ms. XXXX, Number 42, please.

8        (Prospective Juror Number 42 approached the bench.)

9        THE COURT:  Let her get in.  There is your

02:54:08   10   microphone.  All my antics out there, don't worry about

11   it.  Yes.  You have diabetes, right?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  How often do you have to eat?

14        PROSPECTIVE JUROR:  I have to eat, like, probably

02:54:25   15   right after lunch, dinner, later -- probably later on

16   before I go to bed to keep my sugar regulated.

17        THE COURT:  If you could have a break whenever

18   you need it -- we take a break about every hour and 15

19   minutes, hour and a half.  We can take a break whenever

02:54:42   20   you need it.  Would that be of assistance to you?

21        PROSPECTIVE JUROR:  Yes.  I wanted to say, but I

22   didn't put it down.  My great-nephew, I keep him every

23   day, ever since he was three months old.

24        THE COURT:  How old?  Since he was three months?

02:54:58   25        PROSPECTIVE JUROR:  His dad took off today to

*Laura Wells, CRR, RDR*

          1    keep him for me.  His dad is a federal police officer for

          2    border patrol.

          3              THE COURT:  Okay.  And who is watching the

          4    youngster now?

02:55:09  5              PROSPECTIVE JUROR:  His dad took off because I

          6    told him early I had to come to court.

          7              THE COURT:  Any questions?

          8              MR. PEREZ:  No, Your Honor.

          9              MR. FAZEL:  No, Your Honor.

02:55:16 10              THE COURT:  Thank you.  You can take your seat.

         11         (Prospective Juror Number 42 left the bench.)

         12              THE COURT:  All right.  Any -- can both sides

         13    agree on excusing 42?

         14              MR. PEREZ:  No objections.

02:55:29 15              MR. FAZEL:  Yes.

         16              THE COURT:  Number 42.  Do we have a bunch of

         17    hands?

         18              CASE MANAGER:  I think we're going to, yes.

         19              THE COURT:  After all that work, we have more

02:55:37 20    hands.  In New York, by the way, I got through with this

         21    whole business and there was one lady who was -- who

         22    literally knew somebody.  Aside from that, I didn't have

         23    one hand at all.  I had all of them had never heard of all

         24    that business.  But let's see what we have got.  I have a

02:55:54 25    feeling we're going to get hands.

1    (Proceedings concluded at sidebar.)

2         THE COURT:  Okay.  All right.  Ladies and

3    gentlemen, we have completed this phase.  I'm now going to

4    ask one last question, keeping in mind what else you know

02:56:04    5    about jury duty generally.

6         Does anybody else need to speak with us about

7    something that's not on your form anywhere or that I have

8    not asked you that would affect your ability to serve on

9    this case?  Please raise your hand.

02:56:18    10    (Several hands.)

11         CASE MANAGER:  Can I ask them to call out their

12    numbers?

13         THE COURT:  Sure.

14         CASE MANAGER:  Number 3, Number 5, Number 12,

02:56:27    15    Number 14, Number 20 and in the back row and this side,

16    Number 42.

17         THE COURT:  Okay.  Thank you.  We're going to

18    call all these folks up one at a time.  We're going to

19    take a break as soon as this is over.

02:56:47    20         If anybody has to go out and use the facilities,

21    that's fine.  The facilities are right behind this wall.

22    You go out and make a left.  We're going to take a full

23    break as soon as I get through talking to these folks one

24    at a time.  And you will see how quickly it will go.  But

02:57:01    25    I just want to let you know we need everybody back.

Voir Dire by The Court                    Vol 1 - Page 145

```
         1   Otherwise, I can't give you some instructions before we
         2   start making our strikes.
         3        Ellen, who is the first one?
         4             CASE MANAGER:  Number 3.
02:57:16 5             THE COURT:  Mr. XXXXXXX, Number 3.
         6             MR. FAZEL:  Is that what it stands for?  Is it
         7   Lieutenant Colonel?
         8             THE COURT:  Yeah, Lieutenant Colonel.  He was in
         9   the military 28 years.  That's long, unless he started as
02:57:41 10  an enlisted man.  I'm going to ask him.  Otherwise, he
        11   might be up and out before that.
        12        (Prospective Juror Number 3 approached the bench.)
        13             PROSPECTIVE JUROR:  Your Honor, your assistant
        14   asked me to give you information.
02:57:50 15           THE COURT:  Let me ask you one thing.  Did you
        16   serve all 28 years as an officer?
        17             PROSPECTIVE JUROR:  Yes.  I was commissioned in
        18   1972.
        19             THE COURT:  Okay.  Yes.  What do you need to show
02:57:59 20  me?
        21             PROSPECTIVE JUROR:  She asked me to give you
        22   information on scheduling conflicts.  I'm supposed to
        23   build a technical paper in front of 1,500 people in
        24   Austin, Texas for the last week of April.
02:58:13 25           THE COURT:  This is April.  What day is this?
```

*Laura Wells, CRR, RDR*

1    Tell me what day.

2            PROSPECTIVE JUROR:  I'm supposed to give the talk

3    on the 27th and supposed to give a presentation of a

4    national engineering award on the 28th at the same.

02:58:28    5            THE COURT:  Okay.  Is that your conflict?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Okay.

8            PROSPECTIVE JUROR:  We have already invested a

9    serious amount of money for that.

02:58:37    10            THE COURT:  Okay.  Now, I'm not going to talk to

11    the attorneys; but you have no problem serving up to that

12    date?

13            PROSPECTIVE JUROR:  No.  On Sunday we're supposed

14    to leave.

02:58:46    15            THE COURT:  No, we're not.  So it would be the

16    27th and thereafter for that week that you have a

17    conflict, correct?

18            PROSPECTIVE JUROR:  For the 27th, 28th and 29th.

19            THE COURT:  We'll take care of it.  Either way,

02:59:01    20    if you are selected, you'll be out of here before that.  I

21    will tell you that.  Okay.  Yes.  Take a seat.

22        (Prospective Juror Number 3 left the bench.)

23            THE COURT:  Okay.  Come on in.  What do you want

24    to do with the Colonel?  Are there any objections?

02:59:15    25            MR. FAZEL:  No objections.

*Laura Wells, CRR, RDR*

                    1          MR. PEREZ:  No, Your Honor.

                    2          THE COURT:  No objections at all or no objections

                    3   for excusing him?

                    4          MR. FAZEL:  I have no objection to excusing him.

02:59:25            5          THE COURT:  Is it going to last that long?

                    6          MR. MAGLIOLO:  I don't see how it would last.

                    7   That would be two full weeks, as I understand it.

                    8          THE COURT:  Keep your voice down.

                    9          MR. MAGLIOLO:  No, Your Honor.  I do not believe

02:59:36           10   it will last that long.

                   11          THE COURT:  What do you think?

                   12          MR. PEREZ:  I think we can make the deadline.

                   13          MR. FAZEL:  My position is if he is concerned

                   14   about it, we have got -- we're not even close to having

02:59:48           15   busted the panel.  Why even take a chance?  Let's just

                   16   excuse him.

                   17          THE COURT:  Let me put this down here for now.

                   18   Maybe I'll rethink that.

                   19      All right.  Who is next, Ellen?

03:00:05           20          CASE MANAGER:  Number 5.

                   21      (Prospective Juror Number 5 approached the bench.)

                   22          THE COURT:  Number 5, Ms. XXXXXXX, please.  Come

                   23   on right there.

                   24          PROSPECTIVE JUROR:  About the timing of the case,

03:00:30           25   I do have a trip coming up next week, next Thursday.

*Laura Wells, CRR, RDR*

Voir Dire by The Court                              Vol 1 - Page 148

1              THE COURT:  Next Thursday?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  So it's a week from this Thursday?

4              PROSPECTIVE JUROR:  Yes.  I am going to

03:00:40   5    California.

6              THE COURT:  Is it prepaid tickets?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  Any particular occurrence?

9              PROSPECTIVE JUROR:  It's vacation.

03:00:48  10    THE COURT:  Okay.  Questions?

11             MR. PEREZ:  No, Your Honor.

12             MR. FAZEL:  No, Your Honor.

13             THE COURT:  Thank you, ma'am.

14        (Prospective Juror Number 5 left the bench.)

03:00:57  15    THE COURT:  Does everybody agree to excuse 5?

16             MR. FAZEL:  We will not be done by next Thursday.

17             MR. PEREZ:  We'll agree to excuse her.

18             THE COURT:  Okay.  Who is next?

19             CASE MANAGER:  Number 12.

03:01:12  20    THE COURT:  Ms. XXXXXX.

21             MR. PEREZ:  Which number, Your Honor?

22             THE COURT:  Number 12.

23        (Prospective Juror Number 12 approached the bench.)

24             THE COURT:  Yes, ma'am.  Here is the mic.

03:01:37  25    PROSPECTIVE JUROR:  Okay.  Our church has done

*Laura Wells, CRR, RDR*

1   some work with brothels and gone into foreign countries

2   and such and they have come back and reported to us.

3   Several of them have been my close friends.  So I have

4   actually had some interaction with that.  I'm not too sure

03:01:51   5   that I would be terribly impartial in this.

6              THE COURT:  Well, only you know.  Could you be

7   fair and impartial to both sides without having heard any

8   of the evidence?

9              PROSPECTIVE JUROR:  I don't think I could.

03:02:01   10             THE COURT:  Any questions?

11             MR. PEREZ:  I do.

12             MR. MAGLIOLO:  I do.  If you are convinced beyond

13   a reasonable doubt, as the law requires, that the

14   defendant did what she did, then would you be able to find

03:02:14   15   her guilty?

16             PROSPECTIVE JUROR:  Yes.

17             MR. MAGLIOLO:  Okay.  What if you are not

18   convinced beyond a reasonable doubt?  Would you go on and

19   find her guilty anyway because of your relationship with

03:02:26   20   the church and everything?

21             PROSPECTIVE JUROR:  I'm not sure about that.

22             MR. MAGLIOLO:  That's all I have, Your Honor.

23             THE COURT:  Any questions?

24             MR. FAZEL:  Yes, Your Honor.  Ma'am, let me ask

03:02:35   25   you this:  You don't know anything about the facts of the

1    case?

2            THE COURT:  We don't need anymore questions.

3    Take your seat.

4            PROSPECTIVE JUROR:  Okay.

03:02:44  5      (Prospective Juror Number 12 left the bench.)

6            THE COURT:  Do you have a challenge to Number 12?

7            MR. FAZEL:  I do, Your Honor.

8            MR. PEREZ:  No objection, Your Honor.

9            THE COURT:  Okay.  Number 12 is out.  Don't mind

03:02:52  10   me cutting in.  We have been around a long time.

11           MR. MAGLIOLO:  When she said she is not sure,

12   that's it.

13           THE COURT:  Next, Ellen.

14           CASE MANAGER:  14.

03:03:00  15          THE COURT:  Are they all sitting in the same

16   place?

17           MR. FAZEL:  14.  Don't we want to agree to 8?  I

18   feel bad for her.

19           THE COURT:  That's a woman, isn't it?  Yeah.

03:03:17  20     Okay.  Ms. XXXXXX, please, Number 14.

21           MR. MAGLIOLO:  What's wrong with Number 8?

22           MR. FAZEL:  She is pregnant.  She is about to

23   burst.  Did you see her?

24           MR. PEREZ:  It doesn't mean she is going to

03:03:36  25   break.

*Laura Wells, CRR, RDR*

                    1          THE COURT:  Come on up.

                    2      (Prospective Juror Number 14 approached the bench.)

                    3          THE COURT:  Yes, ma'am.

                    4          PROSPECTIVE JUROR:  My son is four months old.  I

03:03:42            5   was going to have either my mother-in-law or my sister

                    6   stay with him.  He is refusing a bottle.  He is

                    7   breast-fed.  He is not eating.

                    8          THE COURT:  Any questions?

                    9          MR. MAGLIOLO:  No.

03:03:52           10          MR. PEREZ:  No.

                   11          MR. FAZEL:  No.

                   12          THE COURT:  Okay.  Take a seat, please.

                   13      (Prospective Juror Number 14 left the bench.)

                   14          THE COURT:  Number 14 by agreement.  Ellen, next?

03:04:01           15          CASE MANAGER:  Number 20.

                   16          THE COURT:  Ms. XXXXXX, please, Number 20.

                   17          MR. FAZEL:  The TV reporter?

                   18          THE COURT:  Yeah.

                   19      (Prospective Juror Number 20 approached the bench.)

03:04:33           20          THE COURT:  How are you doing?  There is your

                   21   microphone.

                   22          PROSPECTIVE JUROR:  Your Honor, I wanted to let

                   23   you know I have a trip scheduled for a week from

                   24   Wednesday, April 22nd.

03:04:42           25          THE COURT:  Where are you headed?

                              *Laura Wells, CRR, RDR*

1          PROSPECTIVE JUROR:  Utah.

2          THE COURT:  Is it a prepaid ticket?

3          PROSPECTIVE JUROR:  Well, I'm going to a retreat

4   that I had to pay for.  I don't know what the cancellation

03:04:53   5   policy is.

6          THE COURT:  Is this a church retreat?

7          PROSPECTIVE JUROR:  No, it's a retreat at a

8   resort for people who have lost a loved one.

9          THE COURT:  Any questions?

03:05:02  10          MR. PEREZ:  Wednesday?

11          PROSPECTIVE JUROR:  A week from this Wednesday on

12   the 22nd.

13          THE COURT:  Any questions?

14          MR. FAZEL:  No, sir.

03:05:08  15          THE COURT:  Take a seat.

16       (Prospective Juror Number 20 left the bench.)

17          THE COURT:  Can everybody agree to excuse 20?

18          MR. MAGLIOLO:  Yes, Your Honor.

19          MR. PEREZ:  Yes, Your Honor.

03:05:15  20          MR. FAZEL:  Yes, Your Honor.  She just lost her

21   husband.

22          THE COURT:  The reason why I'm saying this is I'm

23   going to give you the option of extra strikes, if it's

24   applicable.  So we'll just -- it is strictly up to you.

03:05:29  25       Ms. XXXXXXXXXXXXX, please, Number 37.

1    (Prospective Juror Number 37 approached the bench.)

2         THE COURT:  Have a seat right there.  There is

3    your microphone.  Yes, ma'am.

4         PROSPECTIVE JUROR:  Effectively, I know it's our

03:05:56   5    duty to serve; but I work in a small recovery center.  We

6    just recently had two staff resign.  So I'm a little

7    concerned about staffing for them if I am detained for

8    several days.

9         THE COURT:  Okay.  Do they have -- is it a

03:06:10  10    24-hour operation?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  Okay.  How many other registered

13    nurses do they have there at the facility?

14         PROSPECTIVE JUROR:  We have five full-time in the

03:06:20  15    recovery area.

16         THE COURT:  How many are out?

17         PROSPECTIVE JUROR:  And so, one left.  And then,

18    we had some part-time people.  But we're down to the last

19    part-time person assigned.

03:06:35  20         THE COURT:  How many?

21         PROSPECTIVE JUROR:  We don't have any part-time

22    anymore.

23         THE COURT:  Okay.  How many full-time people?

24    How many full-time people?

03:06:42  25         PROSPECTIVE JUROR:  We have five full-time

 1   people.

 2            THE COURT:  Five full-time?

 3            PROSPECTIVE JUROR:  Well, not including the

 4   manager but nurses on the floor.

03:06:48  5            THE COURT:  All right.  What are you down to now?

 6            PROSPECTIVE JUROR:  If I'm not there, there will

 7   be four.

 8            THE COURT:  Okay.  All right.  Questions?

 9            MR. FAZEL:  No, Your Honor.

03:06:58 10            THE COURT:  Questions?

11            MR. PEREZ:  No, Your Honor.

12            THE COURT:  Okay.  Thank you, ma'am.

13            PROSPECTIVE JUROR:  Thank you.

14       (Prospective Juror Number 37 left the bench.)

03:07:04 15            THE COURT:  All right.  What do you want to do

16   about Number 37?

17            MR. MAGLIOLO:  I don't think she needs to be

18   excused, Your Honor.  People are always going to have

19   shortages.  There is no indication that it would affect

03:07:14 20   her ability to serve as a juror.

21            THE COURT:  Mr. Fazel?

22            MR. FAZEL:  I would ask her to be excused because

23   I think the work would impede her ability to listen and

24   might cause her problems at work.  And so I -- again, we

03:07:25 25   are nowhere close to busting a panel.  There is no reason

 1   to take the chance.

 2              MR. MAGLIOLO:  If we could put her on --

 3              THE COURT:  No.  I'll make my ruling.

 4              MR. MAGLIOLO:  Yes, sir.

03:07:35  5              THE COURT:  Challenge to Number 37 is overruled

 6   just based on what we heard.

 7              MR. FAZEL:  Yes, Your Honor.

 8              THE COURT:  The next one, Ellen.

 9              CASE MANAGER:  50.

03:07:44  10              THE COURT:  All right.  The man in the corner.

11   Then we'll talk about the other question we have.  Okay.

12        Mr. XXXXXXXX, Number 50, please.

13        (Prospective Juror Number 50 approached the bench.)

14              THE COURT:  Just let him on up.  Hi.  Come on up

03:08:21  15   right here.  There is the microphone right here.  If will

16   you shift over.  Okay.

17              PROSPECTIVE JUROR:  I was just concerned how long

18   this case would last because I'm the only one employed in

19   my household.  I'm a subcontractor.  If I don't work, I

03:08:37  20   don't draw it.

21              THE COURT:  Okay.  Are you -- you say cabinets?

22   Are you an independent contractor?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  Okay.  So how do you get your

03:08:46  25   business?

