1      **UNITED STATES DISTRICT COURT**
       **SOUTHERN DISTRICT OF TEXAS**
2              **HOUSTON DIVISION**

3

       UNITED STATES OF AMERICA          *    4:13-CR-00628-1
4                                        *
       VS.                               *    11:40 a.m.
5                                        *
       HORTENCIA MEDELES-ARGUELLO        *    APRIL 14, 2015
6

7               **REDACTED TRIAL ON MERITS**
            **BEFORE THE HONORABLE DAVID HITTNER**
                    **AND A JURY**
8              **Volume 2 of 10 Volumes**

9      ************************************************************
       This transcript has been furnished at public expense under
10     the Criminal Justice Act and may be used only as
       authorized by Court Order.  Unauthorized reproduction will
11     result in an assessment against counsel for the cost of an
       original and one copy at the official rate.  General Order
12     94-15, United States District Court, Southern District of
       Texas.
13     ************************************************************

14     **APPEARANCES:**

15     **FOR THE UNITED STATES OF AMERICA:**
       Mr. Ruben R. Perez
16     Mr. Joseph C. Magliolo
       United States Attorney's Office
17     1000 Louisiana
       Suite 2300
18     Houston, Texas 77002
       (713) 567-9344
19
       **FOR THE HORTENCIA MEDELES-GARCIA A/K/A RAQUEL**
20     **MEDELES-GARCIA A/K/A TENCHA:**
       Mr. Ali R. Fazel
21     Scardino and Fazel
       1004 Congress
22     Third Floor
       Houston,Texas 77002
23     (713) 229-9292

24

25

**APPEARANCES (continued)**

**INTERPRETERS:**
Mr. Ramon Del-Villar
Ms. Linda Hernandez
Ms. Graciela Dachman
Mr. Gregorio Ayala

Court Reporter:
Laura Wells, RPR, RMR, CRR
515 Rusk, Suite 8016
Houston, Texas 77002


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

1                          **VOLUME 2**
                         **(Trial on Merits)**
2                                                              Page
  April 14, 2015
3
  Announcements...................................      4
4
  Hearing on Motions.............................      4
5 Ruling of Court................................      5

6 Rule Invoked...................................      8

7 Hearing on Motion..............................      8
  Ruling of Court................................      9
8
  WITNESSES                                          Page
9

10 **EDWIN CHAPUSEAUX**
       Direct Examination By Mr. Magliolo             13
       Cross-Examination By Mr. Fazel                 44
11     Redirect Examination By Mr. Magliolo           94
       Recross-Examination By Mr. Fazel              106
12     Redirect Examination By Mr. Magliolo          118

13 **XXXXXXXXXXXXXXXXXXXX**
       Direct Examination By Mr. Perez               121
14     Cross-Examination By Mr. Fazel                151
                                                     183
15
                                                   Page
16
   Court Reporter's Certificate....................  188
17

18

19

20

21

22

23

24

25

*Laura Wells, CRR, RDR*

1                          **PROCEEDINGS**

2          (Open court, defendant present, no jury.)

3              THE COURT:  Thank you.  Be seated.  It's warm in

4     here.  Did you call?  Yeah, we'll get it.  Tell the jury

11:40:00   5     we are in here.  I'm in here.  I'm talking to the

6     attorneys.

7              THE MARSHAL:  Thank you.

8              THE COURT:  Please, will you.  How much time do

9     we need?

11:40:14   10             MR. MAGLIOLO:  15 minutes, at the most.

11             THE COURT:  I'm not going to have them in there

12    15 minutes.  Why aren't we doing this after your -- after

13    the morning session on our time instead of their

14    lunchtime?

11:40:23   15             MR. MAGLIOLO:  Because it pertains to the witness

16    that's on.

17             THE COURT:  When did it come up?  It just came

18    up?

19             MR. MAGLIOLO:  We talked about it yesterday; but

11:40:29   20    the Court didn't rule, Your Honor.

21             THE COURT:  About what?  Which one?

22             MR. MAGLIOLO:  Two things, Your Honor.  One is

23    the prior.  I provided you a case yesterday.

24             THE COURT:  Just tell me which one.

11:40:35   25             MR. MAGLIOLO:  The prior that she had when she

Hearing on Motions                          Vol 2 - 5

 1    was arrested during the course of the conspiracy and

 2    convicted of the prostitution charge of --

 3              THE COURT:  What's your response?  I remember.

 4    What is your response?

11:40:50  5              MR. FAZEL:  It's not a conviction.  It was

 6    deferred adjudication for a different crime which was --

 7              THE COURT:  You object?

 8              MR. FAZEL:  I do.

 9              THE COURT:  Sustained.

11:40:55  10              MR. FAZEL:  Thank you.

11              THE COURT:  I have it.  I understand it.  Next.

12              MR. MAGLIOLO:  Can I present you some more cases

13    because all the cases say it's admissible?

14              THE COURT:  I'm saying it's not coming in.  A

11:41:04  15    prior conviction is not coming in.  That's it.  I have

16    been this route before.  It's just not coming in.

17              MR. MAGLIOLO:  Okay.  The other thing, the Court

18    ruled yesterday that --

19              THE COURT:  And it's not a matter of time.  In

11:41:15  20    other words, if we need to take time to discuss it, fine.

21    But I have looked into it.  I understand completely.  So

22    that's -- next.  What is next?

23              MR. MAGLIOLO:  The other thing is that the

24    evidence that the officer gives that explains to the jury

11:41:30  25    what he does and why he does it is not hearsay.  Counsel

1    is --

2              THE COURT:  Which officer does?

3              MR. MAGLIOLO:  The officer, any officer, but

4    particularly this officer on the stand is testifying or

11:41:43  5    trying to testify as to what the victims told him so he

6    can explain to the ladies and gentlemen of the jury why he

7    did what he did.

8              THE COURT:  You are --

9              MR. MAGLIOLO:  It's not hearsay.

11:41:52  10              THE COURT:  I'm not saying if it's hearsay or

11    not.  Okay.  You are talking about basic admissibility,

12    correct?

13              MR. MAGLIOLO:  No.  I'm talking about it's not

14    hearsay, Your Honor.  There is no hearsay objection that

11:42:02  15    would be applicable to that information.

16              THE COURT:  To what he did?

17              MR. MAGLIOLO:  I'm sorry?

18              THE COURT:  To what he did, based upon the

19    information he received?

11:42:09  20              MR. MAGLIOLO:  Yes, because it's not offered for

21    the truth of the matter.  Yes, sir.

22              THE COURT:  All right.  What is your response?

23              MR. FAZEL:  Your Honor, I would submit to the

24    Court that the best way to do that is ask the question.

11:42:17  25    When it's -- I will lodge an objection, if necessary.  The

1    Court will rule on it, just like any other evidence.  I

2    will tell you that if he says, "What did 'X' say?", I'd

3    say that's hearsay.  If he says, "What did you do?" --

4    well, I'm not going to tell him how to do his job.  He has

5    done this long enough.

11:42:31

6              THE COURT:  All right.  The easiest way to do it

7    is that you spoke to him.  As a result of what you

8    discussed, what did you do.

9              MR. FAZEL:  Yeah.

10             THE COURT:  Now, if indeed you have got to show

11:42:41

11   why he acted in a certain way, then you are going to

12   object; is that correct?

13             MR. FAZEL:  Yes.

14             THE COURT:  In other words, why?

15             MR. FAZEL:  Right.

11:42:49

16             THE COURT:  More than likely I'm going to let it

17   in.  You are certainly free to object.

18             MR. FAZEL:  I understand.

19             THE COURT:  I understand your position.

20             MR. MAGLIOLO:  Thank you, Your Honor.

11:42:56

21             THE COURT:  I, basically, agree with it.  The

22   safer thing to do is to always say, "As a result of what

23   they said, what did you do?"

24             MR. MAGLIOLO:  Yes, Your Honor.

25             THE COURT:  If you need the exact words, you get

11:43:03

1    up and object.  More than likely I'll overrule it.  If he

2    acted upon that and it explains his action as to how and

3    what he did, then you have got your record; and you have a

4    record.

11:43:16    5         MR. MAGLIOLO:  Thank you, Your Honor.

6         THE COURT:  What else?

7         MR. FAZEL:  Two quick questions.  I didn't invoke

8    the Rule yesterday.  I do invoke the Rule today, Your

9    Honor, as to the entire case.

11:43:25   10         THE COURT:  What is your response?

11         MR. MAGLIOLO:  I have no objection, Your Honor.

12         THE COURT:  Okay.  Generally you do it at the

13   beginning.  Very well.  The Rule is invoked.  If you see

14   anybody come in subject to the Rule, let me know.  It

11:43:34   15   doesn't go to any of the case agents or any of the

16   officers who are involved in this and certainly now, if

17   you have a paralegal, it certainly doesn't go to your

18   paralegal.

19         MR. FAZEL:  The other issue is, Your Honor, this

11:43:48   20   morning we had -- just real briefly, Judge Werlein wanted

21   us there at 8:00 in the morning the day of --

22         THE COURT:  Say this again.

23         MR. FAZEL:  Judge Werlein wanted us there at 8:00

24   in the morning the day of trial to go over what we agree

11:43:57   25   to as far as evidence is concerned.  We had done that the

Hearing on Motions                                    Vol 2 - 9

```
 1   Friday before.
 2               THE COURT:  I understand that.
 3               MR. FAZEL:  There is a bunch of evidence that we
 4   have agreed to that we have told Ms. Alexander that it's
 5   been --
 6               THE COURT:  I already ruled on that.  I did the
 7   same thing as in the Stanford case.  No, I really did.
 8   I'm not joking.
 9               MR. FAZEL:  I was there.  I hear you.
10               THE COURT:  I understand.
11               MR. FAZEL:  So I just want you to know that the
12   majority of the paper involved in this case that is from
13   the banks has been pre-admitted by you and also not
14   objected by the defense.
15               THE COURT:  Exactly.
16               MR. FAZEL:  There are other things I'm going to
17   stand up to and object to because we just simply don't
18   agree with it, and I don't want the Court to think that
19   we're slowing the Court down.
20               THE COURT:  No.  No.
21               MR. FAZEL:  Thank you, Judge.
22               THE COURT:  In other words, you don't have to
23   offer anything.  You just use every exhibit.  If I don't
24   hear an objection, it's in final evidence.
25               MR. MAGLIOLO:  If I might be heard on that, Your
```

1    Honor.  The problem with that is using something as an

2    exhibit, he then objects.  Then the Court says, well, lay

3    your predicate, which makes it look like I didn't know to

4    lay my predicate in the first place.

11:44:58   5        THE COURT:  I'll tell them that.  I'll tell the

6    jury exactly what I did.  It's no big deal.  I'll tell the

7    jury.

8        MR. MAGLIOLO:  I know what he is going to object

9    to, Your Honor.  If it please the Court, if I could go on

11:45:07  10    and lay the predicate for what he is going to object to,

11    he will object to it and the Court can rule as opposed to

12    going back.  I know -- we have talked about it.  I pretty

13    much know.

14        THE COURT:  I don't understand what you said.

11:45:16  15        MR. MAGLIOLO:  He is going to object to certain

16    things, which I understand he is going to object to.

17        THE COURT:  Okay.

18        MR. MAGLIOLO:  So if I proceed like it's

19    admitted, then I know he is going to object to it.  So if

11:45:24  20    I could go on and just lay my predicate.

21        THE COURT:  Yeah.  You can do whatever you want.

22    I'm going to tell the jury basically what I did at the

23    beginning.  Okay.  So -- I think I did already.  Didn't I

24    mention that?

11:45:34  25        MR. FAZEL:  I don't believe so.

             1          THE COURT:  Okay.  I'm going to say most of those

             2   are in and then a few of -- some of them are not.  I'll

             3   take care of it.  Let's call the jury.

             4          MR. MAGLIOLO:  Thank you, Your Honor.

11:45:44     5          THE MARSHAL:  All rise.

             6          MR. MAGLIOLO:  May the witness take his seat,

             7   Your Honor?

             8          THE COURT:  Yes, sir.

             9      (Jury entered courtroom at 11:45 a.m.)

11:46:19    10          THE COURT:  Thank you.  Be seated.  What we were

            11   talking about, as you can see, ladies and gentlemen, these

            12   two books are either evidence or proposed evidence.  Most

            13   of it the parties have agreed upon or I have ruled upon.

            14   My ruling at the beginning is I did it this way.  I said

11:46:37    15   tentatively everything is in evidence.

            16      So if in this case Mr. Magliolo goes and proves

            17   something up and then he keeps going, well, that's in

            18   evidence already based upon my ruling.  They used it in

            19   trial with no objection forthcoming.  We understand the

11:46:56    20   rules that I set down.

            21      Now, everything is tentatively in evidence.  But if

            22   anything comes in that the defense has an objection to --

            23   and it goes both ways.  Okay -- then I'll consider hearing

            24   it.  So sometimes you'll hear an objection.  Sometimes you

11:47:12    25   won't.

1          Again, don't hold it against either side to objecting

2     to anything.  It's just the nature of the process.  So we

3     did most of that whole stack already.  Both of them are

4     already done.  There are a few things in there that in

11:47:26    5     effect I want to see as to how it develops.

6          A laying of predicate means, well, did you do this,

7     did you do that, is it an accurate representation, did you

8     take the picture and so forth?  And if you hear that, it's

9     laying what we call a predicate to getting it in.  If

11:47:43   10     there is no objection, we keep going.  If there is, I'll

11     consider.

12          Or Mr. Magliolo may offer something feeling that he

13     doesn't have to lay that predicate.  And then the defense

14     will get up and object.  Then if I say, well, on this one

11:47:58   15     you need to do it.

16          What it does is it is speeding up an objection to

17     everything there.  Okay.  So the only objections you hear

18     are the few exhibits that the defense may or the

19     government may have a concern about.

11:48:10   20          So sometimes you'll hear them prove up everything that

21     he thinks the defense may want a predicate done and then

22     will probably have no objection because, obviously, it

23     shows personal knowledge that he was there and that's

24     where he was or that's what he saw.

11:48:27   25          All right.  I'm just explaining to you some of the

1   rules of evidence.  For instance, something known -- I'll

2   get into it later -- as hearsay.  Okay.  Something -- an

3   out-of-court statement trying to get it admitted for the

4   truth of it is hearsay except -- there are 23 exceptions

11:48:44   5   to the hearsay rule.  Plus, there is one saying that even

6   if it's not covered by the exceptions, if it was

7   identified before trial and it's not a surprise, sometimes

8   it can get in.  It's just the nature of the business that

9   we do.  And that's what we were talking about.

11:48:59   10       So I apologize for not getting underway, but a lot was

11   resolved in that 15 minutes that we were in here.

12       Counsel, go right ahead.

13           MR. MAGLIOLO:  Thank you, Your Honor.

14               **EDWIN CHAPUSEAUX,**

15   having been previously duly sworn, testified as follows:

16           **DIRECT EXAMINATION (continued)**

17   BY MR. MAGLIOLO:

18   **Q.**   Deputy Chapuseaux, you are the same Deputy Chapuseaux

19   that was testifying yesterday?

11:49:23   20   **A.**   Yes, sir.

21   **Q.**   For the record, you are still under oath?

22   **A.**   Yes, sir.

23   **Q.**   Now, you may recall testifying to the ladies and

24   gentlemen of the jury that when you talk to a victim you

11:49:33   25   listen to what they had to say; and in order to complete

Direct Examination of Edwin Chapuseaux          Vol 2 - 14

1    your investigation and in order to move forward in the

2    investigation, you would take some action?

3    **A.**   Yes, sir.

4    **Q.**   And part of that action would be to see if what they

11:49:43    5    told you could be corroborated independently from the

6    victim?

7    **A.**   Yes, sir.

8    **Q.**   And what would that -- if you are able to do that,

9    what does that help you do as far as progress with your

11:49:54    10   investigation?

11   **A.**   Corroborate their story, confirm that they actually

12   were victims, that they were there, and that their story

13   is backed by corroboration from others.

14   **Q.**   So then you can proceed with your investigation down

11:50:09    15   the trail that they are sending you on as opposed to going

16   down a false trail?

17   **A.**   Yes, sir.

18   **Q.**   I'm going to direct your attention back to the victim

19   who is the first victim on the chart, Ms. XXXXXX.  Do you

11:50:22    20   recall her?

21   **A.**   Yes, sir.

22   **Q.**   And did you have a conversation with her about where

23   she was kept?

24   **A.**   Yes.

11:50:31    25   **Q.**   Where did she tell you she was kept?

1        MR. FAZEL:  Objection, hearsay, Your Honor, as to

2   what she said.

3        THE COURT:  Overruled.

4   **A.**   She said she was kept in a room on the second floor,

11:50:40    5   the same floor where the prostitution rooms were.

6   **Q.**   (By Mr. Magliolo)  And did she tell you anything

7   specific about the room?

8   **A.**   Yes.  She mentioned that it had an adjoining room.  As

9   you went in, there was a room to the left that connected

11:50:59   10   with that main room.

11        THE COURT:  By the way, will this witness be

12   here?

13   **Q.**   (By Mr. Magliolo)  Will this witness be here to

14   testify?

11:51:05   15   **A.**   Yes.

16   **Q.**   Did she tell you anything else --

17        THE COURT:  Hold it.

18        MR. FAZEL:  I'm sorry.  May I have a running

19   objection as to this line of testimony?

11:51:12   20        THE COURT:  Yeah.  I'll give you a running

21   objection.  Except if you think it's way out of line, then

22   you need to bring it to my attention, like one of the

23   rulings I made this morning.

24        MR. FAZEL:  Yes, sir.

11:51:24   25        THE COURT:  Okay.  I don't want to let in

1  anything that if it's -- it's subject to the running

2  objection.

3        MR. FAZEL:  I understand.

4        THE COURT:  By the way, folks back there, you

11:51:31  5  don't have to sit behind that.  You can go on either side,

6  you know.  You don't have to sit behind all of these

7  exhibits.  Sorry I've got that pole.  I can't do a thing

8  about it.

9  **Q.**  (By Mr. Magliolo)  Did she indicate to you whether she

11:51:45  10  was locked in that room or not locked in the room?

11  **A.**  She said they were locked in the room.

12  **Q.**  And did she give you any idea of what type of locks or

13  what kind of locking mechanism there was?

14  **A.**  No.

11:51:54  15  **Q.**  Did she tell you whether or not there was anything

16  else that would aid her captors keeping her in that room?

17  **A.**  No.  She just said --

18        MR. FAZEL:  Objection, nonresponsive.

19        THE COURT:  The answer is "no."

11:52:08  20  **Q.**  (By Mr. Magliolo)  Well, did she say -- ever tell you

21  whether or not there was any type of alarm system?

22  **A.**  Yes.

23  **Q.**  What did she tell you about any type of alarm system?

24  **A.**  She said there was an alarm that went off when they

11:52:18  25  attempted to escape at one time with the help of Adrian

1  Hernandez.  When they pushed the bar --

2          MR. FAZEL:  Objection, nonresponsive, Your Honor.

3  Objection to hearsay.

4          THE COURT:  Sustained.

5          MR. MAGLIOLO:  Thank you, Your Honor.

6          THE COURT:  Sustained.  Too much of that I don't

7  want you to go into.  You can get it later.

8          MR. MAGLIOLO:  Thank you, Your Honor.

9  **Q.**  (By Mr. Magliolo)  So when you went to the Las Palmas

10  brothel/cantina, did you examine it for the things that

11  this witness told you should be there consistent with her

12  story of being kept there against her will?

13  **A.**  Yes, sir.

14  **Q.**  And did you find anything?

15  **A.**  Yes, sir.

16  **Q.**  Tell the ladies and gentlemen of the jury what you

17  found.

18  **A.**  I found the alarm contact on the door that lead to the

19  outside.  I found the keypad on the wall for the alarm.  I

20  found in the room that fit the description mentioned by

21  her a latch that we saw on the pictures yesterday.  The

22  latch on the door and the frame, that part on the frame

23  was missing; but the mark was there.

24  **Q.**  I'm going to show you what's been marked for

25  identification purposes as P-9 and ask you if you

1  recognize this photograph?

2  **A.**  Yes, sir.

3  **Q.**  And is this a photograph of the contact point you saw

4  in the room that you testified to the jury about?

11:53:42  5  **A.**  Yes.

6  **Q.**  This photograph fairly and accurately depicts what you

7  have just testified to the jury about the contact point

8  that was described to you by the victim and you found in

9  the room?

11:53:54  10  **A.**  Yes, sir.

11         MR. MAGLIOLO:  We would ask that P-9 be published

12  to the jury, Your Honor.

13         MR. FAZEL:  No objection.

14         THE COURT:  No objection.  Thank you.

11:54:03  15  **Q.**  (By Mr. Magliolo)  If you could direct the jury's

16  attention to where the contact was.

17  **A.**  Right there on the top.

18  **Q.**  Is this the way it appeared during the course of this

19  conspiracy at the Las Palmas brothel/nightclub?

11:54:15  20  **A.**  Yes.

21  **Q.**  I direct your attention to P-8 and ask you --

22         THE COURT:  I'll tell you what.  If it's similar,

23  you don't have to lay that entire predicate.  Just briefly

24  say is that the way you found it.  And then, if there is

11:54:27  25  an objection to the predicate, get up and let me hear it.

1    All right.  Go on.

2    **Q.**   (By Mr. Magliolo)  I'll show you P-8 and ask you will

3    the answers to that be the same?  That is a photograph of

4    something you found in the brothel/nightclub that

11:54:45  5    pertained to the victim's statement that she was kept in

6    there against her will?

7    **A.**   Yes, sir.

8    **Q.**   And I believe did you testify -- what does it show?

9    **A.**   It shows a keypad on the wall, on the left side.

11:54:59  10   **Q.**   And what did you see as the significance of that

11   keypad?

12              THE COURT:  Wait a second.  We don't have --

13              MR. FAZEL:  Objection.

14              THE COURT:  We don't have it.  Do we have it up

11:55:08  15   there?

16              MS. POUNCEY:  Yes.

17              MR. MAGLIOLO:  I wasn't going to show it until he

18   -- to see if he was going to object.

19              THE COURT:  He is objecting to the other

11:55:14  20   questions you have.  We're talking about the photograph.

21              MR. FAZEL:  Right.

22              THE COURT:  If you feel it's in, let's get it up.

23   Where is it?

24              MR. FAZEL:  It's up.

11:55:21  25              THE COURT:  It's up?  Where is it?  All right.

1    Can you move that back a little bit?  Oh, wait a second.

2    Hold it.  Hold it.  Call it up on my screen.  All right.

3    Go on.

4    **Q.**   (By Mr. Magliolo)  Is that -- explain to the ladies

11:55:31    5    and gentlemen of the jury how that keypad was consistent

6    with what the victim told you?

7    **A.**   Yes.  It would be consistent with having an alarm.

8            THE COURT:  Next question.

9    **Q.**   (By Mr. Magliolo)  I will show you what is P-10 and

11:55:46   10    ask if you recognize that?

11   **A.**   Yes, sir.

12   **Q.**   What is that a photograph of?

13           THE COURT:  Wait a second.  You ought not to

14   throw it up until he asks what it is and so forth.  Then

11:55:54   15   we can put it up.  Okay.  Let's do it that way.  Go on.

16           MR. MAGLIOLO:  Thank you, Your Honor.

17   **Q.**   (By Mr. Magliolo)  What is that?

18   **A.**   This is the room described by XXXXXXXXXXXXXXXXXXXX as

19   the room they were kept in on the second floor.

11:56:11   20   **Q.**   And is this a photograph of the room at Las Palmas?

21           THE COURT:  Now you can put it up, please,

22   because we don't have an objection to that point.  Go on.

23           MR. FAZEL:  No.

24   **Q.**   (By Mr. Magliolo)  Explain to the ladies and gentlemen

11:56:18   25   of the jury how this room that you found in Las Palmas fit

                1  the description that the victim gave you of the room that

                2  she was kept in.

                3  **A.**   Yes.  She described it as -- I remember her talking

                4  about the fan and the room to the left that connected to

11:56:34   5  it, and you can see on the left here the open door.

                6  **Q.**   I'll direct your attention to P-11 and ask you do you

                7  recognize this?

                8  **A.**   Yes, sir.

                9  **Q.**   What is that?

11:56:44  10  **A.**   That is the door that is on this photo you see to the

              11  left.  And then, this is the entrance looking from the

              12  entrance door to that room from the other room, from the

              13  main room.

              14           MR. MAGLIOLO:  May we display P-11, Your Honor?

11:56:59  15           MR. FAZEL:  No objection.

              16           THE COURT:  You don't have to say anything.  If

              17  you have an objection, let me know.

              18           MR. FAZEL:  I'm sorry.

              19  **Q.**   (By Mr. Magliolo)  What is the significance of this

11:57:06  20  photograph relating to what the victim told you and how

              21  you could proceed in your investigation?

              22  **A.**   This was consistent with what she told me and what she

              23  described, and this is the room where they engaged in

              24  commercial sex with the special clients.

11:57:21  25           THE COURT:  What do you mean by "special

1    clients"?

2          THE WITNESS:  The five, six girls that were kept

3    locked up in that room were not available to everybody.

4    They -- they never went downstairs to the actual bar area

11:57:37   5    where all the prostitutes were.

6          THE COURT:  During the course of your

7    investigation, do you know why?

8          THE WITNESS:  Because --

9          THE COURT:  Yes or no?

11:57:45   10         THE WITNESS:  Yes.

11         THE COURT:  All right.  Why?

12         THE WITNESS:  Because they were minors and

13   because they were kept there for a special clientele that

14   paid a whole lot more and they were kept locked up and

11:57:58   15   they were only -- the customers -- the special clients

16   were brought by either Tencha or her daughter, Delia, to

17   choose which ones they wanted.

18         MR. FAZEL:  Judge, I know you asked the question.

19   I have to object to this because it's hearsay.  It's --

11:58:12   20         THE COURT:  It's double hearsay.

21         MR. FAZEL:  It's triple, quadruple.

22         THE COURT:  All right.  Sustained as to that last

23   point.  We can find it out through somebody else later.

24         MR. MAGLIOLO:  I'm good, Your Honor.

11:58:23   25         THE COURT:  Go on.

1    **Q.**   (By Mr. Magliolo)   Let me show you what's marked as --

2    can you tell what that number is?   I'm sorry.

3    **A.**   72, P-72.

4    **Q.**   P-72, do you recognize it?

11:58:34    5    **A.**   Yes, sir.

6    **Q.**   It's a portion of the interior of Las Palmas?

7    **A.**   Yes, sir.

8        MR. MAGLIOLO:   May it be published to the jury,

9    Your Honor?

11:58:41    10       THE COURT:   Go right ahead.

11    **Q.**   (By Mr. Magliolo)   Explain to the ladies and gentlemen

12    of the jury what this is a photograph of.

13    **A.**   Okay.   This is the stairs that lead to the second

14    floor from the area controlled by Juan Carlos Munoz.   In

11:58:54    15    other words, there is an area at the foot of these stairs

16    where the person, Juan Carlos Munoz, would charge for the

17    room and condom and control the access into that area.   So

18    this has -- this is the stairs that they would take to go

19    to the second floor where the rooms were.

11:59:15    20    **Q.**   Is that where the -- well, we don't know.   I'm going

21    to show you P-7, which I believe was put into evidence

22    yesterday, and ask you if you recognize it?

23    **A.**   Yes, sir.

24    **Q.**   And anything significant about --

11:59:26    25       MR. MAGLIOLO:   May we publish that to the jury?

1    **Q.**  (By Mr. Magliolo)  Anything significant about P-7 as

2    to what the victim told you and how you were able to

3    proceed in your investigation?

4    **A.**  Yes, sir.

11:59:36  5    **Q.**  Explain that to the ladies and gentlemen of the jury.

6    **A.**  This is the frame and the door, which is almost

7    closed; and the dark is the area on the inside of the

8    room.  This is the door leading to that room where XXXXXX

9    XXXXXXXXXXXXX was kept, along with five or six other

11:59:57  10   girls; and she knew it was locked.  She couldn't tell me

11   how, what kind of mechanism; but I found the latch --

12            MR. FAZEL:  Objection to the narrative, Your

13   Honor.

14            THE COURT:  Hold it.  What?

12:00:03  15            MR. FAZEL:  It is a narrative objection, Your

16   Honor.

17            THE COURT:  Narrative.  Sustained.

18   **A.**  And this is the latch --

19            THE COURT:  Hold it.  Next question.

12:00:13  20   **Q.**  (By Mr. Magliolo)  Let me ask you a question.  Is this

21   consistent with what the victim told you which lead you to

22   be able to proceed in this part of your investigation?

