1   **UNITED STATES DISTRICT COURT**
    **SOUTHERN DISTRICT OF TEXAS**
2   **HOUSTON DIVISION**

3

    UNITED STATES OF AMERICA          *    4:13-CR-00628-1
4                                     *
    VS.                               *    9:07 a.m.
5                                     *
    HORTENCIA MEDELES-ARGUELLO        *    APRIL 17, 2015
6
                    **REDACTED TRIAL ON MERITS**
7             **BEFORE THE HONORABLE DAVID HITTNER**
                         **AND A JURY**
8               **Volume 5 of 10 Volumes**

9   *********************************************************
    This transcript has been furnished at public expense under
10  the Criminal Justice Act and may be used only as
    authorized by Court Order.  Unauthorized reproduction will
11  result in an assessment against counsel for the cost of an
    original and one copy at the official rate.  General Order
12  94-15, United States District Court, Southern District of
    Texas.
13  *********************************************************

14  **APPEARANCES:**

15  **FOR THE UNITED STATES OF AMERICA:**
    Mr. Ruben R. Perez
16  Mr. Joseph C. Magliolo
    Assistant United States Attorney
17  1000 Louisiana
    Suite 2300
18  Houston,, Texas 77002
    (713) 567-9344
19
    **FOR THE DEFENDANT, HORTENCIA MEDELES-ARGUELLO:**
20  Mr. Ali R. Fazel
    Scardino and Fazel
21  1004 Congress
    Third Floor
22  Houston,, Texas 77002
    (713) 229-9292
23

24

25

*Laura Wells, RMR, CRR - LauraWellsCSR@comcast.com*

1              **APPEARANCES (continued)**

2    **FOR THE WITNESS, JUAN MANUEL CEPEDA:**
     Ms. Lourdes Rodriguez
3    Attorney at Law
     300 Fannin Street
4    Suite 220
     Houston, Texas   77002-2038
5    (713) 222-8638

6    **FOR THE WITNESS, JUAN CARLOS MUNOZ:**
     Mr. Jimmy Ardoin
7    Ardoin Law
     2118 Smith Street
8    Houston, Texas   77002
     (888) 933-3384
9
     **INTERPRETERS:**
10   Mr. Ramon Del-Villar
     Ms. Linda Hernandez
11   Ms. Graciela Dachman
     Mr. Gregorio Ayala
12
     Court Reporter:
13   Laura Wells, RPR, RMR, CRR
     515 Rusk, Suite 8016
14   Houston, Texas 77002

15

16   Proceedings recorded by mechanical stenography.

17   Transcript produced by computer-assisted transcription.

18

19

20

21

22

23

24

25

1                           **VOLUME 5**
                         **(Trial on Merits)**
2                                                          Page
  April 17, 2015
3
  WITNESSES                                                Page
4
  **MARC DELACERDA**
5        Direct Examination By Mr. Magliolo                 4

6  **JOSE SALAZAR**
         Direct Examination By Mr. Magliolo                22
7        Cross-Examination By Mr. Fazel                     31

8  **JORGE ANTONIO TELOXA-BARBOSA**
         Direct Examination By Mr. Perez                    33
9        Cross-Examination By Mr. Fazel                     47
         Redirect Examination By Mr. Perez                  57
10       Recross-Examination By Mr. Fazel                   59

11 **LUCY TAN**
         Direct Examination By Mr. Magliolo                 71
12
  **PIERRE PERRY**
13       Direct Examination By Mr. Magliolo                113
         Cross-Examination By Mr. Fazel                    114
14
  **LUCY TAN**
15       Direct Examination By Mr. Magliolo                119
         Cross-Examination By Mr. Fazel                    129
16       Redirect Examination By Mr. Magliolo              142
         Recross-Examination By Mr. Fazel                  143
17       Redirect Examination By Mr. Magliolo              145
         Recross-Examination By Mr. Fazel                  145
18
  **CONSTANCE ROSSITER**
19       Direct Examination By Mr. Magliolo                148

20                                                          Page

21 Court Reporter's Certificate....................        160

22

23

24

25

1                          **PROCEEDINGS**

2                THE COURT:  Call the jury in, please.

3                THE MARSHAL:  All rise.

4          (Jury entered courtroom at 9:06 a.m.)

09:07:04  5                THE COURT:  Thank you.  Be seated.  All right.

6    Call your next witness.

7                MR. MAGLIOLO:  Officer Marc Delacerda, Your

8    Honor.

9                THE COURT:  What is he with?  HPD?

09:07:28  10                MR. MAGLIOLO:  Yes, Your Honor.

11                THE COURT:  Raise your right hand to be sworn.

12          (Witness sworn by the case manager.)

13                CASE MANAGER:  Thank you.  You may have a seat.

14                THE COURT:  Go right ahead.

09:07:59  15                MR. MAGLIOLO:  Thank you, Your Honor.

16                          **MARC DELACERDA,**

17    having been first duly sworn, testified as follows:

18                      **DIRECT EXAMINATION**

19    BY MR. MAGLIOLO:

09:07:59  20    **Q.**  Please state your name for the ladies and gentlemen of

21    the jury.

22                MR. FAZEL:  Very, very briefly I want to approach

23    on a matter.

24          (Proceedings held at sidebar.)

09:08:12  25                MR. FAZEL:  I'm sorry, Judge.

             1              THE COURT:  Hold it.  Let everybody come up.

             2    Okay.

             3              MR. FAZEL:  Judge, there was a motion in limine

             4    in the very beginning of this case regarding -- I don't

09:08:24     5    remember if we've lodged it or not.  It's regarding drug

             6    activity.

             7              THE COURT:  It's concerning what?

             8              MR. FAZEL:  Drug activity in the location.

             9              THE COURT:  All right.  Motions in limine, do you

09:08:33    10    have it here?  Hang on.  My notes.  Do you have my notes?

            11    Hold on.  They are probably over here.

            12              MR. MAGLIOLO:  I can solve it, Your Honor.

            13              THE COURT:  What is the motion in limine?

            14              MR. FAZEL:  There might be some discussion about

09:08:54    15    this officer is involved in some kind of interdiction-type

            16    activity where they go raid these types of places.  TABC

            17    is involved.  Drugs are involved.

            18              THE COURT:  Never mind.  I have got it, Jordan.

            19    I have got it right here.

09:09:04    20              MR. FAZEL:  So my position is --

            21              THE COURT:  Which motion is it?

            22              MR. FAZEL:  Honestly, I don't remember.

            23              THE COURT:  Well, here it is.  Which one?

            24              MR. FAZEL:  Let me lodge it now, Judge.  I don't

09:09:17    25    remember.  My position is I would ask the Court not to

1    allow any testimony regarding any type of statements

2    regarding drug activity because it's not relevant to the

3    case at all.

4              THE COURT:  What do you think?

09:09:28    5              MR. MAGLIOLO:  I'm good with that, Judge.  I have

6    told him.  I want to make sure so we don't have --

7              THE COURT:  What is his rank?  Is he an officer?

8              MR. MAGLIOLO:  Yes.

9              THE COURT:  What was he doing then?

09:09:40    10              MR. FAZEL:  Was he with vice?

11              MR. MAGLIOLO:  It was vice.

12              THE COURT:  What is the officer's name?  Marc?

13              MR. MAGLIOLO:  It's Marc, M-a-r-c, Delacerda.  I

14    will get him to spell it.  It is the common spelling of

09:09:49    15    Delacerda, I guess.

16              THE COURT:  D-e-l-a-c-e-r-d-a?

17              MR. FAZEL:  Yes, Your Honor.

18              THE COURT:  Marc.

19              MR. MAGLIOLO:  May I have just a second with him

09:10:27    20    to instruct him on this?

21              THE COURT:  Yes.

22         (Proceedings concluded at sidebar.)

23              MR. MAGLIOLO:  We're ready, Your Honor.

24              THE COURT:  Go.

09:10:31    25    Q.  (By Mr. Magliolo)  Again, state your name for the

Direct Examination of Marc Delacerda                    Vol 5 - 7

1   ladies and gentlemen of the jury.

2   **A.**   Marc Anthony Delacerda.

3   **Q.**   And how do you spell Marc?  It's a little different

4   spelling of Marc.

09:10:38   5   **A.**   Yeah, M-a-r-c.

6   **Q.**   And spell Delacerda for the court reporter.

7   **A.**   D-e-l-a-c-e-r-d-a.

8           THE COURT:  Hold it a second.  Pull the

9   microphone up and in, please.  No, up and in.  Up.  Move

09:10:52   10   it up a little bit.

11          THE WITNESS:  Is that good?

12   **Q.**   (By Mr. Magliolo)  How are you employed?

13   **A.**   With the Houston Police Department.

14   **Q.**   How long have you been with the Houston Police

09:11:02   15   Department?

16   **A.**   About eight years.

17   **Q.**   What is your current assignment?

18   **A.**   I work in the narcotics division.

19   **Q.**   I'm going to direct your attention back to October the

09:11:17   20   1st of 2012.  And were you -- you were, obviously, an HPD

21   officer at that time?

22   **A.**   Yes, sir.

23   **Q.**   Did you -- were you called to investigate some

24   occurrences at a nightclub here in Houston?

09:11:40   25   **A.**   Not necessarily called but we usually go up to that

Direct Examination of Marc Delacerda          Vol 5 - 8

1   area over there.

2   **Q.**   Did you go to the area of a nightclub here in Houston?

3   **A.**   Yes, sir.

4   **Q.**   And do you recall the name of that nightclub?

09:11:51   5   **A.**   Las Palmas.

6   **Q.**   And do you recall its location?

7   **A.**   Yes.  It's 5618 Telephone Road.

8   **Q.**   And is that subject to the jurisdiction of the Fifth

9   Circuit, the Southern District of Texas?

09:12:05   10   **A.**   Yes, sir.

11   **Q.**   About what time did you arrive there, if you recall?

12   **A.**   About 3:30 in the morning.

13   **Q.**   And was there activity in the parking lot?

14   **A.**   Yes.

09:12:17   15          THE COURT:  Hold it one second.  Okay.  Go right

16   ahead.  Now go on.

17   **Q.**   (By Mr. Magliolo)  And what action did you take, based

18   upon the activity you saw in the parking lot?

19   **A.**   Well, when we entered the nightclub there was people

09:12:36   20   consuming alcohol about 3:30 in the morning, way past the

21   hours of consumption.  So we entered the nightclub to, you

22   know, see who all was drinking.  We could see people

23   drinking outside, you know, outside the door; and as we

24   were walking in, you could see people drinking.

09:12:52   25   **Q.**   What would have been the cutoff of drinking alcohol in

1  a club on that particular evening?

2  **A.**   2:15 in the morning.

3  **Q.**   So when you went into the club did -- what did you

4  see?

09:13:06  5  **A.**   There were several males hanging around outside; and

6  there was also several women, probably 20 or more women

7  than there were males inside.  The males were drinking.

8  And as usual with places like that that consume alcohol

9  after hours, as soon as we come in, the lights are coming

09:13:27  10  on and people are leaving.

11        THE COURT:  What lights are coming on?

12        THE WITNESS:  The lights inside the club or the

13  bar or establishment.

14  **Q.**   (By Mr. Magliolo)  So when you made your entry, the

09:13:38  15  lights were rather low?

16  **A.**   Yes.

17  **Q.**   Did you locate someone who appeared to have some

18  authority there in the club?

19  **A.**   Yes, a Mr. Camacho.

09:13:48  20  **Q.**   Did you have -- first, did you have a conversation

21  with him?

22  **A.**   Yes.  We were -- we asked him if he worked here; and

23  he said, yes.  And pretty much he was the only one that

24  said that he worked there.  And he was pretty much the

09:14:01  25  only one left once everyone kind of left.

1    **Q.**   Does that club have a first floor and a second floor?

2    **A.**   Yes.

3    **Q.**   Did something raise your concern about the second

4    floor?

09:14:14   5    **A.**   Yes.

6    **Q.**   And what was that?

7    **A.**   We could hear people shuffling around upstairs.

8    **Q.**   And did you ask the person who represented himself as

9    having some authority there at the club whether or not

09:14:25   10   there was anybody upstairs?

11   **A.**   Yes.

12   **Q.**   And did he give you conflicting answers?

13   **A.**   Yes.

14   **Q.**   And based on the conflicting answers, did you take

09:14:36   15   some action?

16   **A.**   Yes.

17   **Q.**   And what did you all do?

18   **A.**   We asked him for consent to search the upstairs.

19   **Q.**   And did he give you a consent?

09:14:43   20   **A.**   Yes.

21   **Q.**   And did you proceed to the upstairs area?

22   **A.**   Yes.

23   **Q.**   Would you explain to the ladies and gentlemen of the

24   jury what you found when you got there.  First, explain to

09:14:58   25   them whether or not you found any of the people that you

1   heard shuffling around up there?

2   **A.**   We did not find anyone up there.

3   **Q.**   Did you find something that indicated where they may

4   have all gone to?

09:15:09   5   **A.**   Yes.

6   **Q.**   And explain that to the ladies and gentlemen of the

7   jury.

8   **A.**   Well, once we -- do you want me to back up to when we

9   made entry into the door?

09:15:18   10   **Q.**   Sure.

11   **A.**   Well, once we talked to Mr. Camacho, he told us, okay,

12   there is a basically, he said, a trapdoor behind a

13   gambling machine.

14   **Q.**   And explain that to the ladies and gentlemen of the

09:15:30   15   jury.   What does that mean?

16   **A.**   Like a gambling machine.   It is just like an

17   eight-liner, some big, bulky machine.   I'm pretty sure you

18   all have seen those at some gas stations or something like

19   that.   They are pretty bulky.   They look pretty heavy.

09:15:43   20   This one in particular was gutted out, but it looked like

21   it was operational.

22       So when I went to push it, it kind of moved easier

23   than you would expect.   And there was a portion of the

24   wall that there was kind of a seam on the wall.   If you

09:15:58   25   kind of pushed on it, it gave in; and it was kind of built

```
 1    to blend in to give the appearance that there was not a
 2    door there.
 3    Q.  It was kind of like a secret door?
 4    A.  Yes.
 5    Q.  Go ahead, if you would, please.
 6    A.  Keep in mind that we know there was people up there
 7    and the known history of the location for --
 8              MR. FAZEL:  Objection, Your Honor.  I object as
 9    to narrative.
10              THE COURT:  Say that again.
11              MR. FAZEL:  I object as to narrative.
12              THE COURT:  Sustained as to unresponsive at this
13    point.  Just go to the next question.
14    Q.  (By Mr. Magliolo)  Without saying what history, did
15    you know some history about the location?
16    A.  Yes.
17    Q.  And hearing the noise and knowing the history, what is
18    a police officer thinking regarding -- or are you
19    concerned about safety?
20    A.  Yes.
21    Q.  So officer safety and the safety of people who might
22    be involved?
23    A.  Yes.
24    Q.  Okay.  So again, without addressing what you --
25    specifically what you knew about the location, what did
```

09:16:07
09:16:16
09:16:26
09:16:34
09:16:48

1  you all do?

2  **A.**  We forced entry in through the door.  There was one

3  door that -- there were two sets of doors.  We made entry

4  into the first door only to find a small, little,

09:17:05  5  cinderblock area like a hallway.  And then, there was a

6  second door.

7  **Q.**  And were you able, eventually, to gain access to the

8  upstairs?

9  **A.**  Yes.

09:17:13  10  **Q.**  And what did you find when you got up there?

11  **A.**  There was probably more than 10 to 15 rooms up there,

12  approximately, small rooms.

13  **Q.**  How were those small rooms equipped?

14  **A.**  About half of them had a little air-conditioner in

09:17:30  15  them.  Some of them -- every one of them pretty much had a

16  mattress in it, a dirty mattress or something in there.

17  It was littered with trash.  I mean the --

18          MR. FAZEL:  Nonresponsive, Your Honor.

19          THE COURT:  Overruled.

09:17:44  20  **Q.**  (By Mr. Magliolo)  Did you -- oh, you said that you

21  didn't find any of the people that --

22  **A.**  No, sir.

23  **Q.**  -- you heard up there originally?

24  **A.**  No, sir.

09:17:52  25  **Q.**  Did you figure out how they may have made their

Direct Examination of Marc Delacerda                    Vol 5 - 14

1  escape?

2  **A.**   Yes, sir.  On the far corner there was an open --

3  there was a stairwell that went down to the street on the

4  Telephone Road side, and the door was completely open.

09:18:08  5  **Q.**   So by the time you all got up there, is it fair to

6  assume that whoever was up there made their escape through

7  that back doorway out to the street?

8  **A.**   Yes.

9  **Q.**   Did you, yourself, either video what you have

09:18:21  10  described to the ladies and gentlemen of the jury or cause

11  it to be videoed?

12  **A.**   Yes.

13         MR. MAGLIOLO:  May I?

14  **Q.**   (By Mr. Magliolo)  I'm going to show you what's been

09:18:28  15  marked for identification as Government's Number 53 and

16  ask you if you recognize what it is?

17  **A.**   Yes.

18  **Q.**   What is it?

19  **A.**   It's the video or a copy of the video that I filmed.

09:18:40  20  **Q.**   And did you review this particular copy before your

21  testimony here this morning?

22  **A.**   Yes.

23  **Q.**   And does this video fairly and accurately depict what

24  it's intending to depict, what you just testified to the

09:18:51  25  jury about?

Direct Examination of Marc Delacerda                    Vol 5 - 15

1  **A.**  Yes.

2          MR. MAGLIOLO:  We would offer 53 into evidence,

3  Your Honor.

4          MR. FAZEL:  No objections, Your Honor.

09:18:57   5          THE COURT:  It's admitted.

6          MR. MAGLIOLO:  We would ask that we be allowed to

7  play 53 for the ladies and gentlemen of the jury.

8          THE COURT:  Go right ahead.

9          MR. PEREZ:  Move the board to the side.

09:19:23  10      (Government Exhibit Number 53 displayed to jury.)

11  **Q.**  (By Mr. Magliolo)  Now, what does this show?

12  **A.**  This is the door that we initially had went through

13  when we first arrived on the scene.  That's the bottom

14  floor where the -- basically, the bar area where people

09:19:40  15  were drinking inside.

16  **Q.**  Does this also have pool tables and some games?

17  **A.**  Yes, sir.

18  **Q.**  How was the wiring in there?

19  **A.**  The wiring, sir?

09:20:06  20  **Q.**  Electrical wiring.

21          MR. FAZEL:  Objection to relevance, Your Honor.

22          THE COURT:  Overruled.

23  **Q.**  (By Mr. Magliolo)  Do you have an opinion on the

24  electrical wiring and the way things were plugged in and

09:20:15  25  all?

1  **A.**   Probably going to start a fire, in my opinion.

2          THE COURT:  Now, is this downstairs?

3          THE WITNESS:  Yes, sir.

4  **Q.**   (By Mr. Magliolo)  And what is this area, if you

09:20:40  5  recall?

6  **A.**   This is one of the many rooms.  I'm not too sure if

7  this is where the -- let's see.

8          THE COURT:  Again, upstairs or downstairs?

9          THE WITNESS:  Downstairs, sir.

09:20:53  10  **A.**   This is -- that's the area where the trapdoor was.

11  That's after we had forced entry through the door.  That's

12  the little hallway I was describing.  And I believe that's

13  the second door.

14  **Q.**   (By Mr. Magliolo)  Is there a second half to the

09:22:02  15  video?

16  **A.**   Yes, sir.  And this is from the Telephone Road side

17  where the staircase -- where the door was wide open where

18  -- it was wide open when we came up.  That's going up to

19  the second floor.

09:22:29  20  **Q.**   That's where you think the folks went that were up

21  there made their departure?

22  **A.**   Yes, sir.

23  **Q.**   What is that there on the --

24  **A.**   It's a used condom.  The place was kind of littered

09:22:44  25  with that.

1    **Q.**   And does this show some of the small cubicles with the

2    beds in them?

3    **A.**   Yes, sir.

4    **Q.**   Would it be fair to say it looks like a while since

09:23:01  5    housekeeping had been there?

6    **A.**   Yes.  Yes, sir.

7    **Q.**   Does that appear to be the break room slash office?

8    **A.**   More or less.

9    **Q.**   Who is the gentleman we just panned by?

09:24:18  10    **A.**   That's Mr. Camacho.

11    **Q.**   Now, is that kind of a barred, kind of metal door

12    there to his left?

13    **A.**   Yes, sir.

14    **Q.**   You said there were between 10 and 15 of these

09:25:01  15    cubicles with beds in them?

16    **A.**   Just like an approximate, sir.  There was probably

17    well over that.

18    **Q.**   Now they are going down to an area that may be

19    considered -- well, are they going into an area that's

09:25:24  20    kind of like an attic area where there are some more

21    cubicles?

22    **A.**   Yes, sir.

23    **Q.**   That would be where there were some air-conditioning

24    units also sticking out of the little rooms?

09:25:35  25    **A.**   Yes, sir.

```
 1   Q.   We'll get to that in a second.  There is some of that
 2   wiring we were talking about.
 3        Is this that kind of attic area we were talking about
 4   that had more cubicles?
```
09:26:45
```
 5   A.   Yes, sir.
 6   Q.   Where the air-conditioners were?
 7   A.   Yes, sir.
 8   Q.   Was it somewhat of a maze?
 9   A.   Yeah.  We were -- that's why it took a little while to
```
09:27:59
```
10   film because when we thought we were done we found
11   something else.
12             MR. MAGLIOLO:  Pass the witness, Your Honor.
13             THE COURT:  Okay.
14             MR. FAZEL:  No questions, Your Honor.
```
09:28:08
```
15             THE COURT:  No questions.  Thank you, sir.  You
16   may step down.  You are excused.  You are free to leave.
17             THE WITNESS:  Thank you, sir.
18             MR. MAGLIOLO:  Let's talk to him first about it.
19             THE COURT:  All right.  Call your next witness.
```
09:28:42
```
20             MR. MAGLIOLO:  We need to approach just, again,
21   on a question about the witness, Your Honor.
22             THE COURT:  Okay.
23        (Proceedings held at sidebar.)
24             MR. MAGLIOLO:  Two questions.  One, he is parking
```
09:29:02
```
25   his car and getting ready to walk up.  So he is about 5
```

 1   minutes away.

 2        The second is this is the officer who made the arrest

 3   on the --

 4              THE COURT:  Don't block that.

09:29:14  5              MR. MAGLIOLO:  This is the officer who made the

 6   arrest on the defendant that we have discussed that

 7   resulted in a conviction.  The Court has indicated he does

 8   not want us to go into the conviction.

 9              THE COURT:  Right.

09:29:25 10              MR. MAGLIOLO:  What can we go into as far as the

11   arrest?

12              THE COURT:  What was the arrest for?

13              MR. MAGLIOLO:  Promotion of --

14              THE COURT:  Shh-hh.

09:29:34 15              MR. MAGLIOLO:  Promotion -- aggravated promotion

16   of prostitution.

17              MR. FAZEL:  Judge, may I say something?

18              THE COURT:  Give me some suggestions.

19              MR. FAZEL:  Here is my suggestion.

09:29:44 20              THE COURT:  No.  I need you to at least talk.

21              MR. FAZEL:  Here is my position.  The officer

22   that just testified talked about the rooms and gave the

23   description of it and very clearly outlined what the place

24   looked like.  This officer is not going to be able to add

09:29:56 25   anything to that testimony.  It's repetitive, and it's

Proceedings                                                     Vol 5 - 20

1   prejudicial.  There is no reason to put him on the witness

2   stand.  All he is going to talk about is when they went in

3   there and arrested her.  The fact is she got on deferred

4   adjudication out of Marc Carter's court and lived it down

09:30:11   5   fine.  It's not a final conviction in state court.

6             THE COURT:  She got deferred adjudication?

7             MR. FAZEL:  Yes, sir.

8             THE COURT:  I don't know how much that's going to

9   help you.

09:30:20   10             MR. FAZEL:  No.  I understand.

11             THE COURT:  No, not you.  Him.

12             MR. FAZEL:  Right.  And so, I just want -- there

13   is nothing but prejudicial stuff coming in.  There is

14   nothing that's going to add anything.  It is just all -- I

09:30:31   15   don't blame him for wanting to put it on.  I just object

16   because it's not relevant, and it's prejudicial.