1          PROSPECTIVE JUROR:  I am just subcontracting for

2    a cabinet company.

3          THE COURT:  You work for a cabinet company?

4          PROSPECTIVE JUROR:  Yeah, as a subcontractor.

03:08:55    5          THE COURT:  As a subcontractor?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  Okay.  Questions?

8          MR. MAGLIOLO:  Just one, Your Honor.  If, in

9    fact, this case took up to two weeks, would that affect

03:09:08   10   your income production?

11         PROSPECTIVE JUROR:  Yes.

12         MR. MAGLIOLO:  And would it affect it to the

13   point that you might be so concerned about what was

14   happening to your income that you might not be able to

03:09:21   15   give your full attention to this case --

16         PROSPECTIVE JUROR:  Hmmm.

17         MR. MAGLIOLO:  -- if you know?

18         PROSPECTIVE JUROR:  I'm not sure.

19         THE COURT:  How many dependents do you have in

03:09:32   20   the house?

21         PROSPECTIVE JUROR:  I have three kids and a wife.

22         THE COURT:  Okay.  Any questions?

23         MR. FAZEL:  No, sir.

24         THE COURT:  Thank you, sir.  You may take a seat.

03:09:36   25         PROSPECTIVE JUROR:  Thank you.

*Laura Wells, CRR, RDR*

Voir Dire by The Court                          Vol 1 - Page 157

1              (Prospective Juror Number 50 left the bench.)

2                   THE COURT:  Do we have a challenge?

3                   MR. FAZEL:  No, sir.

4                   MR. MAGLIOLO:  We would agree, if he wants to.

03:09:48   5        THE COURT:  Do you want to agree or not?

6                   MR. FAZEL:  No.

7                   THE COURT:  I'll overrule.  I'll excuse him.

8    Which one did you want to call up?  What number?

9                   MR. MAGLIOLO:  Number 9 has a DWI conviction.  I

03:10:03   10  just want to make sure you're aware of that.

11                  MR. FAZEL:  Joe, how do you know that?  How do

12   you know he has got a DWI conviction?

13                  MR. MAGLIOLO:  It says on his form.

14                  MR. PEREZ:  Community service ten years.

03:10:15   15       THE COURT:  What is his name?  It's Number 9.

16   Mr. XXXXXXX, Number 9, please.

17                  MR. FAZEL:  He also served on a jury.

18                  THE COURT:  Yeah, that's true.  That may have

19   been before he had the conviction.

03:10:39   20     (Prospective Juror Number 9 approached the bench.)

21                  THE COURT:  Yes, sir.  Come on right over here.

22                  PROSPECTIVE JUROR:  All right.

23                  THE COURT:  Who has got the questions?

24                  MR. MAGLIOLO:  I do.

03:10:47   25       THE COURT:  All right.  Go on.

*Laura Wells, CRR, RDR*

```
 1              MR. MAGLIOLO:  Sir, you had a DWI conviction?

 2              PROSPECTIVE JUROR:  Yes.

 3              MR. MAGLIOLO:  Anything -- did you think you were

 4    treated fairly?

 5              PROSPECTIVE JUROR:  Yes, I did.

 6              MR. MAGLIOLO:  Anything about that that should

 7    cause me any worry that you won't be able to treat the

 8    prosecutor the same way you treat the defense?

 9              PROSPECTIVE JUROR:  No.

10              MR. MAGLIOLO:  That's all I have.

11              THE COURT:  Yes, sir.

12              MR. FAZEL:  Any problems with your defense

13    lawyer?

14              PROSPECTIVE JUROR:  Pardon?

15              MR. FAZEL:  Did you have any problems with your

16    defense lawyer?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Thank you.  You can take your seat.

19        (Prospective Juror Number 9 left the bench.)

20              THE COURT:  Okay.  All right.  Ellen, is that it?

21              CASE MANAGER:  Judge, Number 37.  She grabbed me

22    in the hall.  Tonight work is short.

23        (Sotto voce discussion between counsel.)

24              THE COURT:  You tell me.

25              MR. MAGLIOLO:  I couldn't hear.
```

1          THE COURT:  She was really concerned -- Ellen,

2   come on up.  When did she grab you?

3          CASE MANAGER:  She told me she was very concerned

4   about work and leaving them short.  They don't have enough

03:11:57   5   people to staff.

6          THE COURT:  They have got four.  I'm not going to

7   disagree.  She did talk to you before she came up?

8          CASE MANAGER:  Yes.

9          THE COURT:  Why didn't you let us know ahead of

03:12:08   10   time?

11          CASE MANAGER:  She was turned down.

12          THE COURT:  Yes.  What do you think?

13          MR. MAGLIOLO:  We ought to ask her that, if she

14   says it's going to be a concern too much.

03:12:19   15          THE COURT:  No, I'm not going to call her up

16   again.  Do you agree or not?

17          MR. MAGLIOLO:  I agree.

18          MR. FAZEL:  I agree.

19          THE COURT:  What number was she?

03:12:27   20          MR. MAGLIOLO:  Number 37.

21          THE COURT:  Let's take a look at what we have.

22          MR. FAZEL:  Judge, may Number 8?  She is the very

23   pregnant female.  I'll grant you I have never had children

24   before.  So I will plead ignorance but --

03:12:43   25          THE COURT:  Listen.

*Laura Wells, CRR, RDR*

```
 1            MR. FAZEL:  Do you have any objection?  Do you

 2   have any objection to 8?  She is the real pregnant lady up

 3   front.

 4            MR. MAGLIOLO:  I'm sorry?

 5            MR. FAZEL:  Do you have any objection to 8?  She

 6   is the real pregnant lady up front.

 7            MR. MAGLIOLO:  If -- she didn't seem to have a

 8   problem.  I don't have a problem with her.

 9            THE COURT:  She is on.  At least she is on for

10   picking.  What I want to do is I don't want to take the

11   chance going now, you guys wait and we put this case off a

12   week.  I'm going to grant the challenge to Number 8.  I

13   don't want any possibility we have to go, knowing it's

14   going to the jury in deliberation.  All right.  Let's see.

15   Where are we now?

16       I'll tell you what:  Everybody check.  Everybody

17   check.  Okay.  Everybody check.  Numbers 8, 5, 12, 14, 20,

18   23, 37, 42 and 50.  Okay.  Let's see where we are.

19            MR. PEREZ:  50 is gone.

20            MR. FAZEL:  Out.

21            THE COURT:  50 is out.  Right now we have --

22   let's see.  Right now we have 32 in the panel, right,

23   Ellen?

24            CASE MANAGER:  Yes, sir.

25            THE COURT:  We have six in the main panel.  All
```

*Laura Wells, CRR, RDR*

```
 1  right.  That brings us to 38, but 37 is out.  Okay.  So,
 2  therefore, Number 39.  Number 39 is in the -- 39 is in the
 3  panel.
 4      Now, how many does that leave us over that amount?
 5  Let me just ask you.  Do you want additional strikes?
 6              MR. PEREZ:  I'm not asking for any, Your Honor.
 7              THE COURT:  Do you think you will oppose
 8  additional strikes?  That's what I mean.  It's just a
 9  different way.  We can give you some additional strikes.
10  If you oppose them -- it's got to be unanimous.  I haven't
11  asked the defense yet.
12              MR. PEREZ:  What do you think?
13              MR. MAGLIOLO:  Can we see if the defense wants
14  them?
15              THE COURT:  Okay.  What do you want?  Do you want
16  additional strikes?
17              MR. FAZEL:  We would love additional strikes.
18              MR. MAGLIOLO:  We're going to get equal?
19              THE COURT:  Equal, yeah.
20              CASE MANAGER:  We have nine left.
21              MR. MAGLIOLO:  Could we get two additional
22  strikes apiece or each?  We wouldn't oppose that.
23              THE COURT:  How many is that with additional
24  strikes?
25              CASE MANAGER:  I think 44.  Number 44.
```

1          THE COURT:  So that Number 44 would be on the

2    panel?

3          CASE MANAGER:  Yes.

4          THE COURT:  Beginning at 44, each side would have

03:16:00    5    four additional strikes, knowing that 50 is out, correct?

6    That's right.  No.  Number 44 would be because we're not

7    going with the eight.

8          CASE MANAGER:  Correct.

9          MR. MAGLIOLO:  If it please the Court, we're each

03:16:18   10    getting two additional.  That's a total of four.  What

11    does that bring us to?

12          CASE MANAGER:  44 is in the panel.

13          THE COURT:  Is in the panel.  Now, Number 44 is

14    in the panel; but keep in mind that Numbers 37 and 42 are

03:16:32   15    out, also, right?

16          CASE MANAGER:  Yes.

17          THE COURT:  That brings it -- all right.  So that

18    means the government gets nine; and then, the defense gets

19    13?

03:16:44   20          CASE MANAGER:  Correct.

21          MR. MAGLIOLO:  Yes, Your Honor.

22          THE COURT:  Is everybody onboard?

23          MR. FAZEL:  Yes.

24          THE COURT:  All right.  Well, how much time do

03:16:50   25    you want to pick the jury?

1          Ellen, what time?  3:45.  I give a two-minute talk.

2     Is that enough time?

3               MR. MAGLIOLO:  I'm sorry.

4               THE COURT:  Let's get back in at 3:50.  3:50 and

03:17:02    5     I need your sheets all struck not later than 3:40 on

6     Ellen's desk.  So right now it's 3:18.

7               MR. FAZEL:  So to be clear, 44 is in the panel?

8     We strike from 1 through 44?

9               THE COURT:  One through 44.  Those are the ones

03:17:21   10     that are out there.  We'll get the jury back.  Should I

11     get them back at 4:00?

12               CASE MANAGER:  Yes.

13               THE COURT:  It's much better that way.  We've got

14     a big jury.  I need them in their seats right away.  I

03:17:35   15     need your sheets with all the strikes face down on Ellen's

16     desk when we take a break.  I guess the defendant is out

17     there.  The government, you can make your strikes in the

18     jury room.

19               MR. MAGLIOLO:  Thank you.

03:17:47   20               THE COURT:  I'm going to give them a few more

21     instructions.

22          (Proceedings concluded at sidebar.)

23               THE COURT:  All right.  Ladies and gentlemen, let

24     me explain to you what we'll be doing now over the next --

03:18:10   25     is everybody back?  If your neighbor is not there --

1        CASE MANAGER:  We're missing one, Judge.

2        THE COURT:  We still have one out.

3        THE MARSHAL:  She is back.  I'm sorry.

4        THE COURT:  Everybody is back.  All right.  Now,

5   for whatever reason -- well, the first thing we do when we

6   take our strikes is my case manager will put two sheets

7   side by side.  One sheet for the defense side.  One sheet

8   for the government side.  She will go down the list with a

9   long ruler.  The first 14 names she comes to will form the

10  jury.

11        So jury selection, in effect, is not a matter of

12  selection.  It's a matter of elimination.  And that's how

13  jury strikes work.

14        In order to do that, we're going to take a break.  And

15  during the break they will be making their strikes,

16  consulting with their clients, getting all of their

17  paperwork up to Ellen.  We have done this before.  We have

18  a big group.  You have been very patient with us up to

19  this point.  We're right on schedule relative, you know,

20  to our trial date.

21        So we are going to take a break at this point.  I'll

22  tell you in a moment what the time is.  However, you are

23  not excused from jury duty.  You need to come back.  Okay.

24        Now, voir dire like this in state court would take

25  maybe two or three or four times the length, based upon my

 1    recollection from being a state judge.  So it moves along

 2    quickly here.  In state court I had some guy during one of

 3    the jury selection breaks say to somebody overheard by the

 4    bailiff, "I've had enough of this jury duty.  I'm going

03:19:42    5    back to work."

 6         Well, we knew where he worked because it was on the

 7    sheets.  And what we did is we had at that time deputies.

 8    We had deputies, Harris County deputies; and our bailiff

 9    call his name three times in the hall.  Nowhere there.

03:19:58   10    But we knew he worked as a shoe salesman.

11         Now, some of you are probably -- talking about age

12    here.  If you were around long enough to know, as you go

13    down Main Street now you have got a lot of fancy shops.

14    You have got the train going down.  But years ago, when I

03:20:14   15    was practicing law, you had either -- what is it -- the

16    two businesses.  Mostly down there were, what is it, pawn

17    shops and, what is it, shoe stores.  And that's p-a-w-n.

18         Why do I spell that out?  You can probably see what is

19    coming.  About ten years ago I had one of our court

03:20:39   20    reporters come and say, Judge, we have been taking these

21    voir dires down the whole time.  When you give the final

22    instruction before the jury break is that word spelled

23    p-a-w-n or p-o-r-n?  And she said, "Oh, my God," she said,

24    "I have been sending up to the circuit transcripts for

03:20:58   25    years.  All of them have been with p-o-r-n."

1    But, anyhow, we knew where he worked.  He was selling

2    a woman a pair of shoes.  I called his name.  I issued an

3    arrest warrant, and the sheriffs go out after him.  I give

4    him the whole business.  Lights are going.  They pull up.

03:21:16  5    He is fitting a woman with a pair of shoes.  They grab him

6    by the back of the neck, cuff him, bring him right back in

7    the same group.  The voir dire continued going.  Now, not

8    only do I have his attention; but I have the jury's

9    attention, also.  I sentence him to three days in the

03:21:33  10    county jail and a $100 fine.

11    But I had spoken to the sheriff ahead of time, and he

12    told me that he did have the money in his pocket.  So we

13    took him downstairs and paid his fine.  They brought him

14    back up, and I gave him an option.  Three days in the

03:21:47  15    county jail or for the next seven business days at 9:00

16    a.m. and at 12:00 noon to report to the central jury room

17    and then listen to those juror lectures over and over and

18    over.

19    Now, if you have been on state jury duty, it's easy

03:22:02  20    now because now it's a videotape.  But in the days when I

21    was over there if you were assigned as a jury judge it was

22    about a one-month time.  You had 400 voters in the

23    morning, 400 in the afternoon; and you gave them -- not

24    that it was a campaign talk, but they really knew who you

03:22:21  25    were at the end of that time.  So he took the juror

Voir Dire by The Court                    Vol 1 - Page 167

1    lectures, but they were a lot longer than they are right

2    now.

3         So what we're going to do is take a break.  In all my

4    years, that was one guy that didn't show up.

03:22:32   5         I had another guy in the middle of trial we took a

6    lunch break and he didn't show up and the fellow jurors

7    said they saw him in the tunnel system or whatever.  But

8    what had happened was it was a gorgeous day.  He fell

9    asleep on a bench in Tranquillity Park across the street.

03:22:47  10    When the marshals went out looking for him, that's where

11    they found him.

12         So the bottom line is you are not excused from jury

13    duty; and you are not to discuss this case with anyone,

14    including each other, until you come back in here and

03:22:59  15    until I put you in the box and swear you in.  The other

16    jurors will be excused.  If you are in the box, we'll give

17    you the oath.  You'll hear the openings.  We're going to

18    go right into calling the first witness.  So the case is

19    moving.

03:23:11  20         Ladies and gentlemen, again, we couldn't do it without

21    you.  Thank you so much.  At this time, we're going to get

22    back in ready to resume at 4:00; and we're going to have

23    all the paperwork done.  So it's a bit of a break.  In any

24    event, we will see you back at 4:00.

04:04:48  25         (Recess from 3:23 p.m. to 4:05 p.m.)

                              *Laura Wells, CRR, RDR*

1          THE COURT:  Thank you.  Please be seated.

2      Ladies and gentlemen, as my case manager, Ellen, calls

3  your name, please come forward.  The first six of you will

4  be in the front -- seven in the front row.  Seven in the

04:05:52   5  back row.

6          CASE MANAGER:  Juror Number 2, XXXXXXXXXXXXXXX;

7  Juror Number 7, XXXXXXXXXXXXXX; Juror Number 9, XXXXXXX

8  XXXXXXX; Juror Number 17, XXXXXXXXXXXXXXX; Juror

9  Number 18, XXXXXXXXXXXX; Juror Number 22, XXXXXXXXXX.

04:06:24  10          JUROR:  XXXXXX.

11          CASE MANAGER:  XXXXXX.  Thank you.  I'm sorry.

12          JUROR:  That's a hard one.

13          CASE MANAGER:  Juror Number 24, XXXXXXXXXX; Juror

14  Number 26, XXXXXXXXXXX; Juror Number 27, XXXXXXXXXXXXXXX;

04:06:54  15  Juror Number 28, XXXXXXXXXXXXXXX; Juror Number 32,

16  XXXXXXXXXXXXXXX; Juror Number 33, XXXXXXXXXXXXXXX; Juror

17  Number 39, XXXXXXXXXX; and Juror Number 40, XXXXXXXX

18  XXXXXX.

19          THE COURT:  Ladies and gentlemen, those of you

04:07:42  20  that have not been selected, I certainly want to thank you

21  for your service.  Hopefully in your short visit with us

22  you have gained a bit of an insight into how the system

23  operates.  It couldn't work without you.  Thank you all

24  very much for coming.  This completes this portion of your

04:07:59  25  jury service.  If you would, don't forget to check those

1   telephones.  You may leave directly from the courthouse at

2   this time.  Thank you and good afternoon.

3        Ladies and gentlemen of the jury, please stand and

4   raise your right hand to take the juror's oath, please.

04:08:56   5        (Jurors sworn by the case manager.)

6        THE COURT:  Thank you.  Please be seated.

7        By the way, I'm going to give the government just a

8   tip.  Don't forget we need to summarize the indictment

9   when we're done with these instructions, and I'll ask how

04:09:14   10  the defendant pleads.  Okay.  So you need to do that, and

11  we do it in all cases.