23   **A.**  Yes, sir.

24   **Q.**  And as to P-7a, is it also just a close-up picture of

12:00:26  25   the latch?

1  **A.**   Yes.

2        MR. MAGLIOLO:   May we publish that just quickly,

3  Your Honor?

4  **Q.**   (By Mr. Magliolo)   Let me direct your attention to

12:00:36   5  P-71 and ask you what it is a photograph of?

6  **A.**   P-71 is a photo of Las Palmas 2 before it had the --

7  this is in the early years before it had a mural painted.

8  This is from 2006, I believe.

9  **Q.**   And do you recall displaying a photograph to the jury

12:00:57  10  yesterday that had a mural?

11  **A.**   Yes, sir.

12  **Q.**   And do you -- it's the same building?

13  **A.**   Same building.

14  **Q.**   With the mural?

12:01:03  15  **A.**   With the mural.

16  **Q.**   Do you know approximately when the mural was painted

17  on there?

18  **A.**   Around 2012, 2011-2012, in that area.

19  **Q.**   Once your investigation started in 2005-2006, did you

12:01:15  20  often go by Las Palmas to kind of take a look at it and

21  see what was going on?

22  **A.**   Yes.

23  **Q.**   At this time, I'm going to show you Government's

24  Exhibit A-1, A-1a -- well, let's do it one at a time.  A-1

12:01:38  25  and A-1a, do you recognize it?

Direct Examination of Edwin Chapuseaux       Vol 2 - 26

```
         1  A.   Yes, sir.

         2  Q.   What is Government's Exhibit A-1?

         3  A.   It's a disk containing recordings done by the source.

         4  Q.   And did you listen to the recording?

12:01:53 5  A.   Yes, sir.

         6  Q.   Is it in Spanish or English?

         7  A.   Spanish.

         8  Q.   Did you afford the source a chance to listen to the

         9  recording with you to determine if, in fact, that was the

12:02:04 10 recording of a conversation he participated in?

        11  A.   Yes, sir.

        12  Q.   And did he, in fact, initial A-1 indicating that he

        13  had listened to it?

        14  A.   Yes, sir.

12:02:13 15 Q.   And is A --

        16  A.   Right there.

        17  Q.   And is A-1a a translation of -- an English translation

        18  of the Spanish in A-1?

        19  A.   Yes, sir.

12:02:24 20 Q.   I direct your attention to A-2 and ask you if A-2 and

        21  A-2a are also a recording that involved a conversation at

        22  Las Palmas?

        23  A.   Yes, sir.

        24  Q.   And did the cooperating individual listen to the

12:02:46 25 recording with you to determine if that was a recording of
```

Direct Examination of Edwin Chapuseaux    Vol 2 - 27

1  a conversation that he had engaged in?

2  **A.**   Yes, sir.

3  **Q.**   And was it?

4  **A.**   It was.

12:02:54  5  **Q.**   And A-2 is an English translation of the Spanish on

6  A-1 -- I'm sorry, on A-2?

7  **A.**   Yes, sir.

8  **Q.**   And you are a Spanish speaker?

9  **A.**   Yes, sir.

12:03:05  10  **Q.**   Did it appear to be an accurate translation?

11  **A.**   Yes.

12  **Q.**   The same as to A-1?

13  **A.**   Correct.

14  **Q.**   I direct your attention to -- and instead of having to

12:03:13  15  go through each one -- A-3, A-3a, A-4, A-4a, A-5, A-5a,

16  A-6, A-6a, A-7, A-7a, A-8, A-8a, A-9, A-9a, A-10, A-10a,

17  A-11, A-11a, A-12 and A-12a, would your testimony be the

18  same?

19  **A.**   Yes.

12:03:42  20  **Q.**   That each of these are recordings of conversations had

21  by a cooperating individual at Las Palmas?

22  **A.**   At Las Palmas or at other locations but they were with

23  Tencha.

24  **Q.**   And were they in Spanish?

12:03:57  25  **A.**   Yes.

Direct Examination of Edwin Chapuseaux            Vol 2 - 28

1  **Q.**   The Spanish conversation is on the disk?

2  **A.**   Yes.

3  **Q.**   Each one of them was translated into English?

4  **A.**   Yes.

12:04:03   5  **Q.**   Each one you allowed the CW or the cooperating

6  individual who was involved in it to listen to the

7  conversation?

8  **A.**   Yes.

9  **Q.**   Identify it as a conversation they participated in?

12:04:12   10  **A.**   Correct.

11  **Q.**   And did you examine the English translation of each of

12  these conversations?

13  **A.**   I did.

14  **Q.**   And did they appear to be accurate?

12:04:20   15  **A.**   Yes, sir.

16          MR. MAGLIOLO:  We would offer -- if they are not

17  in, Your Honor, we would offer A-1 through 12 --

18          THE COURT:  I have got the whole -- okay.

19          MR. MAGLIOLO:  -- and 12a.

12:04:32   20          THE COURT:  Keep going.  I don't hear any

21  objection.

22          MR. FAZEL:  I have no objection, subject to them

23  connecting it up with the person who is going to testify

24  who actually did the recordings and so forth.

12:04:44   25          THE COURT:  That's the question I had.  All

1  right.  Hang on a second.

2      Is the person who made that recording going to be

3  coming?

4              MR. MAGLIOLO:  Yes, Your Honor.

12:04:50  5          MR. FAZEL:  Subject to that connection.

6              THE COURT:  Absolutely.  I was waiting.  I was

7  turning that over in my head.  I said, all right, there is

8  a link missing here.  I didn't think it would be viewed if

9  that wasn't the case but that helps.  In other words,

12:05:04  10  someone here is going to vouch for this later on.  Okay.

11  Go on.

12  **Q.**  (By Mr. Magliolo)  I want to show you what's been

13  marked as P-9 and ask you if you recognize this?

14  **A.**  Yes, sir.

12:05:14  15  **Q.**  And what is it?

16  **A.**  This is what I labeled as "room count sheets."  They

17  were done -- handwritten by Juan Carlos Munoz logging --

18              MR. FAZEL:  Objection to him testifying to that

19  matter.  I'm going to object to that and ask for predicate

12:05:35  20  on that, Your Honor.

21              THE COURT:  Okay.  Go ahead.

22  **Q.**  (By Mr. Magliolo)  Where did you get this sheet?  Tell

23  the ladies and gentlemen of the jury.

24  **A.**  Well, every Tuesday --

12:05:42  25              THE COURT:  Where did you get it?

1    THE WITNESS:  At different locations that I would

2    meet with the sources.

3    THE COURT:  Okay.

4  **Q.**  (By Mr. Magliolo)  Was this -- the testimony I believe

12:05:51  5  yesterday was that the source was working for you at one

6    point in time?

7  **A.**  Yes, sir.

8  **Q.**  After the source was working for you, is this one of

9    the things that the source provided to you?

12:05:59  10  **A.**  Yes, sir.

11  **Q.**  And when and where did the source provide it?

12    MR. FAZEL:  Mr. Magliolo -- I'm sorry -- would

13    you specify which source you are talking about?  Would you

14    specify which source we are talking about?  We have

12:06:11  15  multiple sources.

16    MR. MAGLIOLO:  We can.

17  **Q.**  (By Mr. Magliolo)  Which source provided this to you?

18  **A.**  In regards to the sheets, it was Juan Carlos Munoz.

19  **Q.**  And when did he provide it to you?

12:06:21  20  **A.**  Throughout a year and a half or so.

21  **Q.**  And was there a certain day, a certain time roughly?

22  **A.**  Every Tuesday we would meet somewhere.

23  **Q.**  And what does the sheet describe?

24  **A.**  The room count sheet describes every time the girls go

12:06:38  25  to the rooms.  He would write down the names that they

1  went in and out of the room.  The time they went in and

2  the time they came out of the room.  And he would list the

3  names.

4  **Q.**   And approximately how many of those names -- those

12:06:53  5  sheets did you retain?

6  **A.**   Lots of them.

7  **Q.**   Well, let me ask it this way:  Have you --

8  **A.**   It's over a year and a half.

9  **Q.**   Have you examined Government's No. 37, which would --

12:07:09  10  which is four brown binders containing the same or similar

11  sheets as in evidence P -- or as in P-49; and are those,

12  that is Exhibit 37, the four binders containing these

13  sheets that you described to this jury?

14  **A.**   Yes, sir.

12:07:30  15  **Q.**   I direct your attention then to P-47 and ask you if

16  you recognize it?

17  **A.**   Yes.  This is what I labeled the --

18  **Q.**   First, yes or no?

19  **A.**   Yes.

12:07:40  20  **Q.**   And what is P-47?

21  **A.**   This is what I labeled "sales sheets."

22  **Q.**   And what is it?

23  **A.**   Basically, it's the total sales for the day for the

24  area controlled by Juan Carlos Munoz.

12:07:56  25  **Q.**   And where did you get this document or what is

1  depicted in Government's 47?

2  **A.**   I would get them from Juan Carlos Munoz at the same

3  time I would get the other sheets.

4          MR. FAZEL:  If it pleases the Court and

12:08:12  5  Mr. Magliolo, Your Honor, these are documents that can be

6  easily proved and brought into evidence by the source that

7  provided those.  I would object to this witness trying to

8  bring them into evidence, and I would object to that.

9          MR. MAGLIOLO:  That's not a lawful objection,

12:08:25  10  Your Honor.

11          THE COURT:  Pardon me?

12          MR. MAGLIOLO:  I don't think that's a lawful

13  objection.  The objection who I bring it in through,

14  that's not a lawful objection.

12:08:30  15          MR. FAZEL:  Objection, foundation, hearsay.

16          MR. MAGLIOLO:  It's not hearsay, Your Honor.

17  It's not offered for the proof --

18          THE COURT:  Wait a second.  Hold it.  I'm going

19  to go right down to the bottom line.  Is the person that

12:08:40  20  provided those and can testify, is he coming?

21          MR. MAGLIOLO:  Absolutely, Your Honor.

22          THE COURT:  And Officer -- Deputy, you have

23  spoken to him; is that correct?

24          THE WITNESS:  Yes, sir.

12:08:48  25          THE COURT:  All right.  Overruled.  If it doesn't

1  prove up, it's all going to be thrown out.  Okay.  You

2  make --

3            MR. MAGLIOLO:  Thank you, Your Honor.

4            THE COURT:  The other alternative would be to

12:08:58  5  wait later on until that man comes; and then, we put the

6  deputy back on the stand.  So for the purpose of

7  continuing continuity and getting the basic case out,

8  that's fine.

9       And then, if the defense finds out that indeed it has

12:09:13  10  not been proved up later, not just a slip-up but just

11  forgetting to ask a question, if it has not been proved

12  up, let me know.  And then, I'll take care of it.

13            MR. FAZEL:  Yes, sir.

14            MR. MAGLIOLO:  For the record, Your Honor, this

12:09:25  15  is not being offered for the proof of the matter

16  contained --

17            THE COURT:  It doesn't matter.  It doesn't

18  matter.  Okay.  I'm going to the bottom line.  We don't

19  have to get down into technicalities.  As long as you can

12:09:34  20  have someone vouch for this whole line of questioning

21  later on, I'm allowing it now.

22            MR. MAGLIOLO:  Yes, sir.  Thank you, Your Honor.

23            THE COURT:  Go on.

24  Q.   (By Mr. Magliolo)  I'll direct your attention to P-48

12:09:43  25  and ask you if you recognize it?

1   **A.**   Yes, sir.  It's another sales sheet.

2   **Q.**   Who did you receive it from?

3   **A.**   From Juan Carlos Munoz.

4   **Q.**   Do you know approximately when he received it?

12:09:54   5   **A.**   On or about the date written on it.

6        MR. FAZEL:  Objection.  Let me make the same

7   objection to this document, Your Honor.  He is reading off

8   the document.  So I'm going to make the same objection.  I

9   understand the ruling.  I'm making the same objection.

12:10:05   10        THE COURT:  Overruled.  You don't have to

11   continue objecting.  You have got a running objection to

12   that extent.  Go on.  Let's go.

13        MR. FAZEL:  Thank you.

14   **Q.**   (By Mr. Magliolo)  What is the significance of this

12:10:12   15   document?

16   **A.**   It showed the sales, but it also shows the tickets.

17   As you can see, the handwritten numbers on the tickets

18   every time the girl -- it shows like, for example, on this

19   one, 265.

12:10:28   20        MR. MAGLIOLO:  May we display that to the ladies

21   and gentlemen of the jury, Your Honor?

22        THE COURT:  Go right ahead.

23   **A.**   Okay.  For example, there you see 284.  284 meant that

24   that was the 284th time a girl went to the room.  So when

12:10:48   25   they handed that ticket to Juan Carlos after knocking on

1    the door, not only did it tell Juan Carlos that they paid

2    the $5 but that's the 284th person to go to the rooms that

3    day.

4    **Q.**   (By Mr. Magliolo)  Did the fact that the defendant --

12:11:03    5    that the cooperator told you this was happening and then

6    gave you a sheet indicating that that's what was

7    happening, did that help you proceed in your investigation

8    as you are describing it to the ladies and gentlemen of

9    the jury?

12:11:14   10    **A.**   Yes, sir.

11    **Q.**   I direct your attention then to Government's P-46a and

12    P-46 and ask you if you recognize those?

13    **A.**   Yes, sir.

14    **Q.**   And where -- and where did the objects depicted in

12:11:28   15    these two exhibits come from?

16    **A.**   It came from the booth near the entrance where they

17    collected the cover charge.

18    **Q.**   And did you receive these as photos?

19    **A.**   Yes, sir.

12:11:38   20    **Q.**   Who did you receive them from?

21    **A.**   From Juan Manuel Cepeda.

22    **Q.**   Was this consistent with information he had given you?

23    **A.**   Yes, sir.

24    **Q.**   And that helped you forward your investigation in the

12:11:49   25    direction that it eventually went leading to the arrest of

1   these defendants?

2   **A.**   Yes.

3           MR. MAGLIOLO:  We would like to publish 46 and 47

4   -- 46 and 46a to the jury.

12:11:59   5           MR. FAZEL:  Objection, Your Honor.  This is a

6   different source.  So I'm going to lay that objection for

7   the record purposes.

8           THE COURT:  Is this a different source?

9           THE WITNESS:  Yes, Your Honor.

12:12:05   10           THE COURT:  Is that person coming?

11           THE WITNESS:  Yes, Your Honor.

12   **Q.**   (By Mr. Magliolo)  Is that person -- is that source

13   going to be here to testify?

14   **A.**   Yes.

12:12:12   15           THE COURT:  All right.  Overruled to that extent

16   at this time.  Go on.

17           MR. MAGLIOLO:  May we display that to the ladies

18   and gentlemen?

19           THE COURT:  Yes.  Go on.

12:12:29   20   **Q.**   (By Mr. Magliolo)  Now, I believe you testified

21   yesterday about one of the victims you interviewed

22   originally when you interviewed her that she was unwilling

23   to talk to you?

24   **A.**   Yes, sir.

12:12:37   25   **Q.**   Were you able to take -- were you able to take

Direct Examination of Edwin Chapuseaux          Vol 2 - 37

1  photographs, personally take photographs of that victim at

2  Las Palmas or at least getting ready to walk into or walk

3  out of Las Palmas?

4  **A.**   Yes, sir.

12:12:50  5  **Q.**   During the course of this conspiracy?

6  **A.**   Yes, sir.

7  **Q.**   I direct your attention to --

8          THE COURT:  Slow down a little bit.

9          MR. MAGLIOLO:  Sorry, Your Honor.

12:12:57  10  **Q.**   (By Mr. Magliolo)  -- P-54 and P-53 and P-55 and ask

11  you if you recognize what is depicted in those three

12  exhibits?

13  **A.**   Yes, sir.

14  **Q.**   And what is depicted in P-53?

12:13:11  15  **A.**   P-53 is XXXXXXXXXXXXXX, also known as XXXXXXXXXX

16  XXXXXXXXX, wearing the gray sweater along with --

17          MR. MAGLIOLO:  May that be displayed for the

18  ladies and gentlemen of the jury, Your Honor?

19          THE COURT:  Yes.  Go right ahead.

12:13:30  20          MR. MAGLIOLO:  That would be P-53.

21  **A.**   That is in the parking lot of Las Palmas 2.  They are

22  fixing to walk into the brothel to go to work.

23  **Q.**   (By Mr. Magliolo)  Then is P-54 --

24          MR. MAGLIOLO:  May we display that, please.

12:13:42  25  **Q.**   (By Mr. Magliolo)  -- a closer view?  Yes?  Yes, sir?

1  **A.**   Yes, sir.

2  **Q.**   And then P-55, if we could display that, is that even

3  a blow-up of one of -- the young lady you are talking

4  about?

12:13:57  5  **A.**   This is XXXXXXXXX, but this is not at Las Palmas.

6  This is at the apartment complex where the pimp kept her.

7  And that was a surveillance photograph I took.

8  **Q.**   Okay.  Thank you.  Now, I believe you testified --

9  well, let me show you P-40 and ask you if you recognize

12:14:21  10  it?

11  **A.**   Yes, sir.

12  **Q.**   And what is it?

13  **A.**   It's an envelope containing all the money that was

14  generated in the booth because every area had to account

12:14:35  15  for the money made.

16  **Q.**   And did you -- who did you receive it from?

17  **A.**   Juan Manuel Cepeda.

18  **Q.**   And do you know approximately when?

19  **A.**   It was somewhere around 2012, I believe.

12:14:52  20          MR. MAGLIOLO:  Can we display that to the ladies

21  and gentlemen of the jury, Your Honor?

22          THE COURT:  Go right ahead.

23  **Q.**   (By Mr. Magliolo)  And I believe that you were

24  talking, at least at one time, about this.  Again, you are

12:15:02  25  not saying that you are guaranteeing that the numbers on

1   here are correct, are you?  Yes or no?

2   **A.**   No.

3   **Q.**   This is just what was given to you by your informant?

4   **A.**   Correct.

12:15:12   5   **Q.**   Do you understand -- and just briefly, if you would,

6   reiterate what you testified yesterday about the first

7   name and the two numbers?

8   **A.**   Yes.  It's the beginning -- the numbers on each

9   ticket, they were all serialized; and you have the

12:15:33   10   beginning and the ending.  The first set is for the cover

11   charge.  The second set that says "mujeres", women, is for

12   going to the rooms because they had two different rolls,

13   two different sets of tickets.  One was just the cover

14   charge, and the other one was to pay the $5 to be able to

12:15:50   15   go to the room area.

16   **Q.**   Based on your investigation, what was the purpose of

17   the tickets?  To keep track of what?

18   **A.**   Keep track of the money, to make sure the employees

19   were not robbing money from her, Tencha.  Checks and

12:16:03   20   balances.

21   **Q.**   What is the significance of the numbers at the bottom

22   of this document?

23   **A.**   Money denominations, $1's, $5's, $10's, $20's, $50's

24   and $100 bills and how many of each.

12:16:15   25   **Q.**   Now, I believe you testified that based on your

```
          1    investigation there was money paid at, basically, the

          2    bottom of the stairs to enter; money paid at the bottom of

          3    the stairs to go up to the prostitution rooms; and money

          4    paid at the prostitution rooms; or explain that to the

12:16:32  5    ladies and gentlemen of the jury.

          6    A.   It varied throughout --

          7              MR. FAZEL:  Excuse me.  Excuse me.

          8              THE COURT:  Go ahead.

          9              MR. FAZEL:  I object to the form of the question.

12:16:38 10    I ask it be question and answer so I can object to it.

         11              THE COURT:  Yes, please.  Go on.

         12    Q.   (By Mr. Magliolo)  Was there money paid three times by

         13    a person who was seeking the service of the prostitutes at

         14    Las Palmas?

12:16:52 15              THE COURT:  Yes or no?

         16    Q.   (By Mr. Magliolo)  Yes or no?

         17    A.   No.

         18    Q.   How many times was money paid?

         19    A.   Normally it --

12:17:00 20              THE WITNESS:  Your Honor --

         21              THE COURT:  You can't answer it?

         22              THE WITNESS:  It needs explanation.

         23              THE COURT:  All right.  I'll allow him to

         24    explain.  Overrule any objection.  But not as a narrative.

12:17:10 25    Just explain why there is a deviation from how many times
```

1    funds were paid.

2          THE WITNESS:  Yes.  Because depending on the

3    periods of time, the way the brothel operated changed

4    frequently.  So at times they had somebody on the second

12:17:27    5    floor charging for the condoms and somebody at the bottom

6    charging for the room.

7          Then, at other times, there was nobody upstairs; and

8    the person at the bottom charged for both condom and

9    rooms.

12:17:39    10          So it would be either two or three times.

11          THE COURT:  Okay.  Next question.

12    **Q.**  (By Mr. Magliolo)  Now, you mentioned the condoms.

13    I'm going to show you what is marked as P-45 and ask you

14    if you recognize the photograph?

12:17:52    15    **A.**  Yes.

16    **Q.**  And what is the photograph of?

17    **A.**  It's the backpack that was used on a daily basis to

18    bring the condoms, the money for the till for the

19    different areas, et cetera.

12:18:03    20    **Q.**  Who did you receive the photograph from?

21    **A.**  Juan Manuel Cepeda.

22    **Q.**  He is a gentleman that will be here testifying?

23    **A.**  Yes, sir.

24    **Q.**  Does it show a picture of the condoms in the backpack?

12:18:15    25    **A.**  Of the boxes of condoms in the backpack, yes.

1    MR. MAGLIOLO:  May we display that to the jury,

2  Your Honor?

3    THE COURT:  Go right ahead.

4    MR. MAGLIOLO:  P-45.

12:18:24   5  **Q.**  (By Mr. Magliolo)  I draw your attention to P-41 and

6  ask you if you recognize it?

7  **A.**  Yes, sir.

8    THE COURT:  Now, hold it a second.  What exactly

9  are we looking at here?  Is that one big box of condoms or

12:18:33  10  what?

11    MR. MAGLIOLO:  There are two big boxes, Your

12  Honor.

13    THE COURT:  Okay.  And that's the backpack?

14    THE WITNESS:  Yes, sir.

12:18:38  15    THE COURT:  All right.  Go on.

16  **Q.**  (By Mr. Magliolo)  Okay.  I direct your attention back

17  to P-41 and ask you if you recognize that?

18  **A.**  Yes.

19  **Q.**  And what is it a picture of?

12:18:46  20  **A.**  It's a picture of the loose condoms in the area

21  controlled by Juan Carlos Munoz.

22  **Q.**  And where did you get the picture?

23  **A.**  By the source.  He took the photos and gave it to me.

24  **Q.**  I direct your attention to P-45a and ask do you

12:19:00  25  recognize it?

1   **A.**   Yes, sir.

2   **Q.**   What is it?

3   **A.**   It's a box of condoms provided to me by Juan Manuel

4   Cepeda.

12:19:11   5          MR. MAGLIOLO:  May we display P-41 to the ladies

6   and gentlemen of the jury, Your Honor?

7          THE COURT:  Go right ahead.

8          MR. MAGLIOLO:  And then may we display P-45a.

9   **Q.**   (By Mr. Magliolo)  I direct your attention to

12:19:28   10   Government's 27 and ask you if you recognize it?

11   **A.**   Yes, sir.

12   **Q.**   What is it?

13   **A.**   It's the box of condoms provided by Juan Manuel

14   Cepeda.

12:19:39   15   **Q.**   I'm sorry.  Who did you get it from?

16   **A.**   Juan Manuel Cepeda.

17   **Q.**   Is that the same or similar to the condoms that were

18   in the backpack that the ladies and gentlemen of the jury

19   saw earlier?

12:19:51   20   **A.**   Yes.

21   **Q.**   I'm going to direct your attention to Government's 45b

22   and ask you what it is?

23   **A.**   This is a photograph I took of this box of condoms

24   where it shows that it was made in Korea and it's

12:20:04   25   distributed by CSI in Compton, California, United States

1    of America.

2              MR. MAGLIOLO:  If we may display Government's

3    45b, Your Honor.

4              THE COURT:  Go right ahead.

12:20:23   5              MR. MAGLIOLO:  If I might just have a moment,

6    Your Honor.

7              THE COURT:  Okay.

8              MR. MAGLIOLO:  We pass the witness at this time,

9    Your Honor.

12:20:28  10              THE COURT:  Go right ahead.

11              MR. FAZEL:  May I proceed, Your Honor?

12              THE COURT:  Yes, sir.

13                       **CROSS-EXAMINATION**

14    BY MR. FAZEL:

12:20:34  15    **Q.**   Detective, can you hear my voice?

16    **A.**   Yes, sir.

17    **Q.**   Okay.  Am I correct in saying -- is it detective?  Is

18    that your rank?

19    **A.**   Investigator.

12:20:44  20    **Q.**   Investigator.  Okay.  My name is Ali Fazel.  You and I

21    have met on numerous occasions and spoken on numerous

22    occasions.  If I ask you a question you don't understand

23    or if I go too fast, let me know; and I'll slow down.

24    Okay?

12:20:56  25    **A.**   Okay.

Cross-Examination by Mr. Fazel                    Vol 2 - 45

1          MR. FAZEL:  Now, Mr. Magliolo, do you have all

2     the evidence up there that you -- I was going to do it

3     from up there.  I hate that thing.  Did I turn it off?

4          CASE MANAGER:  No, it's on.

12:21:23   5          MR. FAZEL:  Okay.  So --

6          THE COURT:  I think he might have pushed the

7     button.

8          MR. FAZEL:  I'm sorry.

9          THE COURT:  He said it wasn't on.

12:21:33  10          MR. FAZEL:  I suck at this.  I'm so sorry.

11          CASE MANAGER:  It's okay.

12          THE COURT:  Is the battery out?  All right.  Just

13     keep your voice up, and we'll get it.  I think we need a

14     new battery.

12:21:49  15          MR. FAZEL:  Yes, sir.

16     **Q.**  (By Mr. Fazel)  Detective, I'm going to talk with you

17     a little bit about your investigation; and I'm going to

18     try to go over this evidence that you went through with

19     Mr. Magliolo.

12:21:59  20          MR. FAZEL:  I'll let you keep the condoms.

21     **Q.**  (By Mr. Fazel)  I notice that you were looking at some

22     notes when you were testifying; is that correct?

23     **A.**  Yes.

24     **Q.**  And these notes that you were looking at, are these

12:22:09  25     notes that you acquired through your investigation?

           1   **A.**   Yes.

           2   **Q.**   Okay.  And these are notes that you used to testify

           3   today in open court and yesterday?

           4   **A.**   At times.

12:22:19   5   **Q.**   Okay.  And those are the ones that are right in front

           6   of you?

           7   **A.**   Yes, sir.

           8   **Q.**   Okay.  Did you create offense reports discussing this

           9   case or memorializing your understanding of what occurred

12:22:29  10   in this case?  Do you understand my question?

          11   **A.**   Can you repeat?

          12   **Q.**   Sure.  Did you create offense reports?

          13   **A.**   Yes.

          14   **Q.**   Did you talk about what you did in this case?

12:22:37  15   **A.**   Yes.

          16            THE COURT:  Hang on one second.  Let's just get a

          17   new battery put in there.

          18            MR. FAZEL:  Did you want me to continue while

          19   you --

12:22:45  20            THE COURT:  No.  Hang on a second.  Are they

          21   government batteries?  You better check the expiration

          22   dates.

          23            CASE MANAGER:  Okay.

          24            MR. FAZEL:  Good call.

12:23:15  25            CASE MANAGER:  You are good.

1        MR. FAZEL:  I can't hit this button, right?

2        CASE MANAGER:  Correct.

3        MR. FAZEL:  Can you hear me?

4        THE COURT:  No.  Move it up higher, please.

12:23:30   5        MR. FAZEL:  Yes, sir.

6        THE COURT:  Is it working?

7        MR. FAZEL:  Better?

8        THE COURT:  Barely.  Go on.

9        MR. FAZEL:  All right.

12:23:41   10  Q.   (By Mr. Fazel)  Detective, let's talk about offense

11  reports.  Offense reports are created by folks like

12  yourself during the course of an investigation, correct?