17             MR. MAGLIOLO:  Obviously, all our testimony would

18   be argued as prejudicial.  I don't want to put in the

19   conviction.

09:30:40   20             THE COURT:  What do you want to get in?  That she

21   was there?

22             MR. MAGLIOLO:  Yes.

23             THE COURT:  And who else was there on the

24   premises?

09:30:45   25             MR. MAGLIOLO:  Yes.

1          THE COURT:  And that's it?

2          MR. MAGLIOLO:  And there were some arrests made.

3   I won't even go into the fact whether she was arrested or

4   not.

09:30:51   5          THE COURT:  I'll allow that if he needs to get

6   him on for some reason.  You say he is parking his car

7   right now?

8          MR. MAGLIOLO:  Yes, sir.

9          THE COURT:  We'll just sit here and wait on him.

09:31:00  10   I mean literally sit here and wait on him.  I don't want

11   to let the jury go back in there and I don't want them to

12   get packed back there for something.  I'll just tell them

13   about something.  I've got some stories.  Okay.

14          MR. MAGLIOLO:  It should be five minutes, Judge,

09:31:14  15   hopefully.

16      (Proceedings concluded at sidebar.)

17          THE COURT:  I'm going to go off the record unless

18   I say something that you think is prejudicial and I will

19   get back on the record and I'll repeat it.  How is that?

09:31:26  20          MR. FAZEL:  That's fine.

21          MR. MAGLIOLO:  I'm going to step out in the

22   hallway, Your Honor.

23          MR. FAZEL:  May I be excused, also, Your Honor?

24          THE COURT:  Yes.

09:33:01  25      (Discussion off the record.)

1          THE COURT:  Call your next witness.

2          MR. MAGLIOLO:  We call Officer Salazar, Your

3   Honor.

4          THE COURT:  Come right down the center, please,

09:33:19   5   sir.  Raise your right hand to be sworn.

6          THE WITNESS:  (Complying.)

7       (Witness sworn by the case manager.)

8          THE COURT:  Have a seat, please.

9          THE WITNESS:  Yes, sir.

09:33:40   10          THE COURT:  Sergeant, how do you spell your name,

11   please?

12          THE WITNESS:  J-o-s-e, S-a-l-a-z-a-r.

13          THE COURT:  Salazar?

14          THE WITNESS:  Yes, sir.

15                   **JOSE SALAZAR,**

16   having been first duly sworn, testified as follows:

17                  **DIRECT EXAMINATION**

18   BY MR. MAGLIOLO:

19   **Q.**   State your name for the ladies and gentlemen of the

09:33:56   20   jury, please.

21   **A.**   Jose Salazar, sergeant with the Houston Police

22   Department.

23          THE COURT:  You can move that back a little bit.

24   You are carrying just fine.

09:34:04   25   **Q.**   (By Mr. Magliolo)  How long have you been a Houston

Direct Examination of Jose Salazar                           Vol 5 - 23

```
      1  police officer?
      2  A.   19 years.
      3  Q.   Where are you currently assigned?
      4  A.   South Central Patrol Station, night shift.
09:34:12  5  Q.   What do you do as a patrol officer?
      6  A.   I'm a patrol supervisor.  We monitor the calls for
      7  service of the citizens of Houston, check by certain
      8  scenes that require on-scene supervision.
      9  Q.   Now, I'm going to direct your attention back to June
09:34:27 10  the 7th, 2007; and did you participate in an operation
     11  that occurred that day?
     12  A.   Yes, sir.
     13  Q.   Now, had you done preliminary investigation that lead
     14  up to that operation?
09:34:44 15  A.   Yes, sir.
     16          THE COURT:  You were also on that raid of the
     17  premises, correct?
     18          THE WITNESS:  Yes, sir.
     19          THE COURT:  Okay.
09:34:51 20  Q.   (By Mr. Magliolo)  Just brief -- and what -- where did
     21  the operation take place?
     22          THE COURT:  All right.  By the way, have you
     23  visited with the sergeant about what we talked about?
     24          MR. MAGLIOLO:  Yes, Your Honor.
09:35:01 25          THE COURT:  Okay.  Go on.
```

 1  **A.**   The incident took place in the city of Houston,

 2  southeast part, 5612 Telephone Road.

 3  **Q.**   (By Mr. Magliolo)  Was that at the Las Palmas brothel?

 4  **A.**   Yes, sir.

09:35:16   5  **Q.**   And that's within the jurisdiction of the Southern

 6  District of Texas, Houston, Texas?

 7  **A.**   Yes, sir.

 8  **Q.**   If you could, did the investigations that you did that

 9  lead up to this operation occur over a period of months?

09:35:34  10  **A.**   Yes, sir.

11  **Q.**   And did that investigation involve prostitution going

12  on at Las Palmas?

13  **A.**   Yes, sir.

14  **Q.**   And did you and your officers make several visits to

09:35:52  15  Las Palmas undercover prior to the operation?

16  **A.**   During that time I was an undercover assigned to the

17  Houston Police Department's Vice Division, and we got a

18  complaint.  That's how the investigation initiated.

19  **Q.**   Did you all make several visits in an undercover

09:36:10  20  capacity to that location?

21  **A.**   Yes, sir.

22  **Q.**   And briefly summarize what you and your fellow

23  officers found at that location during the course of that

24  several-month investigation.

09:36:21  25  **A.**   The citizens calling --

1    Q.   Without saying what you were told.  What you found

2    when you actually went into the location.

3    A.   After we entered the location in an undercover

4    capacity, it was a typical what they consider a

09:36:36    5    Mexican-Latino cantina.  A lot of youthful-looking girls

6    soliciting male customers there.  During the investigation

7    it was proven that prostitution was occurring from talking

8    with the patrons at the cantina and then eventually making

9    contact with a working girl who agreed to a sex date.

09:37:01   10    Q.   Now, did you personally make contact with one of the

11   women that were working there?

12   A.   Yes, sir.

13   Q.   And did you all discuss how much it was going to cost?

14   A.   Yes, sir.

09:37:12   15   Q.   And do you recall how much?

16   A.   There is always a -- the house always gets a fee for

17   the condom.

18        MR. FAZEL:  Objection, nonresponsive to the

19   question.

09:37:23   20        THE COURT:  Overruled.

21        MR. FAZEL:  The question was how much.

22        THE COURT:  I know.  I understand.  Go on.

23   A.   It was about $65 total package.

24   Q.   (By Mr. Magliolo)  Did you learn where the

09:37:37   25   prostitution was going to occur?

1  **A.**  Yes, sir.

2  **Q.**  Where was that?

3  **A.**  The same location, upstairs part of the building.

4  **Q.**  Did you accompany the girl upstairs?

09:37:46  5  **A.**  Yes, sir.

6  **Q.**  And did you actually pay the girl the money?

7  **A.**  Paid the fee, yes, sir.

8  **Q.**  And just how did that work, if you would explain to

9  the ladies and gentlemen of the jury?

09:38:00  10  **A.**  As you enter the -- they had a secret door with their

11  own guard there.  They would unlock the iron gate door.

12  You would go upstairs.  You would make contact like a

13  check cashing booth where you would pay the house their

14  fee.

09:38:18  15     And then the girl, the working girl would get her fee.

16  And then they would take you into these little rooms that

17  were divided.  They have mattresses and, of course, they

18  give you a condom, also, and napkins to clean up

19  afterwards.

09:38:33  20  **Q.**  Did you actually go into the room with the girl?

21  **A.**  Yes, sir.

22  **Q.**  And did you close the door, or did she close the door?

23  **A.**  Well, there was curtains.  In this particular area

24  there were just curtains that separated the room.  So

09:38:42  25  there was no -- it was like one big bedroom with curtains

1  that would divide each mattress.

2  **Q.**  Did you actually have sex with the girl?

3  **A.**  No, sir.

4  **Q.**  Would that be prohibited by your standard of

09:38:53  5  operation?

6  **A.**  Yes, sir.

7  **Q.**  Now, in order not to blow the undercover

8  investigation, do you come up with some excuse for not

9  completing the transaction?

09:39:03  10  **A.**  Yes, sir.

11  **Q.**  And what did you tell the girl in order to not,

12  obviously, complete the transaction but not to blow your

13  cover?

14  **A.**  I told her I was feeling guilty, and I couldn't do

09:39:18  15  this to my wife.  So I walked away and just let her keep

16  the money.

17  **Q.**  But did you stay -- was there a period of time that

18  you were permitted, based on the money you paid, to stay

19  in the room?

09:39:29  20  **A.**  They only allow you 15 minutes.  So I made sure to

21  stay the 15 minutes to, you know, enhance the operation,

22  pretend that I was a customer.  And then, I just told her

23  that I couldn't do it because I was feeling guilty, you

24  know, thinking about my wife.

09:39:43  25  **Q.**  So based on these multiple visits to Las Palmas,

1   including your personal visit, did you all determine to

2   run your operation on June 7th, 2007?

3   **A.**   Yes, sir.

4   **Q.**   Now, had you learned during the course of your

09:39:58   5   investigation from the working girls who owned and ran the

6   place?

7   **A.**   They gave a nickname of the main lady.

8   **Q.**   Do you remember it, by any chance?

9   **A.**   The name they gave is Tencha.

09:40:15   10   **Q.**   On June 7th, 2007, was the same thing going on there

11   that you had seen previously?

12   **A.**   Yes, sir.

13   **Q.**   And was Tencha there?

14   **A.**   I was told she was --

09:40:33   15   **Q.**   Just yes or no, if you could.  Was she there on June

16   7th?

17   **A.**   Yes, sir.

18   **Q.**   And yes or no, were arrests made on June 7th?

19   **A.**   Yes, sir.

09:40:49   20   **Q.**   Did you have occasion to check the activity in the

21   club again about a year later?

22   **A.**   Yes, sir.

23   **Q.**   And that -- would that have been on June 6th, 2008?

24   **A.**   Yes, sir.

09:41:04   25   **Q.**   And did an arrest of Odelia and Juan Cerda occur on

Direct Examination of Jose Salazar                    Vol 5 - 29

 1   that date?  Juan Cepeda.  I'm sorry.

 2   **A.**   Yes, sir.

 3   **Q.**   Is that one of the persons that was arrested, a person

 4   you know as Odelia, on June 6th, 2008?

09:41:37  5   **A.**   Yes, sir.

 6   **Q.**   And do you know that she is some relation to the lady

 7   who you said her nickname was Tencha that you talked about

 8   before?

 9   **A.**   Yes, sir.

09:41:49  10   **Q.**   Do you by any chance know what the relation is?

11   **A.**   I believe it was a niece.

12   **Q.**   And she and Juan Cepeda, do you recall what they were

13   charged with?

14   **A.**   They were charged with a liquor violation under the

09:42:05  15   state of Texas for refusing inspection of the location.

16   **Q.**   Were -- oh, do you see the defendant -- or, I'm sorry,

17   do you see the person that you came to know as Tencha in

18   the courtroom today?  You can stand up if you would like.

19   **A.**   She is sitting right over there.

09:42:33  20   **Q.**   Would that be the lady with gray hair and in the black

21   coat?

22   **A.**   Yes, sir.

23        MR. MAGLIOLO:  May the record reflect he has

24   identified the defendant, Your Honor?

09:42:44  25        THE COURT:  The record will so reflect.

1           MR. MAGLIOLO:  Thank you.

2    **Q.**  (By Mr. Magliolo)  Did you have occasion to go to the

3    club again to check later to check to see if they were

4    still -- how they were operating?

09:42:53    5    **A.**  Yes, sir.

6    **Q.**  I direct your attention to August 4th, 2011.  Did you

7    go to the club on that date?

8    **A.**  Yes, sir.

9    **Q.**  And was a prostitution -- were they operating the same

09:43:07   10    way they had been since you had been observing them for a

11    couple of years?

12    **A.**  Yes, sir.

13    **Q.**  And was a prostitution arrest made of XXXXXXXXXX

14    XXXXXXXXX, if you recall?  I think XXXXXXXXXX

09:43:24   15    XXXXXXXXXXXXXXXXX.

16           THE COURT:  Well, were arrests made again at that

17    raid?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  All right.

09:43:38   20    **Q.**  (By Mr. Magliolo)  Did you say "yes"?

21    **A.**  Yes, sir.

22    **Q.**  And could we have P-58, please.

23           MS. POUNCEY:  What number?

24           MR. MAGLIOLO:  P-58.  I'm sorry.

09:43:56   25    **Q.**  (By Mr. Magliolo)  And that would be Ms. XXXXXXX or

```
 1   XXXXXXXXXXXXXXXXX?
 2   A.   Yes, sir.
 3          MR. MAGLIOLO:  That's all we have.  We pass the
 4   witness, Your Honor.
 5          MR. FAZEL:  Very briefly, Your Honor.
 6                      CROSS-EXAMINATION
 7   BY MR. FAZEL:
 8   Q.   Officer, the first time when you were undercover
 9   working and going into Las Palmas, you said that they had
10   -- I just had a question about your terminology.  You said
11   they had a guard.  You don't mean like an armed guard?
12   There was just a guy at some place where you had to pay to
13   get in, right?
14   A.   Yes, sir.
15          MR. FAZEL:  That's all I have, Your Honor.  Thank
16   you.
17          THE COURT:  Thank you, sir.  You may step down.
18   You are excused.  You are free to leave.
19       Call your next witness.
20          MR. PEREZ:  Jorge Antonio Teloxa-Barbosa, Your
21   Honor.
22          THE COURT:  The first name?  I got the last name,
23   Barbosa.  What is the first name?
24          MR. MAGLIOLO:  Jorge, J-o-r-g-e; Teloxa,
25   T-e-l-o-x-a.
```

09:44:07 (line 5)
09:44:15 (line 10)
09:44:25 (line 15)
09:44:32 (line 20)
09:44:53 (line 25)

1          THE COURT:  Okay.  Thank you.  And Barbosa?

2          MR. PEREZ:  Barbosa, B-a-r-b-o-s-a, Your Honor.

3          THE COURT:  Okay.  Do you want to give him the

4  oath?

09:45:18    5          CASE MANAGER:  Please raise your right hand, sir.

6          THE COURT:  He needs an interpreter, I guess.

7  Let's just give him the oath.

8      (Witness sworn by the case manager through the

9  interpreter.)

09:45:42   10          THE WITNESS:  Si'.

11          THE COURT:  The answer was?

12          THE INTERPRETER:  Yes, sir.

13          THE COURT:  Hang on one second.  By the way,

14  we're going to take a break at about, oh, 11:45.  We'll

09:46:48   15  take a break in between.  We're going to take a short

16  break about 11:45; and we'll be about 30 or 35 minutes,

17  something like that.  We'll pick up and go right to 2:30.

18  So if you have a sandwich or something that you brought

19  and you want to quickly --

09:47:02   20          CASE MANAGER:  I made arrangements, Your Honor.

21          THE COURT:  Oh, you are bringing in lunch.  You

22  just made that decision?

23          CASE MANAGER:  You did it yesterday.

24          THE COURT:  I did it yesterday.  Including chips

09:47:17   25  and everything else.  You will have to wolf that down

1   pretty quick.  We will give you an extra five minutes.

2   We'll determine it at that point.  We're doing fine

3   time-wise.  Okay.  We'll just take an abbreviated lunch

4   break.

09:47:29   5        I didn't know.  I thought you said you had to take

6   their orders.  I might have said 35 or 40 minutes.  She is

7   way ahead of me, as usual.  All right.  It's very

8   hospitable.  We try to be around here.  All right.

9        Go right ahead, please.

09:47:44   10        MR. PEREZ:  Thank you, Your Honor.

11              **JORGE ANTONIO TELOXA-BARBOSA,**

12   having been first duly sworn, testified through the

13   interpreter as follows:

14                **DIRECT EXAMINATION**

15   BY MR. PEREZ:

16   **Q.**   State your name for the Court and the members of the

17   jury, please, sir.

18   **A.**   Jorge Antonio Teloxa-Barbosa.

19   **Q.**   And are you from Mexico, sir?

09:47:56   20   **A.**   Yes.

21   **Q.**   When did you come to our country, the United States?

22   **A.**   Two years ago, November 2012 -- 2011.

23   **Q.**   Is it 2012 or 2011?

24   **A.**   2011.

09:48:23   25   **Q.**   Did you come to our country illegally?

1   **A.**   Yes.

2   **Q.**   By way of a coyote?

3   **A.**   Yes.

4   **Q.**   And do you see a person in the courtroom by the name

5   of Tencha?

6   **A.**   Yes.

7   **Q.**   Can you please point to her and describe what she is

8   wearing for the members of the jury, please, sir.

9   **A.**   The lady who is there, gray hair.

10          MR. PEREZ:  May the record reflect this witness

11   has identified the defendant, Your Honor?

12          THE COURT:  Thank you.  The record will so

13   reflect.

14   **Q.**   (By Mr. Perez)  What year did you meet Tencha?

15   **A.**   In 2012.

16   **Q.**   Where did you meet her, sir?

17   **A.**   At the taqueria at Las Palmas 1.

18   **Q.**   Was there a Las Palmas 2?

19   **A.**   Yes.

20   **Q.**   That was the one off Telephone Road?

21   **A.**   Yes.

22   **Q.**   Why did you meet Tencha at Las Palmas 1?

23   **A.**   Because that is where she said we would have a meeting

24   the first time, before I started working at Las Palmas.

25          THE COURT:  What year was it?  Again, what year?

09:48:38
09:48:51
09:49:02
09:49:21
09:49:45

1          THE WITNESS:  2012.

2   **Q.**  (By Mr. Perez)  And you were going to work at Las

3   Palmas 2?

4   **A.**  Yes.

09:49:56   5   **Q.**  Who else was at that meeting where -- who else was at

6   that meeting?

7   **A.**  It was me, the lady and Eduardo Guzman.

8   **Q.**  Is Eduardo Guzman an associate of yours, as well?

9   **A.**  Yes.

09:50:19   10   **Q.**  And do you see a picture of Eduardo Guzman on

11   Government Exhibit B?

12   **A.**  Yes.

13   **Q.**  Can you please point to him.

14   **A.**  (Speaking Spanish.)

09:50:39   15   **Q.**  So the fellow right there, his picture with the name

16   Eduardo Guzman, El Pantera, underneath it?

17   **A.**  Yes.

18   **Q.**  So it was you, Tencha and Pantera?

19   **A.**  Yes, the three of us.

09:50:53   20   **Q.**  What was the purpose -- what was discussed at that

21   meeting?

22   **A.**  About the work I was going to start doing, the rules

23   and norms that they had there at work.

24   **Q.**  Let me ask you this:  You were going to take over Las

09:51:16   25   Palmas 2?

 1  **A.**   Yes.

 2  **Q.**   And who initially was going to take over Las Palmas

 3  before you and Pantera were going to do it?

 4  **A.**   Alfonso.

09:51:30   5  **Q.**   And do you see Alfonso on the board in Government

 6  Exhibit Number B?

 7  **A.**   Yes.

 8  **Q.**   And is that the fellow under whose name is Alfonso

 9  Angel Diaz-Juarez, otherwise known as Poncho?

09:51:49  10  **A.**   Yes.

11  **Q.**   Now, did, in fact, Tencha rent the place out to

12  Poncho?

13  **A.**   Yes.

14  **Q.**   What happened?  Did that deal fall through?

09:51:54  15  **A.**   (No response.)

16  **Q.**   Let me repeat the question.  Okay.  Something happened

17  to Poncho where he couldn't take over the place; is that

18  right?

19  **A.**   Yes.

09:52:06  20  **Q.**   What happened to Poncho?

21  **A.**   He was detained.  He was put in jail.

22  **Q.**   And as a result of that, he did not rent the place

23  from Tencha; is that right?

24  **A.**   Yes.

09:52:21  25  **Q.**   And after that, who is the one that was going to take

Direct Examination of Jorge Teloxa-Barbosa    Vol 5 - 37

1    over Las Palmas 2 when he got detained?  After he got

2    detained, who was going to take over Las Palmas 2?

3    **A.**   That's what we gathered at the taqueria to talk about.

4    **Q.**   So what was the end result of that conversation?

09:52:49    5    **A.**   The conversation was that the one who had hired us was

6    Alfonso.  He had hired me, Eduardo and Alberto.

7    **Q.**   Now, who is Alberto?

8    **A.**   Ardilla.

9    **Q.**   Is he on the board, also?

09:53:10    10    **A.**   Yes.

11    **Q.**   That's the one that is Alberto Mendez-Flores?

12    **A.**   Yes.  The third one.

13    **Q.**   Okay.  What happened?

14    **A.**   That's what we went there for because Alfonso had

09:53:25    15    hired us.  And since he was in jail, so we had to go see

16    the lady to see whether we were still going to work; but

17    we met -- we agreed; and she said, yes, we could work.

18    **Q.**   Now, you could work at Las Palmas 2, right?

19    **A.**   Yes.

09:53:50    20    **Q.**   But who was really going to be in charge of Las

21    Palmas 2?

22    **A.**   I didn't understand the question.

23    **Q.**   Okay.  There were going to be rules and regulations as

24    far as Las Palmas 2 goes, right?

09:54:04    25    **A.**   Uh-huh.  Yes.

```
 1  Q.   Who was going to set the rules under which Las
 2  Palmas 2 would be operated?
 3  A.   Ms. Tencha.
 4  Q.   And were you all supposed to give her so much money
 5  per week in return for you managing the place there at Las
 6  Palmas 2?
 7  A.   Yes.  We reached an agreement about the amount we
 8  would give her per week.
 9  Q.   And how much was that?
10  A.   $20,000.
11  Q.   A week?
12  A.   Yes.
13  Q.   $20,000 in US dollars?
14  A.   Yes.  Dollars.
15  Q.   And then what would happen to the rest of the money
16  after the $20,000?
17  A.   The rest was to pay the workers and pay for the paying
18  bills and paying for the beer and everything else that was
19  sold there.
20  Q.   Now, I think I used the word perhaps "rent" or "take
21  over."  But, in fact, even though you were going to be
22  working there, the person giving you orders would have
23  been Tencha; is that right?
24  A.   Yes.
25  Q.   Describe to the members of the jury what the rules
```

09:54:19 (line 5)
09:54:36 (line 10)
09:54:47 (line 15)
09:55:13 (line 20)
09:55:30 (line 25)

```
 1  were there of the operation of Las Palmas from Tencha?
 2  What rules did she set up?
 3  A.   The rules were coming in, the time that the girls
 4  would come in to work.
 5  Q.   Now, when you say "the girls," were those the
 6  prostitutes that were going to work there?
 7  A.   Yes.
 8  Q.   Okay.  What other rules?
 9  A.   The cost of the selling of tickets, the cost for
10  entering the room, for someone coming late.
11  Q.   Now, what were the rules if somebody came in late?
12  A.   The $20 had to be paid.
13  Q.   Paid to whom?
14  A.   To the person that was in charge of the tickets.
15  Q.   And who was in charge of the tickets?  Do you know?
16  A.   At that time it was Miguel.
17  Q.   What other rules were there?
18  A.   (Speaking Spanish.)
19  Q.   How about the other girls that were to arrive at Las
20  Palmas 2?  What were the rules about that?  Did they get
21  there in taxis or cars?
22  A.   Taxis.
23  Q.   That rule was Tencha's rule, as well?
24  A.   Yes.
25  Q.   Do you recognize anybody else on Government Exhibit
```

09:55:53  (line 5)
09:56:11  (line 10)
09:56:36  (line 15)
09:57:03  (line 20)
09:57:17  (line 25)

1   Number B?

2   **A.**   Yes.

3   **Q.**   Who do you recognize?

4   **A.**   Abel Medeles.

09:57:31   5   **Q.**   He has got Chito underneath him, right?

6   **A.**   Yes.

7   **Q.**   Is he related to Tencha?

8   **A.**   Yes.  It's her brother.

9   **Q.**   What was his job there at the Las Palmas?

09:57:45   10   **A.**   He was at the parking lot at the taqueria.

11   **Q.**   Anybody else?

12   **A.**   Before I was put in jail, those are the only ones I

13   knew.  Now I know all of them, more of them, because they

14   are in jail, too.