12        All right.  Ladies and gentlemen, welcome to jury

13  duty.  We're going to move this case.  Some of you that

14  have had experience in state court, it's a little bit

04:09:32   15  different there.  The judge in federal court can mix it up

16  in the case and move the case very fast, if we have to.

17  Hopefully, you won't see me doing it too often; but it's

18  the prerogative of the federal -- federal trial judge to

19  do so.

04:09:44   20        I'm sure the first thing on your mind is how long are

21  you going to be with us.  I do want to tell you you are

22  not going to hear the same question more than once.  If I

23  think it's getting redundant, I'll move it along.  I'm

24  giving you the best estimate we have.  It will be done

04:09:58   25  next week sometime, and that's the deal.  They told me

1   that's it.  And I have given them that amount of time.  My

2   experience is generally it moves quicker.  If not, I

3   assure you I will have it speeded up for you, keeping in

4   mind the rights of all the parties.

04:10:15   5   We operate on the following schedule.  Daily we begin

6   at 10:00 a.m., and we adjourn at 6:00 p.m.  The only

7   change right now is on Tuesdays.  That means tomorrow we

8   get together at 11:30, 11:30 instead of 10:00 a.m.

9   You'll see we take a lunch break about 1:00 for about an

04:10:42   10   hour and 15 minutes.  That's in -- that's the time needed,

11   in my experience, to get downstairs, you know, walk

12   outside, get through the security and come back in.  So we

13   take a break.

14   So, for instance, tomorrow we begin at 11:30.  We just

04:10:57   15   have to set aside that first hour and a half.  Then we'll

16   break between 1:00 and 1:05.  Also, adjourning in the

17   evening, we adjourn between 6:00 and 6:05.  I always give

18   them a little bit -- the attorneys a little bit of leeway,

19   depending upon where they are.

04:11:13   20   We also take a break at about every hour and a half as

21   the testimony goes on.  Those times are all approximate

22   except for the starting time.  We like to get out right at

23   10:00 a.m.   If there is any delay, more than just a few

24   minutes, either my staff members or I will come back and

04:11:30   25   tell you that we're in here, we're working on stuff and it

1    will narrow down the case.  But you will know.  You are

2    not going to be in there, you know, wondering what's going

3    on.  In other words, I make sure that the jury is

4    informed.

04:11:45   5    Also, you will see that as soon as the case starts I

6    keep a notepad of everything that goes on in this case,

7    that you are in the jury room, as to what we're talking

8    about here, the history of the case, and it will all be

9    here.  And I visit with you and explain that all to you

04:12:06  10    later after the trial has completely commenced.

11    I do permit you to take notes.  But Laura Wells is our

12    official court reporter.  If I need anything read back,

13    I'm not going to ask for your notes.  I'm going to ask for

14    the court reporter.

04:12:22  15    By the way, if you are familiar with -- I guess most

16    of you probably know the new technology.  When I first

17    started out maybe some of you taking depositions are

18    familiar with court reporting.  There used to be a paper

19    tape coming out.  No more paper tape.  It's all on

04:12:36  20    computer.

21    In fact, each court reporter has their own personal

22    library.  They call it a dictionary.  They call it their

23    own dictionary, which means they have certain phrases that

24    they can substitute for spelling out a word or a classic

04:12:54  25    word.  They have their own shorthand within shorthand.

1      So if they hear a -- let's say if I am running a

2   patent case and some of the engineering technology is

3   there, they will in effect type it out as best they can

4   phonetically.  But from then on, it's in their permanent

04:13:11   5   history, their permanent dictionary.

6      And also, at the end of the trial it used to be if the

7   attorneys needed what we call daily copy, they would have

8   to have a reporter in for a half hour, another one in and

9   they would be transcribing it on a microphone and having

04:13:29   10   it typed.  Now within less than a half hour, probably

11   quicker than that, after the day is done, if the attorneys

12   want daily copy, the court reporter pushes a button and

13   runs a rough copy.  Now there may be some misspellings in

14   there that later on they have to correct; but in effect,

04:13:46   15   they can have a rough copy immediately.  So the profession

16   of court reporting has come a long way as has all of our

17   businesses.

18      I've got a room full of books back there.  I mean, law

19   books they look great, like you see in the movies.  I have

04:14:00   20   got them back there.  About a year ago I said no more

21   books.  If there is something that needs it, I run to the

22   books.  The law clerks are there.  They can have the whole

23   thing up and printed out by computer by the time I open

24   the first page.  So no matter what business you're in or

04:14:16   25   that I'm in, technology is moving up quickly.

1    You also note there are 14 jurors.  Now, there are two

2    alternates in this case.  But with the agreement of the

3    attorneys and now many courts across the country are doing

4    this, there are no alternates right now among you 14.

04:14:37   5    At the very end of the trial, at the end of the

6    testimony, I'll read you the instructions.  You'll hear

7    summation by the attorneys.  And just before you begin to

8    deliberate, my case manager will walk over to one of you;

9    and you will draw two names at random.  And that's the

04:14:55   10   alternate jurist.

11   So just because you are sitting in a certain seat

12   doesn't mean you are alternate jurors.  Everybody is fully

13   qualified until our last blind draw is done by one of you

14   all.

04:15:08   15   As I mentioned, if there is a guilty plea -- I mean, a

16   guilty verdict in this case -- you haven't heard any of

17   the evidence -- I'll be doing the sentencing, as I

18   mentioned before.  You will not have a question on that.

19   You have taken an oath which states you are going to

04:15:27   20   decide this case based upon the evidence and the evidence

21   alone, and I want to discuss that with you at this time.

22   First of all, we don't want you to determine who you like

23   and who you dislike and decide a case -- the case

24   accordingly.  Therefore, you will have no contact with

04:15:42   25   anyone involved in this case, including the attorneys, the

1   parties and the witnesses.  Of course, you may say "good

2   morning" or "good afternoon" to them as you pass them in

3   the hall; but you may say nothing further.  You certainly

4   will not extend any favors to or accept any from any of

04:15:59  5   the attorneys or any parties in this case however slight

6   that favor.

7       When you get home this evening, you will be asked, I'm

8   sure, by your friends and family if you have been selected

9   to serve on the jury.  Of course, you may tell them that

04:16:12  10  you have; and you may tell them it's a criminal case, not

11  a civil case.  Beyond that, you are not to discuss this

12  case with anyone, including each other, until you have

13  heard all of the evidence and we wrap it up and I instruct

14  you, the last 12, to commence your deliberations.  So you

04:16:29  15  are not to talk to each other.

16      This case may have some publicity.  In fairness to

17  everybody, they are not in here listening to the evidence.

18  You are.  So, therefore, if anything comes up on the TV,

19  just click the DVR and move to a different channel.

04:16:45  20  Anything shows up in the paper and you spot it, really,

21  give it to your family; and they will hold it for you

22  until the end.  Because we don't want them to make or you

23  to make any determination outside of court.  Because if

24  you do, any comments made or interpretations, what is it,

04:17:05  25  may affect your thinking in this matter but will not be

*Laura Wells, CRR, RDR*

1    accurate.

2        So to keep this clean -- and we all will -- don't

3    read, don't listen to anything.  Make up your mind based

4    upon the evidence you hear from that witness stand and the

04:17:21    5    evidence alone.

6        Also, somewhere we have an evidence book.  Do you have

7    it there anyone?

8            CASE MANAGER:  No.

9            THE COURT:  All right.  We'll have it tomorrow

04:17:29    10    for sure.  And we have gone through most all of the

11    evidence.  Very few you'll hear they will object to on the

12    spot to a piece of evidence.  Most of it is ruled on ahead

13    of time in federal court.  There are a few things that may

14    come in that they will object to.

04:17:45    15        Also, while I'm on that, don't hold it against any of

16    the attorneys or certainly their clients if they object.

17    It's just their way of bringing to my attention that the

18    book, the rules -- and you'll see me hit the rule books --

19    that their interpretation of the rules may be different

04:18:00    20    than my ruling or object to them trying -- one side trying

21    to get in a piece of evidence.  Okay.  So don't hold it

22    against anyone if you hear an objection.

23        When you get out -- let's see.  Oh, yeah, not to

24    discuss this case with anyone until you have heard all of

04:18:17    25    the evidence and don't discuss this case with other

1    members of the jury or your own lawyer or anybody else you

2    think might have expert knowledge.

3        You are not to make any private investigation

4    concerning this case and simply listen to the evidence as

04:18:34  5    it is presented to you in court.  Make up your mind based

6    upon that evidence and that evidence alone.

7        Here we are in the computer age.  So I do say to you

8    don't research this case outside of what you hear here

9    relative to Googling, texting, tweeting or whatever.  Just

04:18:54  10   none of that relative to this case until it's all over.

11       If you have any problems during the course of the

12   trial, let a member of the staff know.  Should you be

13   delayed in arriving at the court in the morning, give us a

14   call.  During your first break, Ellen will come in and

04:19:10  15   visit with you.  Again, we usually go on for about -- oh,

16   it's 6:00.  We'll take a break around 5:00 or 5:10 so

17   Ellen can visit with you.  And then we'll come back in.

18   We're going to get as much as we can every single day.

19   And she will visit with you and give you the court's

04:19:27  20   number to call if you are running late for a medical

21   emergency or car breakdown or something like that.

22       If at any time you have trouble hearing, raise your

23   hand, get my attention, get the marshal's attention, even

24   say, "Could you speak louder" or somehow get our

04:19:43  25   attention.  And I'll have the witness speak up and pull

1    the microphone in as best I can.

2        Also, as far as breaks go, we take a break at every

3    hour and 30 minutes as the case goes on.  If anybody needs

4    to take a break at any time, just let us know.  It happens

04:19:58   5    in every case.  No big deal.  If you need to take a break,

6    let us know.  And then, we'll tell you -- we will always

7    have a -- fit in a 10-minute break.  You know, as the

8    world turns in this case, it's no big deal ten minutes

9    here or there.  It happens in every case.  Nobody is

04:20:15  10    bashful.  Take a break, and we'll get right back in.

11        When you take a break, you'll go into the jury room.

12    If it's a long one, certainly you can leave and go down

13    the hall or outside or whatever.  But when you come back

14    in, Ellen will have you lined up in the same sequence you

04:20:32  15    are in now.  Come into the courtroom.  We'll all remain

16    standing until we are all in place.  And then, we'll have

17    a seat at the same time.

18        As you will note, the federal courthouse is a

19    smoke-free facility.  Certainly, if you desire, you may do

04:20:48  20    so outside the building during the break.

21        I hope you are going to enjoy your jury service with

22    us.  Don't worry about if it seems that this case has been

23    on file for a while.  Cases in federal court do move

24    quicker than you think.  And if you think this case took a

04:21:05  25    while, I will explain it to you when we get back in there.

Opening Statement by The Court          Vol 1 - Page 178

04:21:22

04:21:32

04:21:50

04:22:03

04:22:21

```
 1   But we generally move civil and criminal cases faster than
 2   the perception is, at least, in the federal courthouse.
 3        I have gone to introducing some of the folks because
 4   it's the first question I ever got.  Who are all these
 5   people?
 6        Well, you have a court reporter.
 7        A case manager who keeps my docket straight, sets my
 8   schedule, handles the pleadings, puts them in the computer
 9   when I sign an order.
10        I have two law clerks.  One, Natasha, is on vacation.
11   Jordan is with us.
12        I have two lawyers.  They are both lawyers.  I have
13   over -- well, between two and 300 applicants each year for
14   one slot.  They are with me for two years.  One comes on
15   and one comes off each year.  So they tend to keep me
16   straight.
17        And if they don't, I have an administrative assistant,
18   Karen, over there.
19        You notice I have three other -- they look like
20   lawyers and they probably could try a case after all this,
21   but I have four interns for this semester.  Three of them
22   are here from the local law schools.  During the summer
23   they come from all over the country.  But during the
24   school year I have four law students who are with me for a
25   semester for grades.  So I'm not sure the grades they are
```

1    going to get.  So you better listen carefully because I

2    think they have got just one more week left.

3         All right.  I think that's about it.  Remember,

4    tomorrow we begin at 11:30.  And as the case goes on, this

04:22:52    5    case may be what you think, well, why is it chopped up, as

6    far as some time frame goes, certainly perhaps into next

7    week.  It wouldn't affect it whatsoever if you are in

8    deliberations.  Okay.  When I give you the schedule for

9    next week, it will not affect you if you already have the

04:23:07   10    case that you are deciding.  But it will if we have to

11    come in and all be here.

12         I'll explain it all to you when I come back and visit

13    with you later.  And keep in mind -- I'm already going to

14    write something down in red as to things that occurred

04:23:20   15    that you may want to know about the background of the case

16    that I'm not going to share with you at this time.

17         We're going to move this case along.  But keep in mind

18    both sides have waited for the opportunity.  This is their

19    day in court.  When we're done, we go back to our -- you

04:23:35   20    go back to your business.  The attorneys go on to the next

21    case.  And, of course, I call my next case.

22         But for these parties and the government as an entity

23    and the agencies and the defense, this is their day in

24    court.  Our whole system revolves around just what you

04:23:53   25    see.

1    And we really appreciate your coming down and doing,

2    well, a civic duty.  We all do it.  We all have to do it.

3    And, hopefully, you'll find this interesting.  You'll

4    learn about certain areas you may not have been exposed

04:24:07   5    with that eventually you will make the decision in this

6    case.

7    So the first thing that we have is -- remember, an

8    indictment is no evidence of any guilt whatsoever; but

9    it's the charging mechanism that we get here.  So what I'm

04:24:21  10    going to do in a moment, I will ask the government -- and

11    with the approval of the defendant -- just to summarize

12    the indictment as to the different counts.  You have heard

13    a little bit of it.  Summarize it.  Then I'm going to ask

14    the defendant how she pleads, guilty or not guilty.  And

04:24:37  15    then, we assume what it will be since we are in trial,

16    which is her absolute right.

17    And then, we're going to start with opening

18    statements.  An opening statement is nothing more than

19    what the attorneys anticipate the evidence will show, and

04:24:51  20    that's all.  And if you hear the other side get up and

21    object that's argument, meaning arguing the case is at the

22    end of the case.  So what the evidence will show, each

23    side has 15 minutes -- and I'm not using this yet.  I may

24    not in the case for the whole trial, but I literally have

04:25:08  25    a chess timer up here.  So when they get going, the

1   buttons go down.

2       So at this time, I would ask the government if you

3   would, please, summarize, if that's all right with the

4   defendant, summarize it.

04:25:21  5       MR. FAZEL:  No objection to that, Your Honor.

6           THE COURT:  Summarize, if you would, the various

7   counts and what they are.  And then, I'll ask for a plea.

8           MR. PEREZ:  Your Honor, in Count 1 the defendant

9   is charged with conspiring to provide a place where girls

04:25:34  10  can prostitute themselves, either knowingly or recklessly

11  disregarding the fact that they are either minors who are

12  prostituting themselves against their will or to obtain

13  money -- conspiring to obtain money by providing a place

14  for prostitution knowing and with reckless disregard of

04:25:52  15  the fact that the girls were minors prostituting

16  themselves against their will.  In essence, conspiracy to

17  commit sex trafficking.

18          THE COURT:  Next one.

19          MR. PEREZ:  Count 2, the defendant is charged

04:26:03  20  with agreeing or conspiring to provide a place that would

21  conceal, harbor or shield people who she knew were illegal

22  aliens or was in disregard -- in reckless disregard that

23  they were aliens to make money.

24      In Counts 3, 4 and 5 she is charged with the help of

04:26:19  25  others to hide the money she made in the sex trafficking

1    business by buying properties and placing the properties

2    under someone else's name.

3        In Count 6 she is charged with conspiring with others

4    to provide cashier's checks under $10,000 with money she

04:26:35   5    made from sex trafficking in order to avoid the $10,000

6    reporting requirement.

7        In a nutshell, Your Honor, those are the six counts

8    that the defendant is charged with, Your Honor.

9            THE COURT:  Okay.  Now on the defense as to those

04:26:45  10    six counts how does the defendant plead?  Guilty or not

11    guilty?

12            THE DEFENDANT:  (Speaking in English)  Not

13    guilty.

14            THE COURT:  Thank you so much.  You may be

04:26:54  15    seated.  All right.  I am turning the clock on.  15

16    minutes.  What the evidence will show.  The government has

17    got the burden of proof.  They are going first.

18        Counsel, go right ahead.

19            MR. PEREZ:  May it please the Court, Your Honor.

04:27:03  20            THE COURT:  Yes.

21            MR. PEREZ:  Counsel for the defense.  Good

22    afternoon, ladies and gentlemen of the jury.

23        At the end of the trial the Judge is going to instruct

24    you what the defendant is accused of and what we have to

04:27:16  25    prove before we find the defendant --

1           THE COURT:  Hold it a second.  I'm going to stop

2    you right there.  Since we have an interpreter, can you

3    use a microphone, please?

4           MR. PEREZ:  Yes, sir.

04:27:23  5           THE COURT:  We have the microphone.  It will be a

6    lot easier.  That way the sound will also carry into the

7    back of the courtroom.  I have stopped the clock.

8        By the way, Ruben, put it at the top, just below the

9    knot of your tie.  Go ahead.

04:27:54  10           MR. PEREZ:  At the end of the trial, I anticipate

11   the Judge is going to instruct you again what the

12   defendant is charged with and what we have to do, what we

13   have to prove in order for you to find the defendant

14   guilty.  I have outlined the basic elements or counts that

04:28:13  15   I have to prove to you that we are presenting here to you

16   today.