13  A.   Correct.

14  Q.   And you are trained.  You went through some academy

12:23:51   15  that allows you to understand or learn how to do offense

16  reports, correct?

17  A.   Correct.

18  Q.   Okay.  And offense reports are something that's

19  commonly used by law enforcement to memorialize what

12:24:03   20  happened and how they investigated the case and what they

21  did, correct?

22  A.   Yes.

23  Q.   Okay.  And during the course of this investigation you

24  created and maintained multiple offense reports, correct?

12:24:14   25  A.   Yes, sir.

1    Q.   Okay.  Now, let's break this down a little bit.  Let's

2    talk about what Mr. Magliolo was talking about earlier

3    about being able to verify the investigation.  Are you

4    with me?

12:24:28   5    A.   I'm with you.

6    Q.   All right.  So you indicated that you were part of a

7    task force engaged in stopping smuggling; is that correct?

8    A.   No.

9    Q.   What is it?

12:24:37   10   A.   We do not work smuggling.  We work human trafficking,

11   which is slavery.

12   Q.   Human trafficking, which you say is slavery, correct?

13   A.   It is.  I don't say it is.

14        THE COURT:  Move it up higher.  Move it up.

12:24:49   15   Q.   (By Mr. Fazel)  You define it as slavery, correct?

16   A.   Everybody defines it as slavery.

17   Q.   Not everybody is testifying.  You are testifying.

18   Today you are defining it as slavery, correct?

19   A.   Yes.

12:24:58   20   Q.   All right.  Okay.  And that is the position that your

21   law enforcement agency takes?  Human trafficking is

22   slavery, correct?

23   A.   Yes, sir.

24   Q.   All right.  Okay.  And so, when we talk about your

12:25:07   25   investigation of this case, you went ahead and made sure

Cross-Examination by Mr. Fazel                    Vol 2 - 49

 1  that during the course of your investigation you could

 2  verify what these folks that you are claiming were

 3  trafficked were saying was accurate, correct?

 4  **A.**  Yes.

12:25:21  5  **Q.**  All right.  And in order to do that, you went to the

 6  locations where these folks were engaged in prostitution

 7  and made sure that the actual prostitution occurred,

 8  correct?

 9  **A.**  Yes.  One of -- that wasn't the only thing I did but,

12:25:36  10  yes.

11  **Q.**  Okay.  That's fine.  And when you testified before the

12  jury today and yesterday about the verification process

13  that you undertook, that is one of the biggest things you

14  did?  That is, when somebody said Las Palmas engaged in

12:25:50  15  prostitution, whether it was prostitution occurring at Las

16  Palmas, you wanted to make sure that was accurate,

17  correct?

18  **A.**  Yes, sir.

19  **Q.**  So you went and saw if there was prostitution

12:25:59  20  occurring at Las Palmas, correct?

21  **A.**  We worked --

22  **Q.**  That's a yes or no question.  Did you go to see if

23  there was prostitution occurring at Las Palmas, yes or no?

24  **A.**  Yes, but not --

12:26:09  25  **Q.**  All right.  Okay.  All right.  And so, when you showed

             1   us pictures of the building which, like, for example --

             2           MR. FAZEL:  Your Honor, can I turn this on?

             3           THE COURT:  Yeah.  Sure.

             4           MR. FAZEL:  Okay.

12:26:30     5   **Q.**  (By Mr. Fazel)  Let's just pick out Government

             6   Exhibit 71.  Do you see that?

             7   **A.**   Yes, sir.

             8   **Q.**   Okay.  And you testified that this is the building

             9   that you take a position prostitution occurred in,

12:26:37    10   correct?

            11   **A.**   Correct.

            12   **Q.**   Okay.  And so, somebody told you, hey, prostitution

            13   occurs here.  You went over there, and you took a photo of

            14   it.  And that was one verification that there was slavery

12:26:49    15   occurring, correct?

            16   **A.**   That photo doesn't tell me that slavery is occurring.

            17   **Q.**   So P-71 doesn't tell you that slavery occurred,

            18   correct?

            19   **A.**   No.

12:27:00    20   **Q.**   No.  Yes or no, does it tell you?

            21   **A.**   No.

            22   **Q.**   Does it tell you that there was smuggling occurring?

            23   **A.**   No.

            24   **Q.**   Okay.  And it's just a picture of a building, correct?

12:27:09    25   **A.**   Yes.

1    **Q.**  So if I tell you, hey, there is prostitution occurring

2    at, pick an address, and you go take a photo of it, that's

3    a step in verification?

4    **A.**  Yes.

12:27:27  5    **Q.**  Okay.  Now --

6            MR. FAZEL:  I'm sorry, Your Honor.  There is --

7    **Q.**  (By Mr. Fazel)  Let's talk about P-10.  Do you

8    remember this photograph?

9    **A.**  Yes, sir.

12:27:54  10   **Q.**  Okay.

11           MR. MAGLIOLO:  Perhaps, Your Honor, if we could

12   turn the lights down just a touch the jury might have a

13   better view.

14           THE COURT:  What?

12:28:01  15          MR. MAGLIOLO:  If we could turn the lights down a

16   little bit.  It's hard to see.

17           THE COURT:  You get a choice.  You get that one

18   or you get that one.

19           MR. MAGLIOLO:  I think number two, Your Honor.

12:28:09  20          THE COURT:  All right.  Thank you.

21           MR. FAZEL:  Are you good, Joe?

22           MR. MAGLIOLO:  Yes.

23   **Q.**  (By Mr. Fazel)  On P-10, that's a photograph that you

24   took?

12:28:15  25   **A.**  No, sir.

Cross-Examination by Mr. Fazel                    Vol 2 - 52

```
        1   Q.   Who took that photograph?

        2   A.   HPD vice.

        3   Q.   HPD vice.  Okay.  And when -- this was taken what

        4   year?

12:28:24 5  A.   I believe that one was in 2006.

        6   Q.   2006?

        7   A.   June 7th -- yes, June 7th, 2007.

        8   Q.   I noticed you looked --

        9   A.   Yes, sir.  June 7th, 2007.

12:28:37 10 Q.   I noticed you looked at your notes to determine that?

       11   A.   Yes.

       12   Q.   All right.  So in 2007 they took a photograph of that

       13   room, correct?

       14   A.   Correct.

12:28:43 15 Q.   Okay.  And in that room at that time was the person

       16   that you are claiming was the victim who was locked up in

       17   that room?  Was she in that room?

       18   A.   At that time, no.

       19   Q.   Okay.  Now, the person that was locked up because she

12:28:59 20 is claiming she was locked up in that room claims that she

       21   was locked up in 2001 in that room, correct?

       22   A.   Yes, sir.

       23   Q.   Okay.  So when you say I went up there and I verified

       24   that the room existed, is it fair to say that you went up

12:29:15 25 there and verified there was a room up there, correct?
```

Cross-Examination by Mr. Fazel                    Vol 2 - 53

1    **A.**   It's fair to say that there was a room up there that

2    matched her description.

3    **Q.**   Okay.  And you said throughout time that the location

4    that you investigated that it changed its appearances; and

12:29:33   5    it changed the way it operated, correct?

6    **A.**   They changed the modes of operation, and the

7    appearance changed slightly at times.  Furniture may have

8    been moved here and there and whatnot.

9    **Q.**   Okay.  So that all we know as far as your

12:29:55  10    corroboration is that the person that you talked to, the

11    person that claimed she was in that room, the person that

12    claimed she was locked up in that room, all she told you

13    was there is a room up there that appeared that way,

14    correct?

12:30:08  15    **A.**   Yes.  And I showed the photo; and she said, "That's

16    the room."

17    **Q.**   Okay.  But my point is:  Your corroboration of what

18    she said is simply that she was up there and she saw a

19    room and she is claiming that's the room she was in?

12:30:21  20    **A.**   Yes.

21    **Q.**   Okay.  You don't know for a fact, other than the fact

22    that she says that's the room?  There is no other piece of

23    evidence that you have that says she was locked up in that

24    room, is there?

12:30:33  25    **A.**   Her testimony.  I have there was Adrian Hernandez who

1   also said she was locked up in there.

2   **Q.**   We'll get to Adrian in a minute.

3        MR. MAGLIOLO:  Your Honor, may he answer the

4   question?  He asked the question and --

12:30:45   5        THE COURT:  Yes, sir.  Answer the question.

6   Answer the question, please.

7   **A.**   Adrian Hernandez, --

8   **Q.**   (By Mr. Fazel)  Yes.

9   **A.**   -- he also told us in interviews that, yes, she was

12:30:53  10   there; that he tried to rescue her; that he was the one

11   that caused the alarm to go off when he tried to get her

12   to escape out of there.

13   **Q.**   Okay.  But when -- well, when we talked about Adrian,

14   Adrian didn't say she was locked up in that room?  Adrian

12:31:09  15   said she was there as a prostitute in that location,

16   correct?

17   **A.**   No.  No, sir.

18   **Q.**   Okay.  All right.  Now, as far as her describing the

19   location, there are many people that describe the location

12:31:19  20   that is Las Palmas, correct?

21   **A.**   Yes.

22   **Q.**   Many people that were in there described that

23   location, correct?

24   **A.**   Yes.

12:31:26  25   **Q.**   Many people talked about what's upstairs and what's

1  downstairs, correct?

2  **A.**   Yes.

3  **Q.**   Okay.  So I guess my point is when you say I verified

4  what each individual person said when I went up there and,

12:31:37   5  for example, looked at Government 72 or I looked at 7a,

6  what we're saying is that these -- there is a door up

7  there, correct?

8  **A.**   (Nodding head up and down.)

9  **Q.**   Right.  And what we're saying is there is a stairway

12:31:57  10  up there, correct?

11  **A.**   Yes.

12  **Q.**   But the verification as far as what actually occurred

13  up there is basically the statement of the females who are

14  testifying or talking to you and telling you what

12:32:06  15  happened; is that fair?

16  **A.**   They are telling me in their statement, but then I'm

17  finding things that -- for example, that picture shows

18  there was a locking mechanism.  That if they put that

19  latch on a padlock, they are locked in there.

12:32:21  20  **Q.**   Absolutely.  But the other problem is, also, agent or

21  detective is this that they can simply --

22            MR. MAGLIOLO:  We object to --

23            THE COURT:  Go on.

24            MR. MAGLIOLO:  We object to him saying what the

12:32:30  25  problem is.  He is --

1          THE COURT:  Sustained.  Just rephrase it.

2          MR. FAZEL:  Sure.

3    **Q.**  (By Mr. Fazel)  The fact of the matter is that

4    somebody who is working in that institution who is

12:32:38    5    actually prostituting at that institution can see that

6    there is a door there.  That doesn't make the fact that

7    she was locked up there a fact, does it?

8    **A.**  To me, the latch --

9    **Q.**  Yes.

12:32:48   10    **A.**  -- means they were locked.

11    **Q.**  I see.  So to you as an investigator with the

12    sheriff's -- the Harris County Sheriff's Department, the

13    fact that there is a latch there indicates to you that she

14    was locked in there?

12:33:01   15    **A.**  Yes.  She told me she was locked in there.

16    **Q.**  That's a yes or no question.  In that case she was

17    locked in?

18    **A.**  It -- to me, it's corroboration --

19          THE COURT:  Hold on.  Hold on.  Now everybody is

12:33:10   20    talking.  Let me ask the court reporter.  When everybody

21    is talking over each other, who do you take down?

22          THE REPORTER:  You.

23          THE COURT:  Me, the judge.  Right.  Okay.  I just

24    wanted everybody to understand that.  All right.  One at a

12:33:23   25    time.  Your question, please.

1   **Q.**   (By Mr. Fazel)  All right.  So the corroboration that

2   you are discussing with the jury, the steps that you took

3   to corroborate what happened was basically once somebody

4   says, okay, there is a room upstairs where prostitution

12:33:38   5   occurred or the way they charged for prostitution, you

6   went and you said, okay, that's what the room was up there

7   and this is the way they charge for prostitution and,

8   therefore, she is telling the truth.  Fair?

9   **A.**   No, sir.

12:33:51   10   **Q.**   Okay.  Now, let's talk about the charging part of it.

11   The -- and correct me if I'm wrong.  The women that were

12   prostituting at Las Palmas, they engaged in prostitution;

13   and they set their prices with the person who they are

14   engaging with prostitution with.  Do you understand my

12:34:09   15   question?

16   **A.**   Yes.

17   **Q.**   Okay.  So the girl says I want this much for this

18   sexual act, correct?

19   **A.**   Yes.  Although, there was a standard.

12:34:19   20   **Q.**   Okay.  I understand that.  We'll get to that in a

21   minute.  Okay.  But the question I posed before you was

22   this:  It's the female that sets the price as to what they

23   want to charge for the sexual act; is that correct?

24   **A.**   Correct.

12:34:32   25   **Q.**   Okay.  And each female could charge whatever they

1  wanted; is that correct?

2  **A.**   Yes.

3  **Q.**   Okay.  And the female that charged whatever they

4  wanted, they kept that money, correct?

12:34:43  5  **A.**   No.

6  **Q.**   Okay.  The money they gave to the house was for the

7  use of the room, correct?

8  **A.**   Yes.

9  **Q.**   How much was that?

12:34:51  10  **A.**   $10 for the room, $5 for the condom.

11  **Q.**   Let me just ask the question.  It's quicker that way.

12  I promise.  The room was how much?

13  **A.**   $10.

14  **Q.**   The condoms were how much?

12:35:01  15  **A.**   $5.

16  **Q.**   And then, the ticket to go upstairs was how much?

17  **A.**   $5.

18  **Q.**   So what does that total?

19  **A.**   $20.

12:35:08  20  **Q.**   So each act of prostitution gained Las Palmas $20.

21  Fair?

22  **A.**   Correct.

23  **Q.**   And they sold beer, correct?

24  **A.**   Yes.

12:35:17  25  **Q.**   They sold water?

          1   **A.**   Yes.

          2   **Q.**   And they sold Red Bull?

          3   **A.**   Yes.

          4   **Q.**   Okay.  And in the bar they also had a billiards table?

12:35:25  5   **A.**   Yes.

          6   **Q.**   A dispenser that dispenses food?

          7   **A.**   Yes.

          8   **Q.**   Okay.  And so, that is the amount of money that Las

          9   Palmas made for having the location, correct?

12:35:39  10  **A.**   And the $5 cover charge.

          11  **Q.**   And the $5 cover charge.  I'm sorry.  Let's just say

          12  $25.

          13  **A.**   Yes.

          14  **Q.**   Okay.  So each sexual act that occurred at Las Palmas

12:35:50  15  gained Las Palmas $25?

          16  **A.**   Correct.

          17  **Q.**   All right.  Now, are you telling the ladies and

          18  gentlemen of the jury that every single young lady that

          19  you are talking about today was stored at Las Palmas?

12:36:10  20  **A.**   No.

          21  **Q.**   No.  They were at different locations, correct?

          22  **A.**   Yes.

          23  **Q.**   They had apartments, correct?  Let me rephrase that.

          24  Let me rephrase.

12:36:19  25      They had folks that made them stay at apartments,

 1  correct?

 2  **A.**  They had pimps that --

 3  **Q.**  We'll get to those pimps in a minute.  I promise.  All

 4  right.  So they had other locations where they lived,

12:36:31  5  correct?

 6  **A.**  Yes.

 7  **Q.**  They had transportation to Las Palmas, correct?

 8  **A.**  One way or another.

 9  **Q.**  Okay.  And they had people that brought them or taxi

12:36:41  10  cabs that brought them and took them back home, correct?

11  **A.**  Correct.

12  **Q.**  All right.  Their day-to-day activities were

13  controlled by these pimps, correct?

14  **A.**  Yes.

12:36:51  15  **Q.**  The money they made at the end of the night minus the

16  $25 that the house kept went to whom?

17  **A.**  The pimps.

18  **Q.**  The pimps.

19  **A.**  The padrotes.

12:37:04  20  **Q.**  The padrotes.  All right.

21     Now, let's talk about just the women that are on this

22  chart that you have before the jury that's still up there.

23  Okay.  Each one of these women are from Mexico except for

24  one, correct?

12:37:21  25  **A.**  Yes.

1  **Q.**  And the young lady who is not from Mexico is from?

2  **A.**  Honduras, I believe.

3  **Q.**  You are correct.  And each one of these women were

4  brought from Mexico into the United States, correct?

12:37:35  5  **A.**  Yes.

6  **Q.**  And they were brought to the United States by the

7  folks that we called pimps, correct?

8  **A.**  Most of them.

9  **Q.**  Most of them.  And the pimps that brought these young

12:37:48  10  ladies into the United States used folks that transport

11  illegal, undocumented folks from Mexico into the United

12  States, correct?

13  **A.**  Yes.

14  **Q.**  These pimps or padrotes, as you call them, the Spanish

12:38:00  15  term for pimps, they have family members in Mexico,

16  correct?

17  **A.**  Yes.

18  **Q.**  They have families that are quite large, correct?

19  **A.**  Oh, yes.

12:38:06  20  **Q.**  They have -- their entire families are engaged in the

21  business of being pimps, correct?

22  **A.**  Yes.

23  **Q.**  Their mothers?

24  **A.**  Yes.

12:38:15  25  **Q.**  Their fathers?

Cross-Examination by Mr. Fazel                          Vol 2 - 62

1    **A.**   Yes.

2    **Q.**   Cousins?

3    **A.**   Yes.

4    **Q.**   Uncles?

12:38:18    5    **A.**   Yes.

6    **Q.**   Everybody?

7    **A.**   Family affair.

8    **Q.**   Family affair.  Please tell the ladies and gentlemen

9    of the jury what family member Ms. Medeles, my client, has

12:38:30    10   in Mexico.

11   **A.**   I don't know of any.

12   **Q.**   Okay.

13   **A.**   Not by name.

14   **Q.**   Okay.  Now, as far as the manner in which they bring

12:38:43    15   these women into the United States, they do it through

16   intimidation, correct?

17   **A.**   Yes.  Different ways.

18   **Q.**   Different ways.  We'll go through them.  I promise.

19   Intimidation?

12:38:56    20   **A.**   Yes.

21   **Q.**   Coercion?

22   **A.**   Yes.

23   **Q.**   Fear?

24   **A.**   Yes.

12:38:58    25   **Q.**   They beat them?

 1  **A.**   Yes.

 2  **Q.**   They threaten their families?

 3  **A.**   Yes.

 4  **Q.**   They do all that to make the women be controlled by

12:39:08  5  them, correct?

 6  **A.**   Correct.

 7  **Q.**   All right.  And they do that all in Mexico and in the

 8  United States, correct?

 9  **A.**   Yes.  Most of the time it happens in the U.S. after

12:39:17 10  they were brought here.

11  **Q.**   Most of the time it happens in the U.S.?

12  **A.**   Most of the time the pimps will start using these

13  methods once they have them here.

14  **Q.**   I see.

12:39:27 15  **A.**   Before, it's all rosy and beautiful and it's --

16  **Q.**   So in Mexico they never use the beatings?

17  **A.**   No.  I didn't say never.  I said most of the time it

18  occurs in the U.S.

19  **Q.**   Of the women --

12:39:41 20  **A.**   On some occasions they start in Mexico.

21  **Q.**   Of the women that are testifying before this court in

22  this case, how many of them were beaten by their pimps in

23  Mexico?

24  **A.**   I can't say.

12:39:54 25  **Q.**   Would you believe --

1   **A.**   I can't give you an exact number; but there is a few,

2   yes.

3   **Q.**   Would you believe me if I said all of them, since I

4   have read your reports?

12:40:03   5   **A.**   I couldn't say all of them.

6   **Q.**   Okay.  All right.  And how many of them were --

7   **A.**   Because I have 250-something victims total.

8   **Q.**   Not in this case you don't.

9   **A.**   No.  No.  In all my different cases.  As you

12:40:15   10   understand --

11          THE COURT:  Hold it.  Hold it.  Hold it.  One at

12   a time.

13          MR. FAZEL:  I'm sorry, Your Honor.

14          THE COURT:  Go on.  Finish your statement.

12:40:20   15   **A.**   As you understand, with over 250 victims you start --

16          MR. FAZEL:  I object as nonresponsive.

17          THE COURT:  Sustained.  Okay.  Next question.  I

18   understand you have other cases that you have open and

19   under consideration, correct?

12:40:31   20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  Next question.

22   **Q.**   (By Mr. Fazel)  But we are here today for this case?

23   **A.**   Correct.

24   **Q.**   Let's focus on this case.  Are you with me?

12:40:37   25   **A.**   Yes.

Cross-Examination by Mr. Fazel                     Vol 2 - 65

1    **Q.**  All right.  All right.  Now, these padrotes that we

2    have in this case, all right, all of them selected their

3    women in Mexico, correct?

4    **A.**  Yes.

12:40:48   5    **Q.**  Even the one that's not from Mexico was selected in

6    Mexico, correct?

7    **A.**  Yes.

8    **Q.**  All of them intimidated and beat their women in

9    Mexico, these young ladies in Mexico, correct?

12:40:59  10    **A.**  I am not 100 percent sure that they all were.

11    **Q.**  That's all right.

12    **A.**  I would have to refresh my memory in the report, sir.

13    **Q.**  That's okay.  And so, my point being that all of that

14    occurred in Mexico and none of that had to do with

12:41:12  15    Ms. Medeles who is sitting here today, correct?

16    **A.**  Correct.

17    **Q.**  All right.  She had no family members intimidating,

18    threatening, forcing, coercing, beating any other women in

19    Mexico, any of the women that are testifying today?

12:41:26  20    **A.**  I agree.

21    **Q.**  All right.  Now, when the women arrived here in the

22    United States, would you agree with me that some of them

23    stayed in apartments by themselves?

24    **A.**  They stayed in apartments by themselves with nobody

12:41:49  25    controlling them is what you are trying to say, sir?

Cross-Examination by Mr. Fazel                    Vol 2 - 66

1  **Q.**  No.  The question is:  They lived in an apartment by

2  themselves?  Yes or no?

3  **A.**  I don't recall.

4  **Q.**  Okay.  Fair enough.  You are the lead agent on this

12:42:02  5  case, right?

6  **A.**  Yes.

7  **Q.**  Okay.  Fair enough.  I'm just asking.

8  **A.**  Yes.

9  **Q.**  Okay.  And some of them, if not all of them, had cell

12:42:08  10  phones, correct?

11  **A.**  Yes.

12  **Q.**  And -- okay.  Let's talk about the money.  The pimps

13  that we're talking about that we haven't named yet that

14  we'll get into later, the pimps that we're talking about,

12:42:41  15  they controlled all the money that these women made,

16  correct?

17  **A.**  Yes.

18  **Q.**  They took it from them?

19  **A.**  Yes.

12:42:45  20  **Q.**  Okay.  And they told them where to go, correct?

21  **A.**  Yes.

22  **Q.**  Okay.  In other words, these women that are going to

23  testify before the jury at some time did not just go to

24  Las Palmas, correct?

12:42:58  25  **A.**  Correct.

Cross-Examination by Mr. Fazel                    Vol 2 - 67

1   **Q.**   Some of them were prostituting in motels?

2   **A.**   Most of them went to brothels, a majority; but, yes,

3   they may have gone to motels here and there.

4   **Q.**   Isn't it true that some of them were actually

12:43:11   5   prostituting out of apartments and motels?

6   **A.**   Yes.

7   **Q.**   Okay.  Isn't it true that some of them were

8   prostituting out of other establishments prior to going to

9   Las Palmas?

12:43:20   10   **A.**   Yes.

11   **Q.**   Isn't it true that these other establishments that the

12   pimps took them to these establishments in order for the

13   prostitution to occur?

14   **A.**   Yes.

12:43:29   15   **Q.**   Okay.  Now, the girls when they got to these

16   establishments were because the pimps made them go there,

17   correct?

18   **A.**   Yes.

19   **Q.**   Okay.  The establishments had no control over which

12:43:42   20   girls came to the establishments; is that correct?

21   **A.**   They --

22   **Q.**   Listen to my question.  The establishments had no

23   control over which girls came to the establishments?

24        MR. MAGLIOLO:  We object to that as being

12:43:58   25   irrelevant what some other establishment did.  The

Cross-Examination by Mr. Fazel                    Vol 2 - 68

1    question is what this establishment, as he called it, did.

2        THE COURT:  Okay.  I'll make it this

3    establishment.  To that extent sustained, but you may ask

4    the question as to this establishment.

12:44:12    5        MR. FAZEL:  Let me see if I can ask it a

6    different way, Your Honor.

7        THE COURT:  All right.

8        MR. FAZEL:  I'm sorry, Judge.

9        THE COURT:  Go on.  Go on.

12:44:22   10    Q.   (By Mr. Fazel)  The way the system, the pimp system

11    works is that they decide where to take the girls at a

12    specific night, correct?

13    A.   Yes, sir.

14    Q.   Okay.  So they can decide that the girl needs to go to

12:44:34   15    Las Palmas?

16    A.   Yes.

17    Q.   Yes.  They can decide that the girl needs to go to a

18    hotel?

19    A.   Yes.

12:44:40   20    Q.   They can decide that the girl needs to go nowhere?

21    A.   Yes.

22    Q.   They are the ones that make the decisions as to what

23    happens to these girls?

24    A.   Correct.

12:44:48   25    Q.   All right.  Not Ms. Medeles?

Cross-Examination by Mr. Fazel                              Vol 2 - 69

1    **A.**   Correct.

2    **Q.**   All right.  So Ms. Medeles, at best, was an operator

3    of an establishment where girls came pursuant to the

4    forced order of the pimps, correct?

12:45:10    5    **A.**   Yes.

6    **Q.**   All right.

7    **A.**   They would have to talk to her.

8    **Q.**   Okay.  Well, since you said it, I'll ask you about

9    that.  Prior to two thousand and -- I'm using your chart.

12:45:35    10   Prior to two thousand and, let's see, eleven, from 2000

11   through -- first of all, let's be clear.

12       The indictment is clear as to the time frame that

13   we're talking about sex trafficking, correct?

14   **A.**   Yes.

12:45:51    15   **Q.**   You have seen the indictment?

16   **A.**   2009 through 2013.

17   **Q.**   All right.  So -- and you testified to this jury that

18   Juan Cepeda, that's Confidential Source 1; and your

19   nickname for him was?

12:46:07    20   **A.**   Leon.

21   **Q.**   And we have Juan Carlos Munoz, a confidential source

22   number?

23   **A.**   Two.

24   **Q.**   And your nickname for him was?

12:46:19    25   **A.**   Tigre.

1    **Q.** "Leon" means?

2    **A.** Lion.

3    **Q.** "Tigre" means?

4    **A.** Tiger.

12:46:25  5    **Q.** Okay. So prior to 2011 these guys were not your

6    sources, right?

7    **A.** Correct.

8    **Q.** They were working on their own, correct?

9    **A.** Yes, sir.

12:46:32  10   **Q.** Okay.

11   **A.** For the defendant.

12   **Q.** All right. I understand. Is that all they did? They

13   worked for the defendant? They didn't do anything else?

14   **A.** To my knowledge, that's all they did.

12:46:41  15   **Q.** And you use them as a confidential source, correct?

16   **A.** Yes, sir.

17   **Q.** And you believe what they are telling you, correct?

18   **A.** Yes.

19   **Q.** And you sent them out in the field, correct?

12:46:50  20   **A.** Yes.

21   **Q.** And you gave them a recorder, correct?

22   **A.** No.

23   **Q.** You didn't give them a recorder?

24   **A.** No.

12:46:54  25   **Q.** They used their own recorder?

```
 1  A.   They used their cell phones.
 2  Q.   They used their own cell phones?
 3  A.   Correct.
 4  Q.   Did you tell them what to record?
 5  A.   I told them what we needed.
 6  Q.   I'm sorry.  I'm sorry.  The question was:  Did you
 7  tell them what to record?
 8  A.   I told them to engage in conversations and try to
 9  elicit -- engage in certain conversations that would bring
10  out the evidence that we needed.
11  Q.   Okay.  But you had no control as to how they recorded
12  it, when they recorded it, what they decided to record,
13  did you?
14  A.   No.
15  Q.   Okay.  Did you -- you know, generally speaking, when
16  you have these types of confidential sources you do a
17  background check to see if they are people that -- you
18  create a file for them, right?  Isn't that how you handle
19  confidential sources?
20  A.   We do a criminal history check on them, yes.
21  Q.   You want to make sure that the information that this
22  confidential source is giving you is accurate and correct?
23  A.   Yes.
24  Q.   You don't want to be bamboozled by them, right?
25  A.   No.
```

1  **Q.**  You want to make sure they are telling you the truth,

2  right?