09:58:12   15   **Q.**   Now, how were you physically going to give the money,

16   the $20,000 per week to Tencha?

17   **A.**   I didn't understand the question.  Sorry.

18   **Q.**   You got $20,000.  Was that in cash, right?

19   **A.**   Yes.

09:58:31   20   **Q.**   How did you give the money to Tencha, this cash money

21   per week?  Where did you deliver it?

22   **A.**   Every weekend.

23   **Q.**   Where would you meet her to give her the money?

24   **A.**   There were different places.

09:58:49   25   **Q.**   Did you ever go to her house?

1  **A.**   No.

2  **Q.**   Where would you meet her then?  Give us an example.

3  **A.**   There was a McDonald's and a Walgreens pharmacy, for

4  example; or across the street from the cantina there was a

09:59:19  5  place where there were different shops.

6  **Q.**   Did she have a rule about whether minors should work

7  there or not?

8  **A.**   The only rule was that they had to show their ID.

9  **Q.**   No matter how young they looked, so long as they had

09:59:48  10  ID, it was okay for them to work there; is that right?

11  **A.**   Yes.  Yes.  They had to show their ID, and they had to

12  be of age.

13  **Q.**   They had to show their ID that showed they were of

14  age?

10:00:03  15  **A.**   Yes.  That they should be of age.

16  **Q.**   Now, did she have a rule as to whether -- what you

17  should say if the police came as far as whether she was

18  the owner or not?

19  **A.**   Yes.

10:00:29  20  **Q.**   What were you supposed to tell the police if the

21  police came and asked if she was the owner?

22  **A.**   That she no longer had anything to do with the place.

23  **Q.**   Which was really a lie because she did have something

24  to do with it, right?

10:00:48  25  **A.**   I didn't understand.

1  **Q.**  She told you to tell the police that she had nothing

2  to do with the place, but that was a lie?

3  **A.**  Yes.

4  **Q.**  Because, in fact, she was the one that gave orders.

10:00:59  5  She was the one that set the rules, and she was --

6           MR. FAZEL:  Object to leading, Your Honor.

7           THE COURT:  Sustained.

8  **A.**  Yes.

9  **Q.**  (By Mr. Perez)  Tell the members of the jury what the

10:01:10  10  rules were in terms of when a girl arrived late to work

11  there at Las Palmas.

12           MR. FAZEL:  Asked and answered, Your Honor.

13           THE COURT:  Overruled.

14  **A.**  They had -- she had to pay a late fee.

10:01:27  15  **Q.**  (By Mr. Perez)  Again, that was a rule made by Tencha?

16  **A.**  Yes.

17  **Q.**  Was there any time there where a girl perhaps was

18  suspended from working there?

19  **A.**  Yes.

10:01:39  20  **Q.**  And was that girl allowed -- even though she was

21  suspended, was she allowed to go back to work at Las

22  Palmas?

23  **A.**  I didn't understand.

24  **Q.**  Was there a situation where there was a girl that was

10:01:54  25  not allowed to work but then was allowed to work after

1  all?

2  **A.**  (Speaking Spanish.)

3          MR. FAZEL:  Not responsive, Your Honor.

4          THE COURT:  Sustained.  Sustained.  Let's go

10:02:07  5  question and answer, please.

6          MR. PEREZ:  Yes, Your Honor.

7  **Q.**  (By Mr. Perez)  If a girl wanted to work there, who

8  did they have to get permission to work -- did it have to

9  be cleared through Tencha for her to work there?

10:02:26  10  **A.**  (Speaking Spanish.)

11         MR. FAZEL:  Objection, nonresponsive.

12         THE COURT:  I don't -- I haven't heard it yet.

13 But assume that if it's nonresponsive, redo it.

14         MR. PEREZ:  He is trying to answer my question,

10:02:40  15 Your Honor.

16         THE COURT:  The question again.

17         MR. PEREZ:  It was:  Who was the one who

18 determined who was going to get hired there?

19         THE COURT:  All right.  That calls for a name or

10:02:48  20 two, correct?

21         MR. PEREZ:  Yes, sir.

22         THE COURT:  All right.

23 **Q.**  (By Mr. Perez)  Was Tencha the one that determined who

24 was going to work there or not?

10:03:02  25 **A.**  Yes.  Sometimes they arrived with permission from

1   Tencha already.

2        (Sotto voce discussion between counsel.)

3   **Q.**   (By Mr. Perez)   And when did you start working for

4   Tencha at Las Palmas?

10:03:20    5   **A.**   In November 2012, November or December.   I don't

6   remember.

7   **Q.**   And you were there for how long?   How long were you

8   there working for Tencha at Las Palmas?

9   **A.**   11 months.

10:03:38   10   **Q.**   Were the pimps allowed to work on the property, to go

11   to the Las Palmas?

12   **A.**   No.

13   **Q.**   And was that another rule of Tencha's?

14   **A.**   It's a rule that was already there.

10:03:56   15   **Q.**   Did Tencha ever ask you if you had papers; that is, if

16   you were in this country legally?

17   **A.**   No.

18   **Q.**   She never asked you whether you were here legally or

19   not?

10:04:09   20        MR. FAZEL:   Asked and answered, Your Honor.   He

21   said "no."

22        THE COURT:   I think he did say "no."   Next

23   question.

24   **Q.**   (By Mr. Perez)   Did she ever ask you whether people

10:04:18   25   without papers did not make that much money?

1    **A.**   I didn't understand the question.

2         MR. PEREZ:  I'll move on, Your Honor.

3    **Q.**   (By Mr. Perez)  Did Tencha have a rule as to

4    whether -- how the girls were supposed to be dressed there

10:04:41  5    at that location at Las Palmas to go to work?

6    **A.**   Yes.  Just whatever they wanted.

7    **Q.**   And that was a rule made by Tencha?

8    **A.**   That they should come dressed in whatever way they

9    wanted.

10:05:01  10   **Q.**   Okay.  I think I already asked you this, but just to

11   be sure.  You were in this country illegally, right?

12   **A.**   Me, yes.

13   **Q.**   Yes.  When you worked for Tencha, you were working for

14   her at the Las Palmas 2 illegally?

10:05:18  15   **A.**   Yes.

16   **Q.**   And how about El Pantera?  Was he illegal when he

17   worked there at Las Palmas?

18   **A.**   Yes.

19   **Q.**   How about Alberto Mendez-Flores also known as Ardilla,

10:05:36  20   was he illegal when he worked there for Tencha at Las

21   Palmas?

22   **A.**   Yes.

23         MR. PEREZ:  Can I have a moment, Your Honor?

24         THE COURT:  Yes, sir.

10:06:01  25   **Q.**   (By Mr. Perez)  Let me ask you this, sir:  Did she

Direct Examination of Jorge Teloxa-Barbosa       Vol 5 - 46

 1  also decide how much was going to be charged at the bar?

 2  **A.**   Yes.

 3  **Q.**   I guess the bottom-line question I have is that even

 4  though you were working there and even though the name of

10:06:22   5  the place was changed -- was the name of the place

 6  changed?

 7  **A.**   Yes.

 8  **Q.**   And whose idea was that?  Whose idea was that to

 9  change the name of the bar?

10:06:35  10  **A.**   Tencha's.

11  **Q.**   It was Las Palmas 2; and then, it was changed to what

12  name?

13  **A.**   New Dawn.

14  **Q.**   Do you know why the name was changed from Las Palmas

10:06:55  15  to New Dawn?

16  **A.**   Yes.

17  **Q.**   Why?

18  **A.**   Because there had already been problems at that place

19  with that name.

10:07:08  20  **Q.**   With what name?

21  **A.**   Las Palmas.

22           MR. PEREZ:  One moment, Your Honor, please.  I'll

23  pass the witness, Your Honor.

24           MR. FAZEL:  May I proceed, Your Honor?

10:07:40  25           THE COURT:  Yes, sir.

                          **CROSS-EXAMINATION**

BY MR. FAZEL:

**Q.**  Is your last name Barbosa, sir?

**A.**  Yes.

**Q.**  Mr. Barbosa, were you indicted and charged in this crime with a conspiracy along with other people?

          THE COURT:  Do you mean in this case?

          MR. FAZEL:  Yes, Your Honor.

**Q.**  (By Mr. Fazel)  In this case with other people?

**A.**  Conspiracy, yes.

**Q.**  And you have a lawyer, correct?

**A.**  Yes.

**Q.**  And your lawyer is Mr. Banker, I believe?

**A.**  Yes.

**Q.**  Is he in the courtroom today?  I don't see him.

**A.**  No.

**Q.**  Did you enter into a plea agreement, that is, an agreement with the government?

**A.**  No.

**Q.**  You didn't sign a contract with the government?

**A.**  No.

          MR. FAZEL:  May I approach, Your Honor?

          THE COURT:  Yeah.  Sure.  Go on.

**Q.**  (By Mr. Fazel)  Isn't that your signature?

**A.**  Yes.

1  Q.  Isn't this your plea agreement with the government?

2  A.  Yes.  Guilty.

3  Q.  This is a plea agreement you entered with the

4  government on your case, correct?

10:09:07  5  A.  Yes.

6  Q.  That plea agreement allowed you to enter a plea to an

7  offense with a maximum range of punishment of ten years,

8  correct?

9  A.  Yes.

10:09:24  10  Q.  However, when you were originally charged you were

11  facing a maximum range of punishment of life in prison,

12  correct?

13  A.  Excuse me.  When they caught me?

14  Q.  Let me ask it again.

10:09:41  15  MR. MAGLIOLO:  That's not correct.

16  THE COURT:  All right.  Go talk for a second.

17  MR. MAGLIOLO:  Just a moment, Your Honor.

18  (Sotto voce discussion between counsel.)

19  THE COURT:  Okay.

10:10:02  20  MR. FAZEL:  Let me move on, Your Honor, while we

21  look at that; and I'll circle back around.

22  THE COURT:  All right.

23  MR. FAZEL:  I want the first indictment, not the

24  superseding.

10:10:13  25  Q.  (By Mr. Fazel)  Now, you testified before this jury

1  that you entered into an agreement with Tencha, as you

2  call her, so that you can take over the business of Las

3  Palmas, correct?

4  **A.** Yes. We had a talk.

10:10:28  5         THE COURT: Take over or manage the place?

6         THE WITNESS: To manage.

7         THE COURT: To manage.

8  **Q.** (By Mr. Fazel) So let me be clear, since the Judge

9  talked about managing. If I understand your testimony,

10:10:41  10  you are supposed to take money and give it to Tencha. And

11  you said $20,000, correct?

12  **A.** Yes.

13  **Q.** And then, you were supposed to take some money and pay

14  for the expenses, correct?

10:10:55  15  **A.** I didn't understand the question.

16  **Q.** You were supposed to also pay for the expenses,

17  correct?

18  **A.** Yes.

19  **Q.** So weren't you keeping some money that was left over?

10:11:11  20  **A.** Yes. My pay.

21  **Q.** Well, you call it your pay. I understand that. But

22  the more money you made, the more money you get to keep,

23  right?

24  **A.** I'm sorry. I didn't understand.

10:11:24  25  **Q.** The more money the business makes, the more money you

1  keep, correct?

2  **A.**  Yes.

3  **Q.**  Okay.  So I understand you term it as management; but

4  the reality is, the more money the business makes, the

10:11:37  5  more money you make, correct?

6  **A.**  Yes.

7  **Q.**  So it's not like you are getting a salary?

8  **A.**  (Speaking Spanish.)

9  **Q.**  My question is:  It's not like you are getting a set

10:11:55  10  salary, correct?

11  **A.**  No.

12  **Q.**  You are getting a percentage?

13       THE COURT:  Correct?

14       THE WITNESS:  Yes.

10:12:03  15       THE COURT:  All right.  Let's move along.

16  **Q.**  (By Mr. Fazel)  Which makes you an owner, correct?

17  **A.**  (Speaking Spanish.)

18  **Q.**  Which makes you an owner, correct?

19  **A.**  If I were the owner, I would keep all the money.

10:12:16  20  **Q.**  But that's not the deal you made.  You didn't get to

21  keep all the money?

22  **A.**  No.

23  **Q.**  You got to keep some of the money?

24       THE COURT:  You got to keep some of the money,

10:12:27  25  right?

<pre>
             1              THE WITNESS:  Yes.

             2              THE COURT:  Did you own the place?

             3              THE WITNESS:  No.

             4              THE COURT:  And in your -- all right.  That was

10:12:33     5    the deal they had.  Okay.  That was the deal they had.

             6    All right.  Go on.

             7              MR. FAZEL:  Yes, sir.

             8    Q.  (By Mr. Fazel)  Now, you also said that the pimps

             9    weren't allowed onto the premises, correct?

10:12:48    10    A.  Yes.

            11    Q.  Okay.  And the girls that came into the premises to

            12    engage in prostitution, they either had pimps or some of

            13    them didn't have pimps, correct?

            14    A.  Yes.

10:13:05    15    Q.  You actually had a girlfriend that worked there,

            16    correct?

            17    A.  Yes.

            18    Q.  Okay.  Were you her pimp?

            19    A.  We were a couple.

10:13:16    20    Q.  You were her pimp, right?

            21              THE COURT:  Were or were not?  I didn't catch it.

            22              MR. FAZEL:  I'm asking.

            23    Q.  (By Mr. Fazel)  Were you her pimp, yes or no?

            24    A.  I was her partner.

10:13:29    25    Q.  Were you her pimp?
</pre>

1  **A.**   She lived with me, and I worked for that.  Yes, I

2  lived with her.

3  **Q.**   Did she engage in prostitution voluntarily?  Is that

4  what you are telling me?

10:13:52  5  **A.**   Yes.

6  **Q.**   Now, she could come whenever she wanted, correct?

7  **A.**   Yes.

8  **Q.**   She didn't have to come every day if she didn't want

9  to?

10:14:05  10  **A.**   Yes.

11  **Q.**   The other girls that came into the bar, they could

12  come when they wanted, as well, correct?

13  **A.**   Yes.

14  **Q.**   This was before you took over and became the manager?

10:14:16  15  This is after you were the manager?  It's the same rule?

16  **A.**   Sorry?

17  **Q.**   The girls could come and go as they wished before you

18  became the manager and after you were the manager,

19  correct?

10:14:31  20  **A.**   Yes.

21  **Q.**   The girls negotiated their own fees with the people

22  that wanted to engage in prostitution, correct?

23  **A.**   Yes.

24  **Q.**   The house took some money; and after that, the rest

10:14:49  25  were the girls' money, correct?

```
         1   A.   Yes.

         2   Q.   You never forced the girls to stay on the premises?

         3   If she could, she wanted to, she could leave, correct?

         4   A.   I?

10:15:04  5   Q.   Anybody.

         6   A.   No.

         7   Q.   The rules that the prosecutor talked to you about, the

         8   times that the girls were supposed to go in, that's the

         9   time that the bar opened, correct?

10:15:23 10   A.   Yes.

        11   Q.   So the rule was when the bar opened there were

        12   supposed to be girls there?

        13   A.   Yes.

        14   Q.   And the girls decided if they wanted to work that day

10:15:34 15   or not?

        16   A.   Yes.

        17   Q.   The cost of selling the tickets, you are talking about

        18   the tickets to enter the premises, the admission fee?

        19   A.   Yes, the entrance fee.

10:15:49 20   Q.   And there was a fee to go upstairs for engaging in

        21   prostitution?

        22   A.   Yes.

        23   Q.   And that was a fee that was set by -- let me ask it

        24   this way.  Isn't it true that when you guys took it over

10:16:04 25   you kind of lowered that fee a little bit?
```

 1  **A.**   No.

 2  **Q.**   Would -- okay.  It's your testimony that the cost for

 3  being late was $20?

 4  **A.**   Yes.

10:16:22  5  **Q.**   It was never $40?

 6  **A.**   No.  $40 was for the parking per week.

 7  **Q.**   You didn't have any -- did you all have any armed

 8  guards there, people with guns?

 9  **A.**   No.

10:16:49 10  **Q.**   Did you lock up any girls upstairs and force them to

11  stay there and not leave?

12  **A.**   No.

13       MR. FAZEL:  Judge, could I have one moment,

14  please?

10:17:12 15       THE COURT:  Yes, sir.

16   (Sotto voce discussion between counsel and the

17  defendant.)

18  **Q.**   (By Mr. Fazel)  Sir, when you were negotiating with

19  the government, did you meet with the government to talk

10:18:20 20  about what you were going to testify about today?

21  **A.**   Sorry.  I didn't understand.

22  **Q.**   Prior to testifying today, you did meet with the

23  government and tell them and -- let me rephrase that.

24       Prior to testifying today, you had met with the

10:18:36 25  government, correct?

1    **A.**   Yes.

2    **Q.**   And you talked about what you were going to testify

3    about today, correct?

4    **A.**   Yes.

10:18:45   5    **Q.**   And did you talk to them about how many times you have

6    entered the country illegally?

7    **A.**   Yes.

8    **Q.**   How many times have you entered the country illegally?

9    **A.**   Twice.

10:19:05   10   **Q.**   This is two times that you have entered the United

11   States illegally?  You have never entered more than twice?

12   **A.**   I'm going to explain to him.

13   **Q.**   Sure.

14   **A.**   In the month of September I came in, but I was caught.

10:19:25   15   I left the country.  Then I came in again, and I was

16   caught again.  And the third time is when I entered, but

17   it was on the same month years ago.

18   **Q.**   Did you tell them that?

19   **A.**   Yes.

10:19:50   20   **Q.**   And other than the plea agreement that you entered

21   with -- that I showed you, they have not charged you with

22   any other crimes, correct?

23   **A.**   Yes.

24   **Q.**   So -- but it's your testimony today that you started

10:20:08   25   managing the place and engaged in the same activity that

1  Tencha engaged in, correct?

2  **A.**  Yes.

3  **Q.**  But the only thing they are charging you with is

4  harboring, correct?

10:20:22  5  **A.**  Yes.

6  **Q.**  They are not charging you with conspiracy to sex

7  traffic, are they?

8  **A.**  No.

9  **Q.**  Because you --

10:20:35  10  **A.**  No.

11  **Q.**  Because you didn't sex traffic, did you?

12        MR. PEREZ:  Objection, Your Honor.  Calls for

13  speculation on the part of this witness, Your Honor.

14        THE COURT:  Sustained.

10:20:41  15  **Q.**  (By Mr. Fazel)  You did the same thing that Tencha

16  did, correct?

17  **A.**  I don't understand the question.

18  **Q.**  You engaged in the same activities that Tencha engaged

19  in, you just made less money; is that fair?

10:20:59  20  **A.**  Yes.  I worked there.

21  **Q.**  But you are only charged with harboring, correct?

22  **A.**  Yes.

23        MR. FAZEL:  I pass the witness.

24        MR. PEREZ:  I have no -- well, excuse me, Your

10:21:10  25  Honor.  We have got some.  P-3.

**REDIRECT EXAMINATION**

BY MR. PEREZ:

**Q.** P-3. Can you explain to the members of the jury what P-3 is, please, sir?

10:21:35 **A.** Two switches or buttons.

**Q.** And were those buttons or switches there at Las Palmas?

**A.** Yes.

**Q.** And what did those switches or buttons do?

10:21:51 **A.** One turned off the light. It was by the rooms, one. And I think the other one was for the light at the entrance.

**Q.** Was there any -- was that used to alert if the police were coming?

10:22:11 **A.** Yes.

**Q.** And which one was that? The one -- as you are facing it, the one to the left or the one to the right?

**A.** I don't remember. I think it was this one.

**Q.** That was set up by Tencha, right?

10:22:28 **A.** Yes.

**Q.** P-4, do you recognize what is depicted on P-4?

**A.** Yes.

**Q.** And what is depicted on P-4?

**A.** It's where the ticket sale booth was.

10:22:46 **Q.** Okay. How about P-46?

1  **A.**   The tickets.

2  **Q.**   And what were those tickets used for, sir?

3  **A.**   I can't see the color well but some were to enter the

4  bar and the others were for when the women went to a room

10:23:17  5  she would receive a ticket.

6  **Q.**   How about P-47?  Do you recognize what is depicted on

7  P-47?

8  **A.**   Yes.

9  **Q.**   What is on P-47?

10:23:36  10  **A.**   The money and the tickets and the sheet for

11  accounting.

12  **Q.**   So you managed for Tencha from November, I think, 2012

13  until October 2013; and that date is April 28th, 2012.

14  Even though it's a different date from when you worked

10:24:01  15  there, does that look familiar to you, that sheet?

16  **A.**   Yes.

17  **Q.**   And that basically -- what did you have to do with

18  that sheet or what is similar to that sheet?

19  **A.**   That was put in the bag where we put the money.

10:24:35  20  **Q.**   And this bag, was it given to Tencha with the money?

21  **A.**   No.

22  **Q.**   Who was it given to?

23  **A.**   We would take it with us to take the money out to put

24  it together with whatever we got for the rooms, the beer,

10:25:02  25  the tickets and the bar.  And there the money was all put

1    together for the weekend.

2    **Q.**   And then what would happen?

3    **A.**   The $20,000 came from there and the expenses for the

4    whole week.

10:25:24   5    **Q.**   Then you give the $20,000 to Tencha?

6    **A.**   Yes.

7              MR. PEREZ:  I pass the witness.

8              MR. MAGLIOLO:  Every week.

9    **Q.**   (By Mr. Perez)  Every week, right?

10:25:32   10    **A.**   Every week.

11              MR. PEREZ:  I'll pass the witness, Your Honor.

12                         **RECROSS-EXAMINATION**

13    BY MR. FAZEL:

14    **Q.**   Do you remember the picture that they showed you with

10:25:40   15    the light?

16    **A.**   Sorry?

17    **Q.**   Do you remember the picture they just put up there

18    with the light in the entrance, the switches?

19              THE COURT:  The light switch.

10:25:50   20              THE WITNESS:  Yes.  Yes.

21    **Q.**   (By Mr. Fazel)  That was to alert everybody that

22    Houston Police Department was around, correct?

23    **A.**   Yes.

24    **Q.**   Because nobody wanted to get arrested for

10:26:01   25    prostitution, correct?

1    MR. PEREZ:  Objection, calls for speculation,

2  Your Honor.

3    THE COURT:  Overruled.

4  **A.**  Can you repeat the question?

10:26:10  5  **Q.**  (By Mr. Fazel)  You didn't want to get arrested for

6  prostitution, did you?

7  **A.**  Yes.

8  **Q.**  Am I correct in saying that you did not want to get

9  arrested for prostitution, correct?

10:26:23  10  **A.**  Yes.

11  **Q.**  None of the girls wanted to get arrested for

12  prostitution, correct?

13  **A.**  Yes.

14  **Q.**  Therefore, that light was there to alert if HPD showed

10:26:35  15  up, correct?

16  **A.**  Yes.

17  **Q.**  Are you telling the ladies and gentlemen of the jury

18  that you engaged in sex trafficking?

19    MR. PEREZ:  Objection, Your Honor.  Calls for

10:26:44  20  speculation.  Calls for a legal conclusion on the part of

21  this witness, Your Honor.

22    THE COURT:  Sustained.

23    MR. FAZEL:  I pass the witness.

24    THE COURT:  Anything further?

10:26:54  25    MR. PEREZ:  No, Your Honor.

|  |  |  |
|---|---|---|
|  | 1 | THE COURT:  Thank you.  You may step down.  You |
|  | 2 | are excused. |
|  | 3 | THE WITNESS:  (Complying.) |
|  | 4 | THE COURT:  Who is next? |
| 10:27:01 | 5 | MR. PEREZ:  Can I have a moment, Your Honor? |
|  | 6 | THE COURT:  Yeah. |
|  | 7 | MR. PEREZ:  Juan Carlos Munoz, Your Honor. |
|  | 8 | THE COURT:  All right.  Is he outside? |
|  | 9 | MR. PEREZ:  He should be here. |
| 10:27:11 | 10 | THE COURT:  All right.  Ladies and gentlemen, |
|  | 11 | we're going to do -- hang on.  I'll put that up.  It's now |
|  | 12 | 11:27.  So we're now in session for almost three hours |
|  | 13 | without a break.  Let's take a short break, ten minutes. |
|  | 14 | We'll be right back in ten minutes.  And then, we're going |
| 10:27:29 | 15 | to go right through to about a quarter to 12:00. |
|  | 16 | THE MARSHAL:  Give me one second.  I'll come back |
|  | 17 | for the jury. |
|  | 18 | THE COURT:  All right.  Make it nine minutes. |
|  | 19 | THE INTERPRETER:  Your Honor, it is 10:27. |
| 10:27:37 | 20 | THE COURT:  What did I say? |
|  | 21 | THE INTERPRETER:  11:27. |
|  | 22 | THE COURT:  Oh, it's 10:27.  Thank you.  Now it's |
|  | 23 | 10:28. |
|  | 24 | THE MARSHAL:  Ready. |
| 10:28:09 | 25 | THE COURT:  All right.  The marshal is ready. |

1    All right.  Everybody up.  See you in a little less than

2    ten minutes.