17       The law provides that we can give you a little road

18   map of the evidence that we will be presenting to you.  I

19   anticipate you will hear from a deputy from Harris County,

04:28:27  20   Edwin Chapuseaux, as to a timeline of his investigation

21   from 1999 to 2013.

22       In general, he will tell you that when he meets a

23   victim of sex trafficking he doesn't just take her story

24   up front.  You know, he tries to corroborate her story.

04:28:46  25   He takes steps to investigate and to make sure what she is

1    telling him is what he thinks is the truth.

2         I anticipate your first witness that we will present

3    to you will be XXXXXXXXXXXX, an illegal alien who came to

4    our country illegally from Mexico.  How she worked at Las

04:29:03    5    Palmas and La Feria, a brothel owned by this defendant

6    located here in Houston, Texas, off of Telephone Road and

7    610.

8         You will hear from XXXXXXXXXXXX; and in a nutshell,

9    she will tell you that she worked as a prostitute at Las

04:29:17   10    Palmas from January 20, 2001, to November, 2001.  That she

11    stayed at the defendant's house for three to four weeks.

12    That the defendant transported her and other minors and

13    adults each day to and from Las Palmas to work as a

14    prostitute at that location.

04:29:36   15         That an alarm went off at Las Palmas; and at that

16    time, XXXXX was moved to an apartment.  The defendant

17    asked her if she had any papers; and she said, no.

18         XXXXX and others stayed locked up at Las Palmas for

19    about two months on the second floor.  Hortencia received

04:29:51   20    part of the money collected from the clients who had sex

21    with XXXXX.

22         XXXXX will testify that she was afraid to leave her

23    situation because she might be killed if she tried because

24    she was always being watched.  She will tell you how the

04:30:02   25    defendant used the police to cause fear in the girls and

1    tell them police were bad people and not to report her

2    actions to the police because the police were bad.

3        How the defendant and her daughter, Delia, who she

4    knew as Rosa, would bring special clients to the Las

04:30:19    5    Palmas so they could choose the minors that they wanted

6    for sex.  How special clients wanted four hands.  That

7    refers to when special clients wanted two females instead

8    of just one for the sex act.

9        How the defendant slapped her in the face and how the

04:30:33    10    defendant told her that she owed her $5,000 for clothing,

11    rent, food provided by the defendant.

12        You will hear that XXXXX finally escaped in November

13    of 2001.

14        This is just an example of a case where Deputy

04:30:49    15    Chapuseaux, once she was rescued, he took steps to make

16    sure that whatever she told him was, in fact, the truth.

17    He went to the location, the second floor of Las Palmas;

18    and the description of the second floor was the way that

19    XXXXX told him that it was.

04:31:04    20        That she also told him that there was a -- that there

21    was an alarm there at Las Palmas.  And he went and checked

22    that out and that, sure enough, there was an alarm there.

23    So, there again, to take steps to make sure what the girls

24    were telling him was the truth.

04:31:19    25        I expect you will hear from XXXXXXXXXXXXXXXXX, an

1  illegal from Mexico.  By the way, all these victims that

2  you are going to hear testify, they are all here illegally

3  in the country.  They are all from Mexico except for one

4  that was from Honduras.

04:31:33   5      You will hear from XXXXXXXXXXXXXXXXX, who will tell

6  you that she worked there at Las Palmas from January of

7  2003 through October and November 2003.  That, again, she

8  gave a portion of each sex act to the defendant.  And you

9  will hear testimony that the defendant was known as

04:31:52  10  Tencha.  Tencha, T-e-n-c-h-a.

11      You will hear testimony that XXXXXXXXX heard the

12  defendant talking with other females who had signs of

13  being beaten.  The defendant told them that they should

14  pay attention to their pimps.  You will hear testimony

04:32:10  15  that pimps were called padrotes.  "Padrotes" in Spanish

16  means "pimps."  You will hear testimony about that.

17      You will also hear from XXXXXXXXXXXXXX, another person

18  illegally from Mexico who worked there from May 2003 to

19  May of 2007.  She will tell you she was controlled by her

04:32:30  20  pimp and made to work at Las Palmas by her pimp by beating

21  her and threatening to keep her daughter from her; and if

22  she left her pimp, he would kill her.  That all the money

23  made from Las Palmas went to this defendant.

24      You will hear from XXXXXXXXXXXXXXXXX, who was a minor,

04:32:49  25  again here illegally from Mexico.  She worked at Las

Opening Statement by Mr. Perez       Vol 1 - Page 187

1   Palmas in 2004.  She will identify Lilia Cerda as the one

2   who gave her condoms wrapped in a paper towel.  Lilia is a

3   relative of the defendant, Tencha.  That one of the

4   methods that was used to control her by her pimp was by

04:33:08   5   controlling her by beating her.

6        You will hear from XXXXXXXXXXXXX, also a minor

7   illegally from Mexico who worked as a prostitute in 2004,

8   that the defendant sometimes herself would work in the

9   prostitution area and that sometimes she would collect

04:33:26  10   fees for the use of the rooms and the use of the condoms

11   there at Las Palmas.  You will hear from her and it will

12   show that not only was Tencha like the owner of Las Palmas

13   but she was also there as an on-site manager and that she

14   knew what was going on there at that location.  She knew

04:33:44  15   pimps were supplying girls to that location, and she knew

16   how pimps controlled these girls by beating them and

17   things like that.

18        You will also hear from XXXXXXXXXXXXX --

19        THE COURT:  I will tell you what.  We're cutting

04:33:55  20   in and out.  Let's leave it there, in any event.  We're

21   going to do the best we can.  We're going to get the IT

22   person in from outside.  I'm going to stop the clock for a

23   second.

24        This whole place was redone in the last week, new

04:34:09  25   carpets, walls were oiled down and so forth.  And

*Laura Wells, CRR, RDR*

```
 1   apparently it's just not 100 percent, but I think some of
 2   it helps.
 3       If our interpreters are having problems, you are free
 4   to move anywhere in the courtroom.
 5            THE INTERPRETER:  Thank you, Your Honor.
 6            THE COURT:  Actually, if you need to sit, you can
 7   sit in the witness box.
 8            THE INTERPRETER:  Thank you, sir.  I will do
 9   that.
10            THE COURT:  I may ask you a question.
11            THE INTERPRETER:  Do I take an oath, too?
12            THE COURT:  Yes, ma'am.  You already have an
13   oath, since you are an official interpreter.
14            THE INTERPRETER:  Thank you.
15            THE COURT:  I apologize.  Okay.  Sorry.  We're
16   going to crank it up.  You have used about 6-1/2 minutes.
17            MR. PEREZ:  Thank you, Your Honor.
18       You will hear from XXXXXXXXXXXX, who is also a minor
19   who worked at Las Palmas from May 2005 to July 2005.
20   Again, she made -- gave a portion of her money from these
21   sex acts to Tencha, the acting on-site manager there at
22   Las Palmas.
23       You will also hear from XXXXXXXXXXXXXX, also
24   illegally from Mexico who worked there from 2008 to 2012.
25   You will hear that the defendant did not want the girls to
```

         1    show up with bruises, not because she cared about if the

         2    girls had been beaten up but because if they showed up

         3    with bruises that would alert the police.  She didn't want

         4    the police to be notified.  So she told them not to show

04:35:25  5    up with bruises.

         6         You will hear testimony from her that La Morena,

         7    another relative of the defendant in this case, checked

         8    for bruises on the girls.  And the irony of it is that La

         9    Morena at one time sent a girl home for showing up with

04:35:44 10    bruises that her pimp had given her.  And then, she goes

        11    home; and she gets beaten up again because she got sent

        12    home because of the bruises that the pimp had given her.

        13         You will hear from XXXXXXXXXXXXX, also from -- no.

        14    This one was from Honduras.  She was illegally in our

04:36:01 15    country.  One of the methods used to control her was

        16    threats to harm her child and a forced abortion prior to

        17    bringing her -- the pimp bringing her to the United

        18    States.  And again, the money from each sex act went to

        19    Tencha from each sex act.

04:36:17 20         You will hear from XXXXXXXXXXXXXXXXX, also from

        21    Mexico.  One of the methods of control the pimp used on

        22    her was by beating her.  And the reason I tell you this,

        23    the method of control the pimps were using, was because

        24    Hortencia ran that location, ran that business; and she

04:36:33 25    knew those pimps were doing this to these girls.  I want

1   to tell you also that --

2         MR. FAZEL:  Judge, this is argumentative, Your

3   Honor, as to what she knew or did not know.  I object to

4   that.

04:36:42   5         THE COURT:  Sustained.

6         MR. PEREZ:  You can deduce from the evidence your

7   conclusion at the end of the trial, but we will present to

8   you the girls did show up beaten up and that some of the

9   relatives of the defendant would check them for bruising.

04:36:55  10     You will hear from XXXXXXXXXXXXX, a minor who worked

11   at Las Palmas as a prostitute.  In a minor case -- the

12   Judge will instruct you that with a girl who is a minor we

13   do not have to prove that actual force was used when a

14   minor is involved.  That in the case of the minor, we do

04:37:15  15   not have to prove that force, fraud or coercion was used

16   to compel the girls to engage in prostitution.

17     You will also hear from XXXXXXXXXXXXXX, illegally in

18   the country from Mexico who worked at Las Palmas in 2011.

19   Again, Hortencia kept a portion of the moneys from each

04:37:36  20   sex act for the use of the room and the condom and that

21   her pimp controlled her by regularly beating her.  You

22   will hear from Odelia.  You will hear that Odelia

23   Hernandez, a relative of Tencha, reprimanded her for

24   taking a break inside the restroom and that she came

04:37:53  25   forward and told Deputy Chapuseaux in March about her

*Laura Wells, CRR, RDR*

1  being a victim of human trafficking.  You will hear that

2  Deputy Chapuseaux tried to rescue her in 2011 and 2012,

3  but she did not come forward because of the overwhelming

4  fear of her pimp and for the safety of her family.

04:38:12   5      Finally, you will hear from XXXXXXXXXXXXX, a minor who

6  was illegally in the country from Mexico.  Again, she will

7  identify Tencha as an on-site manager and the owner of

8  that place and that Tencha kept a portion from the moneys

9  from each sex act there at Las Palmas.

04:38:31   10      On October the 1st, 2012, the Houston Police

11  Department raided Las Palmas.  After that raid, Tencha

12  made arrangements with Poncho, another codefendant in this

13  case, for him to run Las Palmas.  But then Poncho was

14  arrested.

04:38:47   15      She then made arrangements with three other pimps to

16  run Las Palmas.  She tells the pimps that they can keep

17  the first $20,000 a week made at the Las Palmas and the

18  rest will go for her, trying to keep from under the radar

19  of law enforcement.

04:39:06   20      In addition to the evidence presented as to Counts 1

21  and 2, we will present evidence in the money laundering

22  counts in Counts 3, 4 and 5.  In Count 3 we will call

23  witnesses to show that around 2012 she purchased a house

24  and trailer in Channelview, Texas and transferred the

04:39:25   25  title to these properties to her son, David Garcia, to

1    hide the source of the money, that is, the sex trafficking

2    occurring at Las Palmas.

3        In Count 4 the evidence will further show that around

4    2012 she purchased a house in Channelview, Texas and

04:39:42  5    transferred the title to this property to her son's name

6    again, David, to hide the source of the money.

7        And in Count 6 the evidence will further show around

8    2012 she purchased a house in Houston, Texas and again

9    transferred the title to this property to her son's name,

04:39:55  10   David, again to hide the source of the money.

11       You will hear her son testify, the defendant's son,

12   David, testify that he did not put up any money for these

13   properties and that he did not actually own these

14   properties.  He just owned them on paper.  Again, evidence

04:40:09  15   that the defendant was trying to hide the source of those

16   moneys and trying to hide the profits made from the sex

17   trafficking at that location.

18       You will hear, per the evidence, that between

19   September 2011 to November 2011 she, the defendant, and

04:40:25  20   her daughter recruited others to conduct financial

21   transactions, that is, to purchase a total of 29 cashier's

22   checks all under $10,000 for a total of $259,689.07 in an

23   effort to evade bank filing requirements.  Banks are

24   required to file a currency transaction report for cash

04:40:48  25   transactions over $10,000.

1    She, along with others, her daughters and her son,

2    purchased a total of 29 cashier's checks for that amount

3    that I just told you.  All the cashier's checks were made

4    for under $9,000.  Sometimes the same date and same time

04:41:02    5    within minutes of the other purchase of the cashier's

6    checks.

7    That's just, again, everything was -- all these checks

8    were for about $9,000, all under $10,000; and David, her

9    son, will tell you and testify from that witness stand

04:41:17    10    that she told him to keep the checks under $9,000 -- under

11    $10,000.

12    THE COURT:  You have two minutes left.  Two

13    minutes left, Counsel.

14    MR. PEREZ:  Thank you, Your Honor.

04:41:25    15    Basically, that's the evidence.  It's just a little

16    road map.  Obviously, we will amplify on that evidence.

17    It's just a little road map of what we foresee coming in

18    this trial.

19    We anticipate that once we bring all the evidence to

04:41:36    20    you, all the relevant evidence to you, that you will find

21    the defendant guilty as to Counts 1, 2, 3, 4, 5 and 6.

22    We look forward to presenting the case to you and

23    thank you very much for your time.

24    THE COURT:  All right.  Counsel for the defense.

04:41:52    25    MR. FAZEL:  May I proceed, Your Honor?

1                THE COURT:  Yes.

2                MR. FAZEL:  Thank you, Your Honor.

3                THE COURT:  Use the mic as best you can.  Then

4       we're going to use the mic when they sit down here.  It

04:42:00   5    will just help, even though it's in and out.  We'll get it

6       fixed.

7                THE INTERPRETER:  My colleague will take over

8       now.

9                THE COURT:  Okay.  Sure.

04:42:15  10    MR. FAZEL:  I'm not good at this, Your Honor.

11               THE COURT:  A little higher up, if it works.  A

12      little higher up.  Okay.

13               MR. FAZEL:  May I proceed, Your Honor?

14               THE COURT:  Yes.

04:42:35  15    MR. FAZEL:  May it please the Court, counsel for

16      the government, ladies and gentlemen.

17          Obviously, the reason we're here is because we don't

18      agree with anything the government said.  I know that

19      doesn't shock anybody.  Nobody is confused about that.

04:42:46  20    But let me be very clear about this.  We are here today

21      because we don't agree with what the government says.  We

22      are pleading not guilty.  We did not do what the

23      government said.

24          Let me tell you -- let me draft up or explain to you

04:43:02  25    the road map that we want or we expect for you to hear.

1    We're not going to argue before you -- although it's very

2    tempting to do this.  But I'm going to draft up or try to

3    give you a road map as to what I believe the government

4    will try to present and why we disagree with it.

04:43:18    5        So let's start with the charging instrument.  As the

6    Judge has told you over and over again, this charging

7    instrument is not anything but a road map, not anything

8    but allegations against the accused.

9        Well, the first thing I want you to pay attention to

04:43:33   10    is Count 1, which is the sex trafficking count, the

11    conspiracy to commit sex trafficking.  Folks, the dates

12    are very clear.  From January of 2009 and continuing to

13    October of 2013.  That is what they are claiming.  All

14    right.

04:43:44   15        So let's talk about that time frame.  Here is what we

16    suspect the evidence will show.  There is no doubt that

17    the defendant was running a location where prostitution

18    was occurring.  There is no debate about that.  I will not

19    argue with that.  She did.  Let me say it again.  She ran

04:44:03   20    a location where prostitution happened.  Guess what?

21    That's not against the federal laws of this country.  The

22    feds have no jurisdiction over prostitution.  The state of

23    Texas does.  And if they want to charge her with a crime,

24    they need to go to the state of Texas where you guys have

04:44:22   25    been, another courthouse five blocks down.

1    The reason why we are here today is because they are

2    claiming a federal crime occurred.  That's why we are here

3    today.  They are claiming that she was involved in a

4    conspiracy.  We suspect that the evidence will show the

04:44:40  5    following:  That the defendant was not involved in

6    trafficking.  That the defendant did nothing of the sort

7    described by the government.  The defendant beat nobody.

8    The defendant didn't traffic anybody.  The defendant

9    didn't recruit anybody.  The defendant was not a pimp.

04:45:00  10    The defendant did not beat anybody, and the defendant did

11    not coerce or force anybody.  None of that occurred.  We

12    suspect the evidence will show none of that.

13        We suspect that the evidence will show that this

14    occurred by individuals in Mexico.  We suspect that this

04:45:16  15    evidence will show that some of these individuals were

16    indicted by the government in this case, and some of these

17    individuals pled guilty in this case and other cases.

18        So she didn't beat anybody.  She didn't coerce

19    anybody.  She didn't put anybody into this type of

04:45:36  20    activity.  She had a place where prostitution occurred.

21    That's all true.  But please understand something.  That

22    is not why we are here today.  We are not here today to

23    demonstrate that prostitution occurred.  We are here today

24    and throughout this week to demonstrate one thing:

04:45:54  25    Conspiracy for sex trafficking on the dates according to

1    the government, which is January of 2009 until October of

2    2013.

3        The government discussed in their opening statement a

4    young lady who claims that there are special clients,

04:46:17  5    things like four hands, and $5,000 owed to the defendant.

6    We look forward to cross-examining this witness.

7        We suspect that the evidence will show that these

8    individuals had a terrible time.  There is no debate about

9    that.  This is nothing that you would wish on anybody.

04:46:36  10   There is going to be facts demonstrated to you.  You are

11   going to hear things that are just not nice.  People out

12   there are treating people badly.  This shouldn't come as a

13   shock to anybody.  We are all adults here.  That's a fact.

14       We suspect, we hope, that what is going to happen when

04:46:55  15   this case is over is that the charges against the accused

16   is what we need to focus on.  This is a court of law.