3  **A.**  That's why we are recording because you can't -- it's

4  there.  The voices are there.

12:48:00  5  **Q.**  Right.  Exactly.  But you are not -- you are not

6  there.  So they could record whatever they want, right?

7  They could skip certain things and record other things,

8  correct?

9  **A.**  I don't see how.

12:48:12  10  **Q.**  You don't see how.  Were you there every minute of the

11  day with them while they were working to tell them what to

12  record and what not to record?

13  **A.**  No, sir.

14  **Q.**  Okay.  Did you have any ability for them to -- for

12:48:23  15  example, when women came in if somebody asked for ID or

16  checked for ID and they decided not to record that

17  conversation, did you have the ability to control that?

18  **A.**  No.

19  **Q.**  Okay.  Did you have the ability to control if somebody

12:48:33  20  said, "Hey, get out of here.  I don't want you here."?

21  Did you have the ability to control that?

22  **A.**  No.

23  **Q.**  Okay.  So you had no ability to control them in the

24  field?  They got to do whatever they wanted, correct?

12:48:44  25  **A.**  They got to choose --

Cross-Examination by Mr. Fazel                    Vol 2 - 73

1   **Q.**   They got to do --

2   **A.**   -- when to record, yes.

3   **Q.**   They got to do whatever they wanted, and they brought

4   it to you?

12:48:51   5   **A.**   Correct.

6   **Q.**   All right.  Now, in 2009 -- excuse me.  In 2009, 2008

7   these folks were the ones that were running the business,

8   were they not?

9   **A.**   I wouldn't say that.

12:49:07   10   **Q.**   You wouldn't say that.  They weren't there on a

11   day-to-day basis?

12   **A.**   Yes.

13   **Q.**   They weren't there letting people into the

14   prostitution rooms?

12:49:14   15   **A.**   Yes.

16   **Q.**   They weren't there selling the tickets?

17   **A.**   Yes.

18   **Q.**   They weren't there engaging in sexual intercourse with

19   women there?

12:49:22   20   **A.**   Yes.  But nothing was done without Tencha's approval.

21   **Q.**   I'm sorry.  I'm sorry.

22   **A.**   Nothing was done without Tencha's approval.

23   **Q.**   Are you saying that Ms. Medeles approved them having

24   sex with the girls in the bar?

12:49:33   25   **A.**   No, I didn't.

1  **Q.**  Did you not know that they had sex with the girls at

2  the bar?

3  **A.**  No.  No.

4       MR. MAGLIOLO:  We're assuming facts not in

12:49:41  5  evidence, Your Honor.

6       THE COURT:  Sustained.

7       MR. FAZEL:  Okay.

8       MR. MAGLIOLO:  May that question and answer be

9  struck from the record?

12:49:47  10       THE COURT:  It's struck.

11  **Q.**  (By Mr. Fazel)  Is there not a report that you took

12  from one of your sources that tells you that he had sex

13  with a girl that worked at that bar?

14  **A.**  Are you talking about Juan Manuel Cepeda?

12:50:13  15  **Q.**  You tell me.  You tell me.

16  **A.**  I knew he was very much interested in XXXXXXXXXXXX.

17  **Q.**  Okay.  Did he have sex with her?

18  **A.**  He denied -- as far as my recollection, he denied

19  engaging in sex with her but --

12:50:36  20       MR. FAZEL:  May I approach, Your Honor?

21       THE COURT:  Go on.

22  **A.**  -- I asked XXXXXXX, also; and she said they never did.

23  **Q.**  (By Mr. Fazel)  Do you recognize this?

24  **A.**  Yes.

12:50:44  25  **Q.**  What is it?

                1  **A.**   It's a 1023 dated 4-9-2013.

                2  **Q.**   And what is a 1023?

                3  **A.**   It's a source report.

                4  **Q.**   It's a source report.  Who created it?

12:50:55        5  **A.**   Me.

                6  **Q.**   Okay.  And what is it about?  I took the liberty --

                7  **A.**   The highlighted portions?

                8         MR. MAGLIOLO:  Your Honor, we object to him

                9  testifying from the document unless it's in evidence.

12:51:04       10         THE COURT:  Sustained.

               11         MR. FAZEL:  All right.

               12  **Q.**   (By Mr. Fazel)  Would you read the document, please.

               13  Does it refresh your recollection?

               14  **A.**   Let's see.

12:51:12       15  **Q.**   Don't read it aloud.  Just does it refresh your

               16  recollection?

               17  **A.**   Yes.

               18  **Q.**   Did he have sex with a girl at the bar that was

               19  16 years old?

12:51:30       20         MR. MAGLIOLO:  We object to the form of that

               21  question, Your Honor.

               22         THE COURT:  Overruled.  Is that what it says?

               23         THE WITNESS:  Yes.

               24         THE COURT:  Okay.

12:51:36       25  **Q.**   (By Mr. Fazel)  And this is your source?

1  **A.**  Yes.

2  **Q.**  Do you know Texas law?

3  **A.**  Yes.

4  **Q.**  What happens in Texas when you have sex with a

12:51:45  5  16-year-old?

6  **A.**  It's aggravated sexual assault of a child.

7  **Q.**  Agg sexual assault of a child.  Did he get charged

8  with that?

9  **A.**  No.

12:51:55  10  **Q.**  Did he tell you he did that?

11  **A.**  No -- well, he did, yes.  He told me at the time he

12  didn't know she was 16.  He learned after talking with the

13  mother later on.

14  **Q.**  I see.  And is that a defense in Texas?  You are a

12:52:08  15  peace officer.

16  **A.**  No.

17          THE COURT:  Pull that mic up some, please, sir.

18          MR. FAZEL:  Yes, sir.

19          THE COURT:  No.  The one you have got on your

12:52:12  20  tie.  Just move it up.  That's why it's not picking up.

21  Go on.

22          MR. FAZEL:  Sorry, Your Honor.  Judge, just for

23  timing, when is the break?

24          THE COURT:  It's now 12:52.  We'll adjourn about

12:52:24  25  1:05.

Cross-Examination by Mr. Fazel                     Vol 2 - 77

1              MR. FAZEL:  Okay.

2     Q.  (By Mr. Fazel)  Now, as part of your investigation --

3     let me back up a little bit.  Do you know what A-files

4     are?

12:52:45   5     A.  Sure.

6     Q.  Okay.  A-files are created by the -- what department

7     in the government?

8     A.  Immigration and Customs Enforcement.

9     Q.  Okay.  Let's use me for an example.  Okay.  Just for

12:52:58   10    an example, a hypothetical, if I am an immigrant into the

11    United States, all right, and I enter the United States

12    when I was in the 4th grade, I would have an A-file,

13    correct?

14    A.  Yes.

12:53:10   15    Q.  And as I gain status, that A-file will be updated with

16    whatever that status is, correct?

17    A.  Yes.

18    Q.  When we say "status," what we're talking about is when

19    I become a legal permanent resident, that is a green card

12:53:25   20    holder, that A-file will reflect that, correct?

21    A.  Yes.

22    Q.  And then when I become a United States citizen, that

23    A-file will reflect that, as well, right?

24    A.  Yes.

12:53:35   25    Q.  Now, each one of the folks that are going to come

Cross-Examination by Mr. Fazel                        Vol 2 - 78

1    testify, each one of these ladies that is going to come

2    testify before this jury has an A-file, right?

3    **A.**   Yes.

4    **Q.**   And each one of these A-files contains documentation

12:53:50    5    created by you, --

6    **A.**   In some cases.

7    **Q.**   -- Ms. Bradley or somebody else involved in this

8    investigation, correct?

9    **A.**   Yes.

12:54:01    10   **Q.**   This documentation is based on the request of law

11   enforcement to have them gain status into this country

12   through a special visa.  What is that called?

13   **A.**   A T-visa.

14   **Q.**   A T-visa.  Okay.  And a T-visa is established so that

12:54:18    15   folks that are victims can obtain status and help law

16   enforcement, correct?

17   **A.**   Victims of human trafficking only.

18   **Q.**   Right.  There are other victims.  There are other

19   visas for them.  We are talking about human trafficking.

12:54:31    20   So T-visas are established so that folks that are helping

21   you can gain status in this country, correct?

22   **A.**   According to the human -- the Trafficking Victims

23   Protection Act of 2000, through that law, yes.

24   **Q.**   Detective, I didn't ask you according to what.  I'm

12:54:46    25   just asking you isn't that correct?

1   **A.**   Yes.

2   **Q.**   All right.  And now, you do that on a regular basis,

3   correct?

4   **A.**   For all the victims.

12:54:51   5   **Q.**   All the victims in this case?

6   **A.**   In any case.

7   **Q.**   I understand.  Okay.  And so, in order for them to be

8   able to obtain that status, they need to have you be a

9   person applying for that visa, correct?

12:55:06   10   **A.**   No.

11   **Q.**   No.  Law enforcement has to apply for that visa,

12   correct?

13   **A.**   No.

14   **Q.**   Okay.  Every one of these girls in this case has an

12:55:14   15   application with either yourself, Ms. Bradley or somebody

16   else as a signatory on there, correct?

17   **A.**   Yes.

18   **Q.**   Okay.  And they obtained status because they assisted

19   you on this case and other cases, correct?

12:55:30   20   **A.**   They obtained status because they are victims, and

21   they have to be assisting the government --

22   **Q.**   In order to get --

23   **A.**   -- in order for us to endorse them.  They can obtain

24   the T-visa without law enforcement.  It's done by an

12:55:47   25   immigration attorney, not by us.

12:55:56

1  **Q.**  I understand that.  I understand who does it, and

2  we'll get to that.  My point being is that in this

3  particular case -- now, I'm not going to go into the legal

4  parts of the immigration.  I know there is somebody else

5  coming to testify.  I'm just focusing on you.  Okay.  All

6  right.

7      What I'm asking you is:  In this particular case, with

8  these particular women that you are saying are telling you

9  the truth, you obtained their status so that they could

12:56:10  10  help you in this investigation and other investigations,

11  correct?  And by "you," I mean law enforcement in general,

12  correct?

13  **A.**  We endorse the T-visa --

14  **Q.**  Okay.  Not only --

12:56:21  15  **A.**  -- because they are victims mostly.

16  **Q.**  Not only did you endorse the T-visa, but you also did

17  other things for them.  You drafted letters for the folks

18  at immigration, correct?

19  **A.**  With their continued presence.

12:56:33  20  **Q.**  Letters about matters such as "They're helping us

21  greatly."  I can show it to you with your signature on it.

22  Is that correct?

23  **A.**  In some cases, yes.

24  **Q.**  Okay.

12:56:41  25      (Sotto voce discussion.)

         1    **Q.**   (By Mr. Fazel)   Okay.  When they do apply for this
         2    visa, part of their application process is they have to
         3    give an affidavit; is that correct?
         4    **A.**   I believe so.  Not to us.  That would be -- that's
12:57:08 5    between them and their immigration attorney.
         6    **Q.**   Fair enough.  That affidavit is under oath, correct?
         7    **A.**   I don't know, sir.  That's something that takes place
         8    between the attorney, the immigration attorney and the
         9    client.  All we do -- it's a very small part of the entire
12:57:27 10   packet, which is an I-914B.  It's a law enforcement
         11   declaration statement.
         12   **Q.**   I am sorry, Detective.  The question --
         13          MR. FAZEL:  It's nonresponsive.  I want to
         14   object.
12:57:37 15   **Q.**   (By Mr. Fazel)   The question I asked you is:  To your
         16   knowledge, do they have to do an affidavit as part of that
         17   process?  Yes or no?
         18   **A.**   I think so.
         19   **Q.**   All right.
12:57:46 20   **A.**   I'm not sure.
         21   **Q.**   Have you looked at the affidavits that these young
         22   ladies provided in this case?
         23   **A.**   No.
         24   **Q.**   Okay.  Do you have a copy of their A-files?
12:57:59 25   **A.**   I don't have it.

Cross-Examination by Mr. Fazel                          Vol 2 - 82

1    Q.   Okay.  But you know that for a fact you and I sat in a

2    building somewhere and we looked through a bunch of them,

3    correct?  I looked through them and you helped --

4    A.   You looked through them.  I helped you locate the

12:58:13   5    files.

6    Q.   Correct.  Do you think -- well --

7    A.   I have never opened an A-file.

8    Q.   You testified that some of these young ladies are

9    helping on other cases.  Do you remember that yesterday?

12:58:35  10    A.   Yes.

11    Q.   Okay.  And other cases involving other people, right?

12    Not in this case?

13    A.   Right.  Correct.

14    Q.   Other cases involving other pimps?

12:58:42  15    A.   Yes.

16    Q.   And those cases are out of Texas?

17    A.   Some.

18    Q.   Out of what states?

19         MR. MAGLIOLO:  Your Honor, we object to that as

12:58:51  20    not being relevant to this case.

21         THE COURT:  Sustained.

22    Q.   (By Mr. Fazel)  When you recruited Juan Carlos Cepeda,

23    was he under arrest?

24    A.   No.

12:59:13  25    Q.   He just came to you and said, "Hey, I want to help

*Laura Wells, RMR, CRR - LauraWellsCSR@comcast.com*

Cross-Examination by Mr. Fazel                    Vol 2 - 83

1    you"?

2    **A.**   He called.

3    **Q.**   Did he --

4    **A.**   He got a phone -- my phone number from a working girl

12:59:24    5    in the bar.

6    **Q.**   I see.  And Mr. Cepeda, is he in the United States?

7    **A.**   Yes.

8    **Q.**   He is testifying today?

9    **A.**   Yes.  He will testify during the trial.

12:59:35   10    **Q.**   Okay.  Fair enough.  And Mr. Cepeda is a U.S. citizen?

11    **A.**   No.

12    **Q.**   Is he a permanent resident?

13    **A.**   No.

14    **Q.**   Does he have a visa?

12:59:45   15    **A.**   Deferred action.

16    **Q.**   Deferred action?  What is that?

17    **A.**   It's a temporary status.

18    **Q.**   How did he get that?

19    **A.**   Through us.

12:59:54   20    **Q.**   Through who?

21    **A.**   Through the FBI.

22    **Q.**   Through the FBI.  When did he get that?

23    **A.**   When he became a source.

24    **Q.**   When he became a source.

01:00:06   25    **A.**   We're not allowed to use -- we have to give them

1    status in order to have them working with us.

2    **Q.**    In other words, what would happen?

3    **A.**    It's temporary.

4    **Q.**    All right.  Hence the term "temporary status"?

01:00:16    5    **A.**    Right.

6    **Q.**    But what would happen if you didn't give them status?

7    **A.**    They would be potentially taken by ICE and deported.

8    **Q.**    Potentially?

9    **A.**    Yes, if they come into an encounter with them.

01:00:33    10    **Q.**    Had ICE come into an encounter with Mr. Cepeda right

11    around the time he called you?

12    **A.**    No.

13    **Q.**    No.  What about Juan Carlos Munoz?  When he called

14    you, what was his status?

01:00:47    15    **A.**    The same, an illegal alien.

16    **Q.**    And so, when he contacted you, did he obtain the same

17    temporary status?

18    **A.**    Yes.

19    **Q.**    Do they have families here?

01:00:58    20    **A.**    Yes.

21    **Q.**    Children?

22    **A.**    No.

23    **Q.**    Wives?

24    **A.**    No.

01:01:05    25    **Q.**    Girlfriends?

1   **A.**   I don't think so, no.

2   **Q.**   Did you provide them with any kind of resources when

3   they became sources?

4   **A.**   Can you be more explicit?

01:01:32   5          THE COURT:  Were they paid anything?

6          THE WITNESS:  Yes.

7   **Q.**   (By Mr. Fazel)  Were they provided anything other than

8   money?

9   **A.**   Just the status and money.

01:01:42  10   **Q.**   Status and money?

11   **A.**   That's all I can recall.

12   **Q.**   Now, when the source went back to work for the -- oh,

13   let me back up.  In 2012 the establishment was sold to

14   three individuals, correct?

01:02:09  15          MR. MAGLIOLO:  We object to the form of that

16   question.  It's facts not in evidence.

17          THE COURT:  Rephrase it.

18          MR. FAZEL:  Sure.

19   **Q.**   (By Mr. Fazel)  In 2012 is it your understanding

01:02:18  20   through your investigation that Ms. Medeles was no longer

21   involved in the day-to-day activity of the establishment?

22   **A.**   My investigation is that she distanced herself and

23   wanted to portray that she was no longer involved when, in

24   fact, she was.

01:02:34  25   **Q.**   When, in fact, she was.  Okay.  That's your position?

1    That's what you believe?

2    **A.**   That's my position.   That's what I believe.

3    **Q.**   Okay.   So let's talk about those facts then.   So you

4    are taking the position -- okay.   There are three

01:02:45   5    individuals that we're talking about, correct?   You know

6    who I'm talking about, correct?

7    **A.**   Yes.   There is four, actually.

8    **Q.**   Okay.   There is Poncho?

9    **A.**   Right.

01:02:51   10   **Q.**   And he was deported, correct?

11   **A.**   He -- yes.

12   **Q.**   Okay.   And that leaves us with Alfonso Diaz-Juarez?

13   **A.**   No, that's Poncho.

14   **Q.**   I'm sorry.   You are right.   Jorge Barbosa?

01:03:06   15   **A.**   Yes.

16   **Q.**   Eduardo Guzman?

17   **A.**   Yes.

18   **Q.**   And Alberto Flores?

19   **A.**   Yes.

01:03:12   20   **Q.**   All right.   These three individuals were running the

21   establishment, correct?

22   **A.**   Yes.   They entered into an agreement with Tencha.

23   **Q.**   I understand.   And that agreement is that they paid

24   her to run the establishment, correct?

01:03:22   25   **A.**   The agreement was that she was going to get $20,000

1   every week from them.

2   **Q.**   I understand.  I understand you want to advocate for

3   your side.  I get it.  But if we could just answer my

4   question.

01:03:33   5              MR. MAGLIOLO:  We object to the sidebar comment.

6              THE COURT:  Sustained.

7              MR. FAZEL:  I object to nonresponsive then.

8              THE COURT:  Keep going.

9              MR. FAZEL:  Yes, sir.

01:03:42   10  **Q.**   (By Mr. Fazel)  They entered into an agreement with

11  Ms. Medeles, correct?

12  **A.**   Yes.

13  **Q.**   Okay.  And this agreement was that they ran the

14  day-to-day activity of that bar, correct?

01:03:51   15  **A.**   Yes.

16  **Q.**   And they got to choose what girls come in and go,

17  correct?

18  **A.**   Yes.

19  **Q.**   Now, here is something interesting.  Each one of these

01:04:01   20  guys had their own girls, right?

21  **A.**   Yes.

22  **Q.**   They were pimps?

23  **A.**   Yes.

24  **Q.**   They had their own girls?

01:04:07   25  **A.**   Yes.  Before they ever even took over that place.

Cross-Examination by Mr. Fazel                    Vol 2 - 88

1   **Q.**   Before they took over.  They have nicknames.  They

2   have got El Pantera, right?

3   **A.**   Correct.

4   **Q.**   Who is that?

01:04:18  5   **A.**   Eduardo Guzman.

6   **Q.**   I can't pronounce this correctly.  If I don't, tell

7   me.  Ardilla?

8   **A.**   Ardilla.

9   **Q.**   Ardilla.

01:04:26  10  **A.**   It means "squirrel."

11  **Q.**   It means "squirrel."  Who was that?

12  **A.**   That was Alberto Mendez Lopez -- Flores.

13  **Q.**   And then Eli, who is that?

14  **A.**   That's Jorge Teloxa-Barbosa.

01:04:37  15  **Q.**   They each had their own girls?

16  **A.**   Yes.

17  **Q.**   They would bring their own girls into the bar?

18  **A.**   Correct.

19  **Q.**   Different than what it was before, right?  Before they

01:04:45  20  took over, Ms. Medeles didn't have her own girls, did she?

21  **A.**   Can you rephrase?  I'm not understanding what you

22  mean.

23  **Q.**   Sure.

24          THE COURT:  Last question.  Then we take a break.

01:04:58  25  Go on.  State it again, please.

1    MR. FAZEL:  There is going to be follow-up.  So

2  if you want to take a break.

3    THE COURT:  All right.  Let's see.  I think they

4  fixed this.  Yes, there it goes.

01:05:08   5    Ladies and gentlemen, we'll take a break at this time.

6  I have now 1:05.  Please be back -- that's right.  There

7  are other things.  We'll get back in at 2:15.

8    If you are not familiar with the downtown area,

9  directly across the street is the -- what is it?  The bank

01:05:25  10  building, the Bank of America.  If you go in the lobby and

11  take the escalator down there are some restaurants there;

12  or, as you get to the bottom of the escalator, right in

13  front of you is the tunnel that cuts into the whole

14  downtown tunnel system, shopping areas, many, many food

01:05:44  15  courts and so forth.  Or we have a cafeteria, certainly,

16  on the first floor.

17    So we'll take a break at this time.  Please be back

18  and ready to resume at 2:15.  We'll see you at that time.

19    THE MARSHAL:  All rise.

01:05:54  20    (Jury exited courtroom at 1:05 p.m.)

21    (Lunch break from 1:05 p.m. to 2:21 p.m.)

22    THE COURT:  Let's call the jury in, please.

23    THE MARSHAL:  All rise.

24    (Jury entered the courtroom at 2:21 p.m.)

02:22:27  25    THE COURT:  Thank you.  You can be seated.  We

1    received a request from the jury that we adjourn today at

2    5:30. So we're going to accommodate the jury. We will be

3    glad. We'll adjourn at 5:30 today. All right. Go right

4    ahead.

02:22:47    5              MR. FAZEL: May I proceed, Your Honor?

6              THE COURT: Yes.

7                    **CROSS-EXAMINATION (continued)**

8    BY MR. FAZEL:

9    **Q.**  Detective, just a few other questions for you where we

02:22:55    10   last left off. We were talking about the transition from

11   -- the transition as far as the establishment was

12   concerned; and we talked about the fact that the folks

13   that took over had their own girls, for the lack of a

14   better way of saying it. Do you remember all that?

02:23:15    15   **A.**  Yes.

16   **Q.**  And we talked about the fact that the defendant,

17   Ms. Medeles, that's sitting right next to me, she was not

18   an individual who you would say was running girls? Would

19   you agree with that?

02:23:30    20   **A.**  At that time.

21   **Q.**  Okay. You have no evidence to show that Ms. Medeles

22   ever went to Mexico to obtain women to bring to the United

23   States, do you?

24   **A.**  I don't.

02:23:43    25   **Q.**  Do you have any information that leads you to believe

Cross-Examination by Mr. Fazel                    Vol 2 - 91

 1  that Ms. Medeles had any family members who obtained women

 2  and brought them into the United States from any South

 3  American country, Central American country or North

 4  American country?

02:23:57   5  **A.**   Well, we have a recording where two --

 6          THE COURT:  The microphone.  Pull the microphone

 7  in, please, sir.

 8          THE WITNESS:  Closer to me, sir?

 9          THE COURT:  Yeah, a little bit.

02:24:07  10  **A.**   There is a recorded conversation where her brother,

11  Chito, talks about bringing girls into the U.S.

12  **Q.**   (By Mr. Fazel)  And Ms. Medeles had nothing to do with

13  that, correct, to your knowledge?

14  **A.**   Yes.

02:24:19  15  **Q.**   Okay.  And, certainly, there is no evidence that you

16  have that shows that Ms. Medeles in any form threatened,

17  coerced anybody in Mexico and made them come to the United

18  States, correct?

19  **A.**   No evidence of that.

02:24:48  20  **Q.**   Okay.  Just briefly, you testified yesterday about

21  something that caught my attention.  You said that you had

22  a grant.  Do you remember that?

23  **A.**   Yes, sir.

24  **Q.**   And let me back up.  You said that there was a task

02:25:00  25  force involved?

 1   **A.**   Yes.

 2   **Q.**   Do you remember talking about that?

 3   **A.**   Yes.

 4   **Q.**   Okay.  And that you were the lead task force -- lead

02:25:07   5   task force, I don't want to put words in your mouth, the

 6   lead guy for the task force?

 7   **A.**   No, sir.  I didn't say that.

 8   **Q.**   I'm sorry.

 9   **A.**   I said I was the founder along with Suzanne Bradley.

02:25:16  10   **Q.**   Who is sitting right here?

11   **A.**   Yes.

12   **Q.**   Okay.  Of this task force that's funded by the federal

13   government?

14   **A.**   Yes.

02:25:21  15   **Q.**   Okay.

16   **A.**   The funding is limited to the locals, not to the

17   federal agents.

18   **Q.**   Oh, okay.

19   **A.**   So the recipient of the grant is the sheriff's office.

02:25:30  20   **Q.**   Okay.  So the sheriff's office is funded so that they

21   can investigate and bring charges involving sex

22   trafficking?

23   **A.**   Yes.

24   **Q.**   And these sex trafficking charges, obviously, could be

02:25:42  25   either brought up in state court or federal court?

1    **A.**   Correction, sex or labor, any kind of trafficking.

2    **Q.**   I see.  And they could be brought up in state or

3    federal court, correct?

4    **A.**   Yes, they could.  And they have been.

02:25:56    5    **Q.**   Okay.  And the manner in which you maintain and obtain

6    your funding is by making sure that you have cases brought

7    up, right?  In other words, if you have a year or two

8    period that you don't bring anymore cases, would the

9    funding just dry up?

02:26:13   10    **A.**   No, sir.

11    **Q.**   They will continue to fund you?

12    **A.**   As long as we are actively investigating and doing

13    what we need to do, investigating, rescuing victims,

14    working cases.  Investigations -- our investigations are

02:26:30   15    long-term investigations.

16    **Q.**   I see.  Okay.  And is it the United States Congress

17    that does the funding?

18    **A.**   I think -- I believe the funding comes from OVC.

19    **Q.**   And "OVC" stands for?

02:26:42   20    **A.**   And BJA, Bureau of Justice Assistance.

21    **Q.**   And "OVC" stands for?

22    **A.**   Office of Victims of Crimes.

23    **Q.**   Those are both under the auspices of?

24    **A.**   I believe DOJ.  I'm not 100 percent sure, sir.

02:26:56   25    **Q.**   Okay.  And those folks are funded by?

```
         1   A.   Federal government, yes.

         2   Q.   Specifically, congress?

         3   A.   I believe so.

         4   Q.   And so, every year they have to go to congress to

02:27:07 5   obtain moneys, correct?

         6   A.   Yes.

         7   Q.   And so, are you telling this jury that if you were

         8   sitting there not creating prosecutions involving

         9   trafficking that they would continue to fund you?

02:27:17 10          MR. MAGLIOLO:  We object to the form of the

        11   question, "creating."

        12          THE COURT:  Sustained.  Sustained.

        13          MR. MAGLIOLO:  Okay.

        14          MR. FAZEL:  May I have just one moment, Your

02:27:27 15  Honor, to look at my notes?

        16          THE COURT:  Yes.

        17          MR. FAZEL:  Thank you.  I pass the witness, Your

        18   Honor.

        19          MR. MAGLIOLO:  Just a few questions, Your Honor.

02:27:52 20          THE COURT:  Sure.

        21                   REDIRECT EXAMINATION

        22   BY MR. MAGLIOLO:

        23   Q.   Are you lying to the ladies and gentlemen of this

        24   jury, the court, the prosecutor --

02:27:57 25          THE COURT:  Do you want a microphone in there,
```

Redirect Examination by Mr. Magliolo                    Vol 2 - 95

1   please, or just plug your station in.

2   **Q.**   (By Mr. Magliolo)  Are you lying to the ladies and

3   gentlemen of the jury, the prosecutors, the judge about

4   what happened in this case so you can get funding for your

02:28:11   5   task force?

6   **A.**   No.