3          (Jury exited courtroom at 10:28 a.m.)

4          (Recess from 10:28 a.m. to 10:41 a.m.)

10:41:11   5          THE COURT:  Tell them we will be a few minutes.

6          MR. FAZEL:  Your Honor, they are about to call

7    Juan Cepeda, I believe, right?

8          MR. MAGLIOLO:  Correct, Your Honor.

9          MR. FAZEL:  Juan Cepeda is the one who admitted

10:41:18   10   committing sexual assault of a child.  If he testifies, he

11   will have to admit to that on the witness stand under

12   oath.  I would submit to the Court that he might need

13   somebody to tell him about his privileges before he does

14   that.  He does not have a lawyer.

10:41:30   15         THE COURT:  Has he been charged with that?

16         MR. FAZEL:  No, sir.

17         MR. MAGLIOLO:  How long ago was that?  The

18   statute has probably run on it.

19         MR. FAZEL:  I mean --

10:41:41   20        MR. MAGLIOLO:  Over ten years?

21         MR. FAZEL:  I don't think so.  It's your OR.  He

22   told Chappy.

23         MR. MAGLIOLO:  But that was back how long ago?

24         MR. FAZEL:  It was LL.  He had sex with her two

10:41:56   25   to three times.

1          MR. MAGLIOLO:  How long ago?  Well, you're

2     bringing it to the Court's attention.  You are saying it's

3     a charge.  You have got to be within the statute to --

4          MR. FAZEL:  The statute of limitations for sexual

10:42:06   5     assault is ten years after the person's 18th birthday in

6     Texas, Mr. Magliolo.

7          MR. MAGLIOLO:  And she is how old?

8          MR. FAZEL:  I have no idea.  She testified.

9          MR. MAGLIOLO:  It's your motion.

10:42:21  10          MR. FAZEL:  Can you tell me how old LL is?

11          THE COURT:  You all be seated, if you want.  You

12     can stand up if you would like; but, no, not the lawyers.

13          MR. MAGLIOLO:  In fairness to Mr. Fazel, he

14     certainly may be confessing.  He will be admitting, we

10:42:46  15     expect, to potentially criminal offenses.  The Court might

16     inquire do you understand you are doing that.  Do you

17     feel -- well, you can do what you want.

18          MR. FAZEL:  He will be admitting to, arguably,

19     sex trafficking, sexual assault of a child.

10:42:57  20          THE COURT:  Well, what do you want to do?  Give

21     him a Miranda warning?

22          MR. FAZEL:  I don't know.  Some judges would not

23     let them testify without talking to a lawyer first.

24          MR. MAGLIOLO:  We can ask him.

10:43:07  25          MR. FAZEL:  She is 20, Your Honor.

 1          THE COURT:  She is 20 now?

 2          MR. FAZEL:  Now.

 3          THE COURT:  Well, do you think we ought to get

 4     the public defender over here just to talk to the guy for

10:43:18   5     safety purposes?

 6          MR. MAGLIOLO:  We would have no objection to it.

 7          THE COURT:  Do you have another witness?  You

 8     better have another witness.  We're going to keep going.

 9          MR. PEREZ:  We'll put on another one, Your Honor.

10:43:27  10          MR. MAGLIOLO:  Perhaps the Court could ask him

11     that he may be subjecting himself and does he want a

12     lawyer.  He may say no.

13          MR. FAZEL:  He is not immunized in state court.

14          THE COURT:  I'm not talking about state court.

10:43:40  15     All right.  Hang on a second.  We have done this in the

16     past.  Why don't we do this.  Why don't you have him -- do

17     you want him -- is he back there?

18          MR. FAZEL:  He is here.

19          THE COURT:  Is that him in the back?

10:44:05  20          MR. CHAPUSEAUX:  Yes.

21          THE COURT:  Why don't you have him come forward.

22     Have him come forward.  This is how I have done it in the

23     past.

24          MR. MAGLIOLO:  He does need an interpreter, Your

10:44:11  25     Honor.

1              THE COURT:  He does?

2              MR. PEREZ:  Yes.

3              THE COURT:  Just talk simultaneous.  All right.

4  It's going to be very short.

5       (Juan Cepeda sworn by the case manager through the

6  interpreter.)

7              THE COURT:  State your name.

8              MR. CEPEDA:  Juan Cepeda.

9              THE COURT:  All right.  Do you have a lawyer?

10             MR. CEPEDA:  No.  No.

11             THE COURT:  All right.  Then I think, Ellen, I

12  think we need to contact the public defender and get

13  somebody over here just to visit with him.

14       We're going to have a lawyer come and talk to you

15  about -- you know, we appreciate your willingness to

16  testify; but before you do, we want you to at least talk

17  to a lawyer.  Okay?

18             MR. CEPEDA:  Okay.

19             THE COURT:  So you have now been sworn.  So you

20  are subject to the orders of this court.  If you would,

21  sir, wait outside.  Don't talk to anybody about this case,

22  okay, until some lawyer comes and visits with you.  All

23  right?

24             MR. CEPEDA:  Okay.

25             THE COURT:  We're just trying to make sure you

1   understand.  I mean, you are free to testify; but at least

2   we want you to understand what your rights are.  Okay?

3           MR. CEPEDA:  Yes.

4           THE COURT:  All right.  So we're going to call

10:45:41   5   the public defender over here.  Okay?  Just say we need

6   somebody to come to advise, you know, a potential witness

7   about possible self-incrimination.  Okay?

8           MR. PEREZ:  Your Honor, may I say something, as

9   well?  The other fellow, the other confidential informant

10:45:57  10  may have the same situation, Your Honor.

11          THE COURT:  Where is he?  Is he here?

12          MR. PEREZ:  He is here, as well, Your Honor.

13          THE COURT:  All right.  Let's call him in.

14          MR. PEREZ:  Not as far as a sexual assault but

10:46:08  15  just engaging, Your Honor.

16          THE COURT:  What?

17          MR. PEREZ:  Well, he did work at the location;

18  and, you know, there was sex trafficking going on there.

19          MR. MAGLIOLO:  Certainly harboring.

10:46:17  20          MR. PEREZ:  He is certainly harboring, and there

21  was sex trafficking going on there, as well.

22          THE COURT:  All right.  Have you got another

23  witness after that?

24          MR. MAGLIOLO:  No.  Well, it would take us a

10:46:26  25  little while to work on it; but we would.

```
                    1              THE COURT:  What do you mean?  Where is the other

                    2    witness?

                    3              MR. MAGLIOLO:  Well, these are several hours

                    4    worth of witnesses, Your Honor.  We figured they would

         10:46:35  5    carry us through the time, but give us -- if you will give

                    6    us a few minutes, we'll come up with something, Your

                    7    Honor.

                    8              THE COURT:  All right.

                    9              THE MARSHAL:  I'm going to tell the jury to sit

         10:46:47  10    down.

                   11              THE COURT:  Tell them to sit down.  I'll be right

                   12    in to talk to them.

                   13              MR. PEREZ:  He needs an interpreter, as well,

                   14    Your Honor.

         10:46:59  15              THE COURT:  Raise your right hand to be sworn.

                   16              MR. MUNOZ:  (Complying.)

                   17         (Juan Munoz sworn by the case manager through the

                   18    interpreter.)

                   19              THE COURT:  All right.  What is your name,

         10:47:09  20    please?

                   21              MR. MUNOZ:  Juan Carlos Munoz.

                   22              THE COURT:  All right.  You are here to testify;

                   23    is that correct?

                   24              MR. MUNOZ:  Yes.

         10:47:18  25              THE COURT:  Do you have a lawyer?
```

Proceedings                                    Vol 5 - 68

1          MR. MUNOZ:  No.  Just the prosecutors.

2          THE COURT:  All right.  We're going to call a

3   lawyer over here to talk with both of you about your

4   testimony.  Okay?

10:47:35   5          MR. MUNOZ:  Okay.  Yes.

6          THE COURT:  You are welcome to testify.  We

7   appreciate your coming here to testify, but we at least

8   want you to talk to a lawyer before you do.  Do you

9   understand?

10:47:51   10          MR. MUNOZ:  Yes.

11          THE COURT:  All the lawyers here agree at least

12   you want to talk to a lawyer and then, certainly, we'll

13   then call you in if it's appropriate.  Okay.  But we want

14   you to understand everything.  Is that all right?

10:48:06   15          MR. MUNOZ:  Yes.

16          THE COURT:  Okay.  So you remain out in the

17   hallway or wherever you are staying until we get a public

18   defender here.  I'm going to talk to the jury and -- no.

19   We're not taking a break now.  We have got to get somebody

10:48:21   20   up, if we can.

21          MR. MAGLIOLO:  Give us ten minutes.  We'll have

22   somebody for you.

23          THE COURT:  All right.  Let me go talk to them.

24   All right.  Off the record.

10:48:27   25          (Recess from 10:48 a.m. to 10:51 a.m.)

1          MR. MAGLIOLO:  If we could approach the bench.

2     There is only one document that counsel for the defense is

3     not going to -- may object to that we would like to talk

4     to the Court about.

10:51:27   5          THE COURT:  Do you want to do it now?

6          MR. MAGLIOLO:  Yes, while we have time.

7          THE COURT:  All right.  Let's do it now, please.

8          MR. MAGLIOLO:  May we approach the bench without

9     the record and just tell the Court what is going on?

10:51:36  10          THE COURT:  All right.  Off the record.

11        (Discussion off the record.)

12          THE COURT:  We're going to say it's now 10:55.

13    Why don't we assume we get back underway right close to

14    11:00.  It's five minutes.  Everybody stand at ease.

11:05:51  15        (Recess from 10:54 a.m. to 11:05 a.m.)

16          THE MARSHAL:  All rise.

17          THE COURT:  Hold it a second.  They've got

18    something else they want on the record.  We will be with

19    you in a minute.  Never mind.  Shut the door for a second.

11:06:05  20    Okay.  On the record.

21          MR. FAZEL:  Real quick, Your Honor.  I believe

22    they are going to put on the IRS agent to talk about the

23    money laundering counts.

24          THE COURT:  Right.

11:06:14  25          MR. FAZEL:  Part of that evidence is produced to

1    them by these two confidential sources.  Should these

2    sources not testify, some of the evidence already put into

3    evidence subject to connection is going to come into

4    doubt.

11:06:25   5        The documents they have used to come up with account

6    sheets and so forth are -- what they did was they took one

7    copy and kept it and produced it to the police and then

8    used the other copy in the business.  So the individual,

9    who if they decide not to testify, has produced this

11:06:41   10   evidence to the police.

11             THE COURT:  This is going to muck up their case,

12   correct?

13             MR. FAZEL:  It is going to muck up their case.

14             THE COURT:  You are going to make an objection?

11:06:50   15        MR. FAZEL:  I am.

16             THE COURT:  This should have been anticipated.

17   This whole business should have been anticipated.  I

18   understand that.  Let's call in the jury.  For the record,

19   you have reserved your objection without prejudice.

11:07:00   20        MR. FAZEL:  Yes, sir.

21        (Jury entered courtroom at 11:07 a.m.)

22             THE COURT:  All right.  Be seated.  All right.

23   There at the end we had another twist, which I'll write

24   down and talk to you about later.

11:07:34   25        All right.  We're going to shift gears for just a

1   witness or two.  We are going to go on to the financial

2   aspect.  You know, remember these money laundering counts?

3   We're going to shift gears for a little bit.

4        Call your next witness.

11:07:47   5        MR. MAGLIOLO:  We call Special Agent Tan, Your

6   Honor.

7              THE COURT:  Yes, ma'am.  Raise your right hand.

8              THE WITNESS:  (Complying.)

9        (Witness sworn by the case manager.)

11:07:57   10             CASE MANAGER:  Thank you.  You may have a seat.

11             THE COURT:  Please state and spell your name for

12   the jury, please.

13             THE WITNESS:  Lucy Tan, L-u-c-y, Tan, T-a-n.

14             MR. FAZEL:  I'm sorry.  Could you push that up a

11:08:11   15   little closer to yourself.  Thank you.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  What agency are you employed by?

18             THE WITNESS:  Internal Revenue Service, Criminal

19   Investigation.

11:08:34   20             THE COURT:  Okay.

21             MR. MAGLIOLO:  Whoever is up, go right ahead.

22                          **LUCY TAN,**

23   having been first duly sworn, testified as follows:

24                      **DIRECT EXAMINATION**

11:08:36   25   BY MR. MAGLIOLO:

Direct Examination of Lucy Tan                    Vol 5 - 72

```
          1   Q.   Would you explain a little bit to the ladies and
          2   gentlemen of the jury -- well, first of all, how long have
          3   you worked for the IRS Criminal Investigations?
          4   A.   I have been employed with the IRS for approximately
11:08:52  5   12 years.
          6   Q.   What do you do for them?
          7   A.   I am a special agent.  I investigate violations to the
          8   Internal Revenue Code and money laundering offenses.
          9   Q.   So would "show me the money" somewhat summarize what
11:09:07 10   you do?
         11        THE COURT:  Microphone, please.
         12   A.   Yes.
         13   Q.   (By Mr. Magliolo)  Would "show me the money" sometimes
         14   fairly accurately describe what you do?
11:09:15 15   A.   Right.
         16   Q.   In a criminal case, some other agencies will look
         17   primarily at the more mundane criminal activity; but you
         18   follow the money?
         19   A.   Correct.
11:09:34 20   Q.   Now, did you do that in the case against this
         21   defendant?
         22   A.   Yes, I did.
         23   Q.   In this particular case, did you subpoena bank
         24   records?
11:09:45 25   A.   Yes, I did.
```

Direct Examination of Lucy Tan                    Vol 5 - 73

1    **Q.**   And explain to the ladies and gentlemen of the jury,

2    other than what they probably already know, what do bank

3    records show and how do they help you?

4              THE COURT:  You need a microphone.  Either that

11:09:59  5    or take the lapel mic and it will help you.

6              MR. MAGLIOLO:  I will, Your Honor.

7              THE COURT:  That way we won't have to worry about

8    it.  We have an interpreter.  Let's see if it works.  Is

9    it working?

11:10:14  10             MR. PEREZ:  Yes, Your Honor.

11             THE COURT:  Let's see.  Tap it.  Let's see.

12             MR. MAGLIOLO:  There.  It is working.

13             THE COURT:  It is working.

14             MR. MAGLIOLO:  Thank you, Your Honor.

11:10:27  15             THE COURT:  You can put that in your pocket or on

16   the table.  Whatever is easier.  That's fine.  Go right

17   ahead.

18             MR. MAGLIOLO:  Thank you, Your Honor.

19   **Q.**   (By Mr. Magliolo)  What do the bank records do to help

11:10:39  20   you determine whether illegal funds are involved in a case

21   and where they may be?

22   **A.**   What I did in this investigation is I subpoenaed the

23   banks for bank statements, checks, deposits, cancelled

24   items and analyzed the banks and traced where the money is

11:11:05  25   going.

Direct Examination of Lucy Tan                     Vol 5 - 74

1    Q.   I'm going to show you what's in evidence as

2    Government's Exhibit 5 and ask you if you recognize it?

3    A.   Yes.

4             MR. MAGLIOLO:  May we display that for the jury,

11:11:23   5    Your Honor?

6             THE COURT:  Are you going to use the pad or not?

7    If you are not, move it.

8             MR. MAGLIOLO:  No, I'm not, Your Honor.

9             THE COURT:  Move it all the way to the wall.  How

11:11:39  10    about that?  Just walk it to the wall.

11    Q.   (By Mr. Magliolo)  Now, even though it's someone

12    charged with a crime, do we still try to protect their

13    rights?

14             THE COURT:  Can we blow that up, or do you have a

11:11:58  15    way to bracket and enlarge it?  Okay.

16    Q.   (By Mr. Magliolo)  So we have a 5a that would be a

17    redacted copy that will actually go into evidence in this

18    case.

19             MR. MAGLIOLO:  Could we display 5a just for a

11:12:15  20    moment so the jury can understand what I'm talking about.

21    Q.   (By Mr. Magliolo)  And that -- the redacted portion,

22    some of the information that really, even if someone is

23    charged with a crime, they have no business to have.  So

24    that will be put into the record?

11:12:29  25    A.   Yes.

Direct Examination of Lucy Tan                          Vol 5 - 75

1  **Q.**   Okay.  I direct your attention back to Government's 5

2  and ask you is this part of your subpoenaed records?

3  **A.**   Yes.

4  **Q.**   And is this on a particular account?

11:12:41  5  **A.**   Yes.

6  **Q.**   And what account is it on?

7  **A.**   This is a Washington Mutual, JPMorgan Chase account

8  ending in 6350 in the name of --

9          THE COURT:  Slow down a little bit.  We have

11:12:53  10  interpreters working here, please.

11  **A.**   Yes.  In the name of Raquel Garcia.

12  **Q.**   (By Mr. Magliolo)  What's the significance of that

13  account, generally, in this crime?  Is this the account

14  that's referenced in Count 3 of the charges in this case?

11:13:07  15  **A.**   Yes.

16  **Q.**   And so we're going to talk about something that

17  happened to the money that went through that account?

18  **A.**   Yes.

19  **Q.**   Okay.  So back to 5, is that what we commonly call the

11:13:19  20  signature card on that account?

21  **A.**   Yes.

22  **Q.**   And that helps establish whose account it is?

23  **A.**   Correct.

24  **Q.**   And whose account is it?

11:13:27  25  **A.**   It's in the name of Raquel Garcia.

Direct Examination of Lucy Tan                    Vol 5 - 76

1  **Q.**  And is there a signature card with her name on the

2  bottom?

3  **A.**  Yes, there is a signature.

4  **Q.**  And that's the defendant in this case who is referred

11:13:38  5  to as Tencha?

6  **A.**  Correct.

7  **Q.**  Again, do you see her in the courtroom?

8  **A.**  Yes, I do.

9  **Q.**  Could you describe where she is and an article of her

11:13:47  10  clothing?

11  **A.**  She is sitting over there with gray hair.

12          MR. FAZEL:  I will stipulate to her being in the

13  courtroom with this agent, Your Honor.

14          THE COURT:  Okay.  The record will so reflect.

11:13:57  15  **Q.**  (By Mr. Magliolo)  So what, if anything, in that

16  account drew your attention?

17  **A.**  The majority of the deposits into this account were

18  cash deposits.  There is a total of 207,000 deposits.  Out

19  of that total, approximately 89 percent, which is about

11:14:18  20  183,000, were cash.

21  **Q.**  What is suspicious about that?

22  **A.**  Because in this investigation we know that

23  Ms. Garcia's business, brothel business, is very cash

24  intensive and generates only cash.

11:14:36  25  **Q.**  Were there -- I have lost my cheat sheet.  Were there

Direct Examination of Lucy Tan                    Vol 5 - 77

1    any --

2              MR. MAGLIOLO:  If I might have a moment, Your

3    Honor.

4              THE COURT:  Yes.

11:14:53   5  **Q.**  (By Mr. Magliolo)  Okay.  Were there any particular

6    series of checks that drew your attention?

7    **A.**   Yes.

8    **Q.**   And what were they?

9    **A.**   There were a series of checks going to individuals for

11:15:15   10  house payments.

11   **Q.**   And what reference number have they been assigned in

12   evidence?

13             MR. FAZEL:  I'm sorry.  I didn't understand the

14   question, Mr. Magliolo.  What is the question?

11:15:33   15            MR. MAGLIOLO:  I'm just getting the reference

16   number of the account.

17             MR. FAZEL:  I don't know what the reference

18   number is.

19             MR. MAGLIOLO:  Can we see Exhibit 6?

11:15:54   20            MR. PEREZ:  Joe, six is 400 pages.  It's this

21   huge one.

22             MS. POUNCEY:  It's 400 pages.  It's that huge

23   one.

24             MR. MAGLIOLO:  Can you -- we'll do it from here,

11:16:11   25  Your Honor.  I'll do it from here.  Thanks.

Direct Examination of Lucy Tan                        Vol 5 - 78

1    **Q.**   (By Mr. Magliolo)  What does Exhibit 6 show?

2    **A.**   Exhibit 6 consists of bank statements, checks,

3    deposits and withdrawal items for an account ending with

4    Chase as 6350.

11:16:39  5    **Q.**   What is significant in Exhibit 6?

6    **A.**   This is just -- it shows the activities of the bank

7    account.

8    **Q.**   And anything particular about it that again draws your

9    attention?

11:16:50  10    **A.**   The checks written to others for purchase of homes

11    that were titled to Ms. Garcia's son named David Garcia.

12    **Q.**   And is this bank -- does it have some kind of

13    certification or status?

14    **A.**   Yes.  JPMorgan Chase is FDIC insured.

11:17:16  15    **Q.**   Was it FDIC insured during the course of the

16    conspiracy and the offenses alleged in this indictment

17    against the defendant?

18    **A.**   Yes.

19    **Q.**   I want to draw your attention to Government's C-1,

11:17:33  20    C-2, C-3 and C-4 and ask you generally to tell the ladies

21    and gentlemen of the jury what they are.

22    **A.**   They are checks written from Chase account ending in

23    6350 to Vanderbilt Mortgage.

24    **Q.**   And is what is on a check significant to your

11:17:57  25    investigation, other than, obviously, the name?

1    **A.**   Also, in the memo line it indicates what was the

2    purpose of the check.  It was for a mortgage, Account

3    Number 844340.

4    **Q.**   And who signed the check or whose signature is on the

11:18:19  5    signature line?

6          MR. FAZEL:  Objection, Your Honor, to the form of

7    the question.

8          THE COURT:  Overruled.

9    **A.**   Raquel Garcia.

11:18:25  10   **Q.**   (By Mr. Magliolo)  And does it show on the note line

11   what it is for?

12   **A.**   Yes.

13   **Q.**   And what is it for?

14   **A.**   Mortgage Account 844340.

11:18:37  15         MR. MAGLIOLO:  And if we could briefly display

16   C-2 and C-3 and C-4.  And C-3.

17   **Q.**   (By Mr. Magliolo)  And on the note line on C-3 is

18   there additional information?

19   **A.**   Yes.  It says Ramon Flores and the account number.

11:19:01  20   **Q.**   And that would be -- would that be the same on C-2 and

21   -- C-2 and C-3?

22   **A.**   Yes.

23   **Q.**   And I would direct your attention, if we could display

24   C-4.  And anything significant on that note line?

11:19:19  25   **A.**   It says pay full for the same account number.

Direct Examination of Lucy Tan                    Vol 5 - 80

1  **Q.**  What did you determine from first looking at the

2  checks?

3  **A.**  That -- can you repeat?

4  **Q.**  Yeah.  So you looked at the checks.  And what

11:19:41  5  determination did you make regarding how much money was

6  paid and what it was paid for?

7          MR. FAZEL:  Judge, I'm going to object to

8  compound and ask him to ask --

9          THE COURT:  Sustained.

11:19:50  10          MR. FAZEL:  Thank you.

11  **Q.**  (By Mr. Magliolo)  Did you determine how much money,

12  approximately, was paid by those four checks?

13  **A.**  Yes.  Those four checks totaled approximately $22,265.

14  **Q.**  And did you determine, based upon the checks, what it

11:20:02  15  was paid for?  What was paid?

16  **A.**  It appeared to -- it was to pay off a mortgage.

17  **Q.**  What was your next step in the investigation?

18  **A.**  I subpoenaed Vanderbilt Mortgage for their records on

19  this specific account.

11:20:18  20  **Q.**  And what did you learn from those records?