17   This is a judge with a robe.  He has got a seal above him.

18   There is all sorts of pomp and ceremony because it's a

19   court of law.  We follow the laws.

04:47:13  20       The government has put themselves before you with a

21   charging instrument.  We ask that that charging instrument

22   is what you focus on.  But I will stand up before you

23   today and tell you, yes, there is going to be facts that

24   you are going to hear that you are not going to be happy

04:47:29  25   with.  It's not going to be sounding nice.  There are

1  going to be people that treated folks very badly.  That's

2  a fact.  I will not take that away.

3      Now, here is the other thing we suspect.  The lady

4  before you, her name is Raquel Medeles-Garcia.  She is

04:47:49  5  68 years old.  The evidence will show she was born in

6  Monterey, Mexico.  She is a U.S. citizen and has been

7  since she was 14 years old.  She is 68 now.  She speaks

8  English but nervously.  All her children were born here.

9  Some of her children don't speak Spanish.  The evidence

04:48:06  10  will show that they speak to her in English.

11      The evidence will show that she has got four kids.

12  You will get to meet some of them.  You will get to meet

13  some of them because the government has made deals with

14  her kids -- her kids to come testify against their mother.

04:48:26  15  The first child, Delia Diaz; second child, Diana; third

16  child, David, that you heard the prosecutor talk about;

17  fourth child, Graciela.

18      At the end of this case, I'll stand up here and tell

19  you -- I would hope, and I hope you accept this -- that

04:48:43  20  the evidence against the person before you is not a

21  federal crime.  This is not a conspiracy.

22      I thank you for your time and your service.

23      Thank you, Your Honor.

24          THE COURT:  Ladies and gentlemen, we're going on

04:49:01  25  as to the schedule.  I have talked to my case manager, who

 1   needs to visit with you just briefly.  The time I have on

 2   my clock is 4:49.  Okay.  We're going to do some paperwork

 3   and have you get some of the information from Ellen.  So

 4   we're going to take a 10-minute break.  She will be right

04:49:18  5   in there with you.  We're going to get back in at 5:00.

 6   We'll go on to 6:00 or 6:05.  So thank you.  You may stand

 7   and walk behind the marshal.

 8            THE MARSHAL:  All rise.

 9        (Jury exited the courtroom at 4:49 p.m.)

05:04:12 10        (Recess from 4:49 p.m. to 5:04 p.m.)

11            THE COURT:  Mr. Fazel, you wanted to get

12   something on the record?

13            MR. FAZEL:  I do, Your Honor.  Just briefly.  I

14   think we -- we touched on this a little bit.  The first

05:04:21 15   witness for the government is going to be Mr. Chapuseaux,

16   who is going to discuss -- sorry.  Did I screw that up?

17   -- who is going to talk about both Count 1 and Count 2,

18   obviously.

19        Count 1 is January of 2009 to October 2013, keeping in

05:04:37 20   mind that the law regarding Count 1 changed in 2008.

21            THE COURT:  All right.  Go on.  What?  You want a

22   running objection, correct?

23            MR. FAZEL:  Well, I guess my point is Count 2

24   talks about harboring.  And so, if they are going to talk

05:04:51 25   about '99 sex trafficking, I do want a running objection

1    to any sex trafficking discussion prior to 2009.

2              THE COURT:  What is your response?

3              MR. MAGLIOLO:  It's the same thing as this

4    morning.  It's 404(b), Your Honor, as to motive, lack of

05:05:05    5    intent, lack of mistake.  It's straight -- it's classic

6    404(b).  We would like an instruction on that.  I think

7    it's proper for the Court to give an instruction on that

8    to the jury.

9              THE COURT:  All right.  Your objection is

05:05:17   10    overruled, but I will give an instruction.  Do you want an

11    instruction?

12             MR. FAZEL:  Yeah, I do.  I do.  There is a Fifth

13    Circuit 404(b) instruction that we would ask that --

14             THE COURT:  Do you have it?

05:05:27   15             MR. FAZEL:  I can find it.

16             THE COURT:  Find it.  I'll tell the jury it will

17    be a couple of minutes.  Get them right into it.

18        (Recess from 5:05 p.m. to 5:06 p.m.)

19             THE COURT:  Yes, sir.

05:06:01   20             MR. MAGLIOLO:  Back on the record, Your Honor.

21    As to Government Exhibit B, counsel for the defense has no

22    objection to it.  It's the pictures of the various

23    codefendants in this case to aid the jury in figuring out

24    who is who during the course of the testimony.

05:06:13   25             THE COURT:  Okay.  Hand it up.  Hand up the

*Laura Wells, CRR, RDR*

Trial on Merits                                     Vol 1 - Page 201

1    machine.

2         MR. FAZEL:  Your Honor, please ignore the dog

3    picture.

4         THE COURT:  Or, as they say in Brooklyn, "dawg."

05:06:31    5         MR. FAZEL:  I believe that's the jury

6    instruction.

7         THE COURT:  Are you familiar with it?

8         MR. MAGLIOLO:  I will have to look at it.

9         THE COURT:  Okay.  Everybody be seated.

05:06:53   10         MR. MAGLIOLO:  That's fine, Your Honor.  The only

11    trick is that they can consider this -- all that evidence

12    as to Count 2.

13         THE COURT:  I'm going to read it, that's all, if

14    you have no objection.

05:07:13   15      All right.  Let's call the jury in.  Terrence, jury,

16    please, if they are ready; but open it slowly.  Are they

17    ready?

18         THE MARSHAL:  Almost.

19         THE COURT:  Almost.

05:07:47   20      Now, do you want to read the state of mind and all

21    that business?

22         MR. FAZEL:  I think the first paragraph is what

23    the Circuit requires, Your Honor; but if you want to

24    scroll down, you can scroll down by using --

05:07:58   25         THE COURT:  I don't need "if you need beyond a

*Laura Wells, CRR, RDR*

 1  reasonable doubt, if you find --"

 2         MR. FAZEL:  I need the whole thing.  That's just

 3  right out of the Circuit pattern.

 4         THE COURT:  Stop where?  You want the whole

05:08:09  5  thing?

 6         MR. FAZEL:  Yes.  That's what the Circuit says.

 7  It's up to you.

 8         THE BAILIFF:  All rise for the jury, please.

 9     (Jury entered the courtroom at 5:08 p.m.)

05:08:18  10        THE COURT:  All right.  Have a seat.  Be seated,

11  please.  I'm going to read a -- by agreement, I have

12  talked to the government and the defense -- an instruction

13  to you.  Okay.

14     "You are about to hear evidence of acts of the

05:09:03  15  defendant which may be similar to those charged in the

16  indictment but which were committed on some other

17  occasion.  You must not consider any of this evidence in

18  deciding if the defendant committed the acts charged in

19  this indictment.  However, you may consider this evidence

05:09:21  20  for a very limited purpose, another very limited purpose.

21  If you find beyond a reasonable doubt from other evidence

22  in the case that the defendant did commit the acts charged

23  in the indictment, then you may consider evidence of the

24  similar acts allegedly committed on other occasions to

05:09:42  25  determine whether the defendant had the state of mind or

1   intent necessary to commit the crime charged in the

2   indictment or whether the defendant had a motive or the

3   opportunity to commit the acts charged in the indictment

4   or whether the defendant acted accordingly to a plan or

05:10:04   5   preparation for commission of a crime or whether the

6   defendant committed the acts for which she is on trial by

7   accident or mistake.  These are the limited purposes for

8   which any evidence of other similar acts may be

9   considered."

05:10:22   10   Okay.  I have read that.  I know I borrowed this from

11   somebody else after we agreed on it so I wouldn't have to

12   type it out to get you moving.  All right.

13   Would you return this to whoever handed it up to me.

14        CASE MANAGER:  (Complying.)

05:10:37   15        THE COURT:  All right.  With that as a

16   background, we'll call in our first witness.

17        Counsel, call your first witness.

18        MR. MAGLIOLO:  The United States would call

19   Deputy Chapuseaux, Your Honor.

05:10:47   20        THE COURT:  Yes, sir.  Raise your right hand to

21   be sworn.

22   (Witness sworn by the case manager.)

23        THE COURT:  Thank you, sir.  Have a seat, please.

24        THE WITNESS:  (Complying.)

05:11:04   25        THE COURT:  Let's pull that microphone in.  The

*Laura Wells, CRR, RDR*

1    chair does not move.  It does not move.  It rocks back and

2    forth.  Go on.

3                        **EDWIN CHAPUSEAUX,**

4    having been first duly sworn, testified as follows:

05:11:11   5                    **DIRECT EXAMINATION**

6    BY MR. MAGLIOLO:

7    **Q.**   Please state your name for the ladies and gentlemen of

8    the jury.

9    **A.**   Edwin Chapuseaux.

05:11:16   10   **Q.**   How are you employed?

11           THE COURT:  Edwin, how do you spell your last

12   name?

13           THE WITNESS:  C-h-a-p-u-s-e-a-u-x.

14           THE COURT:  Okay.

05:11:28   15          THE WITNESS:  Edwin.

16           THE COURT:  Okay.  Pull that microphone over.

17   You carry fine, but I just want a little bit of it

18   amplified so everybody else can hear it so it goes through

19   the system.  Okay.

05:11:40   20          Go right ahead.

21   **Q.**   (By Mr. Magliolo)  How are you employed?

22   **A.**   I work with Harris County Sheriff's Office.

23   **Q.**   What is your job with the Harris County Sheriff's

24   Office?

05:11:49   25   **A.**   Personally, an investigator.

1    **Q.**   Do you have a specialty?

2    **A.**   Yes.  For the last ten years I have been working human

3    trafficking.  I am the founder of the federal task force

4    in the Harris County area.

05:12:05    5    **Q.**   And what is human trafficking?

6    **A.**   Human trafficking is slavery.  It's modern-day

7    slavery.  It's people being forced to provide labor or

8    services against their will, any kind of labor or service

9    through the use of fraud, force or coercion.  The only

05:12:23   10    exception is minors in prostitution where you don't have

11    to prove the fraud, force or coercion.

12    **Q.**   In the course of your work did you become familiar

13    with the defendant in this case?

14    **A.**   Yes.

05:12:36   15    **Q.**   And what is the defendant's name?

16    **A.**   Raquel Hortencia Medeles-Arguello a/k/a Raquel

17    Medeles-Garcia a/k/a Tencha.

18              THE COURT:  "a/k/a" meaning what?

19              THE WITNESS:  Also known as.

05:12:52   20    **Q.**   (By Mr. Magliolo)  And for simplicity, are we going to

21    use the name Tencha in the United States' testimony?

22    **A.**   Yes.

23    **Q.**   Do you see her in the courtroom?

24    **A.**   Yes.

05:13:00   25    **Q.**   Could you point her out for the ladies and gentlemen

*Laura Wells, CRR, RDR*

1    of the jury and describe what she is wearing for the

2    record?

3    **A.**   The lady that is standing up with the black dress.

4          THE COURT:  All right.  The record will so

05:13:12   5    reflect the defendant has been identified.  Go on.

6    **Q.**   (By Mr. Magliolo)  Now, this case or this

7    investigation as charged starts in 1999 and goes to 2013?

8    **A.**   Correct.

9    **Q.**   Did you begin this investigation in 1999 or some other

05:13:29   10   date?

11   **A.**   Some other date.

12   **Q.**   When did you actually begin this investigation?

13   **A.**   First, initial, 2005.

14   **Q.**   And based on what you learned from 2005 to 2013, did

05:13:45   15   the evidence that you received show that there was at

16   least some belief that some of this offense occurred --

17   started in 1999?

18   **A.**   Yes.

19         MR. FAZEL:  Objection to the form of the

05:13:59   20   question, Your Honor.

21         THE COURT:  What is the objection?

22         MR. FAZEL:  Form of the question.

23         THE COURT:  Yeah.  But what?  What is wrong with

24   it?

05:14:04   25         MR. FAZEL:  Well, it's not clear as to the

  1   question.

  2         THE COURT:  It's leading, right?

  3         MR. FAZEL:  Leading.

  4         THE COURT:  Leading.  Sustained.  Go on.

05:14:13   5   **Q.**  (By Mr. Magliolo)  When did the information that you

  6   developed from your investigation that started in 2005

  7   indicate to you that these particular offenses began?

  8   **A.**  Around 2006 is when I started to learn --

  9         MR. FAZEL:  Nonresponsive, Your Honor.

05:14:36  10         THE COURT:  Overruled.

 11   **A.**  2006 is when I learned of all the criminal activity

 12   occurring in the late '90s --

 13   **Q.**  (By Mr. Magliolo)  Now --

 14   **A.**  -- up to 2005.

05:14:51  15   **Q.**  So this case encompasses approximately 13 years?

 16   **A.**  Yes, sir.

 17   **Q.**  Did you, in order to make this clear to all parties

 18   involved, have a chart developed which shows occurrences

 19   between 1999 and 2013?

05:15:11  20   **A.**  Yes.

 21         MR. MAGLIOLO:  May I display the chart to the

 22   jury, Your Honor?

 23         THE COURT:  Go on.

 24         MR. FAZEL:  Over my running objection, Your

05:15:19  25   Honor.

                          *Laura Wells, CRR, RDR*

1    Q.   (By Mr. Magliolo) I'll show you government --

2              THE COURT:  Right.  Now, ladies and gentlemen,

3    keep in mind I'll give you an instruction additionally on

4    this.

05:15:28    5      Those are the two we spoke about beforehand, sir?

6    Mr. Magliolo?

7              MR. MAGLIOLO:  Yes, Your Honor.

8              THE COURT:  All right.  Keep in mind this is only

9    a visual aid.  It's not being entered into evidence.  If

05:15:39   10    the evidence shows something later, you are free to

11    disregard it.  You are free to discard it -- to disregard

12    all of it.  I'm not admitting it into evidence but I'm

13    using it as strictly a visual aid that might assist the,

14    what is it, jury but it is not admitted into evidence.

05:15:57   15    It's -- and it may be referred to from time to time here

16    as a timeline.  You'll then see whether or not the

17    government proves up the timeline.

18         And then, of course, you can discuss it among

19    yourselves back in the jury room.  But that's not coming

05:16:12   20    back in.

21         All right.  So for that limited purpose, you may use

22    it just as an aid.  Go on.

23    Q.   (By Mr. Magliolo)  Based on your 2005 and '06

24    investigation, what is the first victim that you

05:16:26   25    discovered in this particular case?

1              MR. FAZEL:  Object to the term "victim," Your

2    Honor.

3              THE COURT:  Overruled.  That's the

4    characterization of the government and the witness.  You

05:16:34    5    are to determine.  It doesn't go to the admissibility,

6    just to the weight.  Go on.

7    **A.**   XXXXXXXXXXXXXXXXXXXX.

8    **Q.**   (By Mr. Magliolo)  And approximately when did you

9    discover this victim?

05:16:46   10    **A.**   In 2006.

11    **Q.**   And how did you discover her?

12    **A.**   I received a call from the Mexican consulate because

13    she had gone --

14    **Q.**   Without saying what the Mexican consulate said to you,

05:17:01   15    did this cause you to have a meeting with this victim

16    witness?

17    **A.**   Yes.

18    **Q.**   And did she -- in this meeting did she discuss with

19    you her relationship with the -- with Las Palmas

05:17:23   20    nightclub?

21    **A.**   Yes.

22    **Q.**   Okay.  What did you know about Las Palmas nightclub --

23    I'm going to say Las Palmas nightclub -- at the time of

24    this meeting with the victim witness, XXXXXXXXXXXX?

05:17:37   25              THE COURT:  Now, where is it?  You are pointing

*Laura Wells, CRR, RDR*

 1    to something else.

 2              MR. MAGLIOLO:  That would be the timeline, Your

 3    Honor.

 4              THE COURT:  All right.

05:17:43   5              MR. MAGLIOLO:  That will be basically the

 6    occurrences at the beginning of the timeline.

 7              THE COURT:  The jury can't see it all.  Can you

 8    see it behind there?

 9              JURORS:  Yeah.

05:17:51   10             THE COURT:  All right.  Go on.

11    **A.**  Can you repeat, please?

12    **Q.**  (By Mr. Magliolo)  Yeah.  Sure.

13              THE COURT:  Point to it.  Let's move it.

14    **Q.**  (By Mr. Magliolo)  You talked to this witness who

05:18:04   15   indicated her relationship with the Las Palmas nightclub

16    -- I forget.  Not -- Las Palmas nightclub in approximately

17    2000 and 2001?

18    **A.**  Yes.

19    **Q.**  And is this witness going to be available to testify

05:18:24   20   to this jury?

21    **A.**  Yes.

22    **Q.**  Based on what she told you, did you take certain

23    actions to verify what she said?

24    **A.**  Yes, I did.

05:18:37   25   **Q.**  And is this the way you conduct an investigation?

*Laura Wells, CRR, RDR*

1    **A.**   Yes.  I try to corroborate everything that --

2           MR. FAZEL:  Objection to nonresponsive and

3    bolstering.

4           THE COURT:  Sustained.  It's a yes or no.  By the

05:18:50  5    way, if you can't answer it yes or no, so state; and

6    counsel is going to have to rephrase it.  Okay?

7           THE WITNESS:  Okay.  Yes, Your Honor.

8           THE COURT:  Go on.

9    **Q.**   (By Mr. Magliolo)  Why do you try to verify the

05:19:00  10   information that victims tell you?

11   **A.**   Well, to make sure we are dealing with true victims.

12   **Q.**   Let me show you what is marked as Government Exhibit

13   P-1 and ask you if you recognize it?

14   **A.**   Yes, sir.