7           MR. FAZEL:  Objection to bolstering the witness.

8           THE COURT:  Overruled.

9   **Q.**   (By Mr. Magliolo)  Now, based on counsel's questions

02:28:19   10   about the cooperators, you answered that they were

11   illegally in the United States; is that correct?

12   **A.**   Yes.

13   **Q.**   And they were working for the defendant, Tencha?

14   **A.**   Correct.

02:28:29   15   **Q.**   At her establishment?

16   **A.**   Yes.

17   **Q.**   And there were devices there, based on your earlier

18   testimony, that would alert people if the police were

19   coming or the police were around?

02:28:41   20   **A.**   Yes, sir.

21   **Q.**   Would that be shielding them from detection?

22   **A.**   Correct.

23   **Q.**   When you recruited -- the counsel for the defense

24   asked you about when you recruited your cooperating

02:28:55   25   individuals.  You mentioned you recruited Mr. Cepeda

1    first.  What led you -- I believe you started telling,

2    based on a question from defense counsel, what first lead

3    you to Mr. Cepeda?

4    **A.**   Yes.  He was very unhappy because him and Tencha kept

02:29:16    5    having problems in regards to he didn't agree with her

6    allowing some girls that looked very young --

7             MR. FAZEL:  Objection to hearsay, Your Honor.

8             MR. MAGLIOLO:  I'll do it question and answer,

9    Your Honor.

02:29:27    10            THE COURT:  Question and answer, please.

11   **Q.**   (By Mr. Magliolo)  What were they having discord

12   about?

13   **A.**   They were having discord about --

14            MR. FAZEL:  Objection to hearsay, Your Honor, as

02:29:34    15   to what he learned from him directly.

16            MR. MAGLIOLO:  This is not offered for the truth.

17   This is offered for what information he received to show

18   what action he took as far as recruiting this confidential

19   informant, Your Honor.

02:29:44    20            THE COURT:  For that limited purpose I'll

21   overrule the objection.

22   **Q.**   (By Mr. Magliolo)  You were given information to what

23   that caused you to go to try to recruit this informant?

24   **A.**   He gave me the information that --

02:29:56    25            THE COURT:  Yes or no?

Redirect Examination by Mr. Magliolo                  Vol 2 - 97

1      MR. MAGLIOLO:  Were you given --

2      THE COURT:  Hold it.  Hold it.  The answer was a

3  yes --

4      MR. MAGLIOLO:  It wasn't, Your Honor.  It wasn't

02:30:03  5  a yes or no question.

6      THE COURT:  Then it was my fault.  All right.

7  Rather than have it read back, I assume you are correct.

8  Go on.

9  **Q.**   (By Mr. Magliolo)  Did you receive information that

02:30:10  10  lead you to the recruitment of this person?

11  **A.**   Yes, sir.

12  **Q.**   And was that information regarding his discord with --

13  his discontentment with the defendant, Tencha?

14  **A.**   Yes.

02:30:23  15  **Q.**   And was that based on some issues they had regarding

16  who was working as a prostitute at the brothel?

17  **A.**   Yes.

18  **Q.**   And what information was that?

19      MR. FAZEL:  Object to that, Your Honor.  That's

02:30:37  20  hearsay.

21      MR. MAGLIOLO:  Again, it's showing why he went to

22  talk to  --

23      THE COURT:  No, sir.  I'm going to sustain that

24  objection.

02:30:41  25  **Q.**   (By Mr. Magliolo)  Based on that information, did you

Redirect Examination by Mr. Magliolo          Vol 2 - 98

```
         1  contact Cepeda?
         2  A.  Yes, sir.
         3  Q.  And did he confirm the information to you regarding
         4  why he would be willing to work for you and no longer be
02:30:55 5  loyal to Tencha?
         6  A.  Yes.
         7  Q.  And based on that information he gave you, is that one
         8  of the reasons you thought he would be someone who would
         9  be reliable as a confidential informant?
02:31:12 10 A.  Yes.
        11  Q.  Don't answer this until the Court gives you
        12  permission.  What was that information that caused you to
        13  believe that he is someone you could trust as an informant
        14  inside that organization?
02:31:25 15         MR. FAZEL:  Objection to the form of the
        16  question.  Object to hearsay.
        17         THE COURT:  Is he going to come?
        18         MR. MAGLIOLO:  It's again --
        19         THE COURT:  Wait.  Wait.
02:31:31 20         MR. MAGLIOLO:  Sorry.
        21         THE COURT:  Is he going to be here as a witness?
        22         MR. MAGLIOLO:  Yes, he will, Your Honor.
        23         THE COURT:  Overrule the objection.
        24  Q.  (By Mr. Magliolo)  What was the information that,
02:31:38 25 first, the person gave you that caused you to contact
```

1  Mr. Cepeda and then the information Cepeda gave you to

2  confirm that?

3      MR. FAZEL:  Judge, I object to the information

4  that the person gave you.  That's clearly hearsay.

02:31:52  5      THE COURT:  Sustained.  In other words, ask your

6  basic question.  What he told you, period.

7  **Q.**  (By Mr. Magliolo)  What was the information Cepeda

8  gave you that gave you comfort in proceeding in your

9  investigation by -- and telling him about your

02:32:05  10  investigation and getting him on board with you?

11  **A.**  Him telling me he didn't agree with the -- with

12  Tencha, the defendant, allowing girls that were too young,

13  minors, in his opinion, to work at the brothel.

14  **Q.**  And why did that give you comfort that this might be a

02:32:26  15  person you could trust and use to aid in your

16  investigation?

17  **A.**  Because I felt that he was in the position to get the

18  evidence, for one.  He was in the know.  He had been there

19  for a few years.  And he cared -- appeared to care about

02:32:43  20  the minors.  It was something he felt strongly about.

21  **Q.**  And that was why you felt comfortable in going forward

22  with recruiting him as an informant?

23  **A.**  Correct.

24  **Q.**  Counsel also asked you about Mr. Munoz, the other

02:32:57  25  informant.

1   **A.**   Yes, sir.

2   **Q.**   What lead you to recruit him as an informant?

3   **A.**   Juan Cepeda told me about him and told me that he

4   would be in a position to also help and that he --

02:33:08   5          THE COURT:  All right.  All right.  In a position

6   to help.  Next question.

7   **Q.**   (By Mr. Magliolo)  And did you contact Mr. Munoz?

8   **A.**   I contacted him, yes.

9   **Q.**   And did he confirm the information you have?

02:33:18   10   **A.**   Yes, sir.

11   **Q.**   And that, what information he gave you, without going

12   into it, was sufficient to convince you that he would also

13   not only be in a position to help but would be someone you

14   could trust to be an informant?

02:33:31   15   **A.**   Yes.

16   **Q.**   Yes or no?

17   **A.**   Yes.

18          THE COURT:  Anything further?

19          MR. MAGLIOLO:  Not on that issue, Your Honor.

02:33:38   20   I'm going to go to a couple of other issues counsel

21   brought up that I think I need to address.

22   **Q.**   (By Mr. Magliolo)  Counsel for the defense asked you

23   about continued presence.  What is that?

24   **A.**   The continued presence is something that federal law

02:33:56   25   enforcement can provide for the victim.  It allows the

Redirect Examination by Mr. Magliolo                    Vol 2 - 101

```
         1   victim to have a temporary legal status and a work

         2   authorization card.  It's only for one year.  It just

         3   helps --

         4           MR. FAZEL:  Objection, nonresponsive.

02:34:15 5           THE COURT:  Sustained.

         6   Q.  (By Mr. Magliolo)  Can it be renewed?

         7   A.  Yes.

         8   Q.  And does that allow the victim to be here to be a

         9   witness in a case?

02:34:22 10          THE INTERPRETER:  I'm sorry, Your Honor.

        11           MR. FAZEL:  Can we have one moment?

        12           THE INTERPRETER:  I need the microphone closer.

        13   He pushed it away.

        14           MR. FAZEL:  Sorry.  It was my fault.

02:34:30 15          THE COURT:  All right.

        16           THE INTERPRETER:  I apologize, Your Honor.

        17           THE COURT:  Oh, no.  No problem at all.  We have

        18   got to get it all down.  Go on.  Keep going whoever has

        19   got it.

02:34:45 20          MR. MAGLIOLO:  We were talking about continuance

        21   of presence, and I asked if that allowed them to be --

        22           THE COURT:  Ask your question.

        23   Q.  (By Mr. Magliolo)  Would that help allow the witness

        24   to be -- the victim to be a witness in the case?

02:34:53 25  A.  Yes.
```

Redirect Examination by Mr. Magliolo          Vol 2     102

1   **Q.**   Counsel for the defense asked you specifically about

2   the victims telling their story of what happened to them.

3   Do you recall that question?

4   **A.**   Vaguely.

02:35:08   5   **Q.**   And he was talking about affidavits they submitted and

6   were in the --

7   **A.**   Yes.

8   **Q.**   -- A-files, and you indicated you didn't know anything

9   about those affidavits?

02:35:19   10   **A.**   Correct.

11   **Q.**   Based on -- have you interviewed each and every

12   defendant -- I'm sorry, each and every victim that's

13   getting ready to testify to this jury?

14   **A.**   Yes.

02:35:29   15   **Q.**   And is it easy or difficult for them to tell their

16   story?

17   **A.**   It's difficult.

18   **Q.**   And is this something you think they want to share

19   with everybody?

02:35:38   20   **A.**   No, sir.

21   **Q.**   And if they didn't share it with someone relating to

22   an A-file, would that surprise you?

23          MR. FAZEL:  Objection to speculation.

24          THE COURT:  Sustained.

02:35:53   25   **Q.**   (By Mr. Magliolo)  Counsel asked you about one of the

1  witnesses, one of the confidential informants having sex

2  with a 16-year-old.  Do you recall that?

3  **A.**   Yes, sir.

4  **Q.**   Can you prosecute someone just based on their

02:36:04  5  statement in Texas?

6  **A.**   No.  You would have to investigate and get a

7  corroboration and get witnesses of any kind of evidence

8  that would support.

9  **Q.**   The alleged victim in this case said it wasn't true,

02:36:17  10  correct?

11  **A.**   Yes, sir.

12  **Q.**   Back to the questions counsel asked about the

13  cooperating individuals.  By the time you started working

14  them, did they have a different relationship with Tencha

02:36:35  15  than they did originally?

16  **A.**   Yes.  Particularly Juan Manuel Cepeda.

17  **Q.**   Was that because of the problems that you have

18  indicated that you learned about between he and Tencha?

19  **A.**   Correct.

02:36:47  20  **Q.**   So as far as getting recordings, would he have been in

21  a position to get the same recordings when he started

22  working with you, the same intimate recordings as he

23  perhaps might have been earlier in his work for Tencha?

24  **A.**   No, he wouldn't have.

02:37:03  25  **Q.**   Counsel asked you questions about did the

Redirect Examination by Mr. Magliolo          Vol 2    104

1  establishment have control of the girls.  Do you recall

2  that?

3  **A.**   Yes.

4  **Q.**   Did Las Palmas 2, the person who operated Las Palmas

02:37:22   5  2, have rules in which the girls who worked there as

6  prostitutes must follow or they would no longer be able to

7  work there?

8  **A.**   Yes, they did.

9  **Q.**   So, in fact, would it be your testimony that she did

02:37:35  10  have control of the girls that worked at her

11  establishment?

12  **A.**   Yes.

13  **Q.**   You talked about on his questions about the $25, I

14  believe, $5 to enter the establishment, $5 to go upstairs

02:37:52  15  and another $15 for the condom and a paper towel?

16  **A.**   And room.

17  **Q.**   That money went to the house?

18  **A.**   Yes.

19  **Q.**   That would have been to Tencha?

02:38:01  20  **A.**   Yes.

21  **Q.**   Was there also on occasion the money for the first

22  prostitution act also went to the house or to Tencha?

23  **A.**   Yes.

24  **Q.**   He also asked you about the money they were paid.  I

02:38:18  25  think you said -- he asked you about standards, that you

1   said there were standards; that is, certain parameters

2   that the girls had to work within as far as the money they

3   negotiated with the johns?

4   **A.**   Yes.

02:38:33   5   **Q.**   Who set the standards at Las Palmas?

6   **A.**   I am not 100 percent sure, but I believe it was

7   Tencha.

8          MR. FAZEL:  Objection, Your Honor.  It's

9   speculation.

02:38:43   10   **Q.**   (By Mr. Magliolo)  Well, was it --

11          THE COURT:  Hold it a second.  Let me rule.  Make

12   your objection.

13          MR. FAZEL:  Speculation.

14          THE COURT:  Sustained.

02:38:49   15   **Q.**   (By Mr. Magliolo)  Do you know if it was Tencha or

16   someone that worked for Tencha?

17   **A.**   Yes.

18   **Q.**   And it's always hard for me to say.  And, finally,

19   counsel asked you questions about the girls in Mexico and

02:39:02   20   what control Tencha had of them in Mexico.  Do you recall

21   that?

22   **A.**   Yes.

23   **Q.**   Could the pimps who forced these girls or either used

24   the minors for their prostitution girls, could they have

02:39:19   25   done this here in Houston without someone like Tencha or

1    Tencha to provide the establishment for the girls to work

2    in?

3              MR. FAZEL:  Objection, speculation.

4              THE COURT:  Overruled.

02:39:33   5    **Q.**   (By Mr. Magliolo)  Aside from the --

6              THE COURT:  Wait a second.  You asked a very

7    specific question.  I overruled the objection.  Can you

8    answer that, sir?

9              THE WITNESS:  There was always somebody else in

02:39:45  10    Mexico that threatened.  The girls were being threatened

11    with repercussions.

12              THE COURT:  Hold it.  That's not answering the

13    question.  It's a yes or no.

14              MR. MAGLIOLO:  Let me restate if I could, Your

02:39:57  15    Honor.

16              THE COURT:  No, sir.  I want it read back.

17    Please read it back.

18              THE REPORTER:  Yes, Judge.

19         (Question read by court reporter.)

02:40:18  20    **A.**   No.

21              MR. MAGLIOLO:  That's all I have, Your Honor.

22              MR. FAZEL:  May I proceed, Your Honor?

23              THE COURT:  Yeah.  Go on.

24                        **RECROSS-EXAMINATION**

02:40:21  25    BY MR. FAZEL:

1   Q.   So are you telling this jury that without

2   establishments like Las Palmas these pimps couldn't have

3   got any money or had any prostitution done?  Is that what

4   you are telling them?

02:40:33   5   A.   They needed --

6               THE COURT:  Yes or no.  It will go a lot quicker.

7   The whole trial will go a lot quicker.  It's a yes or no

8   question.

9               THE WITNESS:  Yes, sir.

02:40:41   10               THE COURT:  Okay.  Go on.

11   Q.   (By Mr. Fazel)  Is that what you are telling them?

12   A.   Yes.

13   Q.   So when your reports are inundated with the girls

14   being sent to motels, were they not sent to motels?

02:40:48   15   A.   That's a place, also.

16   Q.   It's a place, also.  Yes, it is.

17   A.   For prostitution.

18   Q.   I see.

19   A.   Any location.

02:40:55   20               THE COURT:  Let him finish.  One at a time,

21   please.

22   Q.   (By Mr. Fazel)  So when the prosecutor asks you

23   without places like Las Palmas, your answer is no, what

24   you are saying is without a bed?

02:41:08   25   A.   No.  I'm saying without locations used as brothels.

1   You have apartment brothels.  You have houses being used

2   for these purposes, too.

3   **Q.**   Oh.

4   **A.**   It's not just bars.

02:41:19   5   **Q.**   So it's any -- so when the pimp sets up an apartment

6   and uses the apartment for the prostitution, you are

7   equating that to Las Palmas?

8   **A.**   Yeah.  We call those apartment brothels.

9   **Q.**   I see.  That's what you call them.  Does anybody else

02:41:34   10   call them that?

11   **A.**   Everybody in law enforcement that works vice or what I

12   do.

13   **Q.**   So in your equation, basically all you need is a pimp,

14   right, and a prostitute?

02:41:46   15   **A.**   I'm sorry?

16   **Q.**   All you need is a pimp and a prostitute, right?

17   **A.**   And a customer.

18   **Q.**   And a customer.  That's it, correct?

19   **A.**   Yes.

02:41:53   20   **Q.**   So you don't need Las Palmas?

21   **A.**   It's done anywhere.

22   **Q.**   So you don't need Las Palmas?

23   **A.**   No.

24   **Q.**   All right.  Let me back up a little bit.  The whole

02:42:04   25   shielding thing that Mr. Magliolo brought up under

1  redirect, do you remember that?

2  **A.**  Can you be more specific?

3  **Q.**  Yes.  He said so by putting on a light, turning on an

4  alarm, that's shielding, correct?

02:42:16  5  **A.**  Yes.

6  **Q.**  And you jumped off and said, yes, that's shielding.

7  Do you remember that?

8  **A.**  Yes.

9  **Q.**  Okay.

02:42:22  10      MR. MAGLIOLO:  We object to the sidebar that he

11  jumped off and said something.

12      THE COURT:  Overruled.

13  **Q.**  (By Mr. Fazel)  That shielding is so that when vice

14  comes in and arrests people for prostitution they have

02:42:32  15  some alert to that, correct?

16  **A.**  Yes.  So they can escape.

17  **Q.**  Okay.  Now, are you telling the ladies and gentlemen

18  of this jury that your confidential sources who started

19  working, according to your reports, in 2007 suddenly

02:42:56  20  decided that they don't like the way Tencha runs the

21  business in 2012?

22  **A.**  They -- yes.

23  **Q.**  Is that what it is?

24  **A.**  It wasn't an abrupt --

02:43:10  25  **Q.**  Just answer my question, sir.  Is that correct?

1         MR. MAGLIOLO:  He is trying to answer the

2    question.  Counsel for defense cut him off, Your Honor.

3         THE COURT:  Overruled.

4    **Q.**  (By Mr. Fazel)  Is that correct?

02:43:19    5    **A.**  No, it's not correct.

6    **Q.**  Uh-huh.  So in 2007 there must have been no minors,

7    right?  Right?

8    **A.**  There were minors.

9    **Q.**  Oh, but they didn't care about it in 2007?

02:43:28   10         MR. MAGLIOLO:  We object to him being

11    argumentative, Your Honor.

12         THE COURT:  Overruled.

13    **Q.**  (By Mr. Fazel)  Did they care about it in 2007?

14    **A.**  Sir?

02:43:35   15    **Q.**  Did they care about it in 2007?

16    **A.**  I don't know.

17    **Q.**  You don't know.  How about 2008?  Did they care about

18    it in 2008?

19         THE COURT:  Hold it.  Hold it.  Lower your voice.

02:43:41   20         MR. FAZEL:  Yes, sir.

21    **Q.**  (By Mr. Fazel)  In 2008 did they care about that?

22    **A.**  I guess he did.

23    **Q.**  You guess he did or did not?

24    **A.**  I said I guess he did.

02:43:47   25    **Q.**  He did.  But he didn't do anything about it?

1  **A.**  He didn't know where to -- what to do about it.  He

2  didn't trust law enforcement.

3  **Q.**  I'm sorry?

4  **A.**  He didn't trust law enforcement.

02:43:57  5  **Q.**  Oh.  And so, suddenly in 2011 he found trust in law

6  enforcement?

7  **A.**  No.  Suddenly in 2011 I think he had enough.

8  **Q.**  I see.  Oh, there is somebody forcing him to work

9  there?

02:44:09  10  **A.**  No.

11  **Q.**  And the recordings -- let me be clear about this --

12  you had absolutely no control over how they recorded and

13  what they recorded?

14        MR. MAGLIOLO:  Exceeding the course and scope of

02:44:27  15  redirect, Your Honor.

16        THE COURT:  Sustained.

17  **Q.**  (By Mr. Fazel)  Did you not testify on redirect about

18  the fact that they were allowed to record whatever they

19  wanted to or discuss recordings with the prosecutor?  Did

02:44:45  20  you discuss -- did you -- let me ask you this way:  Did

21  you discuss recordings with the prosecutor on redirect

22  just a minute ago?

23  **A.**  Yes.

24  **Q.**  Okay.  Did you tell the prosecutor that the recordings

02:44:54  25  were something that you felt like you can trust them to

1  do?

2  **A.**   Yes.

3  **Q.**   Okay.  And that trust was established because they

4  were tired in 2011?

02:45:11  5  **A.**   I believed that he felt strongly about the minors and

6  the young girls.  I believed he was a disgruntled employee

7  that was having problems with Tencha regarding the minors

8  working and the young girls working there, and I was

9  confident he was in a position to get the evidence we

02:45:33  10  needed.

11  **Q.**   I see.

12  **A.**   So --

13         MR. MAGLIOLO:  May he answer the question, Your

14  Honor?

02:45:37  15         MR. FAZEL:  He did answer my question.

16         MR. MAGLIOLO:  He wasn't finished with the

17  answer; and he cut him off, Your Honor.

18         THE COURT:  Next question.

19         MR. FAZEL:  Thank you.

02:45:44  20  **Q.**   (By Mr. Fazel)  So if he is disgruntled, in your mind

21  that doesn't give him incentive to manipulate the

22  evidence?

23  **A.**   Sir, I don't --

24  **Q.**   It's a yes or no question.

02:45:53  25         THE COURT:  Can you answer it yes or no?

1  **A.**  I don't believe so.

2  **Q.**  (By Mr. Fazel)  A disgruntled employee has no

3  incentive to manipulate evidence?

4  **A.**  I don't think he was going to -- he was going to

02:46:08  5  manipulate the evidence.  And since there were recordings,

6  it's recorded and everything that's being said, both

7  sides, Tencha and him, is there to be listened to.

8  **Q.**  Well, let me ask you something:  What if you record

9  certain things but not other things?

02:46:24  10        MR. MAGLIOLO:  That's repetitive.  We object to

11  it, Your Honor.

12        THE COURT:  Overruled.

13  **A.**  I never saw evidence in all the recordings that they

14  did, over 800, where that happened.

02:46:36  15  **Q.**  (By Mr. Fazel)  You never saw evidence where they --

16  **A.**  I never saw it --

17        THE COURT:  Hold on.  That's what he said.

18  **Q.**  (By Mr. Fazel)  Did you ever see evidence that he

19  started recording in the middle of a conversation?

02:46:46  20  **A.**  Yes.

21  **Q.**  Well, isn't that something that he did in the middle?

22  So what about the beginning of the conversation?

23  **A.**  That is understandable.  Can I explain why?

24  **Q.**  No.  Answer my question.  He can ask you another one.

02:46:58  25  **A.**  Okay.

1   **Q.**   Isn't starting in the middle of a conversation his

2   choice?

3   **A.**   No.

4   **Q.**   Having control of the girls -- by the way, on these

02:47:19   5   confidential informants, the pimps went to them to talk

6   about their girls coming in and using Las Palmas, right?

7   **A.**   No.

8   **Q.**   They didn't go to them?

9   **A.**   Not that I remember any of that.

02:47:31   10   **Q.**   It was a different Juan that was in charge when the

11   girls came in to say, hey, I want to work there?

12   **A.**   Not the pimps.  You are asking me the pimps or the

13   girls?

14   **Q.**   I'm sorry.  I'll rephrase.  The girls, when they

02:47:44   15   walked into Las Palmas, did they not ask one of them about

16   working there?

17          MR. MAGLIOLO:  That was not the question, Your

18   Honor.  We would ask that the witness be allowed to answer

19   the original question.  It was the pimps, not the girls.

02:47:55   20   He has now changed it.

21          THE COURT:  I'm going to have you ask one

22   question.  We are going to redo it all, that question.

23          MR. FAZEL:  Yes, Your Honor.

24          THE COURT:  Let's ask it and answer it, if you

02:48:03   25   can.

1    MR. FAZEL:  Yes, Your Honor.

2  **Q.**  (By Mr. Fazel)  The women, when they entered Las

3  Palmas, before they started working, wasn't it the

4  confidential sources, one of them, who they requested

02:48:19    5  permission to work there?

6  **A.**  At times.

7  **Q.**  Which confidential source was it?

8  **A.**  It varied.

9  **Q.**  So it could be either one of them?

02:48:29   10  **A.**  Or the assistant manager, like Guadalupe Valdez-Lugo,

11  for example.

12  **Q.**  But my question was something different, Detective.

13  So it varied as to either one of them, correct?

14  **A.**  Yes.

02:48:43   15  **Q.**  The rules that they established, the rules were just

16  basically the moneys that the girls had to pay --

17    MR. MAGLIOLO:  We object.  We would want to know

18  who "they" is, the rules that "they" established.

19    THE COURT:  All right.  Also, this could have

02:48:58   20  been done direct, okay, on your original cross.  I will

21  give you a few more minutes.  And then, you'll pass the

22  witness.

23    MR. FAZEL:  I'm sorry, Your Honor.  I am just

24  addressing the --

02:49:04   25    THE COURT:  I'm just saying that's the rules.  Go

1    on.

2            MR. FAZEL:  Yes, Your Honor.

3    Q.  (By Mr. Fazel)  The prosecutor talked about the rules,

4    do you remember that, on redirect?  Let me just get to the

02:49:15  5    question.

6    A.  Okay.

7    Q.  When you said that the establishment, Las Palmas, set

8    the rules for the girls, do you remember testifying to

9    that?

02:49:23  10    A.  Yes.  Yes, sir.

11    Q.  Okay.  The rules that you are referring to is the

12    amounts of moneys that the girls had to pay to the

13    establishment, correct?

14    A.  No.

02:49:30  15            MR. MAGLIOLO:  We object to the form of that

16    question.  He is saying what the rules are.

17            THE COURT:  Overruled.  He will disagree if he

18    has to.

19    A.  No, those are not the rules.

02:49:38  20    Q.  (By Mr. Fazel)  All right.  Let's go over the rules.

21    If they were late, they had to pay a fine, correct?

22    A.  Yes.

23    Q.  Okay.  If they had -- if they left the establishment,

24    they had to pay some money, correct?

02:49:47  25    A.  Yes.

1    **Q.** "They" being the girls. If they were longer in a room

2    for a certain period of time, they had to pay money,

3    correct?

4    **A.** Yes.

02:49:54   5    **Q.** Okay. Aren't they all rules regarding the money the

6    girls had to pay Las Palmas?

7    **A.** It would be like punishment fines, yeah. Yeah.

8    **Q.** No. Those are your words. My question to you is:

9    The ones I just described to you, aren't they just moneys

02:50:12   10   that the girls have to pay Las Palmas?

11   **A.** Yes.

12   **Q.** It's not rules as to what the pimps did, right?

13   Right? Say yes or no.

14   **A.** No.

02:50:21   15   **Q.** It's not where they could go, correct, the girls?

16   **A.** There were more rules than what you -- than the ones

17   you have said, sir.

18   **Q.** Well, then, the prosecutor can talk to you about them.

19   And then, we can have another conversation.

02:50:33   20       My question to you was: The pimps are the ones that

21   told them the locations to go, correct?

22   **A.** Yes.

23   **Q.** The pimps are the ones that set them up in their

24   houses, correct?

02:50:41   25   **A.** Yes.

02:50:49

    1          MR. FAZEL:  All right.  That's all I have, Your

    2    Honor.  Thank you.

    3          THE COURT:  Anything further?

    4          MR. MAGLIOLO:  Yes, Your Honor.

    5                    **REDIRECT EXAMINATION**

    6    BY MR. MAGLIOLO:

    7    **Q.**  Who did the pimps have to talk to so their girls would

    8    be able to work at Las Palmas?

    9    **A.**  Tencha.  And if they didn't know Tencha, they would

02:50:58   10   use a girl that was already working there that belonged to

   11   a pimp that they knew to introduce that girl because

   12   somebody had to vouch for the new girl.

   13   **Q.**  But who was the ultimate authority about telling the

   14   pimps if their girl could work there or if the girl could

02:51:12   15   remain there?

   16   **A.**  Tencha.

   17          MR. MAGLIOLO:  That's all we have, Your Honor.

   18          THE COURT:  All right.  Thank you, sir.  You may

   19   step down.  You are excused.  You are free to leave.  You

02:51:19   20   are certainly free to remain.

   21       Call your next witness.

   22          MR. MAGLIOLO:  This is our case agent.  May he be

   23   excused from the Rule, Your Honor?