21  **A.**  That this account was in -- this mortgage is in the

22  name of Ramon Flores.

23  **Q.**  So did it appear that the defendant paid off someone

24  else's mortgage?

11:20:39  25  **A.**  Yes.

1    **Q.**   Is that suspicious behavior to you, based on your

2    training and experience?

3    **A.**   Yes.

4    **Q.**   What did you next do?

11:20:57   5    **A.**   The next thing I did was I went on the Texas

6    Department of Housing and Community Affairs, Manufactured

7    Housing Division database.  It's a government database.

8    **Q.**   Would that be Exhibit 8-E?

9    **A.**   Yes.

11:21:12   10   **Q.**   Can we see that?

11           MR. FAZEL:  Your Honor, before he puts it up,

12   that's the one we discussed previously.  I would lodge my

13   objection at this time for the record.  I understand the

14   Court's position.

11:21:21   15          THE COURT:  All right.  The objection is so

16   noted.  The ruling remains at this time.  Go on.  Wait a

17   second.  We didn't get it on the record last time.  Was

18   that on the record?

19           MR. FAZEL:  I don't remember.

11:21:33   20          MR. MAGLIOLO:  The government's understanding is

21   it is conditionally admitted at this time.

22           THE COURT:  It's going to be conditionally

23   admitted subject to another witness proving it up, proving

24   up the underlying facts, correct?

11:21:44   25          MR. MAGLIOLO:  Correct, Your Honor.

1      MR. FAZEL:  For the record, my objection was

2  hearsay and authentication.

3      THE COURT:  Right.  And just for the record, it's

4  overruled at this time.

11:21:51  5      MR. FAZEL:  Yes, sir.

6  **Q.**  (By Mr. Magliolo)  If we could see 8-E.  Now, what did

7  you learn from 8-E relating to these four checks and the

8  property subject to the Vanderbilt Mortgage?

9  **A.**  This shows the ownership history for the property.  It

11:22:13  10  was a trailer located at 403 Elsbeth in Channelview.  On

11  the bottom of the sheet where it says "ownership history"

12  it shows that on November 17th, 2010, the trailer was

13  transferred from Ramon Flores to David Garcia.

14  **Q.**  And what, if anything, was suspicious about that?

11:22:41  15  **A.**  The trailer itself is titled to David Garcia, but the

16  payments were made out of Ms. Garcia's Chase Bank account.

17  **Q.**  Now, in investigating a criminal case, particularly in

18  your line of work, is one of the things you would normally

19  do is try to determine where the money that perhaps was

11:23:04  20  illegally earned by someone went?

21  **A.**  Yes.

22  **Q.**  And will you examine property records to determine if

23  they have property in their name to help you follow the

24  money?

11:23:18  25  **A.**  Yes.

Direct Examination of Lucy Tan                              Vol 5 - 83

1   **Q.**   And in this case was the property in the name of the

2   person who apparently, who according at least to the bank

3   records, paid for the property?

4   **A.**   No.

11:23:35    5   **Q.**   What does that tell you as an IRS criminal

6   investigator?

7   **A.**   That it appears -- that it appears that there is

8   potential concealment, trying to disguise the properties.

9   I guess the defendant didn't want the property to be

11:23:56   10   associated with her name.

11   **Q.**   And if you can't find the property associated with the

12   defendant, you can't tell what the defendant did with the

13   money she earned?

14   **A.**   Yes.

11:24:08   15   **Q.**   Did you -- would it normally then be that you would

16   want to talk to the person whose name was on the property?

17   **A.**   Yes.

18   **Q.**   And did you talk to David Garcia?

19   **A.**   Yes, I did.

11:24:22   20   **Q.**   And I don't know if I mentioned it.  Did you tell the

21   ladies and gentlemen of the jury that that's the

22   defendant's son?

23   **A.**   Yes.

24   **Q.**   And without telling you specific -- without telling

11:24:34   25   the ladies and gentlemen of the jury specifically what you

Direct Examination of Lucy Tan                    Vol 5 - 84

1    were told, did that confirm your hypothesis that the money

2    was trying to be hidden?

3    **A.**   Yes.

4    **Q.**   I may have skipped it; but just if you would, if we

11:24:58    5    could put 7-A up before the jury and if you could explain

6    to the ladies and gentlemen of the jury what that is?

7    **A.**   7-A is records that I received from Vanderbilt

8    Mortgage for the trailer -- for the trailer, yes.

9    **Q.**   And so, the money went to Vanderbilt.  You checked

11:25:22    10    with Vanderbilt records, found it was a trailer, found out

11    who owned the trailer, who had paid the trailer off and

12    whose property the trailer -- whose name the trailer was

13    now in?

14    **A.**   Correct.

11:25:37    15    **Q.**   Now, based on Government's 8-E, the trailer first went

16    into -- the property that the defendant paid for first

17    went into her son David Garcia's name?

18    **A.**   Yes.

19    **Q.**   Did it later -- was it later transferred again?

11:25:55    20    **A.**   Yes.

21    **Q.**   And would it be fair to say the more transfers of a

22    property, the more difficult it is for you to trace the

23    money?

24    **A.**   That's correct.

11:26:02    25    **Q.**   Who was the final entity that it was transferred in;

Direct Examination of Lucy Tan                        Vol 5 - 85

1    that is, from David Garcia to this final entity?

2    **A.**   It was then later transferred to Tone-Tone Investment,

3    Inc.

4    **Q.**   Were you able to determine who or what Tone-Tone

11:26:22   5   Investment, Inc. was?

6    **A.**   Yes.

7    **Q.**   How did you go about doing that?

8    **A.**   I went on the secretary of state database and searched

9    Tone-Tone Investments, and there was an article of

11:26:35   10   formation for Tone-Tone Investments.

11         MR. MAGLIOLO:   Could we have Government's

12    Number 44, please.

13    **Q.**   (By Mr. Magliolo)   And did this document indicate to

14    you who or what Tone-Tone Investments really was?

11:26:58   15   **A.**   Yes.   David Garcia is listed as the director.

16    **Q.**   This is -- 44 will be a multi-page document?

17    **A.**   Correct.   One, two, three -- the third page.

18    **Q.**   How many pages?

19    **A.**   There is four pages total.

11:27:13   20         MR. FAZEL:   Your Honor, I'm sorry.   I have given

21    a lot of latitude.   I would ask the witness not to talk to

22    the prosecutor about matters when she is on the witness

23    stand.

24         THE COURT:   That's sustained.

11:27:22   25         MR. FAZEL:   Thank you.

1              THE COURT:  Next question.

2    **Q.**  (By Mr. Magliolo)  Is it a multiple-page document?

3    **A.**  Yes.

4    **Q.**  On what page is the son of the defendant's name?

11:27:33    5    **A.**  Three, Page 3.

6              MR. MAGLIOLO:  Can we display that.

7    **Q.**  (By Mr. Magliolo)  Could you kind of point out to

8    the -- it's where the box is that shows the defendant's

9    son.

11:27:49   10    **A.**  Correct.  He is the registered agent; and if you

11    scroll down, it also shows him as the director.

12    **Q.**  And is there a part of that document that he actually

13    signs, or is it just the name is put on there?

14    **A.**  This is filed online most of the time.  So there might

11:28:04   15    not be a signature.

16    **Q.**  Now, I'm going to direct your attention to Count 4.

17    Were you also able to on the Chase Account 6350, the same

18    one that you have been testifying to this jury about that

19    you located the trailer that appeared to be purchased by

11:28:26   20    the defendant but put into someone else's name, were you

21    also able to find another purchase that was made under

22    somewhat suspicious circumstances?

23    **A.**  Yes.

24              MR. MAGLIOLO:  Can we display 5-C for the ladies

11:29:05   25    and gentlemen of the jury?  If not, I can put it on the

Direct Examination of Lucy Tan                    Vol 5 - 87

1  ELMO.

2  **Q.**  (By Mr. Magliolo)  Is there a series of checks, C-5,

3  C-6, C-7, C-8, C-9, C-10, C-11 and C-12 through C-20, that

4  you were able to find that went from that same account of

11:29:47  5  the defendant's, that is 6350, to a different person or

6  entity?

7  **A.**  Yes.

8  **Q.**  And who did these checks go to?

9  **A.**  There were 16 checks to Raymond Holbert.

11:30:02  10  **Q.**  Do you know approximately -- well, if we look at the

11  amount displayed, $1,333.33, was that pretty much the same

12  amount on each check?

13  **A.**  Correct.

14  **Q.**  And do you know what the total amount was?

11:30:16  15  **A.**  Approximately $21,333.

16  **Q.**  And did this raise the same suspicions as the previous

17  checks did?

18  **A.**  Yes.

19  **Q.**  And what did you then do to examine to see if there

11:30:31  20  was some chicanery involved with this transaction?

21  **A.**  I went on the Harris County recorder's office to

22  research the property because on the checks the memo line

23  it would mention house payment and for which property,

24  which is that 16501 North Shore Drive.

11:30:54  25  **Q.**  Did you determine that there was a property and that

Direct Examination of Lucy Tan                         Vol 5 - 88

1   it was sold?

2   **A.**   Yes.

3   **Q.**   Is this something which you would commonly refer to as

4   an owner-finance deal?

11:31:09  5   **A.**   Yes.

6   **Q.**   And does an owner-finance-type operation also reduce

7   the amount of paperwork and make it more difficult for you

8   to track?

9   **A.**   Yes.

11:31:19  10   **Q.**   What did you next do in your investigation?

11   **A.**   Next, I reached out to the seller of this property.

12   **Q.**   And without saying specifically what the seller told

13   you, did they confirm that there was a sale of this

14   property to the defendant in this case?

11:31:43  15   **A.**   Yes.

16   **Q.**   And did you learn additional details about the sale of

17   the property?

18   **A.**   Yes, I did.

19   **Q.**   And where was this property located?

11:31:56  20   **A.**   It's located at 16501 North Shore Drive in

21   Channelview, Texas.

22   **Q.**   Did you learn about the mechanism of the sale of the

23   property?

24   **A.**   Yes.

11:32:05  25   **Q.**   And was there a down payment made?

Direct Examination of Lucy Tan                        Vol 5 - 89

```
        1    A.   Yes.

        2    Q.   Was that down payment in cash?

        3    A.   Yes.

        4    Q.   Do you recall how much it was, approximately?

11:32:18  5    A.   Approximately $50,000 or $60,000.

        6    Q.   And then the rest was paid by the checks that we have

        7    identified to the ladies and gentlemen of the jury?

        8    A.   Yes.

        9    Q.   So what would be the approximate total price of that

11:32:33 10    particular piece of property?

       11    A.   Can you repeat that?

       12    Q.   The total price of that particular property; that is,

       13    the sum of the checks and the sum of the down payment.

       14    A.   I am not sure about that.

11:32:46 15    Q.   Okay.  Because there may have been additional money

       16    other than the down payment and the checks paid for the

       17    property?

       18    A.   Correct.  Mostly because --

       19         MR. FAZEL:  Objection, nonresponsive.

11:32:57 20         THE COURT:  Sustained.

       21    Q.   (By Mr. Magliolo)  Whose name was that property put

       22    in?

       23    A.   This property was titled to David Garcia.

       24    Q.   Did it then transfer to any other entity?

11:33:11 25    A.   Later it was transferred to Tone-Tone Investments,
```

1  Inc.

2  **Q.**   It would be similar to the testimony on the first

3  property, the trailer we talked about?

4  **A.**   Correct.

11:33:20  5  **Q.**   Did you talk to David Garcia to see if he had put any

6  of his money in that property or had any control of that

7  property?

8  **A.**   Yes.

9  **Q.**   And did he confirm your suspicions that he had not put

11:33:34  10  any money in it and he had no control of that property?

11        MR. FAZEL:   Objection to what David Garcia said,

12  Your Honor.  It's hearsay.  He is coming to testify is my

13  understanding.

14        THE COURT:   All right.  What is your response to

11:33:46  15  that?

16        THE WITNESS:   Yes.

17        THE COURT:   No.  No.  I was asking the attorneys.

18  All right.  So much for that.

19        MR. MAGLIOLO:   My response would be right now,

11:33:57  20  Your Honor, we are seeking that answer to explain to the

21  ladies and gentlemen of the jury the way she conducted her

22  activity.

23        THE COURT:   Whatever.  He is entitled to a

24  ruling.  Overruled.  I want to tell you.  This reminds me

11:34:08  25  of something that happened years ago.  It was in state

1    court.  Okay.  It was a civil case.  It was about some

2    medical malpractice issues.  But for some reason I needed

3    a probate judge, an active probate judge to come and

4    testify in my state district court about a matter

11:34:27   5    concerning a mother and a son.

6         So the judge is on the stand, and I know him well.  He

7    just recently passed away.  Jim Scanlan.  He was kind of

8    the dean of the probate judges.  It was going back and

9    forth.  It was very heated.  Some lawyer got up and

11:34:43   10   objected.  The witness said that's overruled.  He was so

11   used to having to give and take that he didn't realize his

12   role at that time.  So it reminded me a little of this.

13        All right.  Go right ahead, Counsel.

14             MR. MAGLIOLO:  Can we display for the jury

11:34:59   15   Exhibit 9-A and let the witness explain what that is.

16   **Q.**   (By Mr. Magliolo)  Now is this again pertaining to

17   this piece of property we have been testifying -- you have

18   been testifying to the ladies and gentlemen of the jury

19   about?

11:35:10   20   **A.**   Yes.

21   **Q.**   And what is this document?

22   **A.**   This is a certified copy of a lien.

23   **Q.**   Who has the lien?  The seller or the borrower?

24   **A.**   This is a lien from the seller.

11:35:23   25   **Q.**   Is there something that is also consistent with this

1    that the borrower would have?

2    **A.**   Yes.

3           MR. MAGLIOLO:  And then could you show -- display

4    Exhibit 9 to the ladies and gentlemen of the jury.

11:35:37  5    **Q.**  (By Mr. Magliolo)  Is that common --

6           MR. MAGLIOLO:  Yeah, 9.

7    **Q.**  (By Mr. Magliolo)  And is that commonly called a deed

8    of trust?

9    **A.**   Yes.

11:35:43  10   **Q.**  And that would be the document that the borrower would

11   have?

12   **A.**   Correct.

13   **Q.**  And it shows David Garcia as the grantor.  What does

14   that mean?

11:35:55  15   **A.**   It shows that David Garcia is the borrower and he --

16   and the loan amount is $80,000.

17   **Q.**  But the records show that the person that paid the

18   loan was the defendant in this case?

19   **A.**   Correct.

11:36:09  20          MR. MAGLIOLO:  Could we display 9-B, please.

21   **Q.**  (By Mr. Magliolo)  What is 9-B?

22   **A.**   9-B is a certified copy of the release of lien for the

23   North Shore property.

24   **Q.**  What does the release of lien mean?

11:36:29  25   **A.**   It means that the loan has been satisfied, paid off.

Direct Examination of Lucy Tan                          Vol 5 - 93

1  **Q.**  Does that show who the alleged owner of that property

2  is now?

3  **A.**  Yes.

4  **Q.**  Who does it show?

11:36:42  5  **A.**  David Garcia.

6  **Q.**  That's different than your records show about the

7  payment of the property, the person that paid for the

8  property?

9  **A.**  Correct.

11:36:48  10  **Q.**  And is there an additional transfer of this property,

11  I believe you testified, to Tone-Tone?

12  **A.**  Yes.

13  **Q.**  That would be --

14      MR. MAGLIOLO:  May we display 9-C to the ladies

11:36:59  15  and gentlemen of the jury.

16  **Q.**  (By Mr. Magliolo)  And that then moves from David

17  Garcia to Tone-Tone Investments?

18  **A.**  Yes.

19  **Q.**  And again, I believe you testified to the ladies and

11:37:16  20  gentlemen of the jury that Tone-Tone Investments is

21  really, at least according to the paperwork, David Garcia?

22  **A.**  Yes.

23  **Q.**  Now, did you attempt to talk to the people that owned

24  the property to learn more about what happened?

11:37:28  25  **A.**  Yes, I did.

1  **Q.**  Was there some problem with that?

2  **A.**  Mr. Raymond Holbert has passed away.

3  **Q.**  Did he carry on most of the negotiations, as best you

4  could tell, on this property?

11:37:43  5  **A.**  Yes, he did.

6  **Q.**  Did you talk to his wife, Mrs. Rita Holbert?

7  **A.**  Yes, I did.

8  **Q.**  Did anything she tell you change your opinion that the

9  defendant paid for the property and then had it put in

11:37:59  10  someone else's name?

11  **A.**  Yes.

12  **Q.**  Did it change your opinion of that or did it confirm

13  your opinion of that?

14  **A.**  It confirmed my opinion.

11:38:07  15  **Q.**  It's your understanding she is going to be here today

16  to testify?

17  **A.**  Correct.

18  **Q.**  I would direct your attention to Count 5.  That would

19  be a property located at 919 Freeport; Houston, Texas?

11:38:21  20  **A.**  Yes.

21  **Q.**  And I'm not sure if I covered it or not -- I think it

22  was in the documents -- but the property in Count 4 was at

23  16501 North Shore; Channelview, Texas?

24  **A.**  Correct.

11:38:32  25  **Q.**  Now, is there another series of checks that you --

Direct Examination of Lucy Tan                              Vol 5 - 95

1  that you determined had something to do with the purchase

2  of property?

3  **A.**  Yes.

4  **Q.**  And out of what account did those checks come from?

11:38:53  5  **A.**  The same Chase account ending in 6350.

6  **Q.**  And would those checks be checks C-21 through C-39?

7  **A.**  Yes.

8  **Q.**  And what is significant about a representative sample

9  of those checks, C-21?

11:39:19  10  **A.**  The checks are made payable to Jean Lillard, and on

11  the memo line sometimes on the checks it would mention

12  house payment and the address of the property.

13  **Q.**  What is the check for?  How much -- what is the amount

14  of the check?

11:39:37  15  **A.**  17 checks were each $1,249.55.

16  **Q.**  And is this, again, what you would call kind of an

17  owner-finance-type of deal?

18  **A.**  Correct.

19  **Q.**  And again, this has minimized the paperwork because it

11:39:56  20  shows -- it appears to show or leaves somebody out of the

21  circle here?

22  **A.**  Yes.

23  **Q.**  That it appears that someone paid off their own loan

24  which, in fact, that's not what happened?

11:40:09  25  **A.**  Yes.

1    Q.   And again, as we did in each of these counts, do we

2    have redacted copies of these checks to substitute for the

3    unredacted checks to put in the record?

4    A.   Yes.

11:40:25    5           MR. MAGLIOLO:  And if we could show Exhibit 10

6    for the ladies and gentlemen of the jury.

7    Q.   (By Mr. Magliolo)  And what is Exhibit 10?

8    A.   Exhibit 10 is a certified copy of a special warranty

9    deed with vendor's lien.

11:40:50   10    Q.   And what does it tell you?

11    A.   It shows that the grantor is Jean Lillard and the

12    grantee is David Garcia.

13    Q.   So is this the same or similar to the events that

14    occurred in the other cases where this piece of property

11:41:05   15    goes into David Garcia's name even though the records show

16    the defendant paid for it?

17    A.   Yes.

18           MR. MAGLIOLO:  Can we display 10-A, please.

19    Q.   (By Mr. Magliolo)  And what is 10-A?

11:41:19   20    A.   This is a deed of trust, again reflecting David Garcia

21    as the grantor and the lender as Jean Lillard.

22    Q.   And whose document is that generally thought to be or

23    who does that document represent?  Who would have that

24    document?  The person who is allegedly buying the property

11:41:42   25    or selling the property?

1    A.   This one is for the person who is buying the property.

2         MR. MAGLIOLO:  And then how about 10-D, if we

3    could see -- let's see, 10-A.  Let's do 10-D since it's up

4    there.

11:42:00  5    Q.   (By Mr. Magliolo)  What is 10-D?

6    A.   10-D is the release of lien for 919 Freeport.

7    Q.   And who does it show or allege is the owner of that

8    property?

9    A.   David Garcia.

11:42:19  10   Q.   And was this property also transferred into Tone-Tone

11   like the last two properties?

12   A.   Yes.

13        MR. MAGLIOLO:  And could we see Exhibit 10-B?  I

14   think we have a duplicate, but let's say 10-B.

11:42:35  15   Q.   (By Mr. Magliolo)  Does that show that the grantor was

16   David Garcia and the grantee, the person who now received

17   the paper ownership of the property, is Tone-Tone

18   Investments?

19   A.   Yes.

11:42:49  20   Q.   I'm going to direct your attention to Count 6 and ask

21   you to explain to the ladies and gentlemen of the jury

22   why -- number one, is there a rule about how much cash you

23   can take to a bank without raising some type of suspicion?

24   A.   The banks are required to --

11:43:19  25        MR. FAZEL:  Objection, nonresponsive to the

Direct Examination of Lucy Tan                    Vol 5 - 98

1   question.

2          THE COURT:  Sustained.

3   **Q.**  (By Mr. Magliolo)  First, is there a rule?

4          THE COURT:  Yes or no.

11:43:25   5   **A.**  Yes.

6   **Q.**  (By Mr. Magliolo)  And what is that?

7   **A.**  The banks are required to file a currency transaction

8   report, also known as CTR, for cash transactions over

9   $10,000.

11:43:39   10   **Q.**  If you know, why was that rule put in place?

11          MR. FAZEL:  Objection as to relevance of the

12   rule, Your Honor.

13          THE COURT:  Overruled.

14   **A.**  So it serves as a tracing mechanism for cash that's

11:43:55   15   flowing through the financial institutions.

16   **Q.**  (By Mr. Magliolo)  And in today's world are most --

17   based on your training and experience, are most legitimate

18   transactions done with something other than cash?  Credit

19   cards or some type of check?

11:44:14   20   **A.**  Yes.

21   **Q.**  So a determination was made, I suppose, by Congress

22   that if it's over $10,000 in cash, we would at least like

23   to know who is presenting it?

24          MR. FAZEL:  Speculation, Your Honor, as to what

11:44:32   25   Congress decided.

1          THE COURT:  Sustained.

2     **Q.**  (By Mr. Magliolo)  If you know.

3          THE COURT:  No.  Sustained.  In other words,

4     passed by Congress.  She explained the position of the

5     agency.  Let's move on.

6          MR. MAGLIOLO:  Okay.

7     **Q.**  (By Mr. Magliolo)  Did you in the course of your

8     investigation determine that there were some checks

9     associated with the defendant that were presented that

10    were under $10,000?

11    **A.**  Yes.

12    **Q.**  And what was the figure that most of those checks were

13    presented for?

14    **A.**  $9,000.

15    **Q.**  What kind of checks were they?

16    **A.**  They were cashier's checks.

17    **Q.**  And how many were there?

18    **A.**  29.

19    **Q.**  And how were they -- what were they -- what were those

20    checks purchased with?

21    **A.**  With cash.

22    **Q.**  Explain to the ladies and gentlemen of the jury what

23    was suspicious about 29 checks all purchased with cash all

24    under $10,000 or $10,000, specifically as to the person

25    they were given to and to the time period they were

1    purchased?

2    **A.**   These 29 cashier's checks were purchased between

3    November -- I'm sorry, September 15, 2011 through November

4    7, 2011, within a two-month period, totaling $259,689.

11:46:14    5    And some of these checks were purchased on the same day at

6    the same branch within minutes of each other or on the

7    same day at different banks, different bank branches

8    within hours of each other.  And, also, they were -- some

9    of them were purchased on, you know, consecutive days.

11:46:37    10   **Q.**   And this you learned from subpoenas of the banks who

11   issued those checks, correct?

12   **A.**   Yes.

13   **Q.**   And you -- without slowing this down, Exhibit 40 to

14   Exhibit 68, which is in evidence, would be those checks?

11:46:59    15   **A.**   Correct.

16   **Q.**   Is it more suspicious if the person goes to the same

17   -- if all those checks go to the same person as opposed to

18   different folks?

19   **A.**   Yes.

11:47:10    20   **Q.**   Did all of those checks go to same person?

21   **A.**   Yes.

22   **Q.**   Were you curious about who obtained those checks?

23   **A.**   Yes.

24   **Q.**   And were you able to determine that?

11:47:25    25   **A.**   Yes.