05:19:17  15   **Q.**   What is it?

16   **A.**   This is a photo of Las Palmas 2 and La Feria at 5612

17   and 5618 Telephone Road.

18   **Q.**   And explain the relationship between Las Palmas and La

19   Feria and what they are.

05:19:36  20   **A.**   They were both brothels located in the same building,

21   the same structure, divided into two different bars.  La

22   Feria was regular hours, would close around 2:00 a.m., at

23   which time Las Palmas 2 would open after hours all the way

24   through to 5:00 or 6:00 in the morning on weekends.

05:20:01  25   **Q.**   And have you been to the interior of both of these

1  establishments?

2  **A.** Yes, sir.

3      MR. MAGLIOLO: We would offer P-1 into evidence

4  at this time, Your Honor.

05:20:09  5      THE COURT: Now, wait a second. Remember what we

6  discussed early on. Just keep talking. If there is not

7  an objection -- I put everything in evidence subject to an

8  occasional objection -- I'm going to assume that it's in.

9      MR. FAZEL: Well, Your Honor, since he offered

05:20:23  10  it, I have an objection to foundation as to the

11  photograph. Are you putting the photograph in evidence?

12      MR. MAGLIOLO: Yes.

13      MR. FAZEL: I need a foundation. I would object

14  to foundation.

05:20:31  15      THE COURT: Well, lay some foundation.

16      MR. MAGLIOLO: Well, it's the brothel that is the

17  subject of this investigation. He has identified it, Your

18  Honor. I don't know what else.

19      THE COURT: What more do you need?

05:20:40  20      MR. FAZEL: Who took it? When? I mean, the

21  basics.

22      THE COURT: You are going to make -- all right.

23  You are going to go through every single step. Prove it

24  up.

05:20:48  25  **Q.** (By Mr. Magliolo) Now, did you take --

*Laura Wells, CRR, RDR*

                    THE COURT:  Now, I may do something later on

about -- he is entitled to object, ladies and gentlemen.

Don't get it wrong.  But I'm not -- we have a time frame

here.  We promised.  How we get to it, I'm going to talk

05:21:01  to the attorneys later.  But don't hold it against either

counsel for objecting.  It's their absolute right.

**Q.**  (By Mr. Magliolo)  Do you know who took this

photograph?

**A.**  I did.

05:21:10  **Q.**  Do you recall when you took it?

**A.**  This one was taken, I recall, in 20 -- it was 2005.

**Q.**  Does it fairly depict what it is intended to depict,

that is as the Las Palmas and La Feria nightclub/brothel

appeared during the course of this conspiracy?

05:21:31  **A.**  Yes.

          MR. MAGLIOLO:  We offer it in evidence, Your

Honor.

          MR. FAZEL:  No objection.

          THE COURT:  It's admitted.

05:21:37          MR. MAGLIOLO:  We would ask that it be displayed

to the --

          THE COURT:  All right.  Now, do you have --

          MR. MAGLIOLO:  It is being displayed.

          THE COURT:  Not yet it's not.  Oh, for crine-out

05:21:53  loud.  Come on already.

1          THE WITNESS:  May I?

2          THE COURT:  No.  Wait a second.  I'm saying that

3     I have a lower-the-screen thing and it --

4          MR. MAGLIOLO:  It is on the monitor, Your Honor,

05:22:06  5     if that helps.

6          THE COURT:  Yeah, do it on Ellen's.  Yeah, it

7     will help.  Yeah, I don't think it's going to work.  Hang

8     on.  We have something to lower it.  It's when they re-did

9     the electronics.  Is she gone?  All right.  Call hers up

05:22:29  10    there.  This will take just a second.  This will help.  It

11    says "lower the screen."  What is that?  The board needs

12    to be moved.  You have the "lower the screen."  All right.

13    That one is working.  Okay.  Whatever it takes.

14        We even have -- I would say I'm going to throw a

05:22:51  15    switch, but you are going to kill the light right there.

16    All right.

17        We need to make a note that we need to check my own up

18    here because this one apparently is not working to lower

19    the screen.

05:23:03  20        Okay.  Go right ahead.

21          MR. MAGLIOLO:  May I proceed, Your Honor?

22          THE COURT:  Okay.  All right.

23    **Q.**  (By Mr. Magliolo)  I'll show you what's been marked

24    for identification as P-1a and ask you if you recognize

05:23:12  25    it?

1  **A.**   Yes, sir.

2  **Q.**   And is it a close-up photograph of P-1 of the Las

3  Palmas section of the bar or bordello?

4  **A.**   Yes, sir.

05:23:21   5  **Q.**   And did you want to correct when this photograph was

6  made?

7  **A.**   Yes.  This one was in 2012.  The 2005 one doesn't have

8  the mural.  They hadn't painted the mural yet.

9         THE COURT:  Is that the only change between 2005

05:23:35   10  and when the photo was taken?

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  All right.  Go on.  By the way,

13  ladies and gentlemen, everything going into evidence --

14  that's what those two big books are -- you will get back

05:23:53   15  in deliberation when you deliberate on the case.  And I

16  have got them up here, also, on this screen.

17  **Q.**   (By Mr. Magliolo)  Did you actually enter in Las

18  Palmas and La Feria?

19  **A.**   Yes, sir.

05:24:19   20  **Q.**   I want to direct your attention to P-7 and ask you if

21  you recognize this photograph?

22  **A.**   Yes, sir.

23  **Q.**   And do you know who took this photograph?

24  **A.**   This was extracted from -- it's a photo snapped from a

05:24:32   25  video.

*Laura Wells, CRR, RDR*

1          THE COURT:  Hold it.  Hold it.  The question was:

2   Do you know who took the photo?  Yes or no?

3          THE WITNESS:  Yes.

4          THE COURT:  It will move a lot quicker that way.

05:24:40   5   Next question.

6   **Q.**   (By Mr. Magliolo)  And does this -- do you know what

7   this photo is of?  Did you personally see the location

8   that this photo is of?

9   **A.**   Yes.

05:24:48   10   **Q.**   And what is it of?

11   **A.**   The door of the room on the second floor of Las

12   Palmas 2.

13   **Q.**   Is this the way it appeared during the course of the

14   conspiracy?

05:24:56   15   **A.**   Yes.

16   **Q.**   Does it fairly and accurately depict what it is

17   intended to depict --

18          THE COURT:  No.  The next thing you do, walk and

19   show it to the jury unless they hear an objection.

05:25:09   20          MR. FAZEL:  No objection.

21          THE COURT:  For instance, that's the deal we had.

22   I conditionally made some rulings subject to objection at

23   the time of trial.  What happened with that?

24          MR. FAZEL:  With what?

05:25:21   25          THE COURT:  Isn't that -- wasn't that rotated the

*Laura Wells, CRR, RDR*

1   wrong way?

2        MR. FAZEL:  No.

3        THE COURT:  Maybe not.  All right.  Let me see it

4   again, please.

05:25:29   5        MR. MAGLIOLO:  May we display it, Your Honor?

6        THE COURT:  Is that a door?

7        MR. MAGLIOLO:  Yes, Your Honor.

8        THE COURT:  Where is the door?

9        THE WITNESS:  The door is almost completely shut

05:25:38  10   so you see only it partially opened.  You are seeing the

11   frame, and the door is on the right with a latch on

12   your --

13        THE COURT:  What's the black thing running

14   through the center?

05:25:52  15        THE WITNESS:  That's inside the room, darkness

16   inside the room.

17        THE COURT:  Oh, I've got it.  So, in other words,

18   the latch is on the right?  Is that the metallic-looking

19   thing?

05:25:59  20        THE WITNESS:  Yes.  The latch is on the right of

21   the door.  On the left would be the portion that would

22   latch onto the door, which is missing.

23        THE COURT:  Okay.

24   **Q.**   (By Mr. Magliolo)  And you personally saw this?

05:26:09  25   **A.**   Yes, sir.

1    **Q.**  And what is the significance of this as far as why you

2    captured it in your investigation and why you proceeded

3    with the investigation the way you did?

4    **A.**  Because it corroborates the story of XXXXXXXXXXXXXX

05:26:24    5    XXXXXX where she said that she was --

6              MR. FAZEL:  Objection.  It's --

7              THE COURT:  Sustained.

8              MR. FAZEL:  -- nonresponsive.

9              THE COURT:  It's sustained.  We'll hear from her.

05:26:33    10   **Q.**  (By Mr. Magliolo)  I'm going to show you P-39.

11   **A.**  Yes, sir.

12   **Q.**  Do you recognize this photograph?

13   **A.**  I do.

14   **Q.**  Is it also an interior photograph of Las Palmas?

05:26:43    15   **A.**  Yes, sir.

16   **Q.**  Did you personally observe what is in this photograph?

17   **A.**  Yes, sir.

18             MR. MAGLIOLO:  We would ask to display it to the

19   ladies and gentlemen of the jury.

05:26:50    20             THE COURT:  It's up already.  Yeah.  You may.

21   You have got to watch out by putting it up too quick.

22             MS. POUNCEY:  Yes, sir.

23             THE COURT:  What is that?

24             THE WITNESS:  It's not -- it's not up right.

05:27:00    25   It's sideways.

*Laura Wells, CRR, RDR*

1          THE COURT:  All right.

2          THE WITNESS:  It's a hidden door on the inside of

3   the area controlled by one of the -- by Juan Carlos Munoz.

4   It's the hidden door that the couple had to knock on in

05:27:17   5   order to gain access to be able to go to the second floor

6   where the prostitution rooms were.

7          THE COURT:  How can it be a hidden door if you

8   are looking at it here and it looks like it's facing out

9   as if you walked up?

05:27:27  10          THE WITNESS:  Yeah, it --

11          THE COURT:  Hold it.  It's got a bunch of locks

12   on it.  Go on.

13          THE WITNESS:  Yes.  The inside doesn't appear to

14   be a hidden door; but if you look at it from the outside,

05:27:40  15   if the police or anybody inside the bar would go to that

16   area, they wouldn't see that.  They would see a plain

17   wall.

18          THE COURT:  So that's from inside the door with

19   the outside hallway or whatever from the -- the main entry

05:27:57  20   point that is on the other side?

21          THE WITNESS:  Correct, Your Honor.

22          THE COURT:  All right.

23   **Q.**  (By Mr. Magliolo)  What was the significance of this,

24   to your investigation?

05:28:03  25   **A.**   The reinforcement and corroboration from the different

1  victims that would describe the door and telling us how

2  they had to knock on --

3          MR. FAZEL:  Objection, Your Honor.

4  Nonresponsive.

05:28:16  5          THE COURT:  Sustained.

6  **Q.**  (By Mr. Magliolo)  I'm going to show you what's P-7a

7  and ask if you recognize this photograph?

8  **A.**  Yes, sir.

9  **Q.**  This is a photo you -- of something that you

05:28:26  10  personally observed inside Las Palmas?

11  **A.**  Yes, sir.

12          MR. MAGLIOLO:  I would ask that P-7a be displayed

13  to the ladies and gentlemen of the jury.

14  **Q.**  (By Mr. Magliolo)  Please describe this photograph for

05:28:39  15  the ladies and gentlemen of the jury.

16  **A.**  The same door and latch and door frame shown before

17  and now closed to where you can see it matches with where

18  the latch was on the frame.

19          THE COURT:  So that's the same photo of the other

05:28:56  20  side of the door of that first one with the green door

21  that was open partially?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  All right.

24  **Q.**  (By Mr. Magliolo)  I'm going to show you P-6 and ask

05:29:07  25  you if you recognize that photograph.

1    **A.**   Yes, sir.

2    **Q.**   And is it a photograph of the interior of Las Palmas?

3    **A.**   Yes, sir.

4    **Q.**   Did you personally observe what is shown in that

05:29:17   5    photograph?

6    **A.**   No, sir.

7    **Q.**   Where did you get the photograph from?

8    **A.**   A video that was taken by Houston Police Department on

9    one of the raids they did.

05:29:28   10    **Q.**   And what is the significance of that photograph to you

11   and how you proceeded in your investigation?

12   **A.**   I already had been told by different people about the

13   light bulbs they had that were used to alert when there

14   was a presence of law enforcement.  There were light bulbs

05:29:46   15   in different areas that would be on and would be turned

16   off if the police were --

17          MR. FAZEL:  Objection, nonresponsive, Your Honor.

18          THE COURT:  Overruled.  It's not in yet.  I'm

19   just listening to the predicate he is laying.  Go on.

05:30:00   20   **A.**   So this bulb in particular was in that area behind the

21   hidden door, and it was on constantly.  And if the police

22   were there, somebody in the bar would turn the light on.

23          MR. FAZEL:  I'm sorry.  I'm sorry.  I would ask

24   that counsel do it in question and answer format so I can

05:30:16   25   object, Your Honor.

1          THE COURT:  Next question.

2    **Q.**  (By Mr. Magliolo)  And is this the way it appeared,

3    based on your investigation, during the course of the

4    conspiracy at Las Palmas?

05:30:26   5    **A.**  Yes, sir.

6    **Q.**  And this -- and, again, seeing this video helped you

7    proceed in your investigation?

8    **A.**  Yes, sir.

9          MR. MAGLIOLO:  We would ask that it be published

05:30:35  10    to the ladies and gentlemen of the jury.

11          THE COURT:  Response.

12          MR. FAZEL:  I have no objection to the photo

13    being published, not the video.

14          THE COURT:  Okay.  Thank you.  The photo itself.

05:30:44  15    Keep in mind I guess his objection is -- in other words,

16    that this is what this man, this witness found out during

17    his investigation; but he has no personal, firsthand

18    knowledge of it.  All right.

19    **Q.**  (By Mr. Magliolo)  And is this part of your way,

05:30:57  20    again, of corroborating what the victims tell you as far

21    as whether really or not they were in this bar/brothel

22    when you check out and see if, in fact, as they described

23    it was what it -- was how it was?

24    **A.**  Yes, sir.

05:31:10  25    **Q.**  I show you Government's P-3 and ask if you recognize

*Laura Wells, CRR, RDR*

1   this photograph?

2   **A.**   Yes, sir.

3   **Q.**   And is it something that you personally saw in the

4   brothel or something that was a photograph that was taken

05:31:21   5   for you?

6   **A.**   I personally saw.  I personally took the photo.

7   **Q.**   And what is the photo of?

8   **A.**   It's right at the entrance where the customers would

9   come in.  These are the light switches.  One of them would

05:31:36   10   be used to alert the presence of law enforcement.

11          MR. MAGLIOLO:  We would ask that P-3 be displayed

12   to the jury.

13          MR. FAZEL:  No objection to P-3, Your Honor.

14          THE COURT:  Thank you.

05:31:47   15   **Q.**   (By Mr. Magliolo)  Are those the light switches that

16   the jury can see that you are talking about?

17   **A.**   Yes.

18   **Q.**   And that displayed the -- or that charged the light

19   bulb to show that police officers were in the area?

05:31:57   20   **A.**   Correct.

21   **Q.**   And explain how that aided your investigation as far

22   as whether or not you were receiving the truth from the

23   witnesses you talked to?

24   **A.**   Yes.  Because this is information we had been

05:32:09   25   receiving from victims and informants and witnesses.  And

*Laura Wells, CRR, RDR*

 1  then, we went over there and found --

 2          MR. FAZEL:  Objection, nonresponsive, Your Honor.

 3          THE COURT:  Sustained.

 4  **Q.**  (By Mr. Magliolo)  If you find evidence that is

05:32:27  5  described at the location and it is the same as what has

 6  been described to you by your potential victim witnesses,

 7  does that allow you to go forward with your investigation

 8  or not?

 9  **A.**  Yes.  It allows me to go forward.

05:32:43  10  **Q.**  I'm going to show you P-5 and ask you -- I'm sorry,

 11  P-4 and ask you if you recognize it?

 12          MR. FAZEL:  P as in "Paul" 4?  P-4?

 13          MR. MAGLIOLO:  P-4.

 14  **Q.**  (By Mr. Magliolo)  And is that -- explain how you --

05:32:56  15  explain how you got this photograph.

 16  **A.**  This photo was taken by me inside the booth.  There

 17  was a booth near the entrance where the cover charge was

 18  collected.

 19  **Q.**  What information had you received about that booth?

05:33:11  20  **A.**  I had received information that there was a hidden

 21  button or switch behind the board that was not visibly

 22  seen.  You had to really stick your hand in there to find

 23  it.  And that would also alert on the second floor and in

 24  the area controlled by Juan Carlos Munoz who controlled

05:33:35  25  the hidden door.

*Laura Wells, CRR, RDR*

1          MR. FAZEL:  Objection, nonresponsive, Your Honor.

2          THE COURT:  Sustained as to the very end.  Go on.

3    **Q.**  (By Mr. Magliolo)  Okay.  And does this help your

4    investigation in the sense that the information you are

05:33:45    5    receiving from your victims and informants was

6    corroborated?

7    **A.**  Yes, sir.

8          MR. MAGLIOLO:  We would like to display P-4, Your

9    Honor.

05:33:52    10          THE COURT:  All right.  Just do it unless we have

11    an objection.

12    **Q.**  (By Mr. Magliolo)  And describe it to the ladies and

13    gentlemen of the jury as best you can.

14    **A.**  Yes.  The bottom portion, if you can see, there is a

05:34:02    15    space there between the top ledge and then the bottom.

16    There is that empty space.  It's hollow.  You stick your

17    hand down there.  You can feel the button that was being

18    used to alert law enforcement.

19          THE COURT:  Where is the button?  Put the arrow

05:34:20    20    there.  There is a button there somewhere?