   24          THE COURT:  Yes, of course.

02:51:26   25          MR. MAGLIOLO:  In fact, may all our --

```
 1              THE COURT:  We covered all that already.
 2              MR. MAGLIOLO:  Sorry, Your Honor.
 3              MR. PEREZ:  The United States calls XXXXXXXXXXXX,
 4    Your Honor.
 5              THE COURT:  Is this one of the working girls?
 6              MR. PEREZ:  Yes, Your Honor.  She needs to be
 7    sworn, Your Honor.
 8              THE COURT:  Okay.
 9              CASE MANAGER:  Ms. XXXXXX, please raise your
10    right hand.
11              THE WITNESS:  (Complying.)
12         (Witness sworn by the case manager through an
13    interpreter.)
14              CASE MANAGER:  You may have a seat.
15              THE COURT:  Let me see the attorneys up here.
16         (Proceedings held at sidebar.)
17              THE COURT:  Okay.  You know, historically, when
18    you get your first main witness on -- okay.  I give
19    everybody some leeway.  You will get a lot of these young
20    ladies on.  I want them on and off.  Okay.  I don't want
21    you making the case all over again with each one.  You
22    know what you have to get on.  You know the questions you
23    have to ask.
24         That's why I didn't -- it might have seemed that way.
25    I didn't push on that first witness.  In other words, get
```

1    the case agent in this.  If there is anything you need,

2    fine.  If there isn't, ask the basic questions and pass

3    the witness.

4              MR. PEREZ:  Let me ask you this, Your Honor.

02:53:12    5              THE COURT:  Sure.

6              MR. PEREZ:  They are very illiterate.

7              THE COURT:  They are very what?

8              MR. PEREZ:  Very illiterate.

9              THE COURT:  Illiterate.  Okay.

02:53:19   10              MR. PEREZ:  They also don't speak English.

11              THE COURT:  All right.

12              MR. PEREZ:  Could I have a little leeway in

13    leading, just a little?

14              THE COURT:  Yes.

02:53:26   15              MR. FAZEL:  And allow us to do it?

16              THE COURT:  Pardon?

17              MR. FAZEL:  And allow us to do it?

18              THE COURT:  Sure.

19        (Proceedings concluded at sidebar.)

02:54:34   20              MR. MAGLIOLO:  May I proceed, Your Honor?

21              THE COURT:  Yes, sir.  Go right ahead.

22              THE INTERPRETER:  Thank you, Your Honor.

23              THE COURT:  All right.  Do we need all those

24    posters up there, still?

02:55:00   25              MR. MAGLIOLO:  No, Your Honor.

1          THE COURT:  All right.  Let's get them down.

2          MR. MAGLIOLO:  Yes, Your Honor.

3          THE COURT:  Can you move that into the wall

4     somewhere?  All the way in if you are going to.  Okay.

02:55:29  5     All right.  Let's go.

6          MR. MAGLIOLO:  Thank you.

7                    **XXXXXXXXXXXXXXXXXXX,**

8     having been first duly sworn, testified through the

9     interpreter, as follows:

10                       **DIRECT EXAMINATION**

11    BY MR. PEREZ:

12    **Q.**   State your name for the Court and the members of the

13    jury, please, ma'am.

14    **A.**   XXXXXXXXXXXXXXXXXXX.   XXXXXXXXXXXXXXXXXXX.

02:55:58  15    **Q.**   Do you know a person by the name of Tencha?

16    **A.**   Yes.

17    **Q.**   Is Tencha in the courtroom here today?

18    **A.**   Yes.

19    **Q.**   Can you please point to her or describe what she is

02:56:11  20    wearing for the Court and the members of the jury?

21    **A.**   She is seated over there, and she is wearing a green

22    blouse with black.

23          MR. PEREZ:  Let the record reflect this witness

24    has identified the defendant, Tencha, in this case, Your

02:56:31  25    Honor.

```
          1              THE COURT:  The record will so reflect.

          2   Q.  (By Mr. Perez)  I want to direct your attention to

          3   2001.  Okay.  Did you cross into the United States

          4   illegally from Mexico around that time?

02:56:45  5   A.  Yes.

          6   Q.  Were you brought over by a coyote?

          7   A.  Yes.

          8   Q.  And the coyote is somebody you paid money to to have

          9   him bring you to the United States; is that correct?

02:57:02  10  A.  Please repeat.

          11  Q.  Did you pay that person money to get you across the

          12  river to the United States?

          13  A.  I didn't pay him money directly.

          14  Q.  What did you pay him?

02:57:22  15  A.  With work.

          16  Q.  Where did you meet that person?

          17  A.  On the border.

          18  Q.  Did you cross the river on your own?

          19  A.  Yes.

02:57:39  20  Q.  I'll make this brief.  Okay.  Why did you cross into

          21  the United States on your own?

          22  A.  Because I wanted to have a better life.  My mother had

          23  11 children, and I had to help out my family.

          24  Q.  Were you a prostitute in Mexico?

02:58:05  25              THE INTERPRETER:  (Motioning.)
```

1   **Q.**   (By Mr. Perez)  Were you a prostitute in Mexico?

2   **A.**   No.

3   **Q.**   How old were you when you crossed the river?

4   **A.**   14.

02:58:20   5   **Q.**   Once you made it --

6   **A.**   14, approximately.

7   **Q.**   When you crossed the river, did somebody help you,

8   once you crossed the river, to come to Houston?

9   **A.**   I crossed, and they left me.  They abandoned me there

02:59:01   10   on the border.  And from there I got sick.  I walked three

11   days and three nights.  And so, then, I went over to the

12   highway.  And there I met a man by the name of Juan

13   Pineda, and from there it was there that they brought me

14   over to Houston.

02:59:34   15   **Q.**   And when you say "they," who are you talking about?

16   **A.**   Juan Pineda and Daisy Oviedo.

17   **Q.**   Did you know Juan and Daisy before they met you there

18   at that location?

19   **A.**   No.  No.

03:00:04   20   **Q.**   When you say you got into the street, what did you do

21   on that street or highway?

22   **A.**   I was sick, and I felt that I needed somebody to

23   rescue me.  And so, what I did was I jumped.

24   **Q.**   You jumped?  You jumped onto the road?

03:00:39   25   **A.**   I threw myself on the road as though I were dead.

1  **Q.**  And this is where Juan and Daisy picked you up?

2  **A.**  Yes.

3  **Q.**  Before Juan and Daisy picked you up, had somebody --

4  other people gone by you and ignored you?

03:00:58  5  **A.**  Yes.  I threw myself on the road several times, and

6  they would go around me.  They wouldn't pick me up.

7  **Q.**  At some point, Juan and Daisy picked you up and

8  brought you to Houston?

9  **A.**  At first I thought it was because of charity.

03:01:30  10  **Q.**  Once you got to Houston with Juan and Daisy, where did

11  they take you?

12  **A.**  To an apartment.

13  **Q.**  Did you live with Juan and Daisy at that apartment?

14  **A.**  No.

03:01:45  15  **Q.**  Where did they take you?

16  **A.**  To an apartment that was owned by a woman by the name

17  of Estella Nunez.

18  **Q.**  And how long did you stay with Estella Nunez?

19  **A.**  Approximately about three weeks.

03:02:12  20  **Q.**  Was there some kind of agreement between Juan and

21  Estella for you to remain at Estella's place?

22  **A.**  No.

23  **Q.**  After you stayed there for three weeks, what happened

24  next?

03:02:30  25  **A.**  After that, they took me to work at a house; and I

1  worked there at that house I don't know for how long.  And

2  I had been working there for some time, but I was

3  mistreated.  The woman would throw my food at me.  She

4  would make me clean up the dog's poop.  And then, she

03:03:03  5  mistreated me after that.  And then, she would make me eat

6  my food.

7  **Q.**  Was there any deal between that lady and Juan and

8  Daisy?

9  **A.**  They knew each other.  I don't know.

03:03:26  10  **Q.**  At that point, did you owe Juan and Daisy any money?

11  **A.**  Yes.  What they had charged me for bringing me to

12  Houston, which was $2,000.

13  **Q.**  What were the arrangements for you to pay them the

14  $2,000?

03:03:53  15  **A.**  Work.

16  **Q.**  Work where?

17  **A.**  Wherever it was.  I worked at that house, and I asked

18  them to take me out of there because the woman mistreated

19  me badly.  And he came back, and he told me that he was

03:04:20  20  going to take me to a place where I would be treated well.

21  **Q.**  Juan came back and picked you up?

22  **A.**  Yes.  He picked me up and took me to another place, to

23  an apartment, Apartment Number 8.  I don't know where the

24  place is at.  And I was very happy because I saw other

03:04:50  25  young women very happy there.  They were all happy.  And

 1  they were talking among themselves.  And so, I went in.

 2  And they gave me a very large plate filled with food.  And

 3  so, I then thought that I was in better hands.

 4       After that, a tall man arrived, about 60 years old.

03:05:26  5  And they said that the fresh meat had arrived from Mexico.

 6            MR. FAZEL:  I'm sorry, Your Honor.  Just for the

 7  interpreter.  Did she say "two men" or "tall man"?

 8            MR. PEREZ:  Tall.

 9            MR. FAZEL:  I just want to make sure it's clear.

03:05:41  10  **A.**  After that, they put me in a room with him and they

11  said I had to be kind and that I was going to be doing the

12  best work in all of my life.

13  **Q.**  (By Mr. Perez)  What happened then?

14  **A.**  The man wanted to talk with me.

03:06:05  15            THE COURT:  He wanted to what?  I didn't catch

16  it.  He wanted to what?

17            THE INTERPRETER:  Talk with me.

18  **A.**  And so, they put me in the room.  They closed the

19  door, and the man raped me.  After that, I would scream.

03:06:32  20  I would scream and no one -- no one would pay attention to

21  me.

22  **Q.**  (By Mr. Perez)  What happened next, ma'am?  I know

23  it's hard.

24  **A.**  And after that, more men came in.  More and more.  I

03:06:52  25  don't know how many.

1   **Q.**  What happened next?

2   **A.**  After that, I remained there working as a prostitute.

3   **Q.**  Before that, ma'am, had you ever worked as a

4   prostitute?

03:07:22  5   **A.**  No.  No.  When I was in Mexico, I was in a convent.  I

6   used to believe in God, and I used to pray to God.  But

7   after I was there, I couldn't believe in God; and I didn't

8   believe in anything.

9   **Q.**  After that, what happened next?

03:07:53  10   **A.**  After that I went to someone else's hands and then

11   another one and then another one.

12   **Q.**  How long were you at that apartment?

13   **A.**  I don't know.  I don't remember.

14   **Q.**  After you were at that apartment, where were you taken

03:08:19  15   next?

16   **A.**  After that apartment, I went to Ms. Tencha's house.

17   **Q.**  Who did you owe the smuggling debt at that point to?

18   **A.**  Melissa Garcia.

19   **Q.**  How much did you owe Melissa Garcia?

03:08:49  20   **A.**  Approximately $4,000.

21   **Q.**  Now, you testified earlier that you owed Juan $2,000.

22   Now you owe Melissa $4,000?

23   **A.**  Yes.

24   **Q.**  Did you at that time owe Juan any money?

03:09:15  25   **A.**  Yes.  My debt went over to Melissa.

1  **Q.**  Explain that to the members of the jury, please.

2  **A.**  My debt went over to Melissa because I owed Melissa

3  the clothes, the rent, the jewelry, the makeup, the shoes,

4  my panties.

03:09:58  5  **Q.**  Melissa had sold that to you?

6  **A.**  She simply took them to me; and then, she would charge

7  me for them.

8  **Q.**  So when you wound up at Tencha's place, who did you

9  owe money to?

03:10:22  10  **A.**  Melissa.

11  **Q.**  My question then:  Did you still owe money to Juan and

12  Daisy?

13  **A.**  No.  I owed everything to Melissa.

14  **Q.**  So your debt had been passed from Juan and Daisy to

03:10:43  15  Melissa?

16  **A.**  Yes.

17  **Q.**  So when you got to Tencha's place, you owed Melissa

18  $4,000?

19  **A.**  Yes, $4,000.

03:11:00  20  **Q.**  When you arrived there at Tencha's house, for how long

21  did you stay at that location?

22  **A.**  About three weeks or more.  I don't remember.

23  **Q.**  What did you do for those three or four weeks when you

24  were at Tencha's place?

03:11:29  25  **A.**  We slept there and we ate there and Melissa would take

1    me directly to Las Palmas.  They would take me.  They

2    would bring me back.

3    **Q.**  Who would take and bring you back?

4    **A.**  Melissa and sometimes Ms. Tencha in a station wagon.

03:12:03  5    **Q.**  What did you do when you went to -- you would go to

6    Las Palmas?

7    **A.**  Yes.

8    **Q.**  What would you do at Las Palmas?

9    **A.**  I prostituted myself.

03:12:21  10    **Q.**  How old were you, approximately, at that time?

11    **A.**  I don't remember.  Time didn't matter to me anymore.

12    **Q.**  Were there other young girls who lived there at

13    Tencha's place?

14    **A.**  Yes.  Yes.  Yes.

03:12:46  15    **Q.**  Including you, about how many girls were there at

16    Tencha's house?

17    **A.**  Between five and six.

18    **Q.**  Were they all as young as you?

19    **A.**  Yes.

03:13:06  20    **Q.**  At some point were you moved to Las Palmas?

21    **A.**  Yes.  I was living at Las Palmas.

22    **Q.**  Who took you to Las Palmas to live at Las Palmas?

23    **A.**  Melissa.

24    **Q.**  Okay.  And do you know the relationship between

03:13:27  25    Melissa and Tencha?

```
 1   A.   No.

 2   Q.   Did Melissa live there with you there at Tencha's

 3   place?

 4   A.   No.  No.  No.  She would only come over there, but I

 5   stayed there.

 6   Q.   When you were at Tencha's, Melissa did not live there?

 7           THE INTERPRETER:  I'm sorry?

 8   Q.   (By Mr. Perez)  When you were living at Tencha's

 9   place, Melissa did not live there?

10   A.   Yes.  Melissa lived there.

11   Q.   But when you moved to live at Las Palmas, Melissa did

12   not live at Las Palmas?

13   A.   No.  No.  She didn't go to live there.  She only took

14   me.

15   Q.   And whose idea was it for you to move to Las Palmas?

16   A.   Melissa's.

17   Q.   Okay.  Where did you -- did you live on the second

18   floor at Las Palmas?

19   A.   Yes.

20   Q.   Could you leave from there on your own free will?

21   A.   No.

22   Q.   Tell the members of the jury why you couldn't leave

23   from that second floor at Las Palmas.

24   A.   Because it had locks and because the door downstairs

25   had a peephole and there would be people there who would
```

03:13:43

03:13:56

03:14:10

03:14:30

03:15:01

1    be guarding us.

2    **Q.**   When you say guarding you, did any of them have any

3    arms?

4    **A.**   Yes.

03:15:18   5    **Q.**   How many?

6    **A.**   Two.  Two.

7    **Q.**   When you say "arms," did they have guns, pistols?

8    **A.**   Yes.  Pistols.

9    **Q.**   Did Tencha ever visit you there on the second floor of

03:15:37   10   Las Palmas when you were locked up?

11   **A.**   Yes.

12   **Q.**   Did customers come to the second floor to have sex

13   with you?

14   **A.**   Yes.

03:15:57   15   **Q.**   Were there other young girls up there on the second

16   floor that customers could come up to have sex with the

17   other young girls, as well?

18   **A.**   Yes.

19   **Q.**   How much was the fee to have sex with you?

03:16:21   20   **A.**   She would charge between $300 and $500.

21   **Q.**   When you say "she," who do you mean?

22   **A.**   Ms. Tencha.

23   **Q.**   Would you actually see her collect the money from the

24   clients?

03:16:39   25   **A.**   She would take them in her own hands.  She would hand

1    us the condoms with her own hands, as well.  And she would

2    take us, and she would say that we were fresh meat.  She

3    would let them choose us as though we were animals.

4    **Q.**   How long were you there on the second floor?

03:17:23    5    **A.**   From approximately January to November.

6    **Q.**   Let me ask you this question:  How long were you on

7    the second floor locked up?

8    **A.**   All the time.  They would only take me out so that I

9    could have relations with clients.

03:17:54    10    **Q.**   Let's talk about that.  When you say they would take

11    you out to have relations with clients, where would they

12    take you?

13    **A.**   To some small rooms.  And they would take us out of

14    there, and there would be some small rooms where there

03:18:27    15    were some beds.  Actually, they were mattresses simply

16    thrown on the floor.

17    **Q.**   Did Tencha tell you how much she -- you owed her,

18    Tencha?

19    **A.**   I only knew -- I only knew that my debt had gone into

03:19:08    20    Tencha's hands.  But at that time I didn't know how much I

21    owed her.  I only knew that she had to charge me for rent

22    and for food and for the things that were utilized.

23    **Q.**   At some point did you -- did Tencha tell you some

24    specific figures as to how much you owed her?

03:19:46    25    **A.**   In the beginning, $4,000.

1  **Q.**  You never found out whether you paid off the debt or

2  not?

3  **A.**  No.  I escaped.  I left.

4  **Q.**  Let's talk about that.  How did you manage to escape

03:20:07  5  from that location?

6  **A.**  Because another person started working there, Adrian.

7  He went to work there.

8  **Q.**  Who did he work for?

9  **A.**  For Tencha.  And he went in to ask her to be serviced

03:20:36  10  by me.  He came upstairs and asked to have his service by

11  me.  We didn't have any relations at this time.  We only

12  talked.  But we said we would be seeing each other.  He

13  returned and he said he had been offered a job there and

14  he was going to take it.

03:21:13  15      And so, he came back the second time.  When he came

16  back, we did have relations.  However, the condom tore.

17  And so, I became pregnant.  And so, I was sent to work

18  downstairs when Ms. Tencha found out.

19  **Q.**  She found out that you were pregnant and sent you

03:21:39  20  downstairs?

21  **A.**  Yes.

22  **Q.**  And when you say you were sent downstairs to work

23  downstairs, explain that to the members of the jury,

24  please, ma'am.

03:22:05  25  **A.**  I wasn't working anymore upstairs.  I was working

1   downstairs in the bar.  I wasn't under lock and key

2   upstairs.  I was now in the open bar in the area that is

3   called La Feria.

4   **Q.**   Did you work downstairs in that open area as a

03:22:37   5   prostitute?

6   **A.**   Yes.

7   **Q.**   Explain to the members of the jury why you didn't

8   leave when you were sent downstairs to that location.

9   **A.**   I did it because there were men, also, who were

03:23:01   10   look -- were watching us.  At each corner there was a man.

11   And at the door there was actually another man.

12   **Q.**   And who did these men work for?

13   **A.**   For Hortencia.

14   **Q.**   You mentioned that Tencha would bring special clients

03:23:39   15   to the second floor.  Were there -- was her daughter also

16   a person who would also bring clients to the second floor?

17   **A.**   Yes.

18           MR. PEREZ:  May I approach the board, Your Honor?

19           THE COURT:  Yes.  Go right ahead.

03:24:03   20   **Q.**   (By Mr. Perez)  What was that person's name, Tencha's

21   daughter, that would bring special clients to the second

22   floor?

23   **A.**   What?  What was the question?

24   **Q.**   Let me ask it again.  Okay.  You said that Tencha

03:24:21   25   would bring special clients to the second floor?

 1  **A.**   Yes.

 2  **Q.**   But her daughter would also bring special clients to

 3  the second floor?

 4  **A.**   Yes.

03:24:34   5  **Q.**   What was that daughter's name?

 6  **A.**   Rosa Gloria Chagoyan.

 7  **Q.**   Let me ask you this:  Is that person on this board

 8  here?

 9          THE COURT:  I don't know if she can see it or

03:24:50  10  not.

11  **A.**   Yes.

12  **Q.**   (By Mr. Perez)  This is Government Exhibit B.  Can you

13  point to that person who you knew as Rosa and you said a

14  last name?

03:25:18  15  **A.**   Right here.  This one.

16          MR. PEREZ:  Let the record reflect this person

17  has identified on Government Exhibit B a picture of a

18  person identified as Delia Garcia Diaz, Your Honor.

19          THE COURT:  The record will so reflect.

03:25:35  20  **Q.**   (By Mr. Perez)  You mentioned this last name.  Why did

21  you use that name "Rosa"?

22  **A.**   Because supposedly she was a very well-known artist

23  from Mexico, and she looked a lot like her.

24  **Q.**   Artist or actress?

03:26:01  25  **A.**   I'm sorry.  An actress.

1  **Q.**  So she looked like a famous actress from Mexico; and

2  that's why you called her that, by the Rosa name?

3  **A.**  They said she looked like her, but I didn't even know

4  that actress.  So they were the ones that said she looked

03:26:27  5  like her.

6  **Q.**  I'm going to point at this picture right here.  Do you

7  recognize that person on the picture?

8  **A.**  No.

9  **Q.**  Let me ask you this:  Do you recognize anybody else on

03:26:40  10  this board?

11  **A.**  Yes.

12  **Q.**  Can you point to one, please?

13  **A.**  Cerda, Juanita.  Her name is Juanita.

14         MR. PEREZ:  And, Your Honor, may the record

03:27:12  15  reflect she is pointing to a person identified as Lilia

16  Cerda on Government Exhibit B?

17         THE COURT:  The record will so reflect.

18  **A.**  The black man.

19  **Q.**  (By Mr. Perez)  Your Honor, may the record reflect she

03:27:29  20  has identified a picture of Abel Medeles, also known as

21  Chito?

22  **A.**  Wicho.

23         MR. PEREZ:  Let the record reflect on

24  Government's Exhibit B she has identified somebody on the

03:27:43  25  board pictured as Wicho.

1   **Q.**   (By Mr. Perez)  Where did you see Wicho?

2   **A.**   In the part upstairs.  He handed out the condoms.

3   **Q.**   Who did Wicho work for?

4   **A.**   For the lady who is right there, Ms. Tencha.

03:28:09   5   **Q.**   Who did this fellow who you identified as "El Negro,"

6   who did he work for?

7   **A.**   For Tencha.  Where we were at, he always took care

8   right there.  He was always right there at the door.

9   **Q.**   Do you know if he was related to Tencha?

03:28:36   10   **A.**   No.

11   **Q.**   Who else did you identify?

12   **A.**   Juanita.

13   **Q.**   This person you identified as Juanita, did you see her

14   there at Las Palmas?

03:28:50   15   **A.**   At La Feria.

16   **Q.**   Do you know if she was related to Tencha?

17   **A.**   No.

18   **Q.**   What was her role there at La Feria?

19   **A.**   She cleaned the tables and served beer.

03:29:11   20   **Q.**   Did Wicho do anything to you, ma'am?

21   **A.**   Yes.  He hit me.

22   **Q.**   And how did he hit you?

23       THE COURT:  Ma'am, the microphone would be better

24   so we could pick up what the interpreter says.

03:29:33   25       THE INTERPRETER:  I'm sorry.

                    1          THE COURT:  Yes.  You can aim that microphone

                    2   toward you.  No.  Just aim it.  Yes.  Now, pull it toward

                    3   you.  That is fine.

                    4          THE INTERPRETER:  Okay.

03:29:41            5          THE COURT:  Is that comfortable?  Is that all

                    6   right?

                    7          THE INTERPRETER:  Yes.

                    8          THE COURT:  Thank you.  That way everybody will

                    9   hear, also.

03:29:46           10          THE INTERPRETER:  I'm trying not to get my back

                   11   to the jury.

                   12          JURORS:  Don't worry about it.

                   13          THE COURT:  Okay.  Yes, ma'am.  But you are --

                   14   yeah, but you are facing me.

03:29:56           15          THE INTERPRETER:  Okay.

                   16   **Q.**  (By Mr. Perez)  Let me repeat the question.

                   17   **A.**  Yes.

                   18   **Q.**  What, if anything, did Wicho do to you, ma'am?

                   19   **A.**  He hit me.  He hit me, slapped me in the face; and he

03:30:16           20   grabbed me by both my hands because I hadn't comported

                   21   myself well with a client.

                   22   **Q.**  What do you mean by that?  That you hadn't acted well

                   23   with a client?

                   24          THE INTERPRETER:  We're going to start over.  We

03:30:49           25   don't want to miss anything.

1    **A.**   He hit me because I misbehaved with a client.  And the

2    man was biting my private parts and I started to scream

3    and I asked for help.  So I was screaming, and nobody

4    would come to my help.  He came to help me.

03:31:19   5    **Q.**   (By Mr. Perez)  Who came to help you?

6    **A.**   Wicho.  He came to help me.

7          THE COURT:  Wait.  Yeah.  We've got to answer the

8    question.  All right.

9    **A.**   He came to help me, but he did not.  Instead, he

03:31:36   10    slapped me, gave me two slaps on my face.  And he grabbed

11    me by my hands, and he told me I had to behave well with

12    the client.

13    **Q.**   (By Mr. Perez)  Did Tencha ever hit you, as well?

14    **A.**   Yeah.  She hit me, too.  She slapped me two times, as

03:32:01   15    well.

16    **Q.**   Tell the members of the jury what reason did she hit

17    you?

18          THE INTERPRETER:  I'm sorry.  What?

19    **Q.**   (By Mr. Perez)  Tell the members of the jury why she

03:32:13   20    slapped you.

21    **A.**   Because I didn't want to do what a client wanted me to

22    do; and she wanted me to do whatever the client wanted me

23    to do, whether it was anal sex, oral sex or four hands,

24    because the client would pay her more for each one of

03:33:02   25    these things.

1  **Q.**  Explain to the members of the jury what "four hands"

2  means.

3  **A.**  For two girls to be with one man doing sex at the same

4  time with him.

03:33:22   5  **Q.**  And the term is a -- would be used in -- the term is

6  "four hands"?  It's not in Spanish, but it's in English;

7  is that right?

8  **A.**  That's -- well, that's how we knew it; and that's the

9  only thing that I know how to say it.

03:33:48  10       THE COURT:  Mr. Perez, this may be a time we can

11  take a break.  Let's see.  It's now about 3:35.  We'll

12  take a 15-minute break, keeping in mind we'll adjourn

13  right about 5:30 today.  So we'll see you back in 15

14  minutes.

03:34:05  15       THE MARSHAL:  All rise for the jury.

16       (Jury exited courtroom at 3:34 p.m.)

17       (Recess from 3:34 p.m. to 3:56 p.m.)

18       THE COURT:  Let's call the jury in, please.

19       (Jury entered courtroom at 3:56 p.m.)

03:57:00  20       THE COURT:  You know what we can do.  We'll do it

21  this way so it picks up the interpreter.  The witness

22  doesn't need to speak in the microphone.  We need to get

23  the testimony out.  Thank you.  Be seated.

24       THE MARSHAL:  Do you want a chair?

03:57:12  25       THE INTERPRETER:  Then you won't see me or hear

1  me.

2          THE COURT:  How about over here?  We'll see you

3  and hear you.  How is that?

4          THE INTERPRETER:  I think that's better.

03:57:25  5          THE COURT:  This is a full-service operation.

6          THE INTERPRETER:  Thank you, sir.

7          THE COURT:  Yes, ma'am.  All right.  Let's go,

8  please.

9          **DIRECT EXAMINATION (continued)**

03:57:31  10  BY MR. PEREZ:

11  **Q.**  Senorita --

12          MR. PEREZ:  I'm sorry, Your Honor.  I spoke

13  Spanish.

14          THE COURT:  I understand that.  Therefore, I

03:58:07  15  didn't take it personally.  You are not talking to me.

16  **Q.**  (By Mr. Perez)  Young lady, I mentioned -- well, you

17  pointed to this picture that you knew this women as

18  Juanita, this lady here depicted as Lydia Cerda on the

19  board.  Did you ever ask her for help?

03:58:32  20  **A.**  Yes.

21  **Q.**  Tell the members of the jury what you did to ask her

22  for help.

23  **A.**  I told her I wanted to escape from there.  I asked her

24  could she please help me; and she said, yes, she was going

03:58:58  25  to help me.  So she gave me something, a drink to drink.

1  **Q.**  Alcohol?

2  **A.**  Beer.

3  **Q.**  Okay.

4  **A.**  But I did not drink it.  But I never took -- I never

03:59:24  5  drank either the drinks or the medications to escape from

6  my pain.  And she would also give me cigars, but I never

7  smoked them.  I never drank anything or drugged myself.

8  **Q.**  Now, did Tencha ever ask you if you had any papers?

9  **A.**  (Speaking Spanish.)