Direct Examination of Lucy Tan          Vol 5    101

1  **Q.**   How did you determine that?

2  **A.**   The checks were all payable to an attorney, Michael

3  Von Blon.  I interviewed Mr. Von Blon and --

4  **Q.**   Without saying what he -- specifically what he told

11:47:39  5  you -- by the way, will he be here to testify?

6  **A.**   Yes, he will.

7  **Q.**   And did that cause you to further your investigation

8  in a certain way?

9  **A.**   Yes.

11:47:51  10  **Q.**   What did you then do?

11  **A.**   What, with Mr. Von Blon?

12  **Q.**   No.  Based on what he told you and what you had

13  learned so far, then what did you do to further your

14  investigation?

11:48:03  15  **A.**   Some of these checks were purchased by the defendant,

16  the codefendant, their family members and associates.

17          MR. MAGLIOLO:  Can we direct the -- could we have

18  C-42a.

19  **Q.**   (By Mr. Magliolo)  What is C-42a?

11:48:33  20  **A.**   This is a cashier's check purchased from JPMorgan

21  Chase by Graciela Ochoa for $9,000.

22  **Q.**   Who is Graciela Ochoa?

23  **A.**   Graciela Ochoa is Ms. Garcia's daughter.

24  **Q.**   And there is a notation spot on the check?  There is a

11:48:55  25  notation there?

```
            1   A.   Yes.

            2   Q.   Who is that?

            3   A.   Delia Diaz.

            4   Q.   Who is she?

11:49:01    5   A.   Delia Diaz is also Ms. Garcia's daughter.

            6             MR. MAGLIOLO:   Could we see check number 43-A.

            7   Q.   (By Mr. Magliolo)   Can you explain to the ladies and

            8   gentlemen what 43-A is?

            9   A.   43-A is another check dated September 22nd, 2011,

11:49:28   10   purchased by Raquel Garcia for $9,000.

           11   Q.   And is this, again, fairly typical of the checks that

           12   you described to the ladies and gentlemen of the jury?

           13   A.   Yes.

           14   Q.   Are there some notations on there that also piqued

11:49:46   15   your curiosity, to say the least?

           16   A.   Yes.  It has Delia Diaz' name handwritten on it.

           17   Q.   How about 48-A?  What is 48-A?

           18   A.   This is a cashier's check purchased on October 20th,

           19   2011, at Capital Bank for $9,000 by Diana Marquez Garcia.

11:50:22   20   Q.   Who is she?

           21   A.   Diana Marquez is Ms. Garcia's daughter.

           22   Q.   Again, they go to the same person, attorney Michael

           23   Von Blon?

           24   A.   Correct.

11:50:38   25   Q.   And all purchased within the time frame that you
```

1  described to the ladies and gentlemen of the jury?

2  **A.**   Yes.

3       MR. MAGLIOLO:  50-A, if we could see it.

4  **Q.**   (By Mr. Magliolo)  What is significant about this

11:50:59  5  check?

6  **A.**   This check is dated October 24, 2011, purchased at

7  Bank of America for $9,000, purchased by Guadalupe Lugo.

8  **Q.**   Would that be the same Guadalupe Lugo the jury has

9  already heard some information about and is a codefendant

11:51:21  10  in this case?

11  **A.**   Yes.

12  **Q.**   Again, to the same person and the same time period?

13  **A.**   Yes.

14       MR. MAGLIOLO:  55-A, if we could.  I'm not sure

11:51:31  15  if that was 50 or 55.

16  **Q.**   (By Mr. Magliolo)  What is the significance of that

17  check?

18  **A.**   This is a check from Bank of America purchased on

19  October 26th, 2011, for $9,000 by Ms. Raquel Garcia.

11:51:53  20  **Q.**   That's the defendant in this case?

21  **A.**   Correct.

22  **Q.**   And that is, again, to the same person, Michael Von

23  Blon?

24  **A.**   Yes.

11:52:02  25       MR. MAGLIOLO:  If we could have 60-A, please.

Direct Examination of Lucy Tan                    Vol 5 - 104

 1    **Q.**   (By Mr. Magliolo)  What is the significance of this

 2    check?

 3    **A.**   This is purchased at Chase on November 1st, 2011, for

 4    $9,000 by Graciela Ochoa.

11:52:24   5    **Q.**   And who is Graciela?  I think you already told the

 6    jury but just for the record.

 7    **A.**   Ms. Garcia's daughter.

 8    **Q.**   And, again, $9,000 to the same lawyer in the same time

 9    period?

11:52:36  10    **A.**   Correct.

11    **Q.**   And how about 67-A?  What is the significance of this

12    check?

13    **A.**   This check is purchased at Bank of America dated

14    November 7, 2011, for $9,000 purchased by Diana Garcia

11:52:58  15    Marquez.

16    **Q.**   Who is Diana?

17    **A.**   Ms. Garcia's daughter.

18    **Q.**   Same time period?  Same amount?

19    **A.**   Correct.

11:53:07  20    **Q.**   To the same person?

21    **A.**   Yes.

22    **Q.**   Now, to keep us from having to go through every check

23    and check by check, did you prepare a summary of the

24    checks?

11:53:15  25    **A.**   Yes, I did.

1          MR. MAGLIOLO:  Might I have just a moment, Your

2     Honor?

3          THE COURT:  Yes, sir.

4          MR. MAGLIOLO:  Could we take a look at

11:53:38    5     Government's 43, Your Honor.

6     Q.  (By Mr. Magliolo)  Will you explain Government's 43 to

7     the ladies and gentlemen of the jury.

8     A.  This is a summary of the 29 checks from -- the first

9     date of the check was September 15, 2011, and the last

11:53:57   10     date of the check is 11 -- I mean, November 7, 2011.  And

11     it shows the transaction date, the check number, the

12     amount, who purchased it, at what bank and the branch

13     location and the time.

14     Q.  And the checks we have just previously gone over, were

11:54:17   15     most of the checks that you could locate the person who

16     got the check and then would talk to you about it?

17     A.  Yes.

18     Q.  Now, you mentioned to the ladies and gentlemen of the

19     jury earlier that other suspicious things were the time

11:54:30   20     they were purchased, the time and spatial time.  That is,

21     how close they were purchased to each other, particularly

22     on one day, and other times how they were purchased

23     consecutive days?

24     A.  Correct.

11:54:46   25     Q.  Could you point that out to the ladies and gentlemen

Direct Examination of Lucy Tan                    Vol 5

        1    what you saw from examining the checks that made the

        2    continued purchase of these $9,000 checks under the

        3    $10,000 limit suspicious to you as a criminal

        4    investigator?

11:55:00 5   **A.**   For example, lines 3 and 4.  Lines 3 and 4 dated --

        6    there were two checks purchased on September 22, 2011,

        7    each for $9,000.  One was purchased by Graciela Ochoa; and

        8    the other one was purchased by Ms. Raquel Garcia, both at

        9    the same bank branch.  And as you can see on line 3, the

11:55:28 10  first check was purchased at 9:35 a.m.; and the second

       11    check was purchased at 9:41 a.m.

       12            THE COURT:  All right.  I think -- I got informed

       13    that everyone's food is ready.  We're on a unique schedule

       14    today.  All right.  It's now -- I have about 11:55.  We're

11:55:49 15  going to take -- we're going to get back in and ready to

       16    resume at 12:40.  All right.  So it's shorter; but you

       17    have got a full spread in there, I understand.

       18            MR. MAGLIOLO:  Was that for all of us, Your

       19    Honor?

11:56:04 20          THE COURT:  No.  Not even for the Judge unless

       21    anything is left over.  I get first on the leftovers.  At

       22    the end of the day we always come and look.  Giving away

       23    what goes on behind the scenes.  But, no, you are welcome.

       24    It's for the jury, all 14 of you.  We'll see you back at

11:56:23 25  12:40.  And then, we'll go right about to 2:30.  Not later

1    than 2:30.  We will see you at that time.

2              THE MARSHAL:  All rise for the jury.

3         (Jury exited courtroom at 11:56 a.m.)

4         (Recess from 11:56 a.m. to 12:43 p.m.)

12:43:32   5              THE COURT:  All right.  I understand that the two

6    witnesses have elected to testify, correct?

7              MR. PEREZ:  That's my understanding, Your Honor.

8              THE COURT:  How do you propose going about that?

9    We don't want to keep the attorneys here any additional

12:43:45  10    time, but let me just ask both of the attorneys on the

11    record:  Would you state your name for the record.

12              MR. ARDOIN:  Jimmy Ardoin for Juan Carlos Munoz.

13              MS. RODRIGUEZ:  And Lourdes Rodriguez for

14    Mr. Juan Cepeda.

12:44:05  15              THE COURT:  On the record, thank you for coming

16    down here on such short notice.  You have visited with

17    these individuals as officers of the court and friends of

18    the court and as experienced defense lawyers.  Do you

19    believe they understand what their rights are not to

12:44:18  20    testify?

21              MR. ARDOIN:  Yes, Your Honor.

22              MS. RODRIGUEZ:  Yes, Your Honor.

23              THE COURT:  Do they understand the whole matter

24    and potential self-incrimination?

12:44:26  25              MR. ARDOIN:  Yes, Your Honor.

1          MS. RODRIGUEZ:  Yes, Your Honor.

2          THE COURT:  Each of them, to your mind, as

3   independent attorneys and having visited with them upon

4   request of the Court, believe that they understand it and

12:44:37   5   that they have agreed to testify with full knowledge?

6          MS. ARDOIN:  Yes, Your Honor.

7          MS. RODRIGUEZ:  Yes, Your Honor, with one caveat.

8          THE COURT:  Go ahead.

9          MS. RODRIGUEZ:  Anything related to an unknown

12:44:51   10   sexual assault and that can't be proven at this point, he

11   will have to take The Fifth to anything related to the

12   assault.

13          MR. MAGLIOLO:  He told -- I think the evidence is

14   he told Chapuseaux that he did have sexual relations with

12:45:03   15   one of the victims who was 16 at the time.

16          MR. FAZEL:  And who testified.

17          MR. MAGLIOLO:  And who has testified.

18          THE COURT:  All you have to do then is you

19   understand you have to carve around that or you are going

12:45:14   20   to get a Fifth Amendment objection.

21          MR. MAGLIOLO:  Right.

22          MR. PEREZ:  We are not going to go into that.

23          THE COURT:  I'm just saying you understand that?

24          MR. MAGLIOLO:  Yes, Your Honor.

12:45:22   25          THE COURT:  Now, with that understanding and that

1   assertion, are you going to stick around or --

2              MS. RODRIGUEZ:  I am.

3              MR. ARDOIN:  I'll be happy to stick around, Your

4   Honor.

12:45:31   5              THE COURT:  It's up to you.  I wanted you to put

6   that on the record.  But you are going to be a while with

7   these people, correct?

8              MR. MAGLIOLO:  Yes, Your Honor.

9              THE COURT:  When do you want to start?  Do you

12:45:39  10   want to start today, or do you want to start next week?

11              MR. PEREZ:  Your Honor, as far as the

12   confidential informants, we can start with them Monday

13   morning; but they were ready to go this morning.

14              THE COURT:  I understand that.  But they are

12:45:51  15   taken care of and have got people watching them, if

16   necessary.  We don't want any harm to come to them,

17   correct?

18              MR. PEREZ:  Yes, sir.

19              THE COURT:  So why don't you do this.  I'm going

12:46:01  20   to give you a minute or so, if you would visit with

21   defense counsel.  Find what is the best time for them; and

22   we'll take people out of order, if necessary.

23              MR. MAGLIOLO:  Speaking of that, we have an agent

24   here that we would like to -- because of our order change,

12:46:13  25   we called him in.  He was getting ready to leave with his

         1   family on vacation.  Only one question.  I'd like to put

         2   him on first.  One question.  Counsel for the defense has

         3   three or four questions, and we will then get back.

         4              THE COURT:  Get back to?

12:46:26 5              MR. MAGLIOLO:  Get back to Ms. Tan.  The

         6   government is almost done with Ms. Tan.

         7              THE COURT:  Okay.

         8              MR. PEREZ:  Then we have Ms. Tan, Your Honor.

         9   And we have somebody from the Y.  And then we have got

12:46:37 10  Mr. Perry.  I don't know how much longer.  That's all we

        11   have at this point.

        12              THE COURT:  For the whole case?

        13              MR. PEREZ:  No.  No.  No.  For today.

        14              THE COURT:  I don't know if we can get it all on

12:46:47 15  today.  The bottom line is we'll get these two

        16   confidential informants on Monday, correct?

        17              MR. PEREZ:  Okay, Your Honor.

        18              MR. MAGLIOLO:  That's fine.

        19              THE COURT:  I'm going to take a break.  Where is

12:46:56 20  Ellen?

        21              CASE MANAGER:  Right here, Judge.

        22              THE COURT:  There you are behind the flag.  You

        23   blended in with the flag.  If you would, visit with the

        24   attorneys with their schedules.  Okay.  Let me just tell

12:47:08 25  the jury that we have been out here and that we'll get to

Proceedings                                        Vol 5

 1   them in two or three minutes.  Okay.

 2          MR. FAZEL:  Your Honor, one other issue.  We can

 3   just talk about this, Mr. Magliolo and I.

 4          THE COURT:  Do you want to do it on the record?

12:48:05  5          MR. FAZEL:  On the record.

 6          THE COURT:  By the way, don't forget -- to our

 7   defense counsel, don't forget to submit forms for this for

 8   your time.  Really.

 9       Yes.  What do you want on the record?

12:48:16 10          MR. FAZEL:  If it please the Court, it's my

11   understanding it is the government's position to both

12   counsel for the confidential informants that they are not

13   going to charge the confidential informants in federal

14   court.  I think that's a benefit being offered to them,

12:48:28 15   and I'm going to cross-examine them on that.  I want the

16   Court to be aware of that.  I want it on the record so

17   there is no issue about it on Monday morning.

18          MR. PEREZ:  I don't see a problem.

19          THE COURT:  You see a problem?

12:48:38 20          MR. PEREZ:  No.

21          THE COURT:  Problem?

22          MR. MAGLIOLO:  No, Your Honor.

23          MR. FAZEL:  It's just --

24          THE COURT:  Good.  Thank you for letting me know.

12:48:44 25   I told them they could expect a couple of more minutes.

Proceedings                                           Vol 5

 1    Everyone just hang lose until you get that stuff.

 2          (Recess from 12:49 p.m. to 12:52 p.m.)

 3          MR. MAGLIOLO:  With the Court's permission, we

 4    will call Special Agent Perry.

12:51:25    5    THE COURT:  All right.  Let's get the jury in,

 6    please.

 7          THE MARSHAL:  All rise.

 8          (Jury entered courtroom at 12:51 p.m.)

 9          THE COURT:  Thank you.  You can be seated.  We're

12:52:06   10    going to have one witness out of order for just one or two

11    questions.  I will say, as you walked in, if you heard me

12    say "yes," what happened was -- what is it?  One of the

13    attorneys was testing the microphone.

14          And it reminds me.  About a year ago I had a young

12:52:24   15    man.  First time ever in a courtroom.  He was a witness.

16    He was a witness.  Very nervous and completely focused on

17    the lawyers.  I came in and asked a question; and he said,

18    "Who said that?"  Because I've got a microphone.  I'll

19    never forget that.  It reminded me of that occurrence.

12:52:48   20    It was, Ellen, about a year ago, wasn't it?  Do you

21    remember?

22          CASE MANAGER:  Yes, sir.

23          THE COURT:  "Who said that?"  He is looking up.

24    Oh, me.  All right.

12:52:56   25    Call your next witness.  We have a very short witness

1    we're taking out of order.

2             MR. MAGLIOLO:  Special Agent Perry, Your Honor.

3             THE COURT:  Raise your right hand to be sworn.

4             THE WITNESS:  (Complying.)

12:53:19  5       (Witness sworn by the case manager.)

6             THE COURT:  Thank you.  You may have a seat.  Go

7    right ahead.

8                         **PIERRE PERRY,**

9    having been first duly sworn, testified as follows:

12:53:22  10                   **DIRECT EXAMINATION**

11   BY MR. MAGLIOLO:

12   **Q.**   Please state your name for the ladies and gentlemen of

13   the jury.

14   **A.**   My name is Special Agent Pierre Perry.

12:53:31  15   **Q.**   How are you employed?

16   **A.**   I'm a special agent with the Department of Homeland

17   Security, Immigration and Custom Enforcement, Homeland

18   Security Investigations or H.S.I.

19   **Q.**   What do you do for those folks?

12:53:40  20   **A.**   I'm a special agent.  I have been so since

21   approximately February of 2008.

22   **Q.**   Do you have any particular special training in

23   determining whether people are legally or illegally in the

24   country?

12:53:50  25   **A.**   Yes, I do.

1  **Q.**   And did you know Deputy Chapuseaux?

2  **A.**   I do.

3  **Q.**   And did he submit to you a list of folks that were

4  arrested on 10-10-2013 at Las Palmas 2?

12:54:05  5  **A.**   Yes, he did.

6  **Q.**   Did you evaluate that list to see which of those folks

7  or how many of those folks were in the country illegally

8  at the time of their arrest at Las Palmas?

9  **A.**   Yes, I did.

12:54:18  10  **Q.**   Do you remember how many people were on the list?

11  **A.**   I believe there was approximately 21 who were arrested

12  the day of the raid.

13  **Q.**   And how many were illegally in the country the day of

14  the arrest at Las Palmas?

12:54:29  15  **A.**   The date of the arrest, I believe all 21 were illegal.

16  However, one had a temporary status.  So 20 of them were,

17  you would say, completely illegal; but all 21, I believe,

18  had illegally entered the U.S.

19          MR. MAGLIOLO:  Pass the witness, Your Honor.

12:54:44  20          THE COURT:  Any questions?

21          MR. FAZEL:  Yes, Your Honor.

22                  **CROSS-EXAMINATION**

23  BY MR. FAZEL:

24  **Q.**   Of the 20 folks that you reviewed their file, were

12:54:49  25  most of them females?

Cross-Examination of Pierre Perry          Vol 5

```
         1    A.   I believe it was a mixture of them, but the majority
         2    were females.
         3    Q.   And most of those folks were deported back to their
         4    countries of origin?
12:54:58 5    A.   That's correct.
         6    Q.   And none of those folks claimed any type of issues
         7    regarding trafficking or slavery or anything like that; is
         8    that correct?
         9    A.   I didn't go through the -- I reviewed them for their
12:55:09 10   alienage.  I didn't see any claims submitted on their
         11   behalf.
         12   Q.   If they had, certainly there is procedures that your
         13   agency has to keep them here and have assistance for them;
         14   is that correct?
12:55:19 15   A.   Yes, there are.
         16   Q.   Now, I want to direct your attention to that type of
         17   activity; that is, to assist folks.  You know what a
         18   T-visa is, correct?
         19   A.   Yes, I do.
12:55:27 20   Q.   Okay.  And a T-visa is issued to folks that are
         21   claiming that they were somehow involved in trafficking;
         22   is that correct?
         23   A.   Or a victim of trafficking, correct.
         24   Q.   I understand.  Sorry.  A victim of trafficking or
12:55:39 25   witness to that effect, correct?
```

1  **A.**   Correct.

2  **Q.**   And that visa is something that your agency assists

3  the Department of Justice with, the prosecuting branch of

4  the Department of Justice with at times; is that correct?

12:55:50  5  **A.**   Can you rephrase?

6  **Q.**   Sure.  When the agency, the DOJ, the assistant of the

7  United States Attorney's office needs a witness or

8  somebody to remain in the country, then they seek your

9  agency's assistance in obtaining that type of visa; is

12:56:05  10  that correct?

11  **A.**   They can.  We are not the actual agency -- we are not

12  the actual agency that issues the T-visa, but we are

13  called from time to time to assist the USA at times.

14  **Q.**   Who is the agency that actually issues the T-visa?

12:56:15  15  **A.**   That would come from the Citizenship and Immigration

16  Services or CIS.

17  **Q.**   Which is part of Homeland Security?

18  **A.**   Correct.

19  **Q.**   But just a different section?

12:56:24  20  **A.**   Correct.

21  **Q.**   And in order for them to obtain the T-visas, they

22  submit applications and requests of certain people?

23  "They" being the prosecutors, they submit applications and

24  documents so that these individuals can remain in the

12:56:36  25  country, correct?

1    **A.**   Correct.

2    **Q.**   Okay.  Now, I'm going to hand you what I have handed

3    you before.  I know you are in a rush.  Are you ready?

4    **A.**   Sure.

12:56:55   5    **Q.**   Okay.  That's a letter that I handed you right before

6    the jury walked in, right?

7    **A.**   Yes, it is.

8    **Q.**   Okay.  And it's a kind of a standard letter that is

9    used in these circumstances in order to assist people with

12:57:07  10    the T-visas, correct?

11    **A.**   Well, I mean, lots of people can submit a letter; but

12    this came from the Department of Justice.  So I assume

13    it's a form letter.

14    **Q.**   And is it -- is there somebody specific that it came

12:57:21  15    from?

16    **A.**   Yes, it is.

17    **Q.**   Is that person in the courtroom today?

18    **A.**   Yes, he is.

19    **Q.**   Is he waving at you?

12:57:25  20    **A.**   Yes, he is.

21    **Q.**   Is he asking for adjustment of status of individuals?

22    The last paragraph.

23    **A.**   Yes, he is.

24    **Q.**   Okay.  So that's pretty standard for the Department of

12:57:39  25    Justice to help people that they are witnesses for the

1  Department of Justice to obtain an adjustment of status;

2  is that correct?

3  **A.**   I can't tell you the standard of practice of the

4  Department of Justice.

12:57:51  5  **Q.**   It is not something that's unusual, is it?

6  **A.**   No, it's not unusual.

7          MR. FAZEL:  I pass the witness, Your Honor.

8          MR. MAGLIOLO:  No further questions.

9          THE COURT:  Thank you.  You may step down.  Thank

12:58:00  10  you for coming.  You are free to go.  You are excused to

11  leave.  While he is leaving, give me his name, please.

12      (addressing witness)  Not you.  You don't need to give

13  it to me.  You have got other things to do.  You have

14  family matters.

12:58:14  15          MR. MAGLIOLO:  Pierre Perry, Your Honor.

16  P-i-e-r-r-e.

17          THE COURT:  P-e-r-r-y?

18          MR. PEREZ:  P-e-r-r-y, Your Honor.

19          THE COURT:  What agency is he with?

12:58:26  20          MR. PEREZ:  Homeland Security.

21          THE COURT:  All right.  Special Agent Tan, do you

22  want to return to the witness stand, please.

23          MR. MAGLIOLO:  Your Honor, we're going to mark

24  this letter that counsel for the defense mentioned with

12:58:42  25  the last witness so we can put it -- offer it in evidence.

Direct Examination of Lucy Tan                          Vol 5

```
 1              THE COURT:  Any objection?
 2              MR. FAZEL:  Not at all, Your Honor.
 3              THE COURT:  What exhibit number will this become?
 4              MS. POUNCEY:  55.
 5              THE COURT:  Government 55.
 6              MR. FAZEL:  Can I have my copy back?
 7              MS. POUNCEY:  That's the only copy I have.
 8              THE COURT:  During the break we'll run a copy.
 9    Government 55 is admitted.
10              MR. MAGLIOLO:  May I proceed, Your Honor?
11              THE COURT:  Yes.  Go right ahead.
12              MR. MAGLIOLO:  Can we see Exhibit 48-A, please.
13    Well, we're not going to see 48-A, Your Honor.  I have the
14    wrong note here.  So let me just proceed in another
15    direction.
16         Can we see Exhibit Number 43.
17                        LUCY TAN,
18    having been first duly sworn, testified as follows:
19                  DIRECT EXAMINATION (continued)
20    BY MR. MAGLIOLO:
21    Q.   Okay.  I believe we were talking about activities that
22    happened during the course or the checks that caused
23    suspicion, particularly about the time period in which the
24    checks were obtained and the location of the checks.  I
25    think you directed the jury's attention to lines 3 and 4,
```

Direct Examination of Lucy Tan                      Vol 5

1    that two checks were purchased by two different people

2    within minutes of each other for the same amount, $9,000,

3    and at the location.