21          THE WITNESS:  Yes.  You have to go in and down.

22    That is hollow space in there.

23          THE COURT:  All right.

24    **Q.**  (By Mr. Magliolo)  And on the far right appears to be

05:34:27    25    a bulb; or what is that on the far right, if anything?

Direct Examination of Edwin Chapuseaux    Vol 1 - Page 226

1    **A.**   That was not a bulb, no.

2    **Q.**   And this is at the entrance to the Las Palmas?

3    **A.**   Yes.  Inside the booth where they charge the cover

4    charge and charge also --

05:34:41    5          MR. FAZEL:  Objection, Your Honor, nonresponsive.

6          THE COURT:  Sustained.

7    By the way, is that a whole screen?  We're getting it

8    cut off a little bit to the lower right.  It looks like

9    there is more to that photograph.

05:34:53    10          MS. POUNCEY:  It's the whole screen.

11          THE WITNESS:  There is a little bit cut off, yes.

12          MR. MAGLIOLO:  It's not significant, Your Honor.

13          THE COURT:  Okay.  Go on.

14    **Q.**   (By Mr. Magliolo)  Now, when you -- you personally

05:35:04    15    entered Las Palmas at this location, correct, yes or no?

16    **A.**   Yes.

17    **Q.**   And is there only one way you could proceed or are

18    there a couple of ways you could proceed once you entered

19    Las Palmas?

05:35:13    20    **A.**   There is different ways you could proceed.

21    **Q.**   And is this consistent with the information you were

22    given?

23    **A.**   Yes.

24    **Q.**   And is one of those ways into the club into the first

05:35:24    25    floor of the club?

*Laura Wells, CRR, RDR*

           1  **A.**   Yes.

           2  **Q.**   And is another way up into the prostitution rooms?

           3  **A.**   Yes.

           4  **Q.**   Have you personally examined the prostitution rooms?

05:35:33   5  **A.**   Yes.

           6           THE COURT:  By the way, if you are not using

           7  those posters all the time, you can take them down.

           8           MR. MAGLIOLO:  We're going to use them, Your

           9  Honor.

05:35:41  10           THE COURT:  All right.  Go on.

          11  **Q.**   (By Mr. Magliolo)  I'm going to direct your attention

          12  to the left poster.  You talked about XXXXXXXXXXXX.

          13      Who is XXXXXXXXXXXXXXXXX?

          14  **A.**   Yes.  XXXXXXXXXXXXXXXXXX is another victim we

05:35:58  15  encountered in the process of investigating another case.

          16  **Q.**   She is going to be available to testify to the ladies

          17  and gentlemen of the jury?

          18  **A.**   Yes.

          19  **Q.**   And does this show approximately when she was

05:36:08  20  associated with Las Palmas bordello?

          21  **A.**   Correct.

          22  **Q.**   I'll direct your attention to XXXXXX --

          23  **A.**   XXXXXXXXXXXXXX.

          24  **Q.**   And who is she?

05:36:21  25  **A.**   Another victim.

*Laura Wells, CRR, RDR*

1  **Q.**   And does this show, approximately, based on what you

2  learned, her time associated with the bordello?

3  **A.**   Yes.

4  **Q.**   Is she going to be here to testify to the ladies and

05:36:33   5  gentlemen of the jury?

6  **A.**   Yes.

7  **Q.**   I direct your attention to XXXXXXXXXXXXXXXX.

8  **A.**   Another victim from another case who was also put to

9  work at this location.

05:36:44   10  **Q.**   How about XXXXXXXXXXXXX?

11  **A.**   Yes.  Another victim.

12  **Q.**   And based on your investigation were they both minors

13  during this period of time around 2004?

14  **A.**   Yes, sir.

05:36:57   15       MR. FAZEL:  Objection to the form of the

16  question, Your Honor, as to whether they are minors and

17  what time it was.  If he could reask the question.

18       THE COURT:  Overruled.

19  **Q.**   (By Mr. Magliolo)  And are they going to be available

05:37:07   20  to testify?

21  **A.**   Yes, they will.

22  **Q.**   And have you examined their birth documents?

23  **A.**   Yes, I have.

24  **Q.**   I will direct your attention to approximately 2005.

05:37:20   25  Was there some type of police operation, without saying

Direct Examination of Edwin Chapuseaux   Vol 1 - Page 229

```
 1  the result of it, at Las Palmas brothel?

 2  A.   Yes, sir.

 3  Q.   Who is XXXXXXXXXXXXXXXX?

 4  A.   It's the same one you mentioned.  Right next to the

 5  left of -- she was there twice.  That's why she is in two

 6  different --

 7  Q.   Places on the flowchart?

 8  A.   Yes, sir.

 9  Q.   And did you corroborate their information that they

10  gave you, much as you described the information from

11  Ms. XXXXXX?

12  A.   Yes, I did.

13  Q.   Who is XXXXXXXXXXXXX?

14  A.   Another victim, a minor victim that was prostituting

15  there.

16  Q.   Have you also examined their birth records to see if,

17  in fact, they were telling you the truth so you could go

18  forward in your investigation as to -- particularly as to

19  their part in this conspiracy?

20  A.   Yes, I did.

21  Q.   I direct your attention to 2007.  A Juan Cepeda and a

22  Juan Carlos Munoz are listed in 2007.

23  A.   Yes, sir.

24  Q.   Did you first encounter these folks in 2007?

25  A.   No.
```

05:37:41
05:37:55
05:38:07
05:38:19
05:38:34

*Laura Wells, CRR, RDR*

1    Q.   Did you first encounter them there -- I notice they

2    were also again listed, Juan Cepeda --

3         THE COURT:  Mr. Magliolo, apparently you are not

4    carrying well enough.

05:38:44   5    Ma'am, do you want to move a chair over there?

6         THE INTERPRETER:  No.  I can stand, Your Honor,

7    if it's all right; but I absolutely cannot hear.

8         MR. MAGLIOLO:  I am usually too loud, Your Honor.

9    So sometimes I try to hold it back.

05:38:56   10        THE INTERPRETER:  It's not you.  The posters are

11   between.

12        THE COURT:  We can put a chair.  Why not get a

13   chair.

14   Marshal, if you would get yourself a chair.  Okay.

05:39:05   15        THE MARSHAL:  Yes, sir.

16        THE COURT:  No need to stand.  Why don't you get

17   yourself a chair.  All right.  Just for the rest of the

18   day.  Tomorrow we'll have two, if necessary.

19        MR. FAZEL:  She can have mine.  I'm going to end

05:39:16   20   up standing most of the day.

21        THE COURT:  That's all right.  Okay.  Thank you.

22   Go on.

23   Q.   (By Mr. Magliolo)  I notice that Juan Carlos -- there

24   is a Juan Carlos first in 2007, a Juan Carlos Munoz, and

05:39:34   25   then again in 2012.  And then there is Juan Cepeda in 2007

1  and again in 2011.  What is --

2          THE COURT:  Let me ask you this:  Are the jurors

3  being distracted by that translator?  Are you, ma'am?

4          JUROR:  A little bit.

05:39:53  5          THE COURT:  A little bit.  Okay.  Ma'am, if you

6  will move just right across here.

7          THE INTERPRETER:  Certainly, Your Honor.

8          THE COURT:  What?

9          MR. MAGLIOLO:  I will be louder, Your Honor.

05:40:04  10          MR. FAZEL:  She said, "Certainly, Your Honor."

11          THE COURT:  Okay.  Just let me know these things.

12  We'll work it out.  Again, the whole thing was torn out.

13  This whole place was completely redone last week.  Go on.

14  **Q.**  (By Mr. Magliolo)  What is the significance of Juan

05:40:19  15  Cepeda in 2011?

16  **A.**  Okay.  In 2011 he was recruited as a confidential

17  human source.

18  **Q.**  And what is the significance of Juan Cepeda in 2007?

19  **A.**  When he was hired by Tencha to work at Las Palmas 2.

05:40:39  20  **Q.**  So when he was recruited as a source in 2011, he had

21  been working at Las Palmas from 2007?

22  **A.**  Yes, sir.

23  **Q.**  Now, I direct your attention to 2012 where we

24  mentioned Juan Carlos Munoz.  What is the significance of

05:40:55  25  Juan Carlos Munoz in 2012?

*Laura Wells, CRR, RDR*

| | |
|---|---|
| 1 | **A.**   That's when he was recruited in February. |
| 2 | **Q.**   And was he recruited based on information from Juan |
| 3 | Cepeda? |
| 4 | **A.**   Yes, sir. |
| 05:41:07    5 | **Q.**   And did that add to the corroboration, the fact that |
| 6 | Juan Cepeda gave you information that allowed you to |
| 7 | recruit Juan Munoz? |
| 8 | **A.**   Yes, sir. |
| 9 | **Q.**   Now, Juan Munoz is also listed in 2007.  Had he also |
| 05:41:21   10 | been working at Las Palmas since 2007? |
| 11 | **A.**   Yes.  He got hired in 2007, also. |
| 12 | THE COURT:  What was his job there? |
| 13 | THE WITNESS:  Juan Carlos Munoz had the control |
| 14 | of the hidden door, and they had to present to him a |
| 05:41:37   15 | ticket showing that they already paid in the booth $5 that |
| 16 | allowed them to go to the rooms. |
| 17 | So the couple had to knock on the door that he |
| 18 | controlled.  He would open the door.  They had to give him |
| 19 | the ticket, which meant to him that they paid $5 already. |
| 05:41:59   20 | They would be allowed to come in.  And now they had to pay |
| 21 | him for the room and condom. |
| 22 | THE COURT:  Was that all -- you're going to get |
| 23 | into how much was charged later on? |
| 24 | MR. MAGLIOLO:  Yes, Your Honor. |
| 05:42:12   25 | THE COURT:  It wasn't just $5 or was it? |

*Laura Wells, CRR, RDR*

Direct Examination of Edwin Chapuseaux   Vol 1 - Page 233

1          THE WITNESS:  No, sir.

2          THE COURT:  That's all right.  All right.  Go on.

3   Keep going.

4   **Q.**  (By Mr. Magliolo)  It was $5 to go up to the room

05:42:21   5   where you would be supplied with the --

6          MR. FAZEL:  Judge, I object to him testifying.

7          THE COURT:  Sustained.

8          MR. MAGLIOLO:  Just --

9          THE COURT:  Sustained.

05:42:29  10   **Q.**  (By Mr. Magliolo)  So what then did -- what service

11   did Juan Cepeda perform on this case for you as, I guess

12   you would call him, an informant?

13   **A.**  After he was recruited?

14   **Q.**  Yes.  Starting in 2011.

05:42:46  15   **A.**  Okay.  Basically, he did a lot of recordings.  He was

16   passing on intel; but more importantly, he was -- both him

17   and the other one were our eyes and ears where they would

18   alert us if there were any minors that we could try to

19   rescue and get them out of the situation that they were

05:43:07  20   in.

21   **Q.**  Explain the situation when you are doing a long,

22   ongoing investigation, the hazards of doing a long

23   investigation.

24   **A.**  Yes.  We definitely in these long-term investigations

05:43:23  25   we don't want -- it's not like we are sitting and allowing

*Laura Wells, CRR, RDR*

1   the minors and the women to be exploited throughout all

2   this time.  We're constantly trying to rescue victims,

3   trying to do things that will allow us to get minors,

4   adults, anybody that's being forced out of the situation;

05:43:44   5   and we would do this in different ways that would not

6   affect normally the investigation.

7   **Q.**   So I believe your testimony was that Juan Carlos Munoz

8   and Juan Cepeda were your eyes and ears inside the

9   bordello?

05:44:01   10   **A.**   Yes.

11   **Q.**   And what is your priority as far as rescuing victims

12   even if it may cause your investigation some problems?

13          MR. FAZEL:  Objection to relevance as to what his

14   priority is.

05:44:12   15          THE COURT:  Overruled.

16   **A.**   Minors -- in the case of minors, for example, we act

17   immediately.  We will not, even if it hurts the

18   investigation, even if it destroys what we are trying to

19   accomplish because we will not tolerate -- we will not

05:44:29   20   allow a minor to be exploited, you know, under these

21   circumstances.

22   **Q.**   (By Mr. Magliolo)  Do your minor rescues always go as

23   planned?

24   **A.**   No.

05:44:37   25   **Q.**   And is there one particular defendant you tried to

*Laura Wells, CRR, RDR*

1  rescue in this case -- I'm sorry.  One particular victim

2  you tried to rescue in this case that initially did not go

3  well?

4  **A.**  Yes.

05:44:48  5  **Q.**  And who was that?

6  **A.**  She was using a name XXXXXXXXXXXXXXXXXX.  Her real

7  name was XXXXXXXXXXXXXX.

8  **Q.**  And would that be the young lady that's listed in

9  about 2011?

05:45:01  10  **A.**  Yes.  August 4, 2011, is when she was arrested.

11  MR. FAZEL:  Objection to nonresponsive.

12  THE COURT:  Sustained.

13  **Q.**  (By Mr. Magliolo)  What brought her to your attention?

14  **A.**  Well, the sources had told us that this girl looked

05:45:17  15  very young.

16  MR. FAZEL:  Objection to hearsay as to the

17  sources, Your Honor.

18  THE COURT:  Overruled.

19  **A.**  And based on -- we had no proof but she looked very

05:45:25  20  young and they thought she could -- she was a minor.  So,

21  we did a traffic stop in order to try to get her --

22  **Q.**  (By Mr. Magliolo)  Explain to the ladies and gentlemen

23  of the jury what a traffic stop is.

24  **A.**  It's when, say, a patrolman will do a stop based on

05:45:43  25  any traffic violation.  So, basically, we will have a

*Laura Wells, CRR, RDR*

1   patrolman, in this case, follow the vehicle.  As soon as

2   they see a violation of traffic laws being committed, make

3   a stop of the vehicle.  And at that time, we knew that the

4   people driving the vehicle would be undocumented, would

05:46:05   5   not have a driver's license, would not have insurance.

6           MR. FAZEL:  Objection, nonresponsive, Your Honor.

7           THE COURT:  Overruled.

8   **Q.**  (By Mr. Magliolo)  So were you able to then locate

9   Ms. XXXXX?

05:46:14   10   **A.**   Yes.

11   **Q.**   Were you able to talk to her?

12   **A.**   Yes.

13   **Q.**   And did you -- would she admit at that time that she

14   was a minor?

05:46:21   15   **A.**   No.

16   **Q.**   Were you able to get her to cooperate at that time?

17   **A.**   No.

18   **Q.**   Did you have contact with her later where she had --

19   oh, is Ms. XXXXX going to be here to testify to the ladies

05:46:30   20   and gentlemen of the jury?

21   **A.**   Yes.

22   **Q.**   Did you have contact with her later where she did

23   decide to cooperate and did explain that she was a minor?

24   **A.**   Yes, recently.

05:46:39   25   **Q.**   Explain that to the ladies and gentlemen of the jury.

1    A.   Yes.  I think it was March 28th or 29th of this month.

2    It was over the weekend I got a phone call.  And it was

3    her.  She had gotten my number through a working girl.

4    And she gave me a call, and she was very afraid.

05:47:04   5           MR. FAZEL:   Judge, I'm going to object to

6    whatever the witness may have told the witness -- the

7    potential witness may have told this witness as hearsay.

8    She is going to come testify.

9           THE COURT:   Sustained.  He hasn't said exactly

05:47:14   10   what she said up to this point.  She said she was afraid.

11   Next question.

12   A.   Basically --

13   Q.   (By Mr. Magliolo)  Did she agree to cooperate?

14   A.   Yes.

05:47:24   15   Q.   And she is going to be here to testify?

16   A.   Yes.

17   Q.   I direct your attention to approximately 2008.  Who is

18   XXXX?  And you are going to have to pronounce this name

19   for me.

05:47:32   20   A.   XXXXXXXXXX.

21   Q.   Who is she?

22   A.   She is another human trafficking victim.

23   Q.   How did you come in contact with her?

24   A.   I came in contact with her through YMCA International

05:47:44   25   who made a referral after they learned about her through

1    another victim.

2    **Q.**   Would you explain YMCA International's role in these

3    cases?

4    **A.**   Yes.  Ever since the inception of the grant --

05:47:57   5    **Q.**   Explain it to the ladies and gentlemen of the jury

6    what the grant is.

7    **A.**   Yes.  Our task force receives federal money, a federal

8    grant to form the task force, to fund the task force.  We

9    have members of many different agencies, and we all work

05:48:17   10    together to combat human trafficking.  YMCA is the NGO,

11    the victim service provider, the main one that we use that

12    is part of our task force.

13    **Q.**   And when you say "victim service provider," what do

14    you mean?

05:48:30   15    **A.**   They provide services to our victims.  We as law

16    enforcement --

17             THE COURT:  Like what?

18             THE WITNESS:  They will take the victim, provide

19    shelter, take care of their immediate needs.  They will

05:48:41   20    give them a place to stay.  They will give them food.