03:59:58  10  **Q.**  Did Tencha ever ask you if you had papers?

11  **A.**  Yes, she did ask me.

12  **Q.**  And when you say "papers," does that mean that you

13  have -- were you illegally in the country?  Did she ask

14  you if you were illegally in the country?

04:00:17  15  **A.**  Yes.  She asked me was I legally here in the country.

16  **Q.**  What did you tell her?

17  **A.**  No.  No.

18  **Q.**  When was it that you told her that?  When you were at

19  her house?  When you were locked up or when?

04:00:38  20  **A.**  When I was already locked up.

21  **Q.**  On the second floor?

22  **A.**  Yes.

23  **Q.**  Did Tencha ever give you or other minor females there

24  at the brothel fake ID's?

04:00:59  25  **A.**  No.  I never saw that.

1  Q.  Did she tell you to fear the police?

2  A.  Yes.

3  Q.  Explain that to the members of the jury.  What would

4  she tell you about the police?

04:01:21  5  A.  That the police were bad.  That if we were

6  prostitutes, the police were going to lock us up.  That in

7  this country we didn't have any rights, and that we were

8  going to be deported.

9       I really didn't care if I were to be deported, but

04:01:51  10  what would really bother me was if I were to be jailed

11  because I was a prostitute.  And she would say that what I

12  was doing out here on the outside was nothing in

13  comparison to what would be done to me after I were locked

14  up.

04:02:17  15  Q.  At what point were you taken outside of -- away from

16  the brothel to a hotel to perform -- to perform sexual

17  acts?

18  A.  Would you repeat the question?  When was it that --

19  Q.  Sure.  I'll repeat the question.  At some point were

04:02:42  20  you taken to another location away from Las Palmas to

21  engage in prostitution?

22  A.  Yes.

23  Q.  Explain that to the members of the jury, please.

24  A.  I would be -- I would be taken out from Las Palmas,

04:03:07  25  and I would be taken to a hotel so that I could have

1  relations with even more clients.  They would call that an

2  out call.  And I would have to do whatever it was with all

3  of the clients who were there.  I had to do everything.  I

4  had to do everything.  And Ms. Hortencia would keep guard

04:03:50  5  on the outside.

6  Q.  Explain that when you say Hortencia would guard the

7  outside.  What do you mean by that?

8  A.  She would sit outside the door.  She would stay

9  outside the door.  Once a policeman came by to arrest us

04:04:14  10  because we were having relations with more people.  The

11  policeman went in there and told me that I was under

12  arrest.  So he put the manacles on me.  Then he had sex

13  with me.  And then, he took off.

14      And so she said, "You see.  You see what is going to

04:04:50  15  happen to you.  Nobody is going to believe you.  Nobody is

16  going to believe you because you are whores."

17      And then, I believed that no one else would believe

18  me.

19  Q.  So Tencha is telling you the police are bad.  And then

04:05:12  20  this happens to you, and you really believed that police

21  were bad?

22  A.  Yes.

23  Q.  You mentioned Adrian Hernandez?

24  A.  Yes.

04:05:38  25  Q.  You mentioned that you were able to escape?

1   **A.**   Yes.

2   **Q.**   Who helped you escape?

3   **A.**   Adrian.

4   **Q.**   Tell the members of the jury how Adrian was able to

04:05:53   5   help you escape.

6   **A.**   He had said he would help me.  We had relations.

7            THE COURT:  I can't hear, ma'am.

8   **A.**   He said -- he came back.

9            THE COURT:  Yeah.  Into the microphone.  That

04:06:16   10   will be fine.

11            THE INTERPRETER:  Thank you.

12   **A.**   He came back.  And after that he said we were going to

13   be seeing each other again.  That day he returned he said

14   he wanted to have relations with me.  And he paid so that

04:06:42   15   he could go up there to the room.  He paid; and then, we

16   left.

17        Since he had already paid -- since he had already

18   paid, we went on over to where the man "Negro" was at; and

19   he let us go by.  So we got as far as the door.  There was

04:07:23   20   an iron gate.  And so, instead of going upstairs, we went

21   towards the door; and we went out towards the car.  We got

22   in the car, and we left.

23   **Q.**   (By Mr. Perez)  What happened next?

24   **A.**   And we went round and round on the freeway to make

04:07:50   25   sure nobody was following us, and we did that until we ran

1    out of gas in the car.

2    **Q.**   What happened then?

3    **A.**   After that, I didn't return again.  I escaped.

4    **Q.**   Okay.  When did you make contact with Deputy

04:08:18   5    Chapuseaux?

6    **A.**   I had contacted him after when my baby girl was stolen

7    from me.  Can I explain?

8    **Q.**   Go ahead and explain to the members of the jury.

9    **A.**   After I escaped from Las Palmas, in my womb I was

04:08:51   10   already carrying a baby.  Since I didn't have any

11   identification when I was going to have my baby -- I had

12   to have identification so that my baby could be born in

13   the hospital -- so then I decided to give the ID that I

14   had been using so I could go to the hospital; and it was

04:09:38   15   XXXXXXXXXXXXXXXXXXXXXXXXXXX.

16   **Q.**   And where had you got that identification from?

17   **A.**   From the first captors, Daisy Oviedo and Juan Pineda.

18   **Q.**   Explain that to the members of the jury.

19   **A.**   What do you want me to explain?

04:09:59   20   **Q.**   About getting that ID from Juan and Daisy.

21   **A.**   I had obtained that identification before.  Way before

22   I had gone with Tencha I had obtained it.

23   **Q.**   Obtained it from where?

24   **A.**   From Juan Pineda and Daisy Oviedo.  I got it from

04:10:34   25   them.

1    **Q.**   They gave you that ID?

2    **A.**   Yes.  They gave me everything.

3    **Q.**   And that ID had the name of whom?

4          THE INTERPRETER:  She was still speaking.

04:10:43   5    **Q.**   (By Mr. Perez)  I'm sorry.  I interrupted you.  I

6    apologize.

7    **A.**   They gave me the ID and the identification.

8    **Q.**   And that identification had the name of XXXXXXXXXXX

9    XXXXX?

04:11:01   10   **A.**   Yes.

11   **Q.**   So when you went to the hospital, that's the ID that

12   you presented; is that right?

13   **A.**   Yes.  Yes.

14   **Q.**   Then what happened as far as you making contact with

04:11:18   15   the Mexican consulate?

16   **A.**   After I had my baby my -- the ones who in the

17   beginning had been my captors stole my baby for six

18   months.  I was like a crazy person looking for my baby.  I

19   found her.  I was looking for them everywhere until I

04:12:02   20   found my baby.  And I found my baby, and I stole her from

21   them.

22         After that, I lived in one apartment after another

23   hiding.  I couldn't live in any apartment over three

24   months because I was afraid that they would find me with

04:12:30   25   my baby.

1    Until one day they found me; and when they found me,
2  they told me they were going to take my baby away from me
3  if I didn't work another turn as a prostitute.
4    And because I was so afraid that they would take my
04:13:03  5  baby away from me, I went to ask for help from the Mexican
6  consulate.
7  **Q.**  Did you engage in prostitution the way they wanted you
8  to?
9  **A.**  Yes, they wanted me to go back to prostitute myself.
04:13:24  10  **Q.**  But you didn't?
11  **A.**  No.  No.  No.  No.  I fled.  That's the reason that I
12  fled because I didn't want to go back to that life.
13  **Q.**  So you made contact with the Mexican consulate?
14  **A.**  Yes.  I asked them to help me.  I asked that they help
04:13:50  15  me by changing my baby's name to the correct name on the
16  birth certificate.  They asked me why.  And then they told
17  me that I had committed an error and that I had to pay for
18  it.  They said -- I said if my child has to be paid for by
19  using this identity, then I will do it.  But I'm not going
04:14:36  20  to leave her with them.
21    THE INTERPRETER:  Excuse me.  I think I have
22  misstated.  Can I ask her?
23    MR. PEREZ:  Sure.
24  **A.**  My child is going to be staying with my family.  I am
04:15:04  25  willing to pay for whatever I have done wrong.  And so,

1  they told me they were going to put me in communication --

2          THE COURT:  I can't hear you, ma'am.  Ma'am.

3  **A.**  So then they told me they were going to put me into

4  communication with the FBI so that I could tell them

04:15:27   5  everything that had happened.

6          THE COURT:  That's much better.

7          THE INTERPRETER:  Thank you.

8          THE COURT:  Can you do that or --

9          THE INTERPRETER:  Yes, sir.  Is that better?

04:15:35  10          THE COURT:  Yes.

11          THE INTERPRETER:  Okay.  Thank you.

12  **Q.**  (By Mr. Perez)  So when the Mexican consulate said

13  they would put you in touch with the FBI, they then put

14  you in touch with Deputy Chapuseaux?

04:15:56  15  **A.**  Yes.

16  **Q.**  At that point, did you tell him what had happened to

17  you?

18  **A.**  Yes.  At first I didn't tell him everything.  Not

19  until about the second time that we met.

04:16:19  20  **Q.**  Why didn't you tell him the truth the first time?

21  **A.**  Because I didn't trust him.  I didn't trust anybody.

22  **Q.**  Okay.  And what made you trust him the second time

23  that you talked to him?

24  **A.**  It's that I still didn't trust him.  However, it was

04:16:55  25  down to either it being him or it being the other ones.

1    **Q.**  So that's -- you chose what you thought was a lesser

2    of two evils?

3    **A.**  I chose the person who would be doing justice for me

4    only.

04:17:27   5    **Q.**  Do you trust him now, ma'am?

6    **A.**  Yes.  A lot.  I believe in him.

7    **Q.**  So once you got to meet him, did you tell him your

8    whole story?  Once you got to trust him, did you tell him

9    your story?

04:17:56   10    **A.**  Yes.

11    **Q.**  And are you telling the members of the jury the truth

12    as to what happened to you?

13    **A.**  Yes.  I have no reason to lie to them.

14           MR. PEREZ:  I'll pass the witness, Your Honor.

04:18:20   15           THE COURT:  Okay.  I think we're going to have to

16    switch interpreters.

17           MR. FAZEL:  Yes, sir.

18           THE COURT:  By the way, ladies, if it would help

19    you do the interpreting we can get you a stool if we could

04:18:34   20    find it in the building.  Would that help you?

21           THE INTERPRETER:  No.  Thank you.

22           THE COURT:  All right.  I'll be glad.  I will

23    have to bring one from my house or the jury can bring one

24    from their house or something.  But, no, if it gets to the

04:18:46   25    point you need to, we'll work with it.  Okay?

1          THE INTERPRETER:  I understand, Your Honor.

2    Thank you.

3          THE COURT:  We do need you speaking into the mic

4    so everybody will hear.

04:18:54   5          THE INTERPRETER:  I will, Your Honor.  Thank you,

6    sir.

7          THE COURT:  Okay.

8          MR. FAZEL:  May I proceed, Your Honor?

9          THE COURT:  Yes.  Go ahead.

04:19:11  10          MR. FAZEL:  Thank you, Your Honor.

11                    **CROSS-EXAMINATION**

12    BY MR. FAZEL:

13    **Q.**   Ma'am, can you see me from where you are sitting?

14    **A.**   Yes.

04:19:21  15    **Q.**   My name is Ali Fazel.

16          THE INTERPRETER:  I am doing this simultaneously.

17    So you don't hear me.

18    **Q.**   (By Mr. Fazel)  You and I have never met, correct?

19    **A.**   No.

04:19:35  20    **Q.**   You and I have never spoken, correct?

21    **A.**   No.

22    **Q.**   I know this is very difficult, and I appreciate that.

23    I have some questions for you.  I'm a little confused.

24    And I would -- I'm going to ask you some questions.  If

04:19:51  25    you don't understand them, just let me know; and I'll

1    repeat myself.

2    **A.**    Yes.

3    **Q.**    Now, I speak a little Spanish.  So I might understand

4    you before the translator finishes.  So if we talk over

04:20:09    5    each other, I apologize.  Okay?

6    **A.**    Okay.

7    **Q.**    All right.  Now, because you and I have never spoken,

8    the information I have on you is what the government has

9    provided me.  Okay?

04:20:26   10    **A.**    Okay.

11    **Q.**    So let's start with some basics.  Prior to testifying

12    today you have met with the government, correct?

13    **A.**    Yes.

14    **Q.**    And when I say "the government," I mean the gentleman

04:20:40   15    sitting at this table, the lady and gentleman sitting at

16    this table.

17    **A.**    Yes.

18    **Q.**    The gentleman with the glasses who -- the gentleman

19    with the yellow shirt on.  I'm sorry.  Yes?

04:20:55   20    **A.**    Yes.

21    **Q.**    And the other gentleman that was asking the questions

22    before.

23    **A.**    Yes.

24    **Q.**    Okay.  And when they spoke to you, I'm sure they took

04:21:07   25    notes.

1    **A.**   Yes.

2    **Q.**   And from those notes they created reports, and from

3    those reports -- I read them.

4    **A.**   Yes.

04:21:20  5    **Q.**   I have also had the opportunity to look at your

6    immigration file.

7    **A.**   Yes.

8    **Q.**   Now, it's my understanding, and correct me if I'm

9    wrong, that you were able to obtain status.  That is, that

04:21:40  10   you are able to live in this country --

11    **A.**   Yes.

12    **Q.**   -- currently?

13    **A.**   Yes.

14    **Q.**   And one of the reasons is because you are assisting

04:21:51  15   the government in this case?

16    **A.**   Yes.

17    **Q.**   So they have assisted you with obtaining some

18    documents so that you can stay in this country?

19    **A.**   Yes.

04:22:06  20   **Q.**   Now, they or other people have obtained a lawyer for

21    you?

22    **A.**   Yes.

23    **Q.**   And that lawyer is helping you with the immigration

24    documents?

04:22:19  25   **A.**   Yes.

1    **Q.**  But if you don't mind me asking, is the lawyer here

2    today?

3    **A.**  No.

4    **Q.**  So what I want to do, if you don't mind, is I want to

04:22:37   5    talk to you about some of the declarations you made in the

6    immigration documents.  Okay?

7    **A.**  Yes.

8    **Q.**  Do you read the Spanish language?

9    **A.**  Yes.

04:22:54  10    **Q.**  Let me ask you some basic questions.  What is your

11    date of birth?

12    **A.**  January 14th, '83.

13    **Q.**  And you testified, if I'm not mistaken, that you

14    crossed into the country, the U.S., according to my notes,

04:23:20  15    in 2001, correct?

16    **A.**  Yes.

17    **Q.**  So -- and I'm terrible at math.  So in 2001, how old

18    were you?

19    **A.**  I don't know.

04:23:36  20        (Sotto voce discussion.)

21    **Q.**  (By Mr. Fazel)  I'm bad at math.  Somebody is going to

22    do math while I move on.  So when you crossed into the

23    country, correct me if I'm wrong, but you walked for about

24    two days and two nights, correct?

04:24:02  25    **A.**  Yes.

1   **Q.**   You became ill?

2   **A.**   Yes.

3   **Q.**   Let me back up.  I just had the math done.  You were

4   18 when you crossed; is that correct?

04:24:20   5   **A.**   I don't remember the time.

6   **Q.**   Well, I understand.  But if you were born in 1983 and

7   it's 2001, does that not make you 18?

8   **A.**   Yes.

9   **Q.**   So I want to make sure I'm not mistaken.  You were

04:24:47   10   clearly 18 years old when you entered the United States?

11   **A.**   When I entered the United States is '97.

12   **Q.**   But that's where I'm confused.  I'm a little confused.

13   You just testified under oath that you entered in 2001.  I

14   just asked you twice, and you said you entered in 2001.

04:25:22   15   And now you are telling me you entered in 1997.  Do you

16   see why I'm confused?

17   **A.**   What would you like me to say to you?  That's what you

18   said you found in the immigration papers.

19   **Q.**   Let me back up again.  I know you haven't testified

04:25:52   20   before.  That's why I asked you to let me know if you

21   don't understand my questions.  Okay?

22   **A.**   Okay.

23   **Q.**   The question was very simple.  You told the jury, the

24   ladies and gentlemen of the jury, that you crossed the

04:26:08   25   border in 2001 when this gentleman in front of you with

1 the white shirt and the green tie, Mr. Perez, was asking

2 you questions.

3     I asked you, again, is it correct that you entered the

4 country in 2001; and you said yes, correct?

04:26:32  5 **A.**   I didn't hear the question properly, and I didn't

6 answer it properly.

7 **Q.**   Okay.  But what about your date of birth?  Did you

8 answer that properly?

9 **A.**   That's the date I was born; but my parents changed the

04:26:58 10 date to January 14, '82.

11 **Q.**   Okay.

12 **A.**   Okay.

13 **Q.**   So you were truly born in 1982 or 1983?

14 **A.**   I was born in '83, but my parents changed my birthday

04:27:25 15 to '82.  That usually happens in Mexico.  It's common in

16 Mexico so you will start school at a certain time and so

17 that you can start working sooner.

18 **Q.**   Okay.  Let me move forward.  So when you entered the

19 country, whatever year that was, you walked for two nights

04:27:46 20 and two days; is that correct?

21 **A.**   I walked three days and two nights.

22 **Q.**   And then you said that you were -- that there is a

23 helicopter that crossed over, and everybody scattered; is

24 that true?

04:28:07 25 **A.**   Yes, sir.  I said that.

1  **Q.**  And then you walked over to the street or a highway of

2  some sort?

3  **A.**  Yes, sir.  And I threw myself down.

4  **Q.**  Okay.  And did the folks at the -- the people that

04:28:29  5  were transporting you or bringing you into the United

6  States, were they with you when you were on the street or

7  when you threw yourself on the street?

8  **A.**  No.  They weren't with me when I was on the highway.

9  I was there by myself.  And they arrived.  They arrived a

04:29:02  10  while after I had been throwing myself on the road and

11  cars would whiz by and nobody stopped.  Nobody paid

12  attention to me.  And after a while, they arrived.

13  **Q.**  Okay.  Do you remember earlier I told you that there

14  is a couple of times that you had spoken to other people

04:29:18  15  where they took notes?

16  **A.**  I'm sorry, sir?

17  **Q.**  Do you remember earlier in the testimony when I told

18  you that there are times where you spoke to other people,

19  sometimes for the government; and they took notes of that

04:29:31  20  conversation?

21  **A.**  Yes.

22  **Q.**  Do you recall telling anybody that you were so sick

23  that when the car arrived for you to jump into it you

24  couldn't run to it, and they just left you there?

04:29:57  25  **A.**  Yes, sir.

1    Q.   So again, I just want to be clear and make sure that I

2    understand your statement of what happened because it's

3    important to me.  Which is it?  Did they leave you?  Did

4    the coyotes leave you or were they there and you just

04:30:17    5    simply didn't jump into the truck?

6    A.   I didn't climb back onto the truck by myself.  They

7    helped me.  They helped me get on it.  I didn't jump on

8    it.

9    Q.   Did you ever tell anybody that you were so sick and

04:30:39   10    that when originally you were with a group of people, not

11    by yourself, and the coyotes came to pick everybody up

12    that the group just left you?  Did you say that?

13    A.   Yes.

14    Q.   So which one is it?  Which is true?

04:31:03   15    A.   I told them the truth.  I told them everything.  I

16    told them that I crossed by myself.  I crossed alone.

17    Along the road there were no people.  I crossed by myself.

18    When we were crossing, the coyote wasn't alone.  He was

19    taking along more people.

04:31:29   20    Q.   What was the name of the coyote?

21    A.   The rest of the people left.  They left me alone, not

22    the other people.

23    Q.   What was the name of the coyote?

24    A.   I don't remember his name.

04:31:43   25    Q.   How did you meet him?

1  **A.**  Because I arrived there to make a contract with him or

2  an arrangement.

3  **Q.**  When you say "there," where?

4  **A.**  At the border.

04:32:00  5  **Q.**  Okay.  Were you always at the border?

6  **A.**  I wasn't there all the time.  I was there at some

7  time.  I don't remember how long.

8  **Q.**  And you made a contract with the coyote?

9  **A.**  That he was to help me cross the river and cross the

04:32:29  10  border, and he was going to leave me there.  All I had

11  with me was $500.

12  **Q.**  It would be helpful if you would just listen to my

13  question and answer it, if you don't mind.  Is that okay?

14  **A.**  Yeah.

04:32:42  15  **Q.**  Kind of like you did with the prosecutor.

16        MR. PEREZ:  Your Honor, I object to that sidebar

17  comment, Your Honor.

18        THE COURT:  Sustained.

19  **Q.**  (By Mr. Fazel)  Did you make a deal with the coyote

04:33:02  20  where he agreed that you would take care of a family

21  member for him when you crossed?

22  **A.**  I don't remember having said that to him.

23  **Q.**  To whom, ma'am?  Saying that to whom?

24  **A.**  I don't remember saying that to anyone.

04:33:22  25  **Q.**  So whoever would indicate that would be mistaken?

A.   It's not that someone is mistaken.  It's just that
things happened so long ago, and I don't have good memory
for all that happened so long ago.  I don't want to
remember some of this.

04:33:49   Q.   I completely understand that.  I do appreciate that.
But because we are here in a criminal case there are
certain facts that are important.  So I'm going to ask you
to help me with them.  Okay?

A.   Yes.

04:34:05   Q.   And if you don't understand or don't remember, just
say "I don't understand" or "I don't remember."  Okay?

A.   Yes.

Q.   All right.  Because this is all traumatic, I'm sure
you remember the more traumatic parts of your event?

04:34:23   MR. PEREZ:  Your Honor, I object to him making
all these sidebar comments, Your Honor.  He just needs to
ask her questions, period.

THE COURT:  Sustained.

MR. FAZEL:  Your Honor, it's not a sidebar
04:34:32   comment.

Q.   (By Mr. Fazel)  You would agree with me that what
occurred to you is something that's traumatic in your
life, correct?

A.   Yes, sir.

04:34:41   Q.   And because it's so traumatic there are certain parts

1   of it that you certainly do remember?

2   **A.**   Yes.

3   **Q.**   You remembered all the things that you said about

4   Ms. Medeles, that's my client, right?

04:34:56   5   **A.**   Yes.  Not all of them, but I remember.

6   **Q.**   Now, you testified today under oath in front of the

7   jury that you came over here and whichever way and somehow

8   you got picked up by two people, correct?

9   **A.**   Yes.

04:35:17   10   **Q.**   And they took you straight to Houston?

11   **A.**   Yes.

12   **Q.**   Did you ever stop anywhere?

13   **A.**   Yes.  We did stop somewhere.  I don't remember where.

14   We stopped at a pharmacy to buy medicine.

04:35:37   15   **Q.**   But you went straight from the border to Houston?

16   **A.**   Yes.

17   **Q.**   Do you remember telling somebody that you stopped at

18   San Antonio?

19   **A.**   I just told you.  I don't remember where.  I just know

04:35:55   20   that we did stop.

21   **Q.**   Did you stop at a trailer home?

22   **A.**   Yes.

23   **Q.**   In San Antonio?

24   **A.**   I had just -- I had just arrived.  I didn't know the

04:36:14   25   places.  I don't know where we stopped, San Antonio or

1    elsewhere.

2    **Q.**  Yes, ma'am.  But I just asked you if you went straight

3    from the border to Houston; and you said, "Yes."  You

4    said, "I stopped at a pharmacy."  So which one is it?  Did

04:36:31    5    you stop at a pharmacy, or did you go to San Antonio and a

6    pharmacy?  I'm just trying to get the facts.

7    **A.**  I am only going to tell the truth.  I have not tried

8    to, actually, confuse my ownself.  The facts are there.

9    **Q.**  Yes, ma'am.  I'm just trying to get to the facts.  So

04:36:55    10    you got picked up somehow at the border.  We're not sure.

11    You traveled to Houston somehow; but we know it was

12    through Daisy and a gentleman named Juan, correct?

13           THE INTERPRETER:  May I ask you to repeat, sir,

14    please.

04:37:13    15    **Q.**  (By Mr. Fazel)  Sure.  But we know it's with Daisy and

16    a gentleman named Juan; is that correct?

17    **A.**  Juan and Daisy Oviedo.

18    **Q.**  By the way, did you have a friend in Mexico named

19    Daisy?

04:37:32    20    **A.**  No.

21    **Q.**  Okay.  Now, when you got to Houston, you testified

22    that you started working in a home where you were cooking

23    and cleaning?

24    **A.**  Yes.

04:37:49    25    **Q.**  And that the lady of the house was very mean to you?

Cross-Examination of XXXXXXXXXXXXXXXXXXXX   Vol 2                                 163

```
        1   A.   Yes.

        2   Q.   And she mistreated you?

        3   A.   Yes.

        4   Q.   And do you remember the name of the woman?

04:38:05 5   A.   No.

        6   Q.   When you got to Houston, did you -- let me back up.

        7   When you got to Houston, you stayed at an apartment?

        8   A.   Yes.

        9   Q.   And in that apartment it was just you?

04:38:21 10  A.   No.

       11   Q.   Were there other people?

       12   A.   Yes.

       13   Q.   And then after that you started working for this lady?

       14   A.   Yes.

04:38:31 15  Q.   Okay.  And you had -- about how long did you work with

       16   this lady, if you remember?

       17   A.   No, I don't remember how long.

       18        (Sotto voce discussion.)

       19   Q.   (By Mr. Fazel)  Okay.  And so when?  Was it a month?

04:38:52 20  Two months?  Do you remember?

       21   A.   I don't remember, sir.  I don't remember.

       22   Q.   Okay.  I understand.  And after that, then you moved

       23   to -- according to your testimony here today, you moved to

       24   a home -- another apartment?  Excuse me.

04:39:08 25  A.   Yes.  Apartment Number 8.
```

1  Q.  And in that apartment you -- it was the first time

2  that you had to engage in prostitution?

3  A.  Yes, sir.

4  Q.  Now, I am not a woman, obviously; but I'm assuming

04:39:28   5  that's a very traumatic experience for a woman?

6  A.  Yes.

7  Q.  Now -- and you've described this event, unfortunately,

8  to multiple people by now?

9  A.  Yes.

04:39:44   10  Q.  Okay.  Now, let me do it this way.  After you were --

11  after in that apartment, according to your testimony

12  today, you then moved on to a home, correct?  And that

13  home is where you say Ms. Medeles was there and was the

14  owner, correct?

04:40:14   15  A.  Tencha was her name.  I don't know the other name.

16  Q.  But I want to be clear, so that there is no

17  misunderstanding.

18          THE COURT:  A little bit louder, Counsel.

19          MR. FAZEL:  I'm sorry, Your Honor.  I don't want

04:40:27   20  you to say I'm screaming.

21  Q.  (By Mr. Fazel)  I want to be clear.  It was the

22  apartment and then the home belonging to Ms. Medeles,

23  correct?  Medeles, excuse me.

24  A.  Yes.

04:40:43   25  Q.  Now, so that I understand, would you agree with me

1   that you stayed in that apartment, the first apartment,

2   for a short period of time or a long period of time?

3   **A.**   You must understand that I don't know how long I was

4   in that apartment.  I really didn't care.  All I wanted

04:41:13   5   was to get out of there.

6   **Q.**   Okay.  However, we can agree with each other that you

7   went straight to the house that you claim -- that you say

8   Tencha owned?

9   **A.**   Yes.  From there we went straight to Tencha's house

04:41:32   10   because an accident had happened.  Melissa told her that

11   we had had an accident.

12   **Q.**   Okay.  So if you've previously told somebody that from

13   there you went to another location with a gentleman named

14   Charlie, would that be incorrect?

04:42:09   15   **A.**   I went directly from Apartment Number 8 to the place

16   where that lady was.

17   **Q.**   Okay.

18   **A.**   Yes, but -- yes, but I was with him.  I was with a guy

19   who was holding me hostage, and his name was Charlie.  And

04:42:38   20   I don't know who came first and who came afterwards.  I

21   know that I was being tossed around like a ball from here

22   to there.

23   **Q.**   Yes, ma'am.  I understand that, and that's why I ask

24   you.  Since these things are so traumatic, I want to make

04:42:51   25   sure we get the facts straight because I'm sure it's

1   important to you.  I know it's important to us.  So I'm

2   going to ask you again.

3       If during an interview with a government employee or a

4   government member here you said something differently,

04:43:08   5   that you said it didn't happen the way you are testifying

6   it went to this jury, that you didn't --

7   **A.**   I told them -- I told them the truth, and I'm telling

8   you the truth here today.  I'm only telling you what I

9   remember.