4         Explain to the ladies and gentlemen if you could

5    determine any reason, legitimate reason for two checks to

6    be purchased for $9,000 to the same person within minutes

7    of each other other than to avoid the $10,000 reporting

8    requirement?

9         MR. FAZEL:  Object to the form of the question.

10        THE COURT:  Sustained.

11   **Q.**  (By Mr. Magliolo)  Did the fact that those checks were

12   purchased in the manner that they were lead you to believe

13   that you were proceeding in the right direction on your

14   investigation?

15   **A.**  Yes.

16   **Q.**  Would you point out for the ladies and gentlemen of

17   the jury what other suspicious checks you were able to

18   locate and, if you list it in your summary, that lead you

19   to believe that you were proceeding in the correct

20   direction?

21   **A.**  Lines 8 through 10, three checks purchased on October

22   20th, 2011, at three different banks by Diana Marquez,

23   Delia Diaz and Abel Medeles for $9,000 each.

24   **Q.**  What is suspicious about that?

25   **A.**  These three checks total over $10,000, but each of

1  them were below -- were $9,000.

2  **Q.**  Because of -- and they do total over that and because

3  of the period of time they were purchased?

4  **A.**  Correct.

01:02:06  5  **Q.**  And is there anything else you would like to point out

6  to the ladies and gentlemen of the jury?

7  **A.**  Yes.  They were purchased by family members related to

8  the defendant.

9  **Q.**  And were they not only family members but people that

01:02:19  10  were named, at least most of them were people named in

11  this indictment, but people named in this indictment?

12  **A.**  Yes.

13  **Q.**  Anything else you can point out to the ladies and

14  gentlemen of the jury other than the totality of the

01:02:37  15  circumstances in the list?

16      MR. FAZEL:  Judge, if I could get the

17  prosecutor -- I'm sorry.  I object to the form of the

18  question.  I object to "anything else you want to point

19  out."

01:02:48  20      THE COURT:  Okay.  Sustained.

21      MR. MAGLIOLO:  As to this particular list of

22  checks, Your Honor, is what I unartfully said.

23  **A.**  All these checks were made payable to attorney Michael

24  Von Blon, and they were deposited on the same day into his

01:03:04  25  escrow account.

1    **Q.**   (By Mr. Magliolo)   What was the total amount?   Is that

2    the total at the bottom, $259,689.07?

3    **A.**   Yes.

4    **Q.**   Did you investigate the various members that you

01:03:27    5    have -- the family members that you have recited to the

6    grand jury who purchased these checks and were also

7    involved in this case to determine if they had the type of

8    money that would allow them to purchase these $9,000

9    checks?

01:03:47    10    **A.**   No.

11    **Q.**   They did not have the money to do that?

12    **A.**   Correct.

13    **Q.**   And did you in your investigation determine what the

14    purpose of these checks was?

01:03:58    15    **A.**   Yes.

16    **Q.**   And did the various family members, other than one,

17    have anything to do with the purpose of the payment to the

18    attorney Von Blon?

19    **A.**   Yes.

01:04:12    20    **Q.**   Okay.   Maybe I didn't -- other than the two, have

21    anything to do with it?   In other words, did Diana Diaz

22    have anything to do with the reason the money was paid to

23    Von Blon?

24    **A.**   No.

01:04:30    25    **Q.**   Did -- let's see who else.   Did the other family or

Direct Examination of Lucy Tan                          Vol 5

1  did Ms. -- did Lupe have anything to do with it?

2  **A.**   No.

3  **Q.**   Did any of the people on the list, other than the

4  defendant and perhaps Delia, have anything to do with why

01:04:48  5  the funds were given to Von Blon?

6  **A.**   No.

7  **Q.**   Did you do an analysis of the money that came into the

8  brothel?

9  **A.**   Yes.

01:05:07  10  **Q.**   And did you find anything, other than the money that

11  came into the brothel, that would have supplied the money

12  for government's Counts 3, 4, 5 and 6, the money

13  laundering counts, which you have just testified to this

14  jury about?

01:05:31  15  **A.**   Can you --

16  **Q.**   Yes.   Did you find any other location this much money

17  in cash could have come from in your investigation other

18  than from the money made at Tencha's brothel?

19  **A.**   No.

01:05:48  20  **Q.**   Was there a business, a small business also associated

21  with this group of people?

22  **A.**   Yes.

23  **Q.**   Do you recall what it was?

24  **A.**   It's a clothing boutique.

01:06:01  25  **Q.**   Did you investigate that clothing boutique to

1  determine if it could come up with anywhere near the kind

2  of cash money that is associated with the money laundering

3  counts in this case?

4  **A.**   Yes.

01:06:13   5  **Q.**   And as a result -- what were the results of your

6  investigation?

7  **A.**   I reviewed the bank records for this boutique, which

8  is called La Princessa -- it's located at 919 Freeport in

9  Houston, Texas -- from the periods for the years 2008

01:06:32   10  through 2012.  There were a total of approximately 417 --

11  I'm sorry.  There is a total of $415,024 in total

12  deposits.  And out of the deposits there is approximately

13  $96,253 in cash, and the remaining balance -- remaining

14  deposits were credit cards and other checks and transfers.

01:07:03   15  **Q.**   And you don't really know even if the deposits into

16  that account were legitimate or not?

17          MR. FAZEL:  Objection to the form of the

18  question, Your Honor.

19  **Q.**   (By Mr. Magliolo)  If you know.

01:07:12   20  **A.**   No.

21  **Q.**   When does a transaction become a financial

22  transaction?

23  **A.**   When it --

24          MR. FAZEL:  Object.  Asks for a legal conclusion.

01:07:34   25          THE COURT:  Overruled.  Within the scope of her

Direct Examination of Lucy Tan                                    Vol 5   125

 1   knowledge as an IRS agent in the criminal investigation

 2   division, not as an attorney.  Go on.

 3        By the way, are you an attorney?

 4             THE WITNESS:  No, I'm not.

01:07:49  5             THE COURT:  Very often, you know, folks are.  You

 6   are probably better off not being an attorney.  Look what

 7   happens to us as we get older.  Go on.

 8   **Q.**   (By Mr. Magliolo)  When does a transaction become a

 9   financial transaction?

01:08:04 10  **A.**   When a transaction becomes -- a transaction becomes a

11   financial transaction when it affects interstate and

12   foreign commerce.

13   **Q.**   When a transaction involves a check to a bank that's

14   FDIC insured does it, per se, affect interstate commerce?

01:08:26 15  **A.**   Yes.

16   **Q.**   And I believe we have already shown the jury the

17   documents showing that Chase Bank, which affects Counts 3,

18   4 and 5, that particular account was FDIC insured?

19   **A.**   Correct.

01:08:40 20             MR. MAGLIOLO:  Could we have 48-A posted to the

21   ladies and gentlemen of the jury.  I'm sorry.  It's not in

22   the machine.  Let me show you --

23             THE COURT:  Do you want the overhead?

24             MR. MAGLIOLO:  I need the overhead, Your Honor.

01:08:54 25             THE COURT:  Hang on a second.

Direct Examination of Lucy Tan                              Vol 5

1           MR. MAGLIOLO:  May I proceed, Your Honor?

2           THE COURT:  Yeah.  Go on.

3    **Q.**  (By Mr. Magliolo)  What is 48-A?

4    **A.**  This is a certificate of proof of insured status for

5    Independence Bank located in Houston, Texas; and this is

6    records from FDIC.

7    **Q.**  What is the significance of Independence Bank?

8    **A.**  Independence Bank is where the series of 29 cashier's

9    checks were deposited into.

10          THE COURT:  It is a federally-insured

11   institution?

12          THE WITNESS:  Correct.

13   **Q.**  (By Mr. Magliolo)  And that's a document showing that

14   it is?

15          THE COURT:  Where are they located?

16          THE WITNESS:  They are located in Houston, Texas.

17   **Q.**  (By Mr. Magliolo)  Within the jurisdiction of the

18   Southern District of Texas?

19   **A.**  Yes.

20   **Q.**  So both the banks involving all the checks that you

21   have testified to before the ladies and gentlemen of the

22   jury are FDIC insured so that those checks would be

23   financial transactions affecting interstate commerce?

24          MR. FAZEL:  I object.  That's asking for a

25   legal --

Direct Examination of Lucy Tan                              Vol 5

1          THE COURT:  Sustained.  I think I give a

2    definition of interstate commerce --

3          MR. MAGLIOLO:  You do, Your Honor.

4          THE COURT:  -- in the instructions.  That will

01:10:16  5    suffice.  Just make sure it's in there.  I know it's in

6    there with, you know, if weapons travel interstate

7    commerce.  That's one of the requirements.  It has nothing

8    to do with this case.  So I know it's in that standard

9    charge.  If it happens not to be in this one, just bring

01:10:31  10   it to my attention.

11         MR. MAGLIOLO:  Okay.  Your Honor, normally now I

12   would go into these four binders that we talked about

13   earlier involving the cooperator's testimony.  May we

14   approach the bench on that?

01:10:47  15         THE COURT:  No.  Let's go.  Just tell me about

16   it.  They are going to be testifying, right?

17         MR. MAGLIOLO:  They are going to be testifying,

18   Your Honor.

19         THE COURT:  All right.  With that stipulation

01:10:53  20   that if they don't testify to this it's going to be a real

21   problem.

22         MR. MAGLIOLO:  Yes, Your Honor.

23         THE COURT:  With the understanding that they will

24   be testifying, I'll allow it to go in.  And to which you

01:11:05  25   object at this time --

Direct Examination of Lucy Fan                    Vol 5    128

1          MR. FAZEL:  I do, Your Honor.

2          THE COURT:  -- is that correct?  All right.

3     Overruled.  With that proviso and the jury is so

4     instructed it will be proved up with other elements, other

01:11:17   5     necessary elements through witnesses later.

6          MR. MAGLIOLO:  Okay.

7     Q.  (By Mr. Magliolo)  Did you do -- you understand that

8     Government's 47 is composed -- I'm sorry.  Government's

9     Exhibit 37 is composed of records that Agent Chapuseaux

01:11:40  10     received from the cooperator's in this case --

11          THE COURT:  I didn't understand that.  Say that

12     again.  That agent --

13     Q.  (By Mr. Magliolo)  That Agent Chapuseaux received from

14     the cooperators in this case regarding the amount of

01:11:54  15     business that the brothel did during the course of a

16     little over a year?

17     A.  Yes.

18     Q.  Did you evaluate all those daily records to determine

19     the amount of money that was generated by the prostitution

01:12:14  20     activity at the brothel over that period of time?

21     A.  Yes.

22     Q.  Do you recall what that period of time was?

23     A.  I would have to refer to the summary that I did.

24     Q.  Do you have your summary?

01:12:27  25     A.  Yes.

1   **Q.**  Could you take a look at it?  Could you take a look at

2   your summary?

3            THE COURT:  Have you got it there?

4            THE WITNESS:  Yes.

01:12:55  5            THE COURT:  Okay.

6   **Q.**  (By Mr. Magliolo)  Over what period of time did you

7   examine, let's call them, the line sheets from the brothel

8   at Las Palmas 2?

9   **A.**  From February 15th, 2012, through August 26th, 2013.

01:13:10  10  **Q.**  And did you examine or did you have a line sheet for

11  each day's activity?

12  **A.**  Yes.

13  **Q.**  Were you able to determine the amount of money that

14  the brothel generated as far as the fees that went to the

01:13:27  15  house?

16  **A.**  Yes.

17  **Q.**  And how much did you determine over that period of

18  time?

19  **A.**  From February 15, 2012, through August 26, 2013, the

01:13:39  20  total is approximately $1,607,400.

21            MR. MAGLIOLO:  We pass the witness, Your Honor.

22            MR. FAZEL:  May I proceed, Your Honor?

23            THE COURT:  Yes.  Go right ahead.

24                        **CROSS-EXAMINATION**

01:13:49  25  BY MR. FAZEL:

1   **Q.**   Agent, you and I have spoken before, haven't we?

2   **A.**   Yes.

3   **Q.**   I have a few questions for you.  Let me start with

4   some fundamentals.  We know that Ms. Garcia, the lady

01:14:04  5   sitting to my right-hand side, is not charged with

6   prostitution, correct?

7   **A.**   Yes.

8   **Q.**   All right.  That is correct?

9   **A.**   Correct.

01:14:11  10   **Q.**   And that prostitution is a state crime, correct?

11   **A.**   Correct.

12   **Q.**   And we know that Count 1 is charging her with sex

13   trafficking, correct?

14   **A.**   Conspiracy to commit --

01:14:21  15   **Q.**   Conspiracy to commit sex trafficking, correct?

16   **A.**   Correct.

17   **Q.**   And we know that the counts that are described as in

18   Counts 3, 4, 5 and 6 are the money laundering?

19   **A.**   Yes.

01:14:35  20   **Q.**   All right.  Count 3 and Count 4 and Count 5 are actual

21   aiding and abetting money laundering, actually, correct?

22   **A.**   Correct.

23   **Q.**   All right.  And that is the claim, the allegations

24   that the government is making and that you are testifying

01:14:52  25   about is that the crime of sex trafficking produced the

1  moneys that are in those accounts, correct?

2  **A.**  Yes.

3  **Q.**  All right.  Not prostitution, correct?

4  **A.**  Correct.

01:15:06  5  **Q.**  Because prostitution is not a federal crime, correct?

6  **A.**  Yes.

7  **Q.**  All right.  Now, let's talk about your testimony.  You

8  talked about -- let's start with some basics.  The CTR,

9  currency transaction report, it's something that's created

01:15:27  10  by multiple parties, correct?

11  **A.**  Yes.

12  **Q.**  For example, if you are a bank teller at Chase,

13  JPMorgan Chase, and I walk in there as a customer and I

14  hand you $9,500, you create the CTR, correct?  "You" being

01:15:45  15  the bank, correct?

16  **A.**  Yes.

17  **Q.**  If you are a client, you walk into an attorney's

18  office and you give the attorney $9,500, the IRS will take

19  the position that the attorney ought to create a CTR,

01:16:01  20  correct?

21          MR. MAGLIOLO:  We object to that as not relevant

22  to this case whether --

23          THE COURT:  Sustained.

24          MR. MAGLIOLO:  Thank you.

01:16:07  25  **Q.**  (By Mr. Fazel)  My point being that a CTR is not just

Cross-Examination of Lucy Tan                    Vol 5

```
          1    created by one party but can be created by multiple
          2    parties, correct?
          3              THE COURT:  By multiple parties or other parties?
          4    Q.  (By Mr. Fazel)  Other parties, correct?
01:16:20  5    A.  Can you repeat that question?
          6    Q.  Sure.  The bank on its own can create a CTR, correct?
          7    A.  Yes, correct.
          8    Q.  Other people can also create a CTR, correct?
          9              THE COURT:  You mean in the course of the
01:16:32 10    business transaction, other people?
         11              MR. FAZEL:  Correct.
         12    A.  It would be called something else.
         13    Q.  (By Mr. Fazel)  What would you call it?
         14    A.  It's the form 8300 for trade or business.  Is that
01:16:40 15    what you are --
         16    Q.  I'm sorry.  The form 8300 -- I'm not IRS.  Okay -- in
         17    IRS talk; but it's the same report, correct?
         18    A.  Correct.
         19              THE COURT:  But it's a different number.
01:16:50 20              MR. FAZEL:  You have got it.
         21              THE COURT:  All right.  Go on.
         22    Q.  (By Mr. Fazel)  It serves the same function, correct?
         23    A.  Yes.
         24    Q.  All right.  Now, you also testified that the accused
01:17:03 25    did a lot to hide her transactions.  Do you remember
```

1   talking about that, Mr. Magliolo talking about hiding

2   transactions and using terms such as shenanigans to

3   describe the transactions? Do you remember that?

4   **A.**   Yes.

01:17:17   5   **Q.**   All right. Let's talk about these shenanigans. Your

6   position is that this defendant hid her transactions

7   because she used her family's name in the transactions,

8   correct?

9   **A.**   That's correct.

01:17:31   10   **Q.**   So that if I decide to assist my mother in purchasing

11   a home, that's hiding something?

12   **A.**   No.

13   **Q.**   If she decides to buy a house for her son, is that

14   hiding something?

01:17:54   15   **A.**   No. If the intended purpose --

16   **Q.**   So the answer to my question is no?

17   **A.**   Correct.

18   **Q.**   Okay. If the son then opens -- oh, by the way, is it

19   illegal to get on the web and go to the secretary of

01:18:08   20   state's web page?

21   **A.**   Illegal?

22   **Q.**   Yeah.

23   **A.**   No.

24   **Q.**   Is it illegal to start a company?

01:18:13   25   **A.**   No.

1  **Q.**   Okay.  Is it -- do many people start companies in

2  order to prevent things like lawsuits?

3  **A.**   Yes.

4  **Q.**   And is it illegal to name the company T-o-n-e T-o-n-e

01:18:27  5  I believe is the same of it, correct, with a space?

6  **A.**   Yes.

7  **Q.**   Is that illegal?

8  **A.**   No.

9  **Q.**   It isn't devastatingly hidden that the name in the

01:18:39  10  company is the son's name, right?  David Garcia is on

11  there, right?

12  **A.**   Yes.

13  **Q.**   Did you take a lot of time to be able to find

14  something with her son's name on it?  Did it take you a

01:18:49  15  lot of time to find that?

16  **A.**   Some time.

17  **Q.**   So when you started investigating the accused and you

18  determined that some financial transactions involved her

19  family, that to you was suspicious?

01:19:02  20  **A.**   Yes.

21  **Q.**   Now, you also talked about self-financing.  Do you

22  remember Mr. Magliolo talking about that is somehow

23  nefarious or untoward?  Do you remember that?

24  **A.**   Yes.

01:19:23  25  **Q.**   Okay.  Is it -- is it your position that if I, for

Cross-Examination of Lucy Tan                        Vol 5

1    example, were to go purchase a property in which the -- I

2    tell the property owner let me just pay you on a monthly

3    basis until I pay it off, that's somehow hiding a

4    transaction?

01:19:38   5    **A.**   It makes it more difficult.

6    **Q.**   Makes what more difficult?

7    **A.**   To trace the properties and the money because it's not

8    going through a financial institution.

9    **Q.**   I see.  So with all due respect, to make an agent's

01:19:52   10   life simpler, I have to go and get a financial loan from a

11   bank?  Is that what you are telling me?

12   **A.**   For law enforcement purposes.

13   **Q.**   To make your life simpler?

14   **A.**   It makes it less difficult --

01:20:06   15   **Q.**   For you?

16   **A.**   -- for paper trails.

17   **Q.**   For you, the IRS, yes?

18   **A.**   Sure.

19   **Q.**   Okay.  How about the fact that I don't have to pay

01:20:17   20   interest?  Does that go into your analysis?  I don't have

21   to pay Chase 5 percent interest on a loan.

22   **A.**   Sure.

23   **Q.**   An average mortgage over 30 years is how much

24   interest, do you think?  It's a lot of money, isn't it?

01:20:35   25   **A.**   It could be significant.

1   Q.   Right.  Now, let me ask you something else.  From your

2   testimony one could gather that the only time a CTR, or

3   whatever IRS form that goes with that, is done is when

4   there is cash involved.  Well, that's not the case, is it?

01:21:01   5   A.   No.

6   Q.   Money orders and cashier's checks cause CTRs to be

7   produced, as well, do they not?

8   A.   Yes.

9   Q.   In fact, the IRS has put out regulations that clearly

01:21:16   10   dictate to anybody that money orders, currency and

11   cashier's checks are determined to be the same thing?

12   A.   Yes.

13   Q.   So anybody who receives any of those transactions

14   would then have to, by definition, under regs determined

01:21:30   15   by the IRS, file whatever forms that the IRS requires,

16   correct?

17   A.   If it's over $10,000.

18   Q.   If it's over $10,000.  But the CTR isn't just over

19   $10,000.  It's anything that they determine or the

01:21:44   20   financial institution or whatever institution determines

21   is suspicious, correct?

22   A.   No.

23   Q.   So JPMorgan Chase doesn't file a CTR if they believe

24   that somebody is trying to avoid the currency transaction

01:22:01   25   reports?

1    **A.**    From what I know, sometimes if the transaction is

2    conducted within a short period of time with the same

3    teller and if the teller recognizes that customer and saw

4    that the customer purchased cashier's checks with cash

01:22:24    5    under $10,000, they would -- that will prompt them to file

6    a CTR.

7    **Q.**    Do you have a lot of banking experience?

8    **A.**    No.

9    **Q.**    Would you be surprised if there is actually systems in

01:22:36    10    banks, independent of tellers, that actually create the

11    CTRs, if you know?  Do you know?

12    **A.**    Yes, vaguely.

13    **Q.**    So you know that the CTR is created on the backhouse,

14    on the background of the bank whenever the bank feels like

01:22:54    15    there is suspicious activity?

16         MR. MAGLIOLO:  That's been asked and answered.

17    It's repetitive.

18         THE COURT:  Sustained.

19    **Q.**    (By Mr. Fazel)  So when one takes the position that

01:23:06    20    somebody was trying to avoid currency transaction reports

21    by buying two money orders or two cashier's checks at a

22    bank within three minutes apart, the fact of the matter is

23    that the bank is going to issue those CTRs because the

24    teller doesn't do it, the backhouse does it, correct?

01:23:24    25    **A.**    The backhouse -- from my experience, the backhouse

Cross-Examination of Lucy Tan                    Vol 5 - 138

1   does not always catch the transactions and file the report

2   that way.  It's usually the tellers who recognize the same

3   customer.

4   **Q.**  It's really not perfect; but it's set up and designed

01:23:42  5   so that it would do that, correct?

6   **A.**  Yes.

7   **Q.**  In your investigation you testified that you have

8   determined that there are no other sources of income for

9   this accused or anybody in her family; and, therefore, it

01:24:10  10   must all be from the brothel.  Do you remember testifying

11   to that?

12   **A.**  I just -- I said a majority of the cash was from the

13   brothel.

14   **Q.**  You know for a fact that some of these accounts were

01:24:22  15   in negative status for a period of time, right?

16   **A.**  What do you mean by negative status?

17   **Q.**  Sure.  You know that the Chase account ran a negative

18   balance quite often, correct?

19   **A.**  Yes.

01:24:35  20   **Q.**  What about the Bank of America account?

21   **A.**  I believe that is also the case.

22   **Q.**  As a matter of fact, every bank account that she has

23   had, the accused, runs on a negative balance quite often,

24   correct?

01:24:46  25   **A.**  Yes.  Every once in a while.

Cross-Examination of Lucy Tan                    Vol 5 - 139

1          MR. FAZEL:  May I have a moment, just a moment?

2          THE COURT:  Sure.

3    **Q.**  (By Mr. Fazel)  You also testified about the fact that

4    there were some property transfers from, let's say,

01:25:32    5    individual accounts into this T-o-n-e dash T-o-n-e

6    company, correct?

7    **A.**  Yes.

8    **Q.**  And there is -- first of all, the transfer itself was

9    done in a legal manner, correct?

01:25:42   10    **A.**  Done in a legal manner?

11    **Q.**  Yes.

12    **A.**  Correct.

13    **Q.**  Pursuant to Texas law, correct?

14    **A.**  Yes.

01:25:48   15          THE COURT:  Slow down a little bit.

16          MR. FAZEL:  I'm sorry, Your Honor.  I'm trying.

17    I apologize.

18    **Q.**  (By Mr. Fazel)  It was done in a manner -- it was done

19    with the names of the individuals, for example, her son,

01:25:57   20    the accused's son, correct?

21    **A.**  Correct.

22    **Q.**  When you say that they are hiding something, all you

23    did was get on the secretary of state's web page and look

24    under her son's name, correct?

01:26:09   25    **A.**  Yes.  But it still makes it difficult to trace.