21    They will provide an immigration attorney for them.  They

22    will take care of any medical needs, psychiatric needs,

23    psychological needs, whatever needs they have.  If they

24    can't do it, they will connect them with somebody that

05:48:58   25    can.

```
             1          THE COURT:  Go on.
             2   Q.  (By Mr. Magliolo)  Is this something --
             3          MR. MAGLIOLO:  I'm sorry, Your Honor.
             4   Q.  (By Mr. Magliolo)  Is this something YMCA does for law
05:49:04     5   enforcement, or is this something they do because it's
             6   mandated by the government?
             7   A.  It's mandated through the Trafficking Victims
             8   Protection Act of 2000.  It was passed into law.
             9          THE COURT:  You can't mandate a charity to help;
05:49:15    10   but if they elect to do it, it's subject to those regs,
            11   regulations?
            12          THE WITNESS:  Yes, sir.  The law says that they
            13   are entitled to these services.
            14          THE COURT:  If the grant is in effect and if some
05:49:28    15   agency participates, correct?
            16          THE WITNESS:  Yes, sir.
            17          THE COURT:  Next question.
            18   Q.  (By Mr. Magliolo)  And I guess XXXX is going to be
            19   here to testify to what happened to her?
05:49:39    20   A.  Yes.
            21   Q.  I would direct your attention to 2010 and ask you who
            22   is XXXXXXXXXXXXX --
            23   A.  XXXXXX.
            24   Q.  XXXXXX -- and when you first came in contact with her?
05:49:49    25   A.  Yes.  I came in contact with her March 2011 -- no, I
```

1    interviewed her March 2011.  I came in contact with her in

2    March of 2011, but she was there in 2010 working.  Her

3    pimp had put her to work over there.

4    **Q.**   And did you do anything to corroborate her story?

05:50:07    5    **A.**   Yes, sir.

6    **Q.**   Without saying what you did at this time, is she going

7    to be here to testify before the ladies and gentlemen of

8    the jury?

9    **A.**   Yes.

05:50:13    10    **Q.**   I direct your attention to XXXXXXXXXXXXXXXX and ask

11    you how you first came in contact with her?

12    **A.**   Yes.  Well, I received the call from an attorney; and

13    they were telling me they had --

14             MR. FAZEL:  Objection to hearsay, Your Honor, as

05:50:28    15    to what the attorney said.

16             MR. MAGLIOLO:  It is not for the purposes of the

17    truth, as we talked about, Your Honor.  This is only to

18    explain to the ladies and gentlemen why he did what he

19    did.

05:50:37    20             THE COURT:  I'll sustain the objection to the

21    form of that question.  You spoke to her attorney; is that

22    correct, sir?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.  As a result of that

05:50:46    25    conversation what, if anything, did you do or proceed to

*Laura Wells, CRR, RDR*

1    do?

2              THE WITNESS:  Well, after I received the referral

3    from the attorney, I set up an interview.

4              THE COURT:  All right.  Next question.

05:50:58    5    **Q.**  (By Mr. Magliolo)  And did you -- in fact, were you

6    able to interview Ms. XXXXXXX?

7    **A.**  Yes.

8    **Q.**  And based on that is how she earned her place on the

9    time chart here?

05:51:09   10    **A.**  Yes.

11    **Q.**  Is she going to be here to testify for the ladies and

12    gentlemen of the jury?

13    **A.**  Yes.

14    **Q.**  How about Ms. XXXXX, XXXXXXXXXXXXXX?

05:51:18   15    **A.**  XXXXXXXXXXXXXX, that is the same one that I attempted

16    to rescue in 2011 and then in 2012 again a second time.

17    **Q.**  And so that is the same as XXXXXXXXXXXXX?

18    **A.**  No.

19    **Q.**  That's a different one.  Okay.  Is she going to be

05:51:34   20    here to testify for the ladies and gentlemen of the jury?

21    **A.**  Yes.

22    **Q.**  How about Ms. XXXXX in 2012?

23    **A.**  She was also a minor that was put to work there.

24    **Q.**  And how did you find out about her?

05:51:46   25    **A.**  Through law enforcement action.  We received

1  information from the family in Mexico through --

2  **Q.**  Without telling what the information was what, if

3  anything, did you do based on the information?

4  **A.**  Based on the information received we went to the

05:52:02  5  location that we were told she would be at.  We located

6  her, and we rescued her.

7  **Q.**  And was that partially because she was a minor and you

8  didn't feel like you could let her stay in that type

9  situation as a minor?

05:52:14  10  **A.**  Correct.

11          THE COURT:  And when you say "minor," that's

12  below what age?

13          THE WITNESS:  Minor is anything -- anybody under

14  18.

05:52:23  15          THE COURT:  Okay.  Thank you.  Keep going.

16  **Q.**  (By Mr. Magliolo)  Okay.  Three pimps are listed here:

17  Jorge, Eduardo and Alberto.  What is significant about

18  2012, between 2012 and 2013?  What is their significance

19  in this investigation?

05:52:38  20  **A.**  They are the ones that took over or they were

21  supposedly renting out the place where -- the bar/brothel,

22  Las Palmas 2.  They put the new name on it, and they were

23  working for Tencha.

24  **Q.**  And how about Mr. Diaz-Juarez a/k/a Poncho?

05:53:03  25  **A.**  Poncho was the person that Tencha made the deal with

1    initially to run the brothel; and when he got arrested a

2    couple of days after he took the keys to the business,

3    then Tencha decided to rent it to these other three.

4    **Q.**   Okay.  I'm going to direct your attention back to June

05:53:26    5    6th.  It seems to be there was a raid here June 6th.  Just

6    briefly describe that for the ladies and gentlemen of the

7    jury.

8    **A.**   Yes.  That was one of the law enforcement actions done

9    by HPD vice.  There Juan Manuel Cepeda, then an illegal

05:53:46   10    alien, was arrested and Odelia, the niece, --

11    **Q.**   Who is --

12    **A.**   -- for liquor violations.

13    **Q.**   Who is Odelia?

14    **A.**   The niece.  Her names is Odelia Hernandez, the niece,

05:53:57   15    Tencha's niece.

16    **Q.**   And at that time when CHS-1 was arrested, he wasn't

17    yet working for you?

18    **A.**   No.

19    **Q.**   It shows August 4th, 2011, there is another police

05:54:11   20    action.  Could you explain about that?

21    **A.**   That's another HPD vice operation, and we were always

22    working with them and sharing intel.  And that was another

23    operation where you had three people arrested.

24    **Q.**   And do you know whether or not some, at least to them,

05:54:33   25    were illegally in the country?

*Laura Wells, CRR, RDR*

1  **A.**   Yes, at least one.

2  **Q.**   I direct your attention to approximately October 1st.

3  There is another apparently HPD raid run by Mark -- how do

4  you say his last name?

05:54:44  5  **A.**   Delacerda.

6  **Q.**   And do you know -- what, to you, based on your

7  investigation, was the significance of that raid?

8  **A.**   Well, that was the straw that broke the camel's back

9  in regards --

05:54:55  10  **Q.**   What do you mean by that?

11  **A.**   There had been all these law enforcement actions taken

12  by HPD vice and other agencies like TABC, Texas Alcohol

13  and Beverage Commission.  In August alone there were three

14  consecutive days of patrol units who were passing through

05:55:12  15  going into the parking lot, and that was scaring them a

16  lot.

17         Along with all this then here comes Mark Delacerda.

18  They came to the location with his people, and they heard

19  noises on the second floor.  Basically, they got a consent

05:55:29  20  to search.  They found the prostitution --

21              MR. FAZEL:  Objection, nonresponsive.

22              THE COURT:  Excuse me.  Yes, sir.

23              MR. FAZEL:  Nonresponsive.

24              THE COURT:  Sustained.  It's a narrative.

05:55:36  25  Question and answer, please.

*Laura Wells, CRR, RDR*

1  **Q.**  (By Mr. Magliolo)  And after this third or fourth law

2  enforcement action, is that when the defendant then tried

3  to distance herself somewhat from the brothel?

4  **A.**  Yes.

05:55:48  5  **Q.**  I'm going to direct your attention then to October

6  2013.  When was the takedown of this case?  That is, when

7  are the defendants that were charged in this case arrested

8  or at least attempted to be arrested?

9  **A.**  October 10th, 2013.

05:56:02  10  **Q.**  And who all was arrested?

11  **A.**  13 defendants.

12  **Q.**  And were they charged in this case initially?

13  **A.**  Yes.

14  **Q.**  And have you caused a board to be created with the

05:56:15  15  defendants on it, their photographs?

16  **A.**  Yes.

17  **Q.**  And could you go and explain each defendant to the

18  ladies and gentlemen of the jury based on your

19  investigation?

05:56:27  20  THE COURT:  All right.  Can everybody see?  Some

21  of them are blocked.

22  JURORS:  Some are blocked.

23  THE COURT:  All right.  Now this is cut off.

24  Tomorrow let's get that straight.  Okay?

05:56:35  25  MS. POUNCEY:  Yes, Judge.

*Laura Wells, CRR, RDR*

1    THE COURT:  You can put them up for now.  I think

2    it will help a little bit.

3            MR. MAGLIOLO:  Is that all right?

4            THE COURT:  Okay.

05:56:43  5  **A.**  Eduardo Guzman, one of the three pimps that took over

6    the operation after Poncho was arrested.

7            Abel Medeles a/k/a Chito, Tencha's brother.

8            Alberto Mendez-Flores a/k/a Ardilla, squirrel.

9  **Q.**  (By Mr. Magliolo)  What relation, if any, to the

05:57:08  10  defendant?

11  **A.**  Ardilla, nothing.  He was one of the three pimps.  The

12   three pimps were Eduardo Guzman, Alberto Mendez-Flores and

13   Jorge Teloxa-Barbosa.  Those were the three pimps that

14   took over after Poncho.  The one on the far right on the

05:57:24  15  top got arrested.

16           Then we have Odelia Hernandez, the niece; David

17   Garcia, the son; Delia Garcia Diaz, daughter; Diana

18   Medeles-Garcia, daughter.

19  **Q.**  David Garcia, it is your information he is going to

05:57:45  20  testify for the ladies and gentlemen today?

21  **A.**  Yes.

22  **Q.**  All right.  Who is the next person?

23  **A.**  Delia.  No, she is not going to testify.

24  **Q.**  What relation is she to the defendant?

05:57:51  25  **A.**  Daughter.

*Laura Wells, CRR, RDR*

```
 1   Q.   Okay.  Who is the next person?

 2   A.   Diana.

 3   Q.   What relation is she to the defendant?

 4   A.   Daughter.
```
05:57:57
```
 5   Q.   Is she going to be available to testify?

 6   A.   Yes.

 7   Q.   How about the last on that row, Ms. --

 8   A.   Guadalupe Valdez-Lugo.

 9   Q.   Is she going to be available to testify?
```
05:58:07
```
10   A.   Yes.

11   Q.   Is she a friend of the defendant's?

12   A.   She is a friend.

13   Q.   And employee?

14   A.   She worked as a manager.
```
05:58:13
```
15   Q.   How about the bottom corner?  That's Ms. Cerda?

16   A.   Lilia Cerda, that's the sister.

17   Q.   The sister of the --

18   A.   Tencha's sister.

19   Q.   How about the next person, Graciela Ochoa?
```
05:58:25
```
20   A.   Graciela Ochoa, a daughter.

21   Q.   Is she going to be available to testify?

22   A.   Yes.

23   Q.   Who is the next person?

24   A.   The defendant, Raquel Medeles-Garcia.
```
05:58:32
```
25   Q.   How about the next to the last?
```

1   **A.**   Talat Crippen, he was married to the granddaughter.

2   **Q.**   How about the last person, Wicho?

3   **A.**   Wicho, he is one of the defendants, also.

4   **Q.**   I'm going to show you what's marked as P-40 and ask if

05:58:51   5   you recognize it?

6   **A.**   Yes.

7   **Q.**   Who did you get that from?

8   **A.**   Juan Manuel Cepeda.

9   **Q.**   Was this while he was working for you at the club?

05:59:00   10   **A.**   Yes.

11   **Q.**   During the course of the conspiracy?

12   **A.**   Yes.

13   **Q.**   And do you understand the significance of the numbers

14   on this document?

05:59:07   15   **A.**   Yes.

16          MR. MAGLIOLO:  We would ask that P-40 be

17   displayed to the jury, Your Honor.

18          THE COURT:  Hearing no objection, keep moving.

19   **Q.**   (By Mr. Magliolo)  What do the number -- what is that

05:59:20   20   word at the top left?

21   **A.**   It's "tickets" misspelled in Spanish.

22   **Q.**   And what is the significance of the numbers to the

23   right-hand side of "tickets"?

24   **A.**   Here you have --

05:59:31   25          MR. FAZEL:  Judge, I'm going to object to him --

*Laura Wells, CRR, RDR*

1    a couple of objections to this exhibit as far as I don't

2    have -- I have no problems with the jury looking at it.

3    My objection is he is about to translate and discuss what

4    the exhibit is when the witness is going to come testify

05:59:43   5    about the exhibit.  So I would ask for them to allow the

6    exhibit -- the witness to explain it that actually wrote

7    it out.

8            MR. MAGLIOLO:  If he knows what it is, based on

9    his investigation he should --

05:59:53   10           MR. FAZEL:  That's hearsay.

11           THE COURT:  Is there a witness going to come

12    explain it?

13           MR. MAGLIOLO:  There will be a witness.

14           THE COURT:  Overrule the objection.

05:59:59   15       Ladies and gentlemen, we're going to get it on through

16    him.  It will be corroborated by another witness.

17       If it's not, the defense remind me; and you'll get an

18    instruction on it.

19           MR. FAZEL:  As far as the Spanish being

06:00:09   20    translated into English?

21           THE COURT:  Yeah.  Sir, are you bilingual, by the

22    way?

23           THE WITNESS:  Yes.

24           THE COURT:  All right.  They are not going to

06:00:17   25    have to test him on that.  I'll take his word for it.  He

 1    is under oath.  Okay.  Go on.

 2    **Q.**   (By Mr. Magliolo)  What is the significance of the two

 3    numbers on the right side of the misspelling of "tickets"?

 4    **A.**   Yes.  The tickets all have --

 5              THE COURT:  You are carrying fine, sir.  You can

 6    move the mic away a little bit.  Go on.

 7    **A.**   The tickets had numbers, just like tickets you have

 8    when you go to a theater.  And you have the beginning and

 9    the ending in that roll.  You have a roll of tickets.  And

10    so, they began with 79 -- 796052.  They ended that day

11    with 796482.

12    **Q.**   What is the significance of those tickets?

13    **A.**   Okay.  Those tickets are the tickets for the cover

14    charge.

15              THE COURT:  How much was that?

16              THE WITNESS:  $5.

17              THE COURT:  All right.  Next question.

18    **Q.**   (By Mr. Magliolo)  Then go down.  What is the next

19    entry below the tickets?

20    **A.**   It says "mujeres" meaning "women."

21    **Q.**   What are the numbers across from "mujeres"?  What are

22    they signifying?

23    **A.**   That's also the beginning and ending ticket.

24    **Q.**   What were -- what were those tickets for?

25    **A.**   Those were the tickets that they had to give $5 to go

06:00:28
06:00:47
06:01:06
06:01:15
06:01:25

```
          1    to the prostitution rooms.  In exchange for the $5 they
          2    would get one of those tickets; and they had to show the
          3    ticket to the person controlling the access to the rooms,
          4    which was Juan Carlos Munoz.
06:01:43  5    Q.   What would happen when they get to the room?  Would
          6    they have to pay additional moneys?
          7    A.   Well, to Juan Carlos --
          8              THE COURT:  The answer is yes or no.
          9              THE WITNESS:  Yes, but not in the rooms.  That
06:01:54  10   would be downstairs.
          11   Q.   (By Mr. Magliolo)  Did they have to pay additional
          12   money to get access to the actual prostitution room?
          13   A.   Yes.
          14   Q.   How much was that?
06:02:04  15   A.   Fifteen.
          16             THE COURT:  $15 or $1,500?
          17             THE WITNESS:  Yes, sir, $15.
          18             THE COURT:  All right.  Go on.
          19   Q.   (By Mr. Magliolo)  What was the total paid that went
06:02:14  20   to the owner of Las Palmas for providing the room where
          21   the prostitution occurred?
          22   A.   $20, not including the $5 cover charge.
          23   Q.   What is the total?
          24             THE COURT:  $25?
06:02:28  25   A.   $25.
```

1    **Q.**   (By Mr. Magliolo)   Now, as far as what the girls

2    received for the sex act, that was between them and the

3    john; is that correct?

4    **A.**   Correct.

06:02:35   5    **Q.**   Though occasionally that cost -- the cost of the first

6    sex act still went to the house?   Did you understand that?

7    **A.**   I'm sorry?

8    **Q.**   Did the cost of the first sex act in the room

9    sometimes go to Las Palmas on top of the $25?

06:02:47   10   **A.**   Yes.

11   **Q.**   We show you what's P-46.

12          THE COURT:   I will tell you what.   I'm going to

13   hold to the time.   I have learned that a long time ago.

14   Okay.   No.   Mine is not working.   Do you want to raise the

06:03:02   15   screen, please.   All right.

16      Ladies and gentlemen, we are moving along.   Remember

17   tomorrow, on Tuesdays, we begin at 11:30.   And so, we'll

18   see you.   You may take your books and leave them in the

19   jury room.   Remember all the instructions I previously

06:03:17   20   gave.   Thank you.   We'll see you tomorrow morning ready to

21   resume at 11:30.   You may stand and go into the jury room.

22          THE MARSHAL:   All rise for the jury.

23          THE COURT:   Okay.   Everybody is excused.   I'm

24   going to be up here just shutting it down.

25          (Proceedings adjourned at 6:03 p.m. and continued in

*Laura Wells, CRR, RDR*

1  Volume 2.)

2  *Date: September 3, 2016*

3              ***COURT REPORTER'S CERTIFICATE***

4      *I certify that the foregoing is a true and correct*

5  *copy of the transcript originally filed with the clerk of*

6  *court on September 3, 2016, incorporating redactions of*

7  *personal identifiers requested by Court Order, in*

8  *accordance with Judicial Conference Policy. Redacted*

9  *characters appear as a black rectangle in the transcript.*

10

11                      */s/ Laura Wells*

12                  *Laura Wells, CRR, RMR*

13

14

15

16

17

18

19

20

21

22

23

24

25