04:43:35  10   **Q.**   Okay.  Is your memory good?

11   **A.**   If you had been prostituted like I was and the things

12   that were done to me had been done to you, then your

13   memory would be pretty good to remember the bad things

14   that were done to you.

04:44:02  15           THE COURT:  Question, please.

16           MR. FAZEL:  Yes, sir.

17   **Q.**   (By Mr. Fazel)  So because your memory is so good, I

18   want to make sure we get the facts straight.

19           THE COURT:  Just make -- ask a question.

04:44:12  20           MR. FAZEL:  I'm trying to ask the question, Your

21   Honor.  I'm trying to be delicate about it.

22           THE COURT:  I understand that.  Ask your

23   question.

24           MR. FAZEL:  Yes, sir.

04:44:19  25   **Q.**   (By Mr. Fazel)  So when you tell people that you

1    didn't go straight to Ms. Medeles' house, that you

2    actually did other things before, which is correct?  What

3    you are testifying today, or what you said before?

4    **A.**   Don't you understand that I was going from hand to

04:44:43    5    hand.  What I'm telling you is that I don't remember the

6    dates.  I don't remember the dates.

7    **Q.**   If you told somebody else that after that you were

8    going to people's offices before you went to Las Palmas or

9    ever heard of Las Palmas, would that be accurate?

04:45:11    10    **A.**   I went to different places.  They would take me to

11    offices.  They would take me to hotels.  They would take

12    me to different places to -- so that I could prostitute

13    myself.

14    **Q.**   Yes, ma'am.  I understand that.

04:45:28    15    **A.**   (Witness speaking Spanish.)

16          THE INTERPRETER:  (addressing witness)  Stop.

17    **A.**   What do you want me to tell you?  How they made me

18    open my legs?  How they forced me?  How they cut me?  How

19    they -- the things that they did to me?

04:45:39    20    **Q.**   (By Mr. Fazel)  No, ma'am.  I just want to understand

21    what happened so that I can properly defend my client.

22    And what you're telling us is different than what you've

23    said before at three different occasions.  So I'm going

24    through the smaller ones before I get to the bigger ones.

04:46:02    25    All right?

1    Let me just say it this way:  You indicated through --

2  in direct examination that your debt was transferred to

3  Ms. Medeles.  Do you remember saying that?

4  **A.**  Yes, sir.

04:46:23  5  **Q.**  Okay.  Then during all this time that all these other

6  things that I have just talked about, Ms. Medeles had

7  nothing to do with that?

8  **A.**  No.  That had nothing to do with her.

9  **Q.**  She never took you to another apartment?

04:46:44  10  **A.**  No.  She didn't take me to another apartment.  She

11  took me to another hotel.

12  **Q.**  You testified about that.  We'll get to that in a

13  minute.  That's why I'm trying to do it in chronological

14  order.  During this time when you were taken to these

04:47:03  15  other locations, was it still the gentleman, Juan, that

16  was in charge of you?

17  **A.**  I was in the hands of Juan and Daisy and Charlie and

18  many other people.  The last person that took me to the

19  lady who is sitting there was Melissa Garcia and she --

04:47:44  20  and I stayed in her house.  I was living in her house.

21  **Q.**  Okay.  Let me just move forward then since we can't --

22  all right.

23    When you say you arrived at Ms. Medeles' house and you

24  say Ms. Garcia was living there, Melissa Garcia?

04:48:04  25  **A.**  Yes.

1    **Q.**   And you say that it was there that Ms. Medeles then

2    took you to Las Palmas?

3    **A.**   Yes.  (Speaking Spanish.)

4         MR. FAZEL:  I'm sorry, Your Honor.  I'm going to

04:48:22    5    have to object to nonresponsive at this point.

6         THE COURT:  Sustained.

7    **Q.**   (By Mr. Fazel)  Ma'am, if you'll just listen to my

8    questions and answer me, please.  When you swore an

9    oath -- do you know what an oath is?

04:48:34    10   **A.**   Yes.

11   **Q.**   Okay.  And like you did this morning, before you

12   testified before this jury, you took an oath.  Do you

13   remember that?

14   **A.**   Yes.

04:48:44    15   **Q.**   You swore to tell the truth?

16   **A.**   Yes.

17   **Q.**   Would you please tell me why in an affidavit to the

18   government of the United States for immigration purposes

19   you just failed to mention anything about being locked up

04:49:09    20   in Las Palmas?

21   **A.**   They didn't ask me, and they didn't tell me I had to

22   say that.

23        MR. FAZEL:  Do you have the Spanish version?

24        (Sotto voce discussion between counsel.)

04:49:38    25        MR. FAZEL:  May I approach, Your Honor?

1    THE COURT:  Yes, sir.

2    **Q.**  (By Mr. Fazel)  Ma'am, what I have put in front of you

3    is a Spanish translation of an affidavit that you gave

4    after your rescue to the folks in immigration.

04:50:11   5    THE COURT:  Pull it down some.  Yeah.

6    **Q.**  (By Mr. Fazel)  In that affidavit there is nothing

7    about you being locked up in Las Palmas?

8    **A.**  I did this -- I did this affidavit, but they didn't

9    ask me anything about Las Palmas.

04:50:39  10    **Q.**  There is nothing in there about your child being

11    stolen.  There is nothing about people having guns at Las

12    Palmas.  There is nothing about being a special clientele.

13    None of that is in there.

14    **A.**  It's not my fault that they didn't put it there.  It's

04:51:26  15    not my fault.  Did I have to say everything?

16    **Q.**  You don't think that the statements that we just

17    covered are important?

18    **A.**  Yes, they are important.  And I'm telling all the

19    truth.

04:51:41  20    **Q.**  There is nothing in the statements that you provided

21    to the government about somebody stealing your children or

22    your child.  That was in 2006.

23    **A.**  What would you like me to tell you now?

24    **Q.**  Well, let's cover something basic.  Your escape.  Do

04:52:10  25    you remember testifying about your escape?

1   **A.**   Yes.  I did declare it about how I escaped.

2   **Q.**   Well, the way you described it in your affidavit is a

3   little different than what you testified to.  Look at

4   page four.

04:53:21   5   **A.**   You said that there was nothing about Tencha, but here

6   Tencha is mentioned.

7   **Q.**   Oh, it is.  Just not the way you say it.

8   **A.**   (Speaking Spanish.)

9   **Q.**   Yes, ma'am.

04:53:42   10   **A.**   I'm testifying to everything that is up here.

11   **Q.**   If you would just answer my question.

12   **A.**   You ask me a question, and you don't want me to answer

13   the question that you asked me before.  You said that I

14   had not mentioned Tencha, and I do mention Tencha in here.

04:54:08   15   **Q.**   Yes, ma'am.  Could you tell us where it is that it

16   says you are locked up in a room?

17   **A.**   No.  It doesn't say that I was locked up, but they had

18   me locked up.

19   **Q.**   Could you tell us -- could you tell us where there is

04:54:42   20   mention of people holding guns?

21   **A.**   I don't know what they wrote here.  It was my

22   statement.  But what I lived through is what I'm telling

23   all of you.  I'm not lying to you.

24         MR. FAZEL:  May I approach, Your Honor?

04:55:20   25   **Q.**   (By Mr. Fazel)  Is that your signature?

1  **A.**  Yes.

2  **Q.**  Could you tell us in there that -- can you tell us

3  where it says that they stole your baby?

4  **A.**  (Speaking Spanish.)

04:55:46  5  **Q.**  And it's important.  I'm sorry.  Answer the question.

6  **A.**  It doesn't say that they stole my baby but they did

7  and I told them.  I told you.

8  **Q.**  You told the government?

9  **A.**  Yes, I told them.

04:55:59  10  **Q.**  They failed to put it in the report?

11  **A.**  I don't know.

12  **Q.**  And then your escape that you just told the jury

13  about, it's a little different in that affidavit?

14        THE INTERPRETER:  I'm sorry.  I can't hear you,

04:56:14  15  sir.

16  **Q.**  (By Mr. Fazel)  And the escape that you just described

17  to the jury, it's a little different in that affidavit,

18  isn't it?

19  **A.**  I escaped the way I'm telling you.

04:56:29  20  **Q.**  How about the way you met Adrian?

21  **A.**  Upstairs.

22  **Q.**  What about upstairs?

23  **A.**  I met him when he had sex with me.

24  **Q.**  Is that what your affidavit says?

04:57:50  25  **A.**  Yes.  I met a man at the club Las Palmas named Adrian

*Laura Wells, RMR, CRR - LauraWellsCSR@comcast.com*

1    Hernandez.

2    **Q.**   And you just told us you met him upstairs while you

3    were locked up?

4    **A.**   Yes, sir.  I was locked up upstairs at Las Palmas.

04:58:10   5    **Q.**   That's not what your affidavit says.

6    **A.**   The room where they had me locked up was upstairs at

7    Las Palmas.

8    **Q.**   You never came downstairs?

9    **A.**   No.  No.  I didn't go downstairs.  The clients came

04:58:30   10    upstairs.

11    **Q.**   Did you just say under direct testimony that you did

12    come downstairs?  Isn't that where the two people with the

13    guns were?

14    **A.**   Yes, sir.  I explained to the jury that I was

04:58:47   15    upstairs.  I was locked up upstairs in a room, and I had

16    sex with the clients.

17           MR. FAZEL:  Judge, I'm going to object to

18    nonresponsive.

19           THE COURT:  Overruled.  And?

04:59:00   20           THE WITNESS:  And he came upstairs once.  We had

21    no sex.  And the second time we did, the condom broke; and

22    I became pregnant.

23       And then they took me downstairs because I really had

24    no value for the lady because I was pregnant.  So they put

04:59:27   25    me downstairs to work.

1    And then, I would work out of fear.  I would sit down

2  there to work for the clients.  And I had agreed with him

3  that we would run away together.

4  **Q.**  (By Mr. Fazel)  None of that is in your affidavit?

04:59:52   5  **A.**  It's not in the affidavit, but that's what I lived

6  through.  And the lady really knows what happened, and I

7  told it to them.

8  **Q.**  And you don't --

9  **A.**  I have said the truth all the time.

05:00:09  10  **Q.**  You don't think it's important that you ought to put

11  in that affidavit that after you escaped they stole your

12  baby?  That's not important?

13  **A.**  Since that date they have been trying to help me with

14  my baby, trying to change my baby's name to my name.

05:00:44  15        MR. FAZEL:  Your Honor, if I could have a moment,

16  please.

17        THE COURT:  Okay.  By the way, it's now about a

18  minute after 5:00.  Is everybody okay to go to 5:30, or do

19  you want to take a short break?  You call it.  Do you want

05:00:59  20  to keep it going everybody?

21        JURORS:  (Nodding heads affirmatively.)

22        THE COURT:  Okay.  As the attorneys know, unless

23  you are up examining somebody, everyone else is free to

24  move in and out of the courtroom.

05:01:11  25  **Q.**  (By Mr. Fazel)  Now, in the affidavit, you say that

1   you ran into Juan Pena after you escaped?

2   **A.**   No.   I didn't meet Juan Pena after I escaped.

3   **Q.**   You don't say in the affidavit that you had to pay him

4   money because he ran into you and saw that --

05:01:33   5          THE INTERPRETER:   I'm sorry, sir?

6   **Q.**   (By Mr. Fazel)   You don't say in that affidavit that

7   you ran into him, Juan -- I'm sorry.

8          MR. FAZEL:   What is Juan's last name?

9          MS. STOELKER:   Pineda.

05:01:42   10   **Q.**   (By Mr. Fazel)   Pineda.   I'm sorry.   Juan Pineda, do

11   you know who I'm talking about?

12   **A.**   I don't know.

13   **Q.**   You don't say in that affidavit that you ran into him

14   and you were afraid that he would tell your husband and

05:01:54   15   you started paying him money?

16   **A.**   Where does it say that?

17   **Q.**   Middle paragraph, page four.   Isn't that what that

18   says?

19   **A.**   Repeat the question, please.

05:02:52   20   **Q.**   Isn't that what your affidavit that you signed under

21   oath says?

22   **A.**   Yes.

23          MR. FAZEL:   Judge, I have no other questions.   I

24   pass the witness.   Thank you.

05:03:51   25          MR. PEREZ:   Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. PEREZ:

**Q.**   I'm going to direct your attention to page three, the
last paragraph which runs into page four.  I want you to
read each sentence; but in a nutshell, tell the members of
the jury what that paragraph says.

**A.**   "After the incident, Carla took me to a house to a
woman with a name Melissa, Melissa Garcia.  Melissa told
me that I was free now, but it wasn't the truth.  Each
night he would take me to a nightclub called Las Palmas on
the 5700 block of Telephone Road.  They forced me to
dance, drink and have sex with men.  A woman called Tencha
would watch the girls really closely at the club.  There
were other young women forced to do the same thing that I
was doing.  Some men, Wicho, Martin, El Negro, El Brujo,
worked for Tencha.  They were constantly watching us to
make sure that we were doing what we were supposed to do.
The club had four hidden rooms."

        MR. PEREZ:  Not (speaking Spanish).

        THE INTERPRETER:  Thank you, sir.  Four hidden
rooms.

        MR. PEREZ:  Not four.

        THE INTERPRETER:  Oh, no.  Hidden rooms.

**A.**   "Stairs that went up and full of beds.  I was forced
every night to have sex with men in the room.  Melissa was

 1   the one that collected the money.  I never had any money

 2   that was mine.  I prayed to God every night asking him to

 3   please help me.

 4       "I met a man at the club Las Palmas, Adrian Hernandez,

05:07:12  5   who later on became my husband."

 6   **Q.**  (By Mr. Perez)  In that paragraph you also said that

 7   he helped you escape?

 8   **A.**  Yes.

 9   **Q.**  And then, explain to the members of the jury after you

05:07:23 10   escaped what is this about Juan Pineda, you saw him

11   driving in a black car and about this poor relative that

12   he had no money and you didn't tell your husband.  Explain

13   that to the members of the jury.

14   **A.**  Later on, after I escaped from Melissa Garcia --

05:08:03 15   **Q.**  I know what that says.  What I'm saying is did you

16   tell -- it says here you didn't tell your husband you were

17   a prostitute.  Explain that to the members of the jury,

18   please.

19   **A.**  I didn't tell my husband that I had false papers.  He

05:08:22 20   was not my husband right then.  And I -- neither did I

21   tell him that I was -- that I was prostituting myself with

22   the other men.

23       When he came upstairs, he thought that I was doing

24   private dancing.  And I always made him believe that

05:08:47 25   that's what I was doing, private dancing.  And he said

05:09:13

1   that when he knocked on the door he was looking for a

2   prostitute.  But when I was in the room with him, I would

3   tell him I don't do this; and he believed me.  And the

4   first time he believed me, and we didn't do it.  The

5   second time we did, and the condom broke.

6       When Juan Pineda found us in the car, I asked him.  He

7   was going to tell you that -- he was going to tell him

8   that I had been a prostitute but not at that place.  That

9   in the past I had.  A long time ago, not right then.

05:09:44

10      I was afraid of that, that the only thing that -- the

11  only good thing that had come into my life I would lose.

12  **Q.**  Let me ask you this:  This affidavit that Mr. Ali is

13  referring to was done in 2003; is that right?  When you

14  met Mr. Chapuseaux, that was in 2006.  And again, when you

05:10:16

15  met him, did you tell him the truth?

16  **A.**  Yes.  When I spoke with him, I told him the truth.  I

17  remember that I said at the beginning I didn't trust him

18  so much.  And I told him things little by little.  And now

19  I'm telling you the way that things really were.  And even

05:10:47

20  if the gentleman wants to change things, the facts are

21  there.  And I can go to the place to the --

22          MR. FAZEL:  I'm sorry.  I apologize.

23          THE COURT:  Hold on.  Yes, sir.

24          MR. FAZEL:  Your Honor, at this point I'm going

05:11:02

25  to have to object.  It's a narrative.  Nonresponsive.

```
 1              THE COURT:  Sustained.  Question and answer,
 2    please.
 3    Q.   (By Mr. Perez)  Okay.  Let me hand you what's been
 4    marked and introduced into evidence --
 5              THE COURT:  Do you need the screen down?
 6              MR. PEREZ:  Yes, Your Honor, please.  Thank you.
 7    Q.   (By Mr. Perez)  Government P-10, P-10, Peter 10.
 8              THE COURT:  It was on.  Did you have the white
 9    square in the middle?
10              MR. MAGLIOLO:  I think I turned the ELMO off.
11              THE COURT:  They need to switch to the computer?
12    What do you want?  Do you want the computer?
13              MR. PEREZ:  I want the screen, yes, Your Honor.
14              THE COURT:  No.  Do you want the computer?
15              MS. POUNCEY:  Yes.
16              THE COURT:  You want the computer.  All right.
17    Hang on a second.  Hang on one second.  It's either one or
18    the other.  There it is.
19    Q.   (By Mr. Perez)  Tell the members of the jury what is
20    depicted in Government Exhibit Number 10.
21    A.   This is a room where I was locked up, and next door
22    there was a small room.
23    Q.   As you face the picture.  Okay.
24    A.   It's the small room that I would --
25    Q.   To the left of the picture?
```

05:11:11

05:11:35

05:11:56

05:12:12

05:12:36

```
      1  A.   That I would have sex with the men --
      2  Q.   Go ahead.
      3  A.   -- when the clients paid the price that the lady asked
      4  for.  Here there was a small window this size.
05:12:57  5  Q.   Okay.  Hold on.
      6  A.   You couldn't escape from there.
      7  Q.   Okay.  I think you pointed there is, like, a curtain
      8  in this area?  Is that where you pointed?
      9  A.   Yes.
05:13:08 10  Q.   And is that the room you described as being locked in
     11  that room to Deputy Chapuseaux?
     12  A.   Yes.
     13  Q.   Now, Government Exhibit P-11, what is depicted in
     14  Government P-11?
05:13:27 15  A.   This is the small room, the inside where I had sexual
     16  relations.
     17  Q.   Is that the room next to the room where you were
     18  locked up?
     19  A.   Yes.  It belongs to the same room.
05:13:46 20  Q.   Government P-71, can you identify what is depicted on
     21  Government Number 71?
     22  A.   Yes.
     23  Q.   What is it?
     24  A.   It's the doors of Las Palmas.
05:14:07 25  Q.   When you talk about Las Palmas, that's the Las Palmas
```

1  that was owned by Tencha?

2  **A.**  Yes.

3  **Q.**  Okay.  Now, you described some accident with Melissa.

4  Can you amplify on that, please?

05:14:30  5  **A.**  I'm sorry, sir?

6  **Q.**  It was an accident involving Melissa?

7  **A.**  No, not an accident that happened with Melissa.

8  **Q.**  What happened?

9  **A.**  It's an accident that happened with me when I told her

05:14:51  10  that this man called -- that the man called Wicho had hit

11  me, when he hit me when I asked for help because somebody

12  had bitten my sex, had bitten me; and I was in bad shape.

13       They took me to a clinic where they were going to

14  check me.  They asked me what had happened to me.  I had

05:15:30  15  to tell what had happened because I was hurt in my

16  intimate part.  And they said they would not take care of

17  me because they need my mother to be present to consent.

18  **Q.**  Who had taken you to the clinic?

19  **A.**  First Melissa and then that lady.

05:15:57  20  **Q.**  When you say "that lady", you mean Tencha?

21  **A.**  Yes.

22       THE COURT:  We have about 15 minutes left.  Can

23  you wrap up this witness?

24       MR. PEREZ:  Yes, Your Honor.

05:16:08  25  **Q.**  (By Mr. Perez)  So Tencha showed up at the clinic and

1    posed as your mother?

2         THE INTERPRETER:  I'm sorry, sir?

3    **Q.**  (By Mr. Perez)  So Tencha showed up at the clinic and

4    posed as her mother; is that correct?

05:16:19    5    **A.**  Yes.  And they gave me a vaccine.  They asked what had

6    happened.  She said it was my boyfriend who had mistreated

7    me, that she had told me to get away from him and that I

8    had not done that.

9    **Q.**  Was that a lie that she told the clinic, ma'am?

05:16:50   10    **A.**  Of course.  My boyfriend had not done that.  That was

11    a lie.  It was a client who had bitten me.

12    **Q.**  And Tencha told them that story?

13    **A.**  Yes.  She said it was my boyfriend.

14    **Q.**  Now, you said you made an error when you said you

05:17:09   15    entered in 2001 to the United States?

16    **A.**  Yes.  I made a mistake when I said that because --

17    yes, because I came in -- which I am nervous and when I

18    said I came in 2001, I meant that I came into her house in

19    2001.  I'm nervous because she is looking at me, and she

05:17:41   20    is laughing at me.

21    **Q.**  When did you enter the United States?

22    **A.**  In '97.

23    **Q.**  You mentioned that your true birthday, as far as you

24    know, is when?

05:18:03   25    **A.**  My birthday is January 14th, 1983.

1    **Q.**  And the other date is?

2    **A.**  And the other date is January 14th, '82.

3    **Q.**  The true date of birth, as far as you know, is '83; is

4    that correct?

05:18:19    5          THE COURT:  Okay.  We have been over that.  Keep

6    moving, please.

7          MR. PEREZ:  Okay, Your Honor.  I have no further

8    questions, Your Honor.

9          THE COURT:  Thank you.  Counsel?

05:18:26    10          MR. FAZEL:  I do, Your Honor.  I know there is a

11   5:30 limit.

12          THE COURT:  Go on.

13          MR. FAZEL:  Go on?

14          THE COURT:  In other words, we're going to

05:18:34    15   terminate this witness' testimony, excuse her or

16   whatever --

17          MR. FAZEL:  Yes, sir.

18          THE COURT:  -- in about 11 minutes.

19          MR. FAZEL:  Yes, sir.

05:18:40    20                    **RECROSS-EXAMINATION**

21   BY MR. FAZEL:

22   **Q.**  Isn't it true that you told the government that you

23   went to Magnolia Clinic, as you are describing to the

24   jury, before Ms. Medeles was even involved in your life?

05:19:04    25   **A.**  Ms. Medeles went with me or whatever her name is.

1  Tencha went with me.

2  **Q.**  So the report of 2006 is incorrect, and you are

3  telling the truth today?

4  **A.**  (Speaking Spanish.)

05:19:20  5      MR. PEREZ:  Hold on.  As far as the government

6  report being incorrect and him crossing with a government

7  report to this witness, it's totally incorrect, Your

8  Honor.

9      THE COURT:  Rephrase it.

05:19:29  10      MR. FAZEL:  Yes.

11  **Q.**  (By Mr. Fazel)  So if there is a report saying

12  something completely different than what you are

13  testifying to this jury about, that report is incorrect;

14  and you are telling the jury today --

05:19:38  15      MR. PEREZ:  Improper predicate, Your Honor.

16      THE COURT:  Overruled.  If there is a report.

17  **A.**  You can look for the reports from the clinic, and you

18  will find out that Ms. Tencha was there with me.  You can

19  look for the other things that I have said, and you will

05:20:00  20  find out that it is the truth.  You can take me upstairs

21  to the room and I can tell you where it happened for the

22  first time and where the other things happened and I can

23  tell you everything.

24  **Q.**  (By Mr. Fazel)  Let's talk about the --

05:20:18  25      THE COURT:  Hold it a second.  No.  Next

1    question.

2            MR. FAZEL:  Yes, Your Honor.

3    **Q.**  (By Mr. Fazel)  Let's talk about this since the

4    prosecutor brought it up.  Your affidavit, your sworn

05:20:30    5    affidavit prior to coming and testifying, says quote --

6    well, I won't quote it.  It clearly says that Melissa

7    Garcia was the person who was in charge of you, correct?

8    **A.**    Yes.  She was in charge of me.

9    **Q.**    And you testified earlier, ma'am, that it was

05:20:54    10    Ms. Medeles that was getting the money for your

11    prostitution.  Do you remember that?

12    **A.**    Because she sold me to her.  She passed me on to her.

13    **Q.**    The problem is that's not what you say in this

14    affidavit because in this affidavit you claim that

05:21:11    15    Ms. Melissa Garcia is the one that's getting the money.

16    **A.**    She would receive the money from what I did, and then

17    the lady who is sitting there would get the money.

18    **Q.**    Are you telling us that the gentleman that became your

19    husband went upstairs the way you are describing it, saw

05:21:37    20    you in a locked room, saw everything that you are saying,

21    and had no idea that you were engaging in prostitution?

22    **A.**    He was coming for sex but -- he came for sex, but I

23    told him that I wasn't there for that.  Then he asked me,

24    "Why are you coming to these rooms?"

05:22:06    25            MR. FAZEL:  Objection, nonresponsive.

1          THE COURT:  Then what?

2          THE WITNESS:  Did you think that he didn't ask me

3    that question?

4          THE COURT:  Hold on a second.  We're going to

05:22:13    5    have to go yes or no.  All right.  Now, ma'am, if you

6    can't answer a question yes or no, just say so.  Okay.  He

7    is going to ask you yes or no questions.  All right.  It

8    will go a lot quicker that way.  Go right ahead.

9    **Q.**   (By Mr. Fazel)  Are you telling this jury the way you

05:22:31   10    are describing your situation in Las Palmas that your

11    husband had no idea when you two escaped that you were

12    engaged in prostitution?  Is that what you are telling

13    this jury?

14    **A.**   Yes.  I said he had no idea.

05:22:54   15    **Q.**   And are you telling this jury that afterwards you ran

16    into your -- the gentleman who actually brought you over

17    or brought you to Houston and he threatened to tell your

18    husband about your prostitution and you continued to pay

19    him money?

05:23:15   20    **A.**   Yes.

21    **Q.**   So that part of your affidavit is correct?

22    **A.**   I gave him money, yes.  I gave him money.

23    **Q.**   Yet you never brought that up in direct examination,

24    correct?  It's not in any of these government reports?

05:23:41   25    **A.**   I don't know if they put it there or not.

1    Q.   And the other part of the affidavit that talks about

2    who actually did what at Las Palmas has nothing to do --

3    does not mention guns?

4            MR. PEREZ:  Objection, Your Honor.  That's

05:23:54   5    repetitious.  We have gone over that before, Your Honor.

6            THE COURT:  Sustained.

7            MR. FAZEL:  I'd like to admit the affidavit into

8    evidence, Your Honor.

9            MR. PEREZ:  Objection.  He clearly knows it's not

05:24:03   10   admissible into evidence, Your Honor.

11           MR. FAZEL:  She can prove it up.

12           THE COURT:  Do you object?

13           MR. PEREZ:  You know what, Your Honor, I don't

14   object.

05:24:08   15           MR. MAGLIOLO:  We don't object, Your Honor.  We

16   want it in evidence.

17           THE COURT:  Okay.  It is marked as what, then?

18           MR. FAZEL:  Defendant's Exhibit Number 1.

19           THE COURT:  Defendant's Exhibit Number 1 is

05:24:16   20   admitted in evidence.  The jury will have it in evidence.

21           MR. FAZEL:  Pass the witness, Your Honor.

22           THE COURT:  Defendant's Exhibit Number 1.  I need

23   to put this down so we keep it in the record.  Thank you.

24   You may step down.  You are excused.  You are free to

05:24:31   25   leave.

05:24:48

1    Ladies and gentlemen, it's 5:25.  I think it's about

2 time.  We'll adjourn.  We'll have a full day tomorrow.

3 We'll see you back ready to go at 10:00 a.m. tomorrow.

4 Thank you and good afternoon.

5         THE MARSHAL:  All rise for the jury.

6     (Jury exited courtroom at 5:24 p.m.)

7         THE COURT:  I think we have got it all.

8     (Proceedings adjourned at 5:24 p.m. and continued in

9 Volume 3.)

10 *Date: September 3, 2015*

11                **COURT REPORTER'S CERTIFICATE**

12     *I certify that the foregoing is a true and correct*

13 *copy of the transcript originally filed with the clerk of*

14 *court on September 3, 2016, incorporating redactions of*

15 *personal identifiers requested by Court Order, in*

16 *accordance with Judicial Conference Policy.  Redacted*

17 *characters appear as a black rectangle in the transcript.*

18

19            */s/ Laura Wells*

20     *Laura Wells, CRR, RMR*

21

22

23

24

25