Cross-Examination of Lucy Tan                    Vol 5 -

```
 1   Q.   It's difficult to type in her son's name in the
 2   secretary of the state's web page?  What is her son's
 3   name?
 4   A.   Well, if -- the property will only show up if you type
 5   in Tone-Tone Investment; and if you type in David's name,
 6   it would show that it's been transferred over to
 7   Tone-Tone, which looks like a company.
 8   Q.   It is a company, isn't it?  It doesn't look like a
 9   company.  It is a company.
10   A.   It is -- from my investigation, it's a -- it's more
11   like a shell company, to me.
12   Q.   A shell company?
13   A.   Yes.
14   Q.   And by "shell company" you mean it's protecting
15   assets?
16   A.   Correct.
17   Q.   Something illegal about that?
18   A.   It's -- I mean, if the intent of this is to hide
19   assets from the government and from the investigation,
20   then, yes.
21   Q.   Well, if that's the intent or purpose.  But here is my
22   question:  What we have here is a transaction where the
23   property was taken, forms were appropriately filled out,
24   correct?
25   A.   Yes.
```

01:26:23
01:26:39
01:26:52
01:27:03
01:27:18

Cross-Examination of Lucy Tan                    Vol 5 -

1   **Q.**   Transfers were done legally, correct?

2   **A.**   Yes.

3   **Q.**   Put into a company's name legally, correct?

4   **A.**   Yes.

01:27:24    5   **Q.**   Taxes were paid on it, correct?

6   **A.**   I am not sure about that.

7   **Q.**   You didn't check if taxes were paid?

8   **A.**   That was not my part of my focus.

9   **Q.**   You are with the IRS.  And so, the company now is the

01:27:41   10   proprietor of the property, correct?

11   **A.**   Yes.

12   **Q.**   And then all you have to do in your search is to just

13   look up the company's name; and then, you'll find all the

14   property there, correct?

01:27:51   15   **A.**   Yes.

16   **Q.**   Okay.  So it's -- if the position is that they did --

17   they were trying to hide the assets, you can fairly say

18   they didn't do a real good job of hiding anything,

19   correct?

01:28:03   20   **A.**   Rephrase that?

21   **Q.**   I mean, if they are hiding it by putting it in her

22   son's name, it's not that complicated a find, correct?

23   **A.**   No.

24   **Q.**   No, as in it's not complicated to find?

01:28:18   25   **A.**   It's a little complicated.

1    Q.   It's a little.

2         MR. FAZEL:  I pass the witness, Your Honor.

3         MR. MAGLIOLO:  Just a few.

4         THE COURT:  Go on.

01:28:23   5              **REDIRECT EXAMINATION**

6    BY MR. MAGLIOLO:

7    Q.   Because someone is not very good at disguising their

8    assets does that mean they are not disguising assets?

9    A.   No.

01:28:30  10    Q.   Now Mr. Fazel, I think, used himself, he and his mom,

11   as an example.  And if Mr. Fazel received a very large

12   fee, let's say a couple hundred thousand dollars for

13   something, cash and he didn't want to pay taxes with it

14   and bought a house in his mom's name but his mom had no

01:28:49  15   control over that house at all, might he be up to some

16   shenanigans?

17   A.   Yes.

18   Q.   But for the fact that a couple of those transactions

19   that you outlined for the ladies and gentlemen of the jury

01:29:08  20   on Count 5 were close together and a CTR was filed by the

21   bank, it's very possible you would not have picked all

22   that up?

23   A.   That's correct.

24   Q.   So you were somewhat lucky that you found that because

01:29:21  25   that one CTR was found out of all those transactions which

1   caused you to be able to locate Von Blon, find out about

2   the money and then backtrack it all the way to the

3   defendant?

4   **A.**   That's correct.

01:29:32   5   **Q.**   So she also almost made it in that series of

6   transactions?

7          MR. FAZEL:  Object to the form of the question,

8   Your Honor.

9          THE COURT:  Sustained.  Just rephrase.

01:29:41   10   **Q.**   (By Mr. Magliolo)  She was almost able to disguise it

11   so well that you wouldn't have found those transactions

12   and that, however much, $200,000?

13   **A.**   Yes.

14          MR. MAGLIOLO:  We pass the witness, Your Honor.

01:29:53   15                 **RECROSS-EXAMINATION**

16   BY MR. FAZEL:

17   **Q.**   Explain this to me so I understand it.  You have a

18   property.  You know it's in the name of the son, correct?

19   **A.**   Yes.

01:30:00   20   **Q.**   You go do a property search under the son's name; and

21   you find all the properties under the son's name, correct?

22   **A.**   Yes.

23   **Q.**   Or you go and do a search under the son's company's

24   name; and you find all the properties under that, correct?

01:30:12   25   **A.**   Yes.

1  **Q.**  And then you go look at the title search and look at

2  the title chain, correct?

3  **A.**  Correct.

4  **Q.**  And then you look at the --

01:30:17  5        THE COURT:  Slow down.

6        MR. FAZEL:  Sorry.  It's just --

7  **Q.**  (By Mr. Fazel)  And you look at the cashier's checks

8  that they used to pay for it, correct?

9  **A.**  Yes.

01:30:24  10  **Q.**  And then you go from there and you grab a subpoena and

11  you go to all the banks, correct?

12  **A.**  Yes.

13  **Q.**  And then you grab all that information, correct?

14  **A.**  Yes.

01:30:32  15  **Q.**  And there you have it?

16  **A.**  No.

17  **Q.**  No?

18  **A.**  There is more to that.

19  **Q.**  Yeah.  I mean, there is a lot of checks.

01:30:39  20  **A.**  No.  May I explain?

21  **Q.**  No.

22  **A.**  Okay.

23  **Q.**  There is a lot of checks involved, right?

24  **A.**  Yes, and other evidence.

01:30:48  25  **Q.**  Sure.  I understand there is other evidence.  I'm

Redirect Examination of Lucy Tan                        Vol 5

```
      1   talking about hiding it.  The point is it's not that -- it
      2   was not hidden that well, correct?
      3   A.   (No response.)
      4        MR. FAZEL:  I pass the witness.
01:30:59  5        MR. MAGLIOLO:  One more.  I know it's bad for the
      6   lawyers to say that.
      7        THE COURT:  Go on.  We'll go back and forth until
      8   we have all the questions handled.
      9               REDIRECT EXAMINATION
01:31:04 10   BY MR. MAGLIOLO:
     11   Q.   Based on what Mr. Fazel said, you have a pretty good
     12   circumstantial case of money laundering?
     13   A.   Yes.
     14   Q.   But until the person whose name it has been put into
01:31:20 15   actually tells you they had no control over that property,
     16   you don't really have a for-sure case of money laundering?
     17   A.   That's correct.
     18   Q.   So until, in our example, Mr. Fazel's mom would say,
     19   hey, yeah, that house is in my name but I have no control
01:31:41 20   over it or, in our case, if the person, Mr. David Garcia,
     21   comes in and says, hey, yeah, it was put in my name but it
     22   wasn't my money and I have no control over it, you really
     23   don't have the slam-dunk case?
     24   A.   That's right.
01:31:54 25        MR. MAGLIOLO:  That's all I have, Your Honor.
```

1                    **RECROSS-EXAMINATION**

2  BY MR. FAZEL:

3  **Q.**  So if David had control over it, it's not money

4  laundering, correct?  He just said that; and you said,

01:32:04  5  yes.  So if David says I had control over it or some

6  control over it, that's not money laundering, is it?

7            MR. MAGLIOLO:  That's not what I said, Your

8  Honor.  I said if he has no control over it.

9            THE COURT:  Your question.

01:32:13  10  **Q.**  (By Mr. Fazel)  Didn't you just say that if David came

11  in and said I had some control, like my mommy would say --

12            MR. MAGLIOLO:  That's not what I said.

13            THE COURT:  What?  His mother?

14            MR. FAZEL:  Keep my mother out of this, by the

01:32:24  15  way.

16            MR. MAGLIOLO:  He brought his mother into it,

17  Your Honor.  Not me.

18            THE COURT:  All right.  Hold it a second.  I'm

19  going to rule.  Would you please restate your question.

01:32:32  20            MR. FAZEL:  Yes.

21            THE COURT:  And leave parents out of this.

22            MR. FAZEL:  I'm going to tell her.

23  **Q.**  (By Mr. Fazel)  My point is that you just answered in

24  the affirmative when the prosecutor said if David comes in

01:32:44  25  and says he had some control over the property, that's not

1    money laundering, correct?

2            MR. MAGLIOLO:  That's a misstatement.  I said if

3    David had no control over the property at all.

4    **Q.**  (By Mr. Fazel)  Which means if he had some control

01:32:55  5    over the property it's not money laundering, correct?

6    **A.**   It's still money laundering.

7    **Q.**   It's still money laundering.

8            MR. FAZEL:  Pass the witness.

9            MR. MAGLIOLO:  No further questions.

01:33:04  10            THE COURT:  All right.  Thank you, ma'am.  You

11   may step down.

12       Call your next witness.

13            MR. MAGLIOLO:  Constance Rossiter, Your Honor.

14            THE COURT:  Constance.

01:33:09  15            MR. MAGLIOLO:  Rossiter, Your Honor.  I will get

16   her to spell it, Your Honor.

17            THE COURT:  I think I can figure it out.

18            MR. PEREZ:  I will spell it for the Court.

19            THE COURT:  R-o-s-s-i-t-e-r?

01:33:27  20            MR. PEREZ:  R-o-s-s-i-t-e-r.  That's correct,

21   Your Honor.

22            THE COURT:  If you will raise your right hand,

23   please.

24       (Witness sworn by the Court.)

01:33:37  25            THE COURT:  Please have a seat.

Direct Examination of Constance Rossiter   Vol 5

```
 1        THE WITNESS:  (Complying.)

 2        THE COURT:  We can take that -- if you want to

 3  take that document off.  Okay.  Go right ahead.

 4                   CONSTANCE ROSSITER,

 5  having been first duly sworn, testified as follows:

 6                   DIRECT EXAMINATION

 7  BY MR. MAGLIOLO:

 8  Q.   Please state your name for the ladies and gentlemen of

 9  the jury.

10  A.   My name is Constance Rossiter.

11  Q.   And what do you do for a living?

12  A.   I work for YMCA International Services.  I'm the

13  program director for the trafficked persons assistance

14  program.

15  Q.   What does the program director do?

16        THE COURT:  For which?  Traffic what?  What

17  program?  What is the name of the program?

18        THE WITNESS:  Trafficked persons assistance

19  program.

20        THE COURT:  Okay.

21  A.   What we do, basically, is we help victims of human

22  trafficking regain their lives and become economically

23  independent and self-sufficient.

24  Q.   (By Mr. Magliolo)  How long have you been doing that?

25  A.   For more than seven years.
```

01:33:41 (line 5)
01:34:00 (line 10)
01:34:10 (line 15)
01:34:20 (line 20)
01:34:31 (line 25)

1    **Q.**   And do you personally deal with the victims of human

2    trafficking?

3    **A.**   Yes, I do, by psychosocial assessments of them when

4    they come in.

01:34:43    5    **Q.**   And how many do you suppose you have done over the

6    last seven years, just guessing?

7    **A.**   More than 300.

8    **Q.**   And what qualifies you to be able to do that?

9    **A.**   I am a licensed professional counselor.  I have got a

01:34:57   10    graduate degree in psychology and counseling.

11    **Q.**   Do you work -- well, do you have any training in

12    trauma that people receive from these type of events and

13    when they affect their life?

14    **A.**   Certainly.

01:35:11   15          THE COURT:  You need to slow down a little bit

16    because we have interpreters working, too.  Okay.  We're

17    just saying it has to be simultaneously interpreted.  So

18    slow down just a bit.

19          MR. FAZEL:  Can we repeat the question?

01:35:22   20          THE COURT:  Yes, slow down.  We're going to have

21    it again.

22          MR. FAZEL:  Thank you.

23    **Q.**   (By Mr. Magliolo)  Do you have any training in what

24    trauma that affects victims of human trafficking when

01:35:33   25    these -- because of these events that impact their lives?

01:35:59

01:36:09

01:36:23

01:36:37

01:37:03

1   **A.**   Certainly.  I have training during my graduate studies

2   and afterwards, Traumatic Stress Institute.

3   **Q.**   Was there at one time a big problem about having

4   witnesses, especially those who were illegally in the

5   country, remain and be available to testify in these types

6   of cases?

7            MR. FAZEL:  Objection to the relevance of this

8   question, Your Honor; and I object to the line of

9   questioning.

10           THE COURT:  Overruled.

11  **A.**   Could you repeat that?

12  **Q.**   (By Mr. Magliolo)  If you know, was there a big

13  problem at one time that the congress eventually remedied

14  of being able to have victims who were illegally in the

15  country remain in the country in order to be eventually

16  witnesses in these types of cases?  I know it's a long

17  question.

18  **A.**   Yeah.  Was there a problem with that?

19           THE COURT:  The answer is yes or no.  I'm sorry.

20  The question wasn't clear.  What is it?

21      Laura, would you read it back, please.  She is going

22  to read it back to you.  Okay.

23      (Question read by reporter.)

24           THE COURT:  Yes or no?

25           THE WITNESS:  Yes.

1           THE COURT:  All right.

2  **Q.**  (By Mr. Magliolo)  Was something done to help these

3  victims be able to receive help, remain in the country,

4  receive treatment and get on the road to a better life by

01:37:17  5  the congress?

6  **A.**  Certainly.  They --

7           THE COURT:  Oh, no.  No.  It's going -- the

8  reason why the other attorney was about to object, it was

9  a yes or no answer.  Okay.  If he asks you a yes or no

01:37:31  10  question, answer it yes or no unless you can't answer it

11  yes or no and let me know or let the lawyer know and then

12  he will have to rephrase it or ask for your opinion.

13  Okay.  So your answer was yes?

14           THE WITNESS:  Yes.

01:37:44  15           THE COURT:  Okay.  Next question.

16  **Q.**  (By Mr. Magliolo)  What was done?

17           THE COURT:  There you go.  Now.  But not too

18  fast.

19  **A.**  Congress passed the Trafficking Victims Protection Act

01:37:54  20  in 2000.

21  **Q.**  (By Mr. Magliolo)  And has it been updated a couple of

22  times since then?

23  **A.**  Yes.  A couple of times, yes.

24  **Q.**  Are you familiar with that?

01:38:06  25  **A.**  Yes.

1  **Q.**  And do you have to be familiar with that based on what

2  you do for a living?

3  **A.**  Yes.

4  **Q.**  Is that something you work with every day when you are

01:38:14   5  trying to assess people who are trafficking victims?

6  **A.**  Yes.

7  **Q.**  And are there some requirements in that act that have

8  to be or that should be met regarding victims?

9  **A.**  Yes.

01:38:31  10  **Q.**  And has funding been placed in a way that

11  organizations are funded so they can supply people to do

12  what the act requires them to do?

13  **A.**  Yes.

14  **Q.**  And is that -- some of that money actually comes to

01:38:51  15  the YMCA?

16  **A.**  Yes.

17  **Q.**  I don't know if it directly pays your salary; but

18  certainly comes into the YMCA, which then pays your

19  salary?

01:39:01  20  **A.**  Yes.

21  **Q.**  Explain to the ladies and gentlemen of the jury what

22  you are required to do when you interview a person who may

23  be a trafficking victim.

24       MR. FAZEL:  Judge, I'm going to object to the

01:39:13  25  relevance of this line of questioning.

1          THE COURT:  Overruled.  It's background.  I'll
2    allow her to go into it.
3    **Q.**   (By Mr. Magliolo)  If you could answer that question.
4    **A.**   When we screen somebody for whether they are a victim
01:39:26   5    of human trafficking, when they meet the requirements,
6    there are certain components to the law that they have to
7    meet.  When I think that -- we think they meet those
8    requirements, we actually engage our law enforcement
9    partners in the process.
01:39:41   10   **Q.**   Okay.  Are there benefits that once you make a
11   determination a person is a victim that are the benefits
12   that the Act would require you to help the victims get?
13   **A.**   Yes.
14   **Q.**   Explain that to the ladies and gentlemen of the jury
01:39:57   15   what those benefits are and how you go about helping them
16   get those benefits.
17   **A.**   The law basically says that everybody that is
18   identified as a victim of human trafficking has the right
19   to receive comprehensive services.  That means that they
01:40:16   20   can receive anything from food to shelter.  You do an
21   individualized assessment, and part of that is you have to
22   stabilize them and you -- actually, it's mental health.
23   It's medical care and, also, referral to an immigration
24   attorney to help them with their status.
01:40:35   25   **Q.**   Now, you are familiar with what law enforcement can

1  do, such as getting a continued presence or attempt to get

2  continued presence for a victim in the country so they can

3  be available to testify?

4  **A.**   Yes.

01:40:50  5  **Q.**   Also, does law enforcement, me included, I guess,

6  relay information to you or to a person's civil attorney,

7  a victim's civil attorney, relating to law enforcement's

8  knowledge of the case, whether or not law enforcement

9  believes that person to be a victim of trafficking and

01:41:16  10  some synopsis of the case?

11  **A.**   Yes.

12  **Q.**   And that's to aid you and their attorney and whatever

13  other service providers in being able to take care of the

14  victim?

01:41:27  15  **A.**   Yes.

16  **Q.**   But whether law enforcement, me included, prosecutors,

17  law enforcement, do or do not give you that information,

18  you are still required to do what the law demands, which

19  is to take care of those victims?

01:41:41  20  **A.**   Yes.

21  **Q.**   Okay.  And if I told you not to take care of that

22  victim, would you -- you and I kind of -- well, you and

23  all of us have been kind of friends, for lack of a better

24  word, over a period of time doing these cases.  If I told

01:41:55  25  you to not take care of a victim, would you follow my

1   direction?

2   **A.**   No.

3   **Q.**   On more than one occasion you probably have not

4   followed my directions.  So that's a -- I guess what I'm

01:42:06   5   getting to is that's separate and apart from what

6   prosecutors do, law enforcement do as far as victims.  The

7   services, if you want to call them benefits, that are

8   provided really are not controlled by the prosecutors or

9   law enforcement but we give you information that may help?

01:42:22   10   **A.**   That's correct.

11   **Q.**   And trafficking victims not only are international

12   victims.  There can be domestic trafficking victims, also?

13   **A.**   Yes.

14   **Q.**   And you service those people, those, too?

01:42:46   15   **A.**   Yes.

16            MR. MAGLIOLO:  That's all I have, Your Honor.

17            THE COURT:  Okay.

18            MR. FAZEL:  I don't have any questions.

19            THE COURT:  Okay.  Thank you, ma'am.  You may

01:42:53   20   step down.  You are free to leave.

21        By the way, you can remain in the courtroom now if you

22   would like.  You are free to leave.

23            THE WITNESS:  Thank you, sir.

24            THE COURT:  Call your next witness.

01:43:01   25            MR. MAGLIOLO:  We either have bad or good news,

Trial on Merits                                     Vol 5     156

1       Your Honor.  There aren't anymore witnesses for today.

2            THE COURT:  I'll explain to you why we're

3       adjourning early today.  We did the best we could, as you

4       can see, to jump ahead a little bit and to fill in some

01:43:15   5    voids that we would have had to do next week; but next

6       week we're on schedule.

7            The only break next week, a little bit different

8       again, is Tuesday when we get underway at 1:30.  We'll be

9       back at 10:00 to 6:00 on Monday.  I appreciate everybody

01:43:33  10    working with me today on some of the concerns that arose

11      before we got to this point, but we're adjourning a little

12      bit early.  We're on schedule and moving along.

13           I'll talk to the attorneys, also, to see what is

14      coming next week and to make sure that in the interest of

01:43:50  15    the rights of all parties that we can move it as fast as

16      we can.

17           So thank you for your attention this week.  We'll

18      stand adjourned at this time.  Have a nice weekend.  We

19      will see you Monday at 10:00.  Thank you and good

01:44:03  20    afternoon.

21           (Jury exited courtroom at 1:44 p.m.)

22           THE COURT:  Somebody is flashing me back there.

23      Somebody has got a light going.  All right.  Have a seat

24      for just a moment.  We'll adjourn in a few minutes.

01:44:34  25       What is the projection for next week?  I'm not going

```
 1   to ask.  You know, I'm not supposed to; and I won't ask

 2   the defense what their position is.  I don't ask them

 3   about their case until the government is over.

 4       Give me a ballpark thought on where we are on this

 5   case moving along.  I am sorry we couldn't get in another

 6   45 minutes but sobeit.  All right.  We did the best we

 7   could.

 8            MR. PEREZ:  Judge, the two big witnesses are

 9   going to be the confidential informants.

10            THE COURT:  How long?  Are they going to take a

11   day?

12            MR. PEREZ:  I don't expect them being a day.

13            THE COURT:  Okay.  All right.

14            MR. PEREZ:  A couple of hours, at the most, Your

15   Honor.

16            MR. FAZEL:  Both of them?

17            MR. PEREZ:  I think so.

18            MR. MAGLIOLO:  It depends on counsel's cross.

19   From our side, maybe an hour apiece, I think.

20            THE COURT:  It is not going to be a day and a

21   half like one witness I recall?

22            MR. MAGLIOLO:  No, Your Honor.

23            THE COURT:  You don't know what I'm talking

24   about.  Yeah.  You know what I'm talking about, that

25   expert in the *Stanford* case.  We had him on for a day and
```

01:44:50
01:45:01
01:45:10
01:45:20
01:45:28

1   a half.

2            MR. FAZEL:  Talking about me or the government's

3   expert?

4            THE COURT:  No.  No.  Their expert.  Your cross

01:45:39   5   of their expert on *Stanford*.  That's still something I

6   recall.

7            MR. PEREZ:  I counted, like, 12 witnesses; but

8   they are all short.  Most of them are real short

9   witnesses.

01:45:49   10            THE COURT:  Like what?

11            MR. MAGLIOLO:  On the money laundering counts the

12   people -- a couple of the people who were involved, the

13   sellers, will be for two or three questions.  Two or three

14   of the defendant's children are going to be called to

01:46:04   15   testify.  Two of them will be short.

16            THE COURT:  Pardon me.  I am listening.

17            MR. MAGLIOLO:  David will testify.  That will be

18   a little longer.  Counsel will spend some time with him.

19   What else?

01:46:13   20            MR. PEREZ:  I think that three fact witnesses are

21   going to be fairly long but not that long, Your Honor.  I

22   think we might be able -- I hate to say this.

23            MR. MAGLIOLO:  A couple of days, Your Honor.

24            THE COURT:  A couple of days.  All right.  Just

01:46:27   25   ballpark.  Don't forget, the jury charge looks somewhat

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
|          | 1  | standard.  I mean, that is absolutely standard.  So just |
|          | 2  | keep that in mind because, you know, after we're done we |
|          | 3  | have a full charge conference. |
|          | 4  | MR. MAGLIOLO:  Yes, Your Honor. |
| 01:46:40 | 5  | THE COURT:  So, again, I'm not pushing anybody. |
|          | 6  | I just want to know basically where we are.  All right. |
|          | 7  | Anything further you want to talk about today? |
|          | 8  | MR. FAZEL:  No, sir. |
|          | 9  | MR. MAGLIOLO:  We did want counsel's mother's |
| 01:46:51 | 10 | full name and address. |
|          | 11 | THE COURT:  Someone was shining a light on me |
|          | 12 | from the back.  I'm wondering about that.  Pardon me? |
|          | 13 | MR. FAZEL:  Nothing, Your Honor.  Ready to go. |
|          | 14 | THE COURT:  All right.  Then we'll stand |
| 01:47:03 | 15 | adjourned for today.  Thank you everyone.  We'll see you |
|          | 16 | on Monday.  I will stay here for a minute to shut down the |
|          | 17 | electronics. |
|          | 18 | MR. PEREZ:  10:00, right, Your Honor? |
|          | 19 | THE COURT:  Yes, sir.  Everybody is free to |
|          | 20 | leave. |
|          | 21 | (Proceedings adjourned at 1:47 p.m. and continued in |
|          | 22 | Volume 6.) |
|          | 23 | *Date: September 3, 2015* |
|          | 24 | ***COURT REPORTER'S CERTIFICATE*** |
|          | 25 | *I certify that the foregoing is a true and correct* |

1    *copy of the transcript originally filed with the clerk of*

2    *court on September 3, 2016, incorporating redactions of*

3    *personal identifiers requested by Court Order, in*

4    *accordance with Judicial Conference Policy.  Redacted*

5    *characters appear as a black rectangle in the transcript.*

6

7                    */s/ Laura Wells*

8              *Laura Wells, CRR, RMR*